# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CLARITY SPORTS** | : | |
| **INTERNATIONAL LLC and** | : | |
| **JASON BERNSTEIN,** | : | |
| **Plaintiffs** | : | **No. 1:19-cv-00305** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **REDLAND SPORTS, <u>et</u> <u>al.</u>,** | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

Before the Court are Defendants' motions to dismiss Plaintiffs' amended complaint (Doc.

Nos. 10, 11), and motion to bifurcate discovery (Doc. No. 29).  For the reasons that follow, the

Court will grant the motions to dismiss under Federal Rules of Civil Procedure 12(b)(1) and

12(b)(6) and dismiss the amended complaint without prejudice to Plaintiffs' ability to file a

second amended complaint consistent with the Court's discussion <u>infra</u>.  The Court will deny the

Boone Defendants' motion to dismiss for lack of personal jurisdiction under Federal Rule of

Civil Procedure 12(b)(2), deny Defendants' request to stay this case, and deny Defendants'

motion to bifurcate discovery.

## I.    BACKGROUND[1]

Plaintiff Clarity Sports International LLC ("Plaintiff Clarity Sports") is a Maryland

limited liability company with a principal place of business in Potomac, Maryland (Doc. No. 7

¶ 1), and Plaintiff Jason Bernstein ("Plaintiff Bernstein") – a Maryland resident – is its majority

owner (<u>id.</u> ¶ 2).  Defendant Redland Sports ("Defendant Redland") conducts business in

Pennsylvania, has a principal place of business in York, Pennsylvania, and is owned by

---

[1] Unless otherwise noted, the factual account recited herein is derived from Plaintiffs' amended complaint.  (Doc. No. 7.)

Defendant Gerry Ochs ("Defendant Ochs"), who is a resident of Pennsylvania. (Id. ¶¶ 3-4.)[2]

Defendant MVP Authentics, LLC ("Defendant MVP Authentics") also conducts business in the

Commonwealth of Pennsylvania, with a principal place of business in Dauphin County,

Pennsylvania, and is owned by Defendant Daryl Eisenhour ("Defendant Eisenhour"), a

Pennsylvania resident, and Defendant Jason Smith ("Defendant Smith"), a New Jersey resident.

(Id. ¶¶ 5-7.) Defendant Boone Enterprises, Inc., d/b/a Boone Enterprises Authentic Autographs

("Defendant Boone Enterprises") has a principal place of business in Pompton Plains, New

Jersey and, according to the complaint, regularly conducts business in Pennsylvania. (Id. ¶¶ 8-

9.)[3] Defendant Craig Boone ("Defendant Boone"), a New Jersey resident, is the owner and/or

manager of Defendant Boone Enterprises. (Id. ¶ 10.)[4]

      Plaintiff Bernstein is "a National Football League Players' Association ('NFLPA')

certified contract advisor" who "represents several players in the National Football League

('NFL') as their agent." (Id. ¶ 16.) Plaintiff Bernstein is the owner of Plaintiff Clarity Sports, "a

full-service sports management company with a focus on providing management and advisory

services to professional athletes." (Id. ¶ 17.) Plaintiff Clarity Sports "represents NFL players in

their contractual negotiations and dealings with the NFL, and in other matters to which the

parties agree, including the representation of players in those players' marketing and

endorsement contract negotiations." (Id. ¶ 18.) In this capacity, Plaintiff Bernstein previously

---

[2] When referring to Defendant Redland Sports and Defendant Ochs together, the Court refers to them as the "Redland Defendants" herein.

[3] When referring to Defendants MVP Authentics, Eisenhour, Smith, Boone Enterprises, and Boone collectively, the Court does so using the term the "Boone Defendants" herein.

[4] When referring to both Plaintiffs collectively, the Court refers to them as "Plaintiffs" herein, and refers to all of the defendants in this case as "Defendants" herein.

represented Kenny Golladay ("Golladay"), an NFL player who is currently under contract with the Detroit Lions.  (Id. ¶ 19.)

Defendants Redland Sports, MVP Authentics, and Boone Enterprises are sports memorabilia companies, and, as such, "are each in the business of procuring and selling autographed sports memorabilia."  (Id. ¶¶ 20-21.)  In connection with its line of business, Defendant Redland Sports "arranges and . . . presents autograph signings with NFL players and then markets and sells the items signed[,]" and in so doing, advertises the signed memorabilia on its Facebook page.  (Id. ¶ 22.)  Defendants MVP Authentics and Boone Enterprises also arrange autograph signings with NFL players and market the signed memorabilia on various social media platforms.  (Id. ¶¶ 23-24.)  In connection with these autograph signings, "Defendants contract with NFL players to pay those players for their appearance and autographs, typically on a per-autograph or per-appearance basis[,]" and "typically negotiate the contracts for NFL players' autograph signings with those NFL players' agents."  (Id. ¶¶ 25-26.)  In addition, "Defendants are and were aware that in the NFL, NFLPA registered agents are often in exclusive marketing arrangements with their player-clients."  (Id. ¶ 27.)

On December 23, 2016, Plaintiff Bernstein and Golladay "executed an NFLPA Standard Representation Agreement" ("SRA"), under which Plaintiff Bernstein "agreed to represent, advise, counsel, and assist Golladay in the negotiation and execution of Golladay's playing contracts in the NFL."  (Id. ¶ 28) (internal quotation marks omitted).[5]  Pursuant to the SRA, Plaintiff Bernstein "was the exclusive representative of Golladay for the purpose of negotiating playing contracts for Golladay[,]" and "[i]n return, Golladay agreed to pay [Plaintiff] Bernstein

_____

[5] "An SRA is a standard-form contract between NFL players and their agent-representatives; virtually all [] NFL players are represented by agent-representatives pursuant to an NFLPA [SRA]."  (Doc. No. 7 ¶ 31.)

three percent of the compensation Golladay earned under the playing contracts [Plaintiff] Bernstein negotiated for him." (Id. ¶¶ 29-30) (internal quotation marks omitted).[6] The SRA provides, in pertinent part, that as Golladay's agent, Plaintiff Bernstein was to receive 3% of "the compensation received by [Golladay] for each playing season covered by the [SRA]." (Doc. No. 29-1 at 13.)

Plaintiff Clarity Sports and Golladay also entered into an "Endorsement and Marketing Agreement" ("EMA") on the same date, which Plaintiff Bernstein signed on behalf of Plaintiff Clarity Sports, and under which Plaintiff Clarity Sports "agreed to 'procure, negotiate, and manage Endorsement Opportunities' for Golladay." (Id. ¶¶ 32-34) (second set of internal quotation marks omitted). Such endorsement opportunities consisted of "contracts for the endorsement of commercial products and services, paid personal services, and other opportunities related to the commercial exploitation of Golladay's status as an NFL player, including but not limited to autograph-signing appearances." (Id. ¶ 35.) As consideration, "Golladay agreed to pay [Plaintiff Clarity Sports] fifteen percent of the endorsement monies he earned" in connection with the EMA, which established "an exclusive agreement" between the parties as to "opportunities such as autograph signings and other paid appearances available to Golladay." (Id. ¶ 37.) As stated in the amended complaint, "[i]n other words, as under the SRA," Plaintiffs "were Golladay's exclusive representatives in the endorsement and marketing arena." (Id. ¶ 38.) Accordingly, pursuant to the EMA, Plaintiff Clarity Sports "contracted for,

---

[6] A review of the docket in this matter indicates that Plaintiffs did not attach a copy of this agreement to the amended complaint. (Doc. No. 7.) The agreement is, however, attached as an exhibit to the Boone Defendants' motion to dismiss (Doc. No. 11-3), and is also included in a copy of Plaintiffs' NFLPA grievance that has been submitted in the record in this case (Doc. No. 29-1).

arranged, and helped execute multiple autograph signings and similar appearances for Golladay." (Id. ¶ 39.)

On January 2, 2019, Defendant Redland Sports "announced on its Facebook page . . . that it would host, 'in conjunction with Boone Enterprises and MVP Authentics,' a private autograph signing with Golladay on January 21, 2019." (Id. ¶ 40.) Plaintiffs neither "arrange[d] for Golladay's appearance at this event," nor were they "aware of the then-upcoming signing until [Defendant] Redland Sports announced it on its Facebook page[,]" and "[i]n fact, Plaintiffs at that time were in the process of negotiating for Golladay a contract for a different signing, pursuant to the terms of their exclusive [EMA]." (Id. ¶¶ 41-42.) After becoming aware of the Facebook post and autograph signing, Plaintiff Bernstein emailed Defendant Ochs on January 7, 2019 "to inform him that [Plaintiff Clarity Sports] had an exclusive marketing agreement in place with Golladay[,]" specifying that the agreement "includes handling all signings" and also sending Defendant Ochs a text message to that effect. (Id. ¶¶ 43-45.) Through both the email and text message, Plaintiff Bernstein "asked [Defendant] Ochs to remove the Facebook post advertising the January 21, 2019 signing" and "asked that [Defendant] Ochs contact him by telephone" (id. ¶ 46) (internal quotation marks omitted), but Defendant Ochs did not respond to either the email or text message (id. ¶ 47).

As stated by Plaintiffs, "Defendants ignored Plaintiffs' exclusive arrangement with Golladay and did not negotiate the contract for Golladay's appearance with Plaintiffs[,]" but rather, worked "with Todd France ('France'), a different NFLPA registered agent, on the contract for Golladay to appear at the January 21, 2019 signing." (Id. ¶¶ 48-49.) Defendants also "worked with other representatives from and employees of France's employer, CAA Sports LLC ('CAA Sports')[,]" which is affiliated with Creative Artists' Agency ("CAA"), a California-

based talent agency. (Id. ¶ 49.) Per this arrangement, which Plaintiffs allege "Defendants negotiated with France and CAA Sports, Golladay was paid to appear and was paid for a number of his autographs signed at the January 21, 2019 appearance." (Id. ¶ 50.)

In addition, on January 24, 2019, Defendant Redland Sports advertised through its Facebook page various autographed items for sale from the signing involving Golladay, which it described as its "#Massive #PrivateSigning." (Id. ¶ 52.) Also on this date, Defendant Boone Enterprises posted an announcement on its Facebook page that advertised autographed items and noted that they were "from [its] private signing" with Golladay. (Id. ¶ 53.) According to Plaintiffs, "Defendants worked and negotiated with France and/or others at CAA Sports to arrange the signing, despite Defendants' full knowledge and awareness that France was not Golladay's NFLPA certified contract advisor or marketing agent." (Id. ¶ 54.) Further, while "Defendants have negotiated numerous autograph signing and appearance deals for NFL player-clients of France and CAA Sports in the past . . . [i]n this instance, however, Defendants were aware that Golladay was not in fact represented by France and CAA Sports, either under [an SRA] or marketing agreement." (Id. ¶¶ 55-56.) Plaintiffs further allege that "Defendants were also aware that France desired to represent Golladay, and that through negotiating a contract for Golladay's appearance, France hoped to persuade Golladay to terminate his relationship with Plaintiffs and become France's client." (Id. ¶ 57.) Moreover, Plaintiffs assert that despite being "aware that Golladay in fact had an exclusive marketing agreement with Plaintiffs[,]" and regardless of their knowledge of the EMA, "Defendants negotiated the contract for Golladay's January 21, 2019 appearance with France and CAA Sports." (Id. ¶¶ 58-59.) Additionally, Plaintiffs allege that despite being aware of Plaintiffs' SRA with Golladay, Defendants were both "aware that France desired to represent and enter into [an SRA] with Golladay" and "through

their negotiations with France about the January 21, 2019 signing, and knowledge of his desire to represent Golladay, purposefully interfered with the SRA." (Id. ¶¶ 60-62.) Following the January 21, 2019 appearance and signing, "Golladay terminated the SRA with Plaintiffs on January 24, 2019." (Id. ¶ 63.)

Plaintiffs subsequently commenced the above-captioned action by filing a complaint against Defendants in this Court on February 22, 2019. (Doc. No. 1.) On March 15, 2019, Plaintiffs filed an amended complaint (Doc. No. 7), alleging tortious interference with existing contractual relationships with respect to the EMA (Count I), and tortious interference with existing contractual relationships pertaining to the SRA (Count II). Plaintiffs aver that "[a]s a result of Defendants' interference, Plaintiffs sustained and will sustain in the future pecuniary losses in excess of $75,000, representing their lost fees" under the SRA and EMA. (Id. at 13-14.) The Redland Defendants moved to dismiss the amended complaint on April 14, 2019 (Doc. No. 10), and on April 15, 2019, the Boone Defendants also moved for dismissal of the amended complaint (Doc. No. 11).[7] The Court heard oral argument on the motions on July 23, 2019 (Doc. No. 26), and having been fully briefed (Doc. Nos. 18, 19, 21, 23, 24), the motions are ripe for disposition.

## II.     STANDARD OF REVIEW

### A.     Motion to Dismiss for Lack of Subject Matter Jurisdiction Pursuant to Federal Rule of Civil Procedure 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) permits a party to move for dismissal of a claim on the basis that subject matter jurisdiction is lacking. See Fed. R. Civ. P. 12(b)(1). "A 12(b)(1) motion may challenge jurisdiction based on the face of the complaint or in its existence in fact."

---

[7] While the instant motions to dismiss were pending, Defendants also filed a motion to bifurcate discovery pending the Court's resolution of the motions to dismiss. (Doc. No. 29.)

Henderson v. Nationwide Mut. Ins. Co., 169 F. Supp. 2d 365, 367 (E.D. Pa. 2001) (citing Gould Elecs. Inc. v. United States, 220 F.3d 169, 176 (3d Cir. 2000)).  "When the challenge is facial, the [C]ourt must accept as true all well-pleaded allegations in the complaint and draw reasonable inferences in favor of the plaintiff[,]" but when a party raises a factual challenge, "the [C]ourt is not bound by the allegations in the pleadings" and "[t]herefore, 'no presumptive truthfulness attaches to [the] plaintiff's allegations' for factual challenges."  See id. (citation omitted) (quoting Mortensen v. First Fed. Savs. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)).  "Regardless of whether the challenge is facial or factual, the plaintiff bears the burden of persuasion."  Id. (citing Mortensen, 549 F.2d at 890); see also Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, at *1409 (3d Cir. 1991) ("When subject matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff must bear the burden of persuasion." (citing Mortensen, 549 F.2d at 891)).

**B.     Motion to Dismiss for Lack of Personal Jurisdiction Pursuant to Federal Rule of Civil Procedure 12(b)(2)**

Federal Rule of Civil Procedure 12(b)(2) permits a defendant to bring a motion challenging the court's right to exercise personal jurisdiction over it.  See Fed. R. Civ. P. 12(b)(2).  Once "the defendant raises the question of personal jurisdiction, the plaintiff bears the burden to prove, by a preponderance of the evidence, facts sufficient to establish personal jurisdiction."  See Carteret Sav. Bank, FA v. Shushan, 954 F.2d 141, 146 (3d Cir. 1992).  To avoid dismissal pursuant to Rule 12(b)(2), the plaintiff must "establish[] jurisdictional facts through sworn affidavits or other competent evidence."  See Time Share Vacation Club v. Atl. Resorts, 735 F.2d 61, 66 n.9 (3d Cir. 1984).  "[A]t no point may a plaintiff rely on the bare pleadings alone in order to withstand a defendant's Rule 12(b)(2) motion to dismiss for lack of in personam jurisdiction."  Id.

"A federal court may assert personal jurisdiction over a nonresident of the state in which the court sits to the extent authorized by the law of the state." Carteret Sav. Bank, 954 F.2d at 144-45 (quoting Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n, 819 F.2d 434, 436 (3d Cir. 1987)). Pennsylvania's long-arm statute permits the Court to exercise personal jurisdiction "to the fullest extent allowed under the Constitution of the United States." 42 Pa. Cons. Stat. § 5322(b). Therefore, in its exercise of personal jurisdiction, this Court is constrained only by the Due Process Clause of the United States Constitution, which requires that a defendant has "certain minimum contacts with [the forum state] such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." See O'Connor v. Sandy Lane Hotel Co., Ltd., 496 F.3d 312, 316 (3d Cir. 2007) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). Requiring "minimum contacts" between the defendant and the forum state gives "fair warning" to a defendant that he or she may be called to defend a lawsuit in that state. See Marten v. Godwin, 499 F.3d 290, 296 (3d Cir. 2007) (quotation omitted).

Two types of personal jurisdiction comport with these notions of due process: specific and general jurisdiction. See Daimler AG v. Bauman, 134 S. Ct. 746 (2014). Specific jurisdiction encompasses cases "in which the suit 'aris[es] out of or relate[s] to the defendant's contacts with the forum.'" Id. at 754 (citations omitted). General jurisdiction, however, may be exercised by a court when foreign corporations' "affiliations with the [s]tate are so 'continuous and systematic' as to render them essentially at home in the forum [s]tate." Id. (citations omitted).

**C.    Motion to Dismiss for Failure to State a Claim upon Which Relief May Be Granted Pursuant to Federal Rule of Civil Procedure 12(b)(6)**

Federal notice and pleading rules require the complaint to provide the defendant notice of the claim and the grounds upon which it rests. See Phillips v. Cty. of Allegheny, 515 F.3d 224,

232 (3d Cir. 2008). The plaintiff must present facts that, accepted as true, demonstrate a plausible right to relief. Fed. R. Civ. P. 8(a). Although the Federal Rule of Civil Procedure 8(a)(2) requires "only a short and plain statement of the claim showing that the pleader is entitled to relief," a complaint may nevertheless be dismissed under Federal Rule of Civil Procedure 12(b)(6) for its "failure to state a claim upon which relief can be granted." See Fed. R. Civ. P. 12(b)(6).

When ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint and all reasonable inferences that can be drawn from them, viewed in the light most favorable to the plaintiff. See In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 314 (3d Cir. 2010). The Court's inquiry is guided by the standard of Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009). Under Twombly and Iqbal, pleading requirements have shifted to a "more heightened form of pleading." See Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009). To avoid dismissal, all civil complaints must set out "sufficient factual matter" to show that the claim is facially plausible. See id. The plausibility standard requires more than a mere possibility that the defendant is liable for the alleged misconduct. As the Supreme Court instructed in Iqbal, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

Accordingly, to determine the sufficiency of a complaint under Twombly and Iqbal, the United States Court of Appeals for the Third Circuit has identified the following steps a district court must take when determining the sufficiency of a complaint under Rule 12(b)(6): (1) identify the elements a plaintiff must plead to state a claim; (2) identify any conclusory

allegations contained in the complaint "not entitled" to the assumption of truth; and (3)

determine whether any "well-pleaded factual allegations" contained in the complaint "plausibly

give rise to an entitlement for relief." See Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d

Cir. 2010) (internal quotation marks omitted) (quoting Iqbal, 556 U.S. at 675, 679).

In ruling on a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a court must consider

only the complaint, exhibits attached to the complaint, matters of public record, as well as

undisputedly authentic documents if the complainant's claims are based upon these documents."

See Mayer v. Belichick, 605 F.3d 223, 230 (citing Pension Benefit Guar. Corp. v. White Consol.

Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)). A court may also consider "any 'matters

incorporated by reference or integral to the claim, items subject to judicial notice, matters of

public record, orders, [and] items appearing in the record of the case.'" Buck v. Hampton Twp.

Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006) (quoting 5B Charles A. Wright & Arthur R. Miller,

Federal Practice & Procedure § 1357 (3d ed. 2004)).

## III.    DISCUSSION

The Court observes that all Defendants move for dismissal of the amended complaint

pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure and to stay the

case pending the outcome of an NFLPA grievance asserted by Plaintiffs against France on July

1, 2019, and that the Boone Defendants also move for dismissal for lack of personal jurisdiction

under Rule 12(b)(2). Additionally, Defendants have also moved for bifurcation and sequencing

of discovery so as to limit discovery to jurisdictional issues pending the disposition of the instant

motions to dismiss.  The Court addresses each asserted basis for dismissal in turn, beginning

with Defendants' motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1).[8]

### A. Defendants' Motions to Dismiss for Lack of Subject Matter Jurisdiction Pursuant to Federal Rule of Civil Procedure 12(b)(1)

#### 1. Applicable Legal Standard

"Federal courts, being courts of limited jurisdiction, have a continuing duty to satisfy

themselves of jurisdiction before addressing the merits of a case." Tasker v. Farmer's New

Century Ins., No. 3:04-cv-2620, 2005 WL 8168231, at *1 (M.D. Pa. Mar. 10, 2005) (citing

Packard v. Provident Nat'l Bank, 994 F.2d 1039, 1049 (3d Cir. 1993)); see also id. (noting the

proposition that federal courts have "been too cautious in addressing the large number of cases"

that "do not belong in federal courts" (citing Nelson v. Keefer, 451 F.2d 289, 293-85 (3d Cir.

1971))).  28 U.S.C. § 1332 provides, inter alia, that in order for federal diversity jurisdiction to

exist, the amount in controversy must "exceed[] the sum or value of $75,000." See 28 U.S.C.

§ 1332(a).  "It is well-settled that '[w]hen deciding a motion to dismiss pursuant to [Rule]

12(b)(1) on an allegation that the amount in controversy does not meet the jurisdictional

minimum, the sum claimed by the plaintiff controls if the claim is apparently made in good

faith.'" Chrestman v. NHB, LLC, No. 07-cv-492, 2007 WL 1575202, at *1 (E.D. Pa. May 31,

2007) (first alteration in original) (second set of internal quotation marks omitted) (quoting

---

[8] It is proper for the Court to examine Defendants' 12(b)(1) arguments prior to addressing any
other asserted bases for dismissal.  See Leroy v. Great W. United Corp., 443 U.S. 173, 180
(1979) ("[N]either personal jurisdiction nor venue is fundamentally preliminary in the sense that
subject-matter jurisdiction is, for both are personal privileges of the defendant, rather than
absolute strictures on the [C]ourt, and both may be waived by the parties." (citing Olberding v.
Ill. Cent. R. Co., 346 U.S. 338, 340 (1953); Neirbo Co. v. Bethlehem Shipbuilding Corp., 308
U.S. 165, 167-68 (1939))); see also Grezak v. Ropes & Gray, LLP, No. 3:15-cv-02111, 2018 WL
4289338, at *4 n.5 (M.D. Pa. May 16, 2018) (citing Leroy, 443 U.S. at 180), report and
recommendation adopted, No. 3:15-cv-02111, 2018 WL 4282780 (M.D. Pa. Sept. 7, 2018).

Krauss v. Steelmaster Bldgs., LLC, 2006 WL 3097767, No. 06-cv-796, at *1 (E.D.Pa. Oct. 27, 2006)). To determine whether the purported amount in controversy is sufficient to establish diversity jurisdiction, courts employ the "legal certainty" standard, which provides that:

> [I]f, from the face of the pleadings, it is apparent, to a legal certainty, that the plaintiff cannot recover the amount claimed or if, from the proofs, the [C]ourt is satisfied to a like certainty that the plaintiff never was entitled to recover that amount . . . the suit will be dismissed.

Valhal Corp. v. Sullivan Assocs., Inc., 48 F.3d 760, 761 (3d Cir. 1995) (quoting St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 288-89 (1938)).

### 2.    Arguments of the Parties[9]

Defendants assert that this Court lacks subject matter jurisdiction over the instant claims because the $75,000 threshold applicable to the amount in controversy requirement is not met. (Doc. No. 18 at 16.) Specifically, they argue that "Plaintiffs' actual damages are, at most, $1,350.00" and note that Plaintiffs, as "experts in the industry, are well aware that they could not earn more than a small sum in connection with the autograph signing at issue" and "are equally well aware that the SRA is terminable at will, and that they are financially protected from any damages in the event of termination." (Id. at 16.) Further, Defendants state that because the Court is ultimately concerned with a factual challenge to jurisdiction under Rule 12(b)(1), Plaintiffs are not entitled to any presumption of truth as to the allegations set forth in the amended complaint, and because "Plaintiffs cannot argue that the Court should consider future SRAs or deals they could have entered into with [Golladay] in determining whether their damages are in excess of $75,000 . . . Plaintiffs are limited to their present damages, which

---

[9] In their respective briefing submitted in support of their motions to dismiss, each set of Defendants advances overlapping arguments in favor of dismissal. Where such arguments overlap, the Court has noted the arguments in both sets of briefs, but for purposes of concision, declines to cite both sets of briefing herein.

undeniably amount to no more than $1,350.00." (Id. at 17.) Defendants contend that under the applicable authority, "the only actual and present damages that [Plaintiffs] can claim are $1,350.00, representing their 15% commission on what [Golladay] earned at the autograph signing" and "[t]hey have no damages arising out of the terminated SRA, because the SRA itself provides that they will get paid their 3% commission even after its termination." (Id. at 18.) Further, Defendants argue that Plaintiffs cannot satisfy the applicable jurisdictional amount "by arguing that they have been deprived of entering into future NFL [p]layer contracts or participating in future marketing events with [Golladay] because they have no unconditional right to such future contracts or payments thereunder." (Id.)[10] Moreover, Defendants assert that Plaintiffs' purported amount in controversy is insufficient to establish diversity jurisdiction because "while punitive damages may be included in the calculation, where it appears that the punitive damages claim comprises the bulk of the amount in controversy, 'that claim will be given particularly close scrutiny.'" (Id. at 19) (quoting Smith v. Nationwide Mut. Fire Ins. Co., 935 F. Supp. 616, 623 (W.D. Pa. 1996)). According to Defendants, therefore, Plaintiffs cannot meet the $75,000 jurisdictional threshold and, as a result, this Court lacks subject matter jurisdiction over Plaintiffs' claims.

In opposition, Plaintiffs argue that they have met their burden in establishing that they have satisfied the requisite jurisdictional amount, stating that they "have expressed no intention to seek less than the statutory amount in controversy and the potential liability of []

_____

[10] To that end, the Redland Defendants state that: (1) "any SRA is terminable at will"; (2) "the issue of whether Plaintiffs would be able to enter into a new SRA with [Golladay], or whether [Golladay] would participate in marketing events that Plaintiffs would be compensated for via any 'side agreement' – such as the EMA – lies wholly within the discretion of a third party, namely [Golladay]"; and (3) "as a matter of law, such alleged future damages are too speculative to be considered for jurisdictional purposes." (Doc. No. 18 at 18-19.)

14

Defendants . . . exceeds the statutory requirement." (Doc. No. 21 at 16.) More specifically,

Plaintiffs point to their damages allegations "in the form of lost fees under both the marketing

agreement and the SRA[,]" and state that "[i]t is simply untrue for Defendants to argue at this

stage that the maximum damages Plaintiffs can recover are their fees due for the autograph

signing" where they have "alleged that Defendants' interference caused far more monetary

damage than the one autograph signing." (Id. at 17.) To that end, Plaintiffs aver that under the

case law pertaining to this issue in the context of tortious interference claims, they have

sufficiently pled both past and future damages. (Id. at 18.) Plaintiffs also rebuff the contention

described supra that their damages claim is insufficiently speculative, stating that the case law on

which the Redland Defendants rely is inapposite because it does not concern tortious interference

claims (id. at 19), and that "[i]n the context of a claim for tortious interference with [a] contract,

the law is clear that a plaintiff bringing such a claim may seek and recover lost expectation

damages" (id. at 20). Here, Plaintiffs maintain, they have asserted a claim for damages in the

form of "lost profits based on lost commissions in the future" and "Defendants have not

demonstrated [that] Plaintiffs cannot recover an amount over $75,000 as a matter of law." (Id.)

(internal quotation marks omitted) (citing Intertran Corp. v. Railquip, Inc., No. 1-08-cv-0684,

2008 WL 3981493, at *4 (M.D. Pa. Aug. 22, 2008)). Plaintiffs state that "to the contrary, the

law is that Plaintiffs can recover future lost profits on their tortious interference claims." (Id.)

(citing Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1175 (3d Cir. 1993)).[11]

_____

[11] Defendants have put forth additional arguments in support of dismissal under Rule 12(b)(1),
asserting that Plaintiff Clarity Sports is not registered to do business in Pennsylvania, and,
therefore it "is not properly a party to this lawsuit, and any claims asserted by it against []
Defendants should be dismissed." (Id. at 27.) In addition, Defendants claim that Plaintiff Clarity
Sports – which is an LLC – has failed to identify its members, and, as a result, this Court cannot
ascertain whether there is complete diversity of citizenship as it pertains to the existence of
federal diversity jurisdiction. (Id.) In light of Plaintiffs' representation that Plaintiff Clarity

### 3. Whether Defendants' Motions to Dismiss Should be Granted for Lack of Subject Matter Jurisdiction Pursuant to Rule 12(b)(1)

Upon review of the record, the parties' arguments, and the applicable authority, the Court concludes that it lacks subject matter jurisdiction over Plaintiffs' claims as represented in Plaintiffs' amended complaint on the ground that the amount in controversy requirement has not been satisfied. As noted <u>supra</u>, Defendants have called into question whether the requisite amount in controversy has been met in order to satisfy this threshold requirement for federal diversity jurisdiction. Additionally, because this case presents a factual attack as to subject matter jurisdiction, the Court is not required to accept the allegations in the amended complaint as true for purposes of the instant Rule 12(b)(1) analysis.[12]

As a threshold matter, the Court acknowledges that the burden associated with establishing that the amount in controversy is sufficient to bestow federal subject matter jurisdiction is not particularly stringent. <u>See</u> <u>Valley v. State Farm Fire & Cas. Co.</u>, 504 F. Supp. 2d 1, 3-4 (E.D. Pa. 2006) (discussing the requirements imposed by the "legal standard" for purposes of ascertaining whether the amount in controversy has been met and stating that under the governing authority, "a case must be dismissed . . . if it appears to a legal certainty that the plaintiff cannot recover more than . . . $75,000"). At present, the amended complaint appears to contain only the allegation that Plaintiffs have sustained and will sustain pecuniary losses exceeding $75,000 in the future. (Doc. Nos. 7 at 14-15, 21 at 14-20.) While Plaintiffs are legally permitted to seek damages for the monetary amount they would have received had

---

Sports is currently registered to do business in Pennsylvania, as well as Plaintiffs' reference to Plaintiff Bernstein's declaration stating that each of the two members of Plaintiff Clarity Sports are natural persons and Maryland citizens (Doc. No. 21 at 32), the Court finds the aforementioned issues raised by Defendants to be moot.

[12] <u>See</u> <u>supra</u> Section II.

Defendants not committed the alleged interference with either agreement between Plaintiffs and

Golladay, the damages that Plaintiffs claim are impermissibly speculative for purposes of

establishing that the amount in controversy requirement has been met.  See Mazza v. Peerless

Indem. Ins. Co., No. 13-cv-3225, 2013 WL 4014569, at *3 (E.D. Pa. Aug. 7, 2013) (remanding

case for lack of subject matter jurisdiction in regard to the amount in controversy and noting,

inter alia, that the "burden to prove the amount in controversy to a legal certainty is not satisfied

by the suggestion of possible future events").  Moreover, the Court is unpersuaded by Plaintiffs'

argument that any claim for punitive damages permits them to satisfy the jurisdictional amount

because Plaintiffs' requested damages would need to consist almost entirely of punitive damages

in order to meet the threshold amount to establish diversity jurisdiction, as opposed to

representing a more proportionate ratio.  See Pecko v. Allstate Ins. Co., No. 16-cv-1988, 2016

WL 5239679, at *4 (E.D. Pa. Sept. 22, 2016) (noting that "[w]hile a claim for punitive damages

alone is too speculative to push the amount in controversy over the jurisdictional threshold," the

plaintiff had met her burden as to the amount in controversy where "in conjunction with the

estimated damages of $136,905.20, [her] claim for punitive damages weighs in favor of a

determination that the amount in controversy requirement is met" (citation omitted)).

Consequently, the showing put forth by Plaintiffs is simply insufficient to invoke federal

diversity jurisdiction because it would require the Court to find that subject matter jurisdiction

exists as a result of conjecture.  See, e.g., Katarincic v. Genworth Life. Ins. Co., No. 09-cv-1561,

2010 WL 374752, at *2 (W.D. Pa. Feb. 3, 2010) (remanding action for lack of subject matter

jurisdiction where the court had "no way of ascertaining whether the value of the object of the

litigation exceeds the $75,000 jurisdictional minimum" and commenting that "we will not

ordinarily consider [] speculative arguments in determining the amount in controversy" (citing Columbia Gas Transmission Corp. v. Tarbuck, 62 F.3d 538, 543-44 (3d Cir. 1995))).

In light of this authority, the Court finds that, as to the claimed damages pertaining to the EMA, Plaintiffs cannot rely solely on damages stemming from that agreement, in conjunction with punitive damages, to meet the amount in controversy requirement; to permit them to do so would allow for a ratio of compensatory to punitive damages that is extremely disproportionate to establish subject matter jurisdiction, and, therefore, the amended complaint as pled does not contain allegations as to the amount in controversy that would permit the Court to find that the jurisdictional threshold has been met. The Court, however, will not prohibit Plaintiffs from filing a second amended complaint containing sufficient factual allegations to demonstrate that, under the SRA, had the alleged tortious interference not occurred and the agreement continued up to at least its four-year limit, Plaintiffs would have damages that permit them to meet the amount in controversy requirement. (Doc. No. 29-1 at 13.) In their briefing and at oral argument, Plaintiffs directed the Court to Lightning Lube, Inc. v. Witco Corporation, a Third Circuit decision in which the Court of Appeals discussed whether a party could meet the amount in controversy requirement in asserting a tortious interference claim under New Jersey law and, in doing so, commented that while certain testimony could have been presented that the plaintiff "could not have sustained an award of $70 million in future lost profits, nonetheless the jury could have concluded reasonably that [the plaintiff] would have earned $7 million over the ten-year period." See Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1175 (3d Cir. 1993). In contrast, however, Plaintiffs' amended complaint does not allege a reason to believe that Plaintiff Bernstein's contractual relationship with Golladay would have been renewed once the SRA's four-year term expired, or that Golladay's earnings would have resulted in earnings for Plaintiff

Bernstein in excess of $75,000 pursuant to the SRA. Despite this deficiency in the amended complaint, though, the Court cannot definitively conclude that it would be implausible to find that the alleged tortious interference with the SRA would permit Plaintiffs to claim damages in excess of $75,000, provided that sufficient factual allegations are pled to support such a finding. Accordingly, the Court will grant Defendants' motions to dismiss the amended complaint under Rule 12(b)(1) for lack of subject matter jurisdiction and dismiss the amended complaint without prejudice to Plaintiffs' right to file a second amended complaint consistent with the Court's discussion supra.

    **B.**    **The Boone Defendants' Motion to Dismiss for Lack of Personal Jurisdiction Pursuant to Federal Rule of Civil Procedure 12(b)(2)**

        **1.**    **Applicable Legal Standard**

In the case at bar, Plaintiffs have asserted two claims alleging tortious interference with their contractual relationships, and, therefore, allege the commission of an intentional tort. See Remick v. Manfredy, 238 F.3d 248, 260 (3d Cir. 2001) ("Tortious interference is an intentional tort . . . ."). When examining the issue of personal jurisdiction in the context of an intentional tort claim, the Court is to employ the Calder "effects test," which requires the plaintiff to establish the following:

> (1) The defendant committed an intentional tort;
> (2) The plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; [and]
> (3) The defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity.

Id. at 258 (quoting IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 265-66 (3d Cir. 1998)). This test requires "that the tortious actions of the defendant have a forum-directed purpose." See Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 99 (3d Cir. 2004).

## 2.    Arguments of the Parties

The Boone Defendants specifically assert that this Court lacks personal jurisdiction over them (Doc. No. 19 at 35), stating that: Defendant Boone is a life-long New Jersey resident; Defendant Boone Enterprises is a New Jersey corporation with a principal place of business in New Jersey; and neither party has ever filed tax returns, owned or leased real property, owned assets, held a bank or other financial account, had an agent for service of process, been served with process, or had employees in the Commonwealth of Pennsylvania (id. at 36).  Additionally, the Boone Defendants contend that while they have arranged approximately six hundred autograph signings, only one – which is unrelated to the instant dispute – took place in Pennsylvania, while the January 2019 signing with Golladay was held in Chicago, Illinois.  (Id. at 37.)  Further, the Boone Defendants state that in connection with the Golladay signing, neither of them traveled to Pennsylvania or conducted any activity therein.  (Id.)  Moreover, the Boone Defendants maintain that although they sell merchandise that is available for purchase over the internet, that fact alone is insufficient to warrant the exercise of personal jurisdiction over them in this case because under the relevant authority, it does not permit Plaintiffs to demonstrate that by selling such merchandise, the Boone Defendants specifically directed their actions at residents of Pennsylvania for purposes of the governing personal jurisdiction analysis.  (Id. at 40.)  According to the Boone Defendants, therefore, because the Court lacks personal jurisdiction over them, all claims asserted against them in the amended complaint should be dismissed.

In response, Plaintiffs assert that dismissal of the claims against the Boone Defendants per Rule 12(b)(2) would be improper in light of their contacts with Pennsylvania for purposes of the tort alleged in this case.  (Doc. No. 21 at 34.)  First, Plaintiffs state that "[t]he Boone Defendants co-host 'monthly' autograph signings in Pennsylvania" and on March 22, 2019

Defendant MVP Authentics "posted on its Instagram account that MVP 'in conjunction with #BooneEnterprises and #RedlandSports presents another in our monthly autograph series at the newly remodeled' Wharf Bar and Grill located in Harrisburg, Pennsylvania." (Id.) (citing Doc. No. 21-15). Further, Plaintiffs contend that on April 8, 2019, Defendant MVP Authentics "advertised that 'in conjunction with' [Defendants] Redland Sports and Boone Enterprises, it was 'excited to announce the next three events' in their monthly autograph series at the Wharf Bar and Grill in Harrisburg, Pennsylvania." (Id.) Plaintiffs state that "[b]ased on this evidence alone, it is clear that the Boone Defendants are regularly doing business in Pennsylvania" and are also "'partnering with MVP Authentics and Redland Sports, both of which are Pennsylvania companies." (Id. at 34-35.) Additionally, Plaintiffs state that Defendant Boone's "own social media posts also expressly claim that [he] hosts memorabilia signings in Pennsylvania[,]" which is evidenced by, for example, him hosting a February 16, 2019 signing at the Harrisburg mall (id. at 35) (citing Doc. No. 21-15), as well as a February 14, 2019 Facebook post by the Boone Defendants stating that Defendant Boone Enterprises "would 'have' certain athletes at the Harrisburg Sports Card Show" from February 15 to February 17, an event for which Defendants advertised that tickets were available. (Id. at 35-36.) Plaintiffs state that in light of such evidence, "it does not offend any notion of fair play for [these Defendants] to be sued in Pennsylvania and [the Boone Defendants] should not be surprised such has happened." (Id. at 36) (citing Kehm Oil Co. v. Texaco, Inc., 537 F.3d 290, 300 (3d Cir. 2008)).[13] Plaintiffs

---

[13] In additional support of their arguments regarding personal jurisdiction, Plaintiffs state that "it is worth noting that any argument by [the Boone Defendants] that [they] did not participate in these signings is undercut by certain other advertisements by [Defendant] MVP Authentics, which do not include the Boone Defendants." (Doc. No. 21 at 36.) According to Plaintiffs, Defendant Boone Enterprises "would sometimes be included in [Defendant MVP Authentics'] events and sometimes would not," demonstrating that "Defendants know how to say so when

maintain, in sum, that the Court should deny the Boone Defendants' motion for dismissal under

Rule 12(b)(2) because there is in fact both general and specific personal jurisdiction over these

Defendants.

      **3.**      **Whether the Boone Defendants' Motion to Dismiss for Lack of Personal Jurisdiction Pursuant to Federal Rule of Civil Procedure 12(b)(2) Should Be Granted**

When judged against the applicable standard, the Boone Defendants' motion for

dismissal due to lack of subject matter jurisdiction lacks merit, for the exercise of specific

personal jurisdiction over the Boone Defendants by this Court is proper.[14]  As noted above, the

Court employs the Calder "effects test" because Plaintiffs have alleged an intentional tort by

asserting a claim for tortious interference.  See Remick, 238 F.3d at 260 (commenting that for

purposes of examining personal jurisdiction, the Calder effects test is applicable to a tortious

interference claim because tortious interference is an intentional tort).  Accordingly, the Court

proceeds to the second and third elements of this test: whether Plaintiffs "felt the brunt of the

harm in the forum such that the forum can be said to be the focal point of the harm suffered by

the plaintiff as a result of that tort" and whether the Boone Defendants "expressly aimed [the]

tortious conduct at the forum such that the forum can be said to be the focal point of the tortious

activity[,]" respectively.  Id. at 258 (quoting IMO Indus., 155 F.3d at 265-66).

The Court finds that under this standard, the exercise of personal jurisdiction over the

Boone Defendants is proper.  In light of contacts between the Boone Defendants and the other

_____

[the Boone Defendants] partnered with [Defendants MVP and Redland Sports] to conduct a signing or related event."  (Id. at 36-37.)

[14] Initially, the Court observes that in light of the allegations set forth in the amended complaint, as well as a lack of documentation to support the assertion that the Boone Defendants' contacts with Pennsylvania are sufficiently continuous and systematic so as to raise the issue of general jurisdiction, the Court's analysis of personal jurisdiction addresses only the existence of specific jurisdiction.

named Defendants in this action, who are based in Pennsylvania and conduct much of their business in this state, Plaintiffs have shown that "the brunt of the harm" of the alleged tortious interference could be experienced in Pennsylvania. Further, while the Boone Defendants assert that they lack a sufficient connection to Pennsylvania for specific jurisdiction to exist, Plaintiffs have pointed to instances in which the Boone Defendants have engaged in business pertaining to autograph signings in Pennsylvania that involve the Redland Defendants and, therefore, demonstrate that they have directed certain conduct toward Pennsylvania that Plaintiffs allege furthered their tortious interference. (Doc. No. 21-15.) Additionally, the fact that Defendant Boone or the Boone Defendants generally may have not had an extensive physical presence in Pennsylvania is of no moment because a physical presence in the forum state is not necessary in order for the exercise of personal jurisdiction to be proper. See Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino, 960 F.2d 1217, 1225 (3d Cir. 1992) (observing that "the physical presence of the defendant in the forum has not been regarded as a jurisdictional litmus test"). Accordingly, having found the Boone Defendants' arguments in favor of dismissal for lack of personal jurisdiction unpersuasive, the Court will deny their motion to dismiss under Rule 12(b)(2).

### C.     Defendants' Motion to Dismiss for Failure to State a Claim upon Which Relief May Be Granted Pursuant to Federal Rule of Civil Procedure 12(b)(6)

#### 1.     Applicable Legal Standard[15]

To state a viable claim for tortious interference with existing contractual relationships, a plaintiff must allege facts in support of the following elements:

> (1) the existence of a contractual . . . or economic relationship between the plaintiff and a third party; (2) purposeful action by the defendant, specifically

---

[15] The Court analyzes the sufficiency of Plaintiffs' tortious interference claims in accordance with Pennsylvania law. See, e.g., Fry v. Phoenix Ins. Co., 54 F. Supp. 3d 354, 361 (E.D. Pa. 2014) ("When exercising diversity jurisdiction, a federal court sitting in Pennsylvania must predict how the Supreme Court of Pennsylvania would decide questions of state law.").

intended to harm an existing relationship or intended to prevent a prospective
relation from occurring; (3) the absence of privilege or justification on the part of
the defendant; [and] (4) legal damage to the plaintiff as a result of the defendant's
conduct.

Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 212 (3d Cir. 2009) (citing

Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 530 (3d Cir. 1998)).  A claim

for tortious interference with prospective contractual relationships consists of these elements

with respect to a prospective contractual or economic relationship, and includes the additional

element of "a reasonable likelihood that the relationship would have occurred but for the

defendant's interference."  See id. (citing Brokerage Concepts, 140 F.3d at 530).

        "In determining whether there is a prospective contractual relationship in a tortious

interference case, Pennsylvania courts have considered whether the evidence supports a finding

that there was an objectively 'reasonable likelihood or probability' that the contemplated contract

would have materialized absent the defendant's interference."  Id. at 213 (quoting Glenn v. Point

Park Coll., 272 A.2d 895, 898-99 (Pa. 1971); Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173,

184 (3d Cir. 1997)).  For a court to find a "'reasonable likelihood or probability' of a prospective

contractual relationship," there must be "more evidence than the existence of a current business

or contractual relationship."  See Phillips v. Selig, 959 A.2d 420, 428-29 (Pa. Super. Ct. 2008)

(citing Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 471 (Pa. 1979)).  "[A] mere

historical relationship between parties is not sufficient to show a prospective contractual

relationship."  BP Envt'l Servs., Inc. v. Republic Servs., Inc., 946 F. Supp. 2d 402, 412 (E.D. Pa.

2013).

        As to the alleged conduct on the part of the defendant, "[t]ortious interference with [a]

contract does not have a technical requirement as to the kind of conduct that may result in

interference" and "[i]nterference with the third party's performance may be by prevention of the

performance . . . [such as] by depriving him of the means of performance." See Martin v. Finley, 349 F. Supp. 3d 391, 409 (M.D. Pa. 2018) (alterations and omissions in original) (quoting RESTATEMENT (SECOND) OF TORTS § 766 cmt. K (AM. LAW INST. 1979)). "[I]n order to plead adequately a tortious interference claim, a plaintiff must plead that the defendant crossed the line from capitalistic self-interested behavior to unfair conduct." Ferrone v. Huntington Bankshares Inc., No. 1279-WDA-2016, 2017 WL 3443794, at *5 (Pa. Super. Ct. Aug. 11, 2017) (citing Salsgiver Commc'ns, Inc. v. Consolidated Commc'ns Holdings, Inc., 150 A.3d 957, 964 (Pa. Super. Ct. 2016)).

### 2.      Arguments of the Parties

Both sets of Defendants move for dismissal of the amended complaint on the basis that Plaintiffs have failed to allege sufficient facts that would support their tortious interference claims. First, Defendants state that their respective roles in the athlete representation industry indicate that they are incapable of interfering with Plaintiffs' contractual relationships as alleged in the complaint. The Redland Defendants state that "it is facially implausible that any actions by Ochs – a furniture mover and sports enthusiast – and Redland Sports . . . could somehow cause [Golladay] to terminate his relationship with Plaintiffs and hire a new agent." (Doc. No. 18 at 20.) Similarly, the Boone Defendants state that they "are not contract advisors (or agents) registered with the NFLPA, and are certainly not in the business of advising professional football players as to their important business affairs[,]" noting, instead, that "[t]he Boone [p]arties earn their living by arranging for and participating in celebrity autograph signings, where the celebrities come from all fields of entertainment, not just sports" and "[t]he MVP [p]arties merely provide custom mounting and displays for memorabilia signed by such celebrities." (Doc. No. 19 at 27.)

In addition, Defendants assert that Plaintiffs' allegations do not satisfy the elements applicable to a tortious interference claim. As to this point, the Redland Defendants aver that "Plaintiffs completely fail to describe how and why [their] alleged actions had more than an incidental effect on [Golladay's] decision to terminate his contracts and relationship with them – most importantly, the SRA – and hire a new agent[,]" and that Plaintiffs do not explain how the Redland Defendants acted with a malevolent purpose as it pertains to a tortious interference claim. (Doc. No. 18 at 22.) The Boone Defendants contend that Plaintiffs' amended complaint does not "expressly plead that [Plaintiffs] informed [the Boone Defendants] of either their relationship with [Golladay] or the terms of the specific contracts at issue." (Doc. No. 19 at 29) (stating that the Boone Defendants could not have committed tortious interference "with contracts they did not know about"). Additionally, the Boone Defendants argue that they are neither NFL contract advisors nor agents, and, like the Redland Defendants, would have no incentive to interfere with Plaintiffs' contractual relationship with Golladay. (Id. at 29.)

In response, Plaintiffs advance several arguments in opposition to dismissal of their tortious interference claims. Plaintiffs note that "Defendants cite no case that suggests Plaintiffs must expressly allege any [d]efendant['s] 'motive' for their tortious conduct" (Doc. No. 21 at 20), and also state that, in any event, they have pled adequate facts to demonstrate Defendants' motivation to interfere with their contractual relationships, citing Defendants' "business with CAA Sports and Todd France and [] autograph signings with many clients of CAA Sports[,]" as well as Defendants' characterization of certain CAA Sports' clients as "Defendants 'exclusive' clients for purposes of memorabilia" (id. at 21) (citing Doc. No. 21-4). In further support of this point, Plaintiffs posit that "[b]ecause Defendants do much business with CAA Sports and Todd France specifically, it is not only plausible but nearly certain that Defendants have an incentive

to coordinate their actions with CAA Sports and France to continue receiving that memorabilia business." (Id.)

As to the issue of Defendants' motive, Plaintiff argues that Defendants improperly assert that they "must prove at this early stage that Defendants acted with some bad purpose[,]" a requirement that does not accompany the Rule 12(b)(6) standard, which Plaintiffs have satisfied by "expressly alleg[ing] that Defendants were aware of Plaintiffs' contracts with Golladay and nonetheless proceeded with the signing." (Id. at 21-22) (stating that Plaintiff Bernstein "emailed and texted Ochs to inform him of Clarity's [EMA] and request that [Defendant] Redland Sports take down the Facebook post advertising Defendants' upcoming signing"). Plaintiffs also point to additional portions of the record as further support for Defendants' purported improper motive, noting that in the declaration of Emily Ries ("Ries"), Plaintiff Clarity Sports' marketing director, Ries states that "she learned of Defendants' planned signing through [Defendant] Redland Sports' Facebook []advertisement and called [Defendant] Ochs on January 6, 2019" to inform him that Plaintiffs "represented Golladay and that [Plaintiff Clarity Sports] had an exclusive marketing agreement with Golladay." (Id. at 22.) According to Plaintiffs, "[d]espite this conversation and despite receiving a voicemail, a text message[,] and an email from [Plaintiff] Bernstein," Defendants "proceeded to ignore Plaintiffs entirely and co-hosted the signing about two weeks later." (Id.) In addition, Plaintiffs state that Defendants' own exhibits submitted in connection with their motions to dismiss are indicative of an improper motive on Defendants' part, noting that "Defendants attached as an exhibit . . . the contract for the Golladay signing, which is dated 'As of January 8, 2019' and effective 'January 7, 2019'" and stating that such evidence demonstrates that "Defendants, through Boone Enterprises, entered into the contract with Golladay after hearing from Ries . . . and after hearing from Jason Bernstein

himself." (Id. at 23) (citing Doc. No. 11-4 at 2). According to Plaintiffs, it also bears noting that the signing took place on January 21, 2019, "which means that Defendants had nearly two weeks to reconsider" after being in contact with Ries. (Id.) As to the argument put forth by certain Defendants that they were unaware of Plaintiffs' contracts with Golladay and, consequently, could not have tortuously interfered with the agreements, Plaintiffs state that Defendant Redland Sports "was indisputably informed of Plaintiffs' contracts with Golladay, and the joint nature of the memorabilia signing makes it highly implausible (at least) that [Defendants MVP Authentics and Boone] knew of the contracts as well." (Id. at 23-24.) Accordingly, Plaintiffs assert that in light of the standard applicable to the instant Rule 12(b)(6) arguments before this Court, Plaintiffs have pled sufficient facts to support their tortious interference claims and, therefore, the Court should deny the motions to dismiss.

### 3. Whether Defendants' Motion to Dismiss for Failure to State a Claim upon Which Relief May Be Granted Pursuant to Federal Rule of Civil Procedure 12(b)(6) Should be Granted

As noted above, Defendants have also called into question Plaintiffs' ability to plead facts as to the second element of a tortious interference claim: "purposeful action by the defendant, specifically intended to harm an existing relationship or intended to prevent a prospective relation from occurring." See Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d at 212 (citing Brokerage Concepts, 140 F.3d at 530). The apparent crux of Defendants' Rule 12(b)(6) argument is that the amended complaint is devoid of any facts to support the notion that Defendants were acting in concert with CAA Sports and France for the purpose of interfering with Plaintiffs' representation of Golladay. The Court is cognizant of Plaintiffs' representations made at oral argument, including references to certain social media posts indicating potential involvement on the part of Defendants with CAA Sports and France's clients, as well as the

suggestion that it would seem incredible for a sports enthusiast such as Defendant Ochs to be able to initiate contact with a professional athlete of Golladay's stature on his own, both of which weigh in favor of denying Defendants' Rule 12(b)(6) motion. These assertions, though, do not alter the fact that the amended complaint does not contain factual allegations to support the conclusion that the named Defendants acted in concert with CAA Sports and France in order to interfere with Plaintiffs' representation of Golladay. Finding it possible that such facts could be alleged, however,[16] the Court will grant Defendants' motions to dismiss under Rule 12(b)(6) and dismiss the amended complaint without prejudice to Plaintiff's right to file a second amended complaint that clarifies whether Plaintiffs are asserting tortious interference claims as to existing or prospective contracts and that includes additional factual allegations as to the alleged concerted actions by Defendants discussed above.[17]

---

[16] "Leave to amend is properly denied if amendment would be futile, i.e., if the proposed complaint could not 'withstand a renewed motion to dismiss.'" City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp., 908 F.3d 872, 878 (3d Cir. 2018) (quoting Jablonski v. Pan Am. World Airways, Inc., 863 F.2d 289, 292 (3d Cir. 1988)). In light of the Court's conclusion regarding the sufficiency of the amended complaint herein, the Court cannot conclude at present that permitting the filing of a second amended complaint would be futile and, therefore, finds that amendment is appropriate in this case.

[17] First, it bears noting that Plaintiffs appear to assert two claims for tortious interference with existing contractual relationships. (Doc. No. 7 at 13-14.) As noted with respect to Defendants' arguments regarding subject matter jurisdiction, a key dispute in this case is whether Plaintiffs have made a sufficient showing regarding future contracts with Golladay. Here, it is unclear whether Plaintiffs intend to assert claims for tortious interference with an existing contractual relationship or a prospective contractual relationship, or, rather, for both types of contractual relationships. Accordingly, the Court will permit Plaintiffs to file a second amended complaint that addresses this distinction appropriately and clarifies Plaintiffs' positions as to the specific claims asserted.

**D.      Defendants' Request for a Stay**

In their respective motions to dismiss, Defendants also request that this Court dismiss or stay the instant case pending the resolution of Plaintiffs' NFLPA grievance against France, which was filed on July 1, 2019.[18]

**1.      Applicable Legal Standard**

"A decision to stay litigation lies within the sound discretion of the [C]ourt and represents an exercise of the [C]ourt's 'inherent power to conserve judicial resources by controlling its own docket.'" Peschke Map Techs., LLC v. J.J. Gumberg Co., 40 F. Supp. 3d 393, 395-96 (D. Del. 2014) (quoting Neste Oil OYJ v. Dynamic Fuels, LLC, No. 12-cv-1744, 2013 WL 3353984, at *1 (D. Del. July 2, 2013)).  "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." Nken v. Holder, 556 U.S. 418, 434 (2009) (citing Clinton v. Jones, 520 U.S. 681, 708 (1997); Landis v. N. Am. Co., 299 U.S. 248, 255 (1936)).  In determining whether to grant a request for a stay of proceedings, courts typically weigh the following considerations: (1) "whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party"; (2) "whether denial of the stay would create a clear case of hardship or inequity for the moving party"; (3) "whether a stay would simplify the issues and the trial of the case"; and (4) "whether discovery is complete and/or a trial date has been set."  See Akishev v. Kapustin, 23 F. Supp. 3d 440, 446 (D.N.J. 2014) (internal quotation marks and citations omitted) (compiling pertinent case law regarding factors to be considered in examining a request for a stay).  Moreover, the Court may consider additional

---

[18] A copy of the grievance has been submitted in the record in this case as an exhibit to Defendants' motion to bifurcate discovery.  (Doc. No. 29-1.)

factors unique to a given case "depending upon the circumstances for which the movant requests a stay."  See id.

### 2.    Arguments of the Parties

As previously noted, Defendants also request that this action either be dismissed or stayed pending the adjudication of any NFLPA grievance filed by Plaintiffs, which would be resolved through arbitration in accordance with NFLPA policies and procedures.  (Doc. Nos. 18 at 24, 19 at 31.)  According to Defendants, "Plaintiffs' actual claim appears to be that CAA and France, their competitors, poached Plaintiffs' former client, [Golladay], and that [Defendants] Ochs and Redland Sports somehow aided and abetted this poaching."  (Doc. No. 18 at 24.)  Defendants aver that "the actions between NFLPA registered contract advisors/agents must be brought exclusively in the forum of NFLPA arbitration" and if a case presents a dispute that is non-arbitrable, the case should be stayed "until the primary dispute between the agents [is] resolved in the proper forum."  (Id.)  Defendants state that they "do not take the position that they are required – or even allowed – to be parties to the NFLPA arbitration[,]" but assert "that the actual gravamen of this dispute is whether one agent (Plaintiffs) have a claim for wrongdoing against another agent (CAA and France) for wrongdoing arising out of Plaintiffs' SRA and 'side agreements' with [Golladay]."  (Id.)  Defendants, therefore, request that the Court stay the instant case until Plaintiffs' grievance is adjudicated.  (Id. at 26.)

Conversely, Plaintiffs state that Defendants' request for a stay is improper and, consequently, should be denied because "[w]hile Plaintiffs would need to bring claims against CAA and Todd France in the NFLPA arbitration process, there is no such agreement to arbitrate between Plaintiffs" and the defendants in this case, rendering this case non-arbitrable.  (Doc. No. 21 at 25.)  In addition, as stated by Plaintiffs, Plaintiff Bernstein's "potential claims against

France (which must be brought in arbitration) involve different elements and require different proof than [Plaintiffs'] tortious interference claims against these memorabilia dealer defendants" and, therefore, there is no risk of potentially inconsistent rulings between either dispute that would warrant granting Defendants' request for a stay.  (Id. at 27-28.)  Furthermore, Plaintiffs assert that Defendants' request should also be denied on the basis that Defendants have failed to demonstrate that the elements for a stay have been satisfied generally.  (Id. at 30.)

3.     **Whether Defendants' Request That This Action be Stayed Pending the Outcome of Plaintiffs' NFLPA Arbitration Proceeding Should be Granted**

The Court finds that Defendants have failed to meet their burden in showing that a stay of this case pending the outcome of Plaintiffs' NFLPA grievance proceedings is warranted and, consequently, will deny Defendants' request for a stay.  As noted previously, the law governing such a request requires that the Court take into consideration the following: (1) whether a stay would cause Plaintiffs, the non-movants, undue prejudice or "present a clear tactical disadvantage to" them; (2) whether denying a stay "would create a clear case of hardship or inequity for" Defendants as the moving parties; (3) whether a stay "would simplify the issues and the trial of the case"; and (4) "whether discovery is complete and/or a trial date has been set."  See Akishev, 23 F. Supp. 3d at 446 (internal quotation marks and citations omitted) (discussing relevant factors as to whether a stay of proceedings should be granted).  Weighing these factors, the Court finds that a stay of proceedings is unwarranted.  First, in light of the Court's conclusion supra regarding Defendants' Rule 12(b)(1) and 12(b)(6) arguments, the Court views a stay as prejudicing Plaintiffs and their ability to carry forward with filing a second amended complaint per this Court's discussion herein.  Second, the Court is unconvinced that denying a stay would cause Defendants to suffer "a clear case of hardship or inequity[,]"

especially in light of the fact that the NFLPA proceedings involve different Defendants and, as represented by Defendants at oral argument, are likely to be resolved in a shorter time period. Third, while there may be overlapping factual issues in the NFLPA proceedings and this case, the Court is unconvinced that staying this case would simplify the issues presently before the Court because this case includes different named Defendants who are not parties to the NFLPA proceedings and concerns independently actionable claims under Pennsylvania law. Finally, although discovery has not been completed and a trial date has not been set in this case, the Court finds that this factor is outweighed by the others discussed above. Accordingly, having weighed the applicable factors, the Court finds that Defendants have not met their burden in demonstrating that a stay of this case is proper, and, therefore, the Court will deny Defendants' motions in this regard.

### E.  Defendants' Motion to Bifurcate Discovery

While the motions to dismiss were pending, the Boone Defendants filed a motion "to bifurcate and sequence discovery" (Doc. No. 29), which the Redland Defendants joined and in which Plaintiffs do not concur.

### 1.  Applicable Legal Standard

Motions to bifurcate are governed by Federal Rule of Civil Procedure 42, which provides, in relevant part, that "[f]or convenience, to avoid prejudice, or to expedite and economize, the [C]ourt may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims." See Fed. R. Civ. P. 42(b); see also, e.g., Loreaux v. ACB Receivables Mgmt., Inc., No. 14-cv-710, 2015 WL 5032052, at *3 (D.N.J. Aug. 25, 2015) (discussing the bifurcation of discovery under Rule 42(b)). Bifurcation is disfavored in the Third Circuit. See Barr Labs., Inc. v. Abbott Labs., 978 F.2d 98, 115 (3d Cir. 1992)

(remarking on a previous decision and observing that "we condemned the district court's practice of bifurcating trials as a general rule"); Hanover 3201 Realty, LLC v. Village Supermarkets, Inc., No. 2:14-cv-1327, 2016 WL 4541870, at *2 (D.N.J. Aug. 31, 2016) ("Bifurcation is 'the exception' and 'the moving party bears the burden of demonstrating that bifurcation' is needed." (quoting Cephalon, Inc. v. Sun Pharms. Indus., Ltd., No. 11-cv-5474, 2013 WL 3417416, at *3 (D.N.J. July 8, 2013))). "[T]he moving party bears the burden of demonstrating that bifurcation would serve judicial economy, avoid inconvenience, and not prejudice any of the parties." EQT Prod. Co. v. Terra Servs., LLC, No. 14-cv-1053, 2014 WL 12838677, at *1 (W.D. Pa. Oct. 22, 2014) (omission in original) (quoting Cephalon, 2013 WL 3417416, at *3). "The decision to bifurcate, and the manner in which bifurcation should be ordered, is left to the trial court's informed discretion and must be decided on a case by case basis." Hartley-Culp v. Credit Mgmt. Co., No. 14-cv-0282, 2014 WL 4630852, at *3 (M.D. Pa. Sept. 15, 2014) (citing Idzojtic v. Pa. R.R. Co., 456 F.2d 1228, 1230 (3d Cir. 1972)).

### 2.      Arguments of the Parties

In their motion to bifurcate discovery, Defendants request an order that "limit[s] the timing and sequence of discovery to the issue of jurisdiction to avoid the unnecessary burden and expense that [D]efendants will incur if the Court soon determines that it lacks jurisdiction over" this case or the claims asserted against the Boone Defendants. (Doc. No. 29 at 14.) According to Defendants, because they have raised jurisdictional questions through their motions to dismiss, bifurcation of discovery would be appropriate because it "would promote economic use of resources" in that "if jurisdiction is lacking, the Court can dispose of [P]laintiffs' claims without further discovery or other proceedings." (Id. at 19.) Defendants further request that "[i]f following the Court's decision as to jurisdiction, any of [P]laintiffs' claims remain, discovery

should proceed first as to the parties, and then as to [Golladay] before any further third party discovery is completed." (Id. at 20.) In opposition, Plaintiffs generally argue that under the applicable legal standard and in light of relevant precedent, bifurcation of discovery is unwarranted, and the Court should deny both the motion to bifurcate, as well as Defendants' request to sequence discovery. (Doc. No. 36 at 11-17.)

### 3. Whether Defendants' Motion to Bifurcate Discovery Pending the Disposition of Defendants' Motions to Dismiss Should be Granted

As with Defendants' request for a stay, the Court similarly finds that it would be inappropriate to grant Defendants' motion to bifurcate and to sequence discovery so as to limit discovery in this case to jurisdictional issues. As a threshold matter, a request for bifurcation is not only highly discretionary and case-specific, but also generally disfavored in this Circuit. See Barr Labs., 978 F.2d at 115 ("[W]e condemned the district court's practice of bifurcating trials as a general rule."); see also Hanover 3201 Realty, LLC v. Village Supermarkets, Inc., No. 2:14-cv-1327, 2016 WL 4541870, at *2 (D.N.J. Aug. 31, 2016) (describing bifurcation as "the exception"). Here, while Defendants offer their request and proposed sequencing of discovery topics in the interest of judicial economy and to avoid burdening third-party witnesses (Doc. No. 29 at 16-17), the Court finds nothing in the record to suggest that the Court should depart from its typical discovery-related procedures and grant either of these requests. This conclusion finds further support in the fact that, pursuant to the Court's discussion as to Defendants' Rule 12(b)(1) and 12(b)(6) arguments supra, the Court has permitted the filing of a second amended complaint; because the legal sufficiency of Plaintiffs' tortious interference claims is still being litigated, the Court sees no reason either to bifurcate or order Defendants' proposed sequencing of discovery and, consequently, will deny Defendants' motion. (Doc. No. 29.)

## IV.    CONCLUSION

In consideration of the foregoing, the Court will grant the motions to dismiss (Doc. Nos. 10, 11) under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) and dismiss the amended complaint (Doc. No. 7) without prejudice to Plaintiffs' ability to file a second amended complaint consistent with the Court's discussion herein.  The Court will also deny the Boone Defendants' motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), deny Defendants' request to stay this case, and deny Defendants' motion to bifurcate discovery (Doc. No. 29).  An appropriate Order follows.