# Exhibit 3

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

 3    - - - - - - - - - - - - - - - X

 4    CLARITY SPORTS INTERNATIONAL,   :

 5    LLC and JASON BERNSTEIN,        :

 6       Plaintiffs,                  :   Case No:

 7    v.                              :   1:19-CV-00305

 8    REDLAND SPORTS, et al.,         :   (YK)

 9       Defendants.                  :

10    - - - - - - - - - - - - - - - X

11                          Remote Deposition

12                          Monday, August 16, 2021

13              Deposition via Zoom of JASON BERNSTEIN, a

14    Plaintiff herein, called for examination by counsel

15    for Defendants in the above entitled matter, pursuant

16    to notice, the witness being duly sworn by Desirae S.

17    Jura, a Notary Public in and for the State of

18    Maryland, taken at 10:30 a.m., ET, and the

19    proceedings being taken down by Desirae S. Jura, RPR,

20    and transcribed under her direction.

21

22

23

24

25
```

Jason Bernstein

1 my attorneys to answer.
2   Q.   Okay.  Your company, Clarity Sports, is
3 bringing a claim against the defendants for tortious
4 interference with contract, correct?
5   A.   Repeat that, please.
6   Q.   Your company, Clarity Sports, is bringing
7 a claim against the defendants for tortious
8 interference with contract, correct?
9   A.   Correct.
10   Q.   And the contract that Clarity Sports --
11   A.   The pleadings speak for themselves; but
12 yes, correct.
13   Q.   And the contract that Clarity Sports is
14 alleging was tortiously interfered with was the EMA,
15 or exclusive marketing agreement, between Clarity
16 Sports and Kenny Golladay, correct?
17   A.   That's one.  And the standard
18 representation agreement as well.
19   Q.   But Clarity Sports is not a party to the
20 standard representation agreement, correct?
21   A.   That's correct.  The document speaks for
22 itself on the SRA.  I believe you have a copy of the
23 standard representation agreement.
24   Q.   As a matter of fact, you should be aware,
25 as an NFLPA licensed contract adviser, that Clarity

1 Sports cannot be a party to an SRA, correct?
2   A.   Right.  I believe it's -- the document
3 speaks for itself again.  But that is correct, the
4 SRA has to be signed as an individual agent or
5 individual agents.
6   Q.   Okay.  So other than the EMA and the SRA,
7 are there any other contracts that I'm missing that
8 you allege are being tortiously interfered with?
9   A.   Again, those are the -- it's those two
10 agreements, and it is all spelled out in our claims
11 and briefs.
12   Q.   Okay.  So it's the EMA and the SRA.
13 There's no other contracts that you're claiming were
14 tortiously interfered with?
15   A.   Correct.  It's in our -- again, it's in
16 our claims and in our briefings.
17   Q.   Okay.
18   A.   Yes.
19   Q.   Now, let's talk about the acts of tortious
20 interference.  I'm still a little confused about it.
21   Is the signing event that took place on
22 January 21st, 2019 an act of tortious interference
23 with the SRA and the EMA?
24   A.   Again, I --
25   MR. COMERFORD:  It calls for a legal

1 conclusion, calls for attorney-client communications,
2 seeks attorney work product.  You can answer, though.
3   MR. CLEMENTS:  Well, he almost has to
4 answer.
5 BY MR. CLEMENTS:
6   Q.   Is that an act of tortious interference
7 that you're claiming, Mr. Bernstein, the signing
8 event itself?
9   A.   Yes.
10   Q.   Okay.  So putting aside the signing event
11 itself, are there any other acts of tortious
12 interference with the SRA and the EMA that you're
13 alleging?
14   MR. COMERFORD:  Objection.  It's vague and
15 ambiguous.  Calls for legal conclusions.  You can
16 answer.
17   THE WITNESS:  Yeah.  I mean, there's
18 nothing I'm alleging right now aside from what is in
19 our claims and briefings.
20 BY MR. CLEMENTS:
21   Q.   Okay.  But that's not the question I'm --
22 okay.  I'll just correct it, it's an endorsement and
23 marketing agreement, not an exclusive marketing
24 agreement.  So I misspoke, the EMA.
25   I'm asking, you testified -- your lawyer

1 graciously allowed you to testify that the signing
2 event is an act of tortious interference.  What else
3 besides the signing event is an act of tortious
4 interference, if anything?  Can you list them for me?
5   MR. COMERFORD:  Objection.  Vague and
6 ambiguous.  Calls for legal conclusions.  Subject to
7 that, you can answer.
8   THE WITNESS:  Yeah, I think the -- asking
9 what facts constitute tortious interference is
10 attorney-client privileged and something I've talked
11 to my attorneys about.
12 BY MR. CLEMENTS:
13   Q.   So you're not going to answer because you
14 think it's privileged?  You're not going to tell me
15 what the acts of tortious interference are?
16   MR. COMERFORD:  The same objections.
17 You're just asking the witness to tell you what his
18 attorneys are going to argue at trial.  You're not
19 asking him for facts or within his personal
20 knowledge.  Please move on.
21 BY MR. CLEMENTS:
22   Q.   I think we all understand, I'm asking you
23 facts within your personal knowledge.  And I think we
24 all understand, an attorney can make no argument at
25 trial unless it's based in evidence that's admitted

Page 54

1     MR. CLEMENTS: Except when you do it to
2  our witnesses and put your own spin on it.  This
3  indicates to me that somebody is --
4     THE COURT: All right.  Enough.  How many
5  more hours of Mr. Bernstein do we have here?
6     MR. COMERFORD: We've been going for 40
7  minutes, Your Honor, so we have -- there's four
8  minutes and 14 -- or four hours and 14 minutes left
9  and minus the 40 minutes that we've done already.
10    THE COURT: All right.  Thanks.  I'm here
11 if you need me.
12    MR. COMERFORD: Thank you, Judge.
13    MR. CLEMENTS: Thank you, Your Honor.
14    (End of telephone conference.)
15 BY MR. CLEMENTS:
16    Q.   Mr. Bernstein, keeping in mind the judge's
17 instruction and keeping in mind my instruction, I'm
18 asking only for your personal factual knowledge,
19 only.
20       Do you have any personal factual knowledge
21 of Aaron Donald being involved in any of the
22 transactions or events giving rise to or pertaining
23 to this lawsuit?
24    A.   And that question I already answered that
25 I did not have any personal knowledge.  So if you go

Page 55

1  back on the transcript, I did say I didn't have
2  personal knowledge and may or may not have been
3  involved.  But my personal knowledge is that I don't
4  know any facts that would say that he was involved.
5     Q.   Do you have any personal knowledge whether
6  Todd France made or cancelled any airline reservation
7  to Chicago to attend the signing event?
8     A.   No.  The only knowledge -- no, I don't
9  have personal knowledge aside from what has been
10 discovered.
11    Q.   Okay.  Do you have any personal knowledge
12 of whether Todd France was at the signing event?
13    A.   I answered that question as well.  I said
14 I did not have any personal knowledge as to whether
15 he was at the signing event.  He may or may not have
16 been, but I don't have any personal knowledge as to
17 whether he was.
18    Q.   I think you heard the judge as well as us.
19 I think a yes or no would probably suffice, in her
20 view, of these questions.
21       Do you have any personal knowledge of what
22 kind of vehicle picked Kenny Golladay up from the
23 airport to transport him to the signing event?
24    MR. COMERFORD: Objection.  Asked and
25 answered.

Page 56

1  BY MR. CLEMENTS:
2     Q.   In light of the judge's instructions.
3     A.   Yeah, I answered that question as well.
4  And I do not have any personal knowledge as to what
5  car Mr. France or any of the -- Mr. Golladay got
6  picked up in.
7     Q.   Do you have any personal knowledge of what
8  snacks, food, or beverages were served to Kenny
9  Golladay at the signing event?
10    A.   I don't have any personal knowledge aside
11 from what has been discovered.
12    Q.   Do you have any personal knowledge as to
13 whether Todd France exerted any control over any of
14 the memorabilia defendants to cause them to schedule
15 and participate in the signing event?
16    A.   My personal knowledge, as far as his
17 involvement or any of the defendants' involvement, I
18 believe you've asked or it's been discovered and
19 you've asked me.
20       As far as personal knowledge as to what
21 they -- I think your question is general.  But in
22 terms of a specific question as to whether I was
23 involved in conversations between Mr. France and
24 memorabilia dealers, I was not involved in any direct
25 conversations, if that's what your question is.

Page 57

1     Q.   Well, do you any personal knowledge of
2  whether Todd France ever had any communications with
3  any of the memorabilia dealer defendants regarding
4  the signing event?
5     A.   I don't have personal knowledge.  I was
6  not a part of any calls as far as direct
7  communication, and any other evidence would have been
8  discovered.
9     Q.   Do you have any personal knowledge as to
10 whether Jake Silver exerted any control or required
11 any of the memorabilia defendants to participate or
12 schedule the signing event?
13    A.   I don't have direct knowledge as far as
14 the conversations.  I wasn't a part of the
15 conversations that Jake had with the memorabilia
16 defendants, and a lot of that or any conversations
17 that took place or communications were part of the
18 discovery.  But as far as personal knowledge, I
19 wasn't a part of any of those conversations.
20    Q.   Okay.  Do you have any personal knowledge
21 as to whether anybody at CAA, other than France who
22 you answered and Silver, exerted any influence over
23 any of the memorabilia dealer defendants to schedule
24 or participate in the signing event?
25    A.   Yeah.  Again, it's been discoverable.  I

Jason Bernstein

1  don't have personal knowledge of any conversations.
2  I wasn't a part of any conversations between CAA and
3  the memorabilia dealer defendants.  But any
4  communication that they've had has been discovered.
5      Q.  Okay.  Now, keeping in mind what the judge
6  just said -- and this is where we stopped.  You
7  already testified that the signing event itself is an
8  act of tortious interference you're complaining of.
9  So put away the signing event.
10      Explain in your own words, just like the
11  judge just said, what acts of tortious interference
12  are you alleging occurred in this lawsuit that caused
13  Kenny Golladay to terminate the SRA and the EMA?
14      MR. COMERFORD:  Object to the form of the
15  question.
16  BY MR. CLEMENTS:
17      Q.  You can answer.
18      A.  Yeah.  So my initial answer is that the --
19  and you did ask me this question in the previous -- I
20  believe you asked it.  I don't know if you used the
21  same words, but you asked it in the previous
22  deposition, but -- and I answered it there.
23      So I would adopt that answer, as well as
24  -- I believe I answered it there, if I can remember
25  it correctly.  So I adopt that as well as what has

1  been, you know, claimed.  And if you want a summary,
2  I can give you a general summary, but in terms of it
3  being all inclusive, I would refer to the, you know,
4  the claims and the briefings.
5      Q.  Okay.  Well, that was your --
6      A.  If you want a summary, I'm happy to give
7  you a summary.
8      Q.  Yes.  Because the judge ordered you to do
9  it.  She just ordered on the record.  As
10  Mr. Comerford said, it was on the record.
11      Explain it in your own words.
12      A.  Well, that was part of my answer, so --
13      Q.  I get it.  I get it.  The summary was I
14  have to go back and read the pleadings and everything
15  else.  Forget about that.  You just said.  Just
16  explain it in your own words.
17      A.  Well, the reason that's part of the answer
18  is because I'm giving you summary and not an
19  all-inclusive.
20      Q.  We understand that.  Just explain it in
21  your own words.
22      A.  Okay.
23      MR. COMERFORD:  Object to the form of the
24  question.
25  BY MR. CLEMENTS:

1      Q.  Go ahead.
2      A.  In summary, a signing was set up,
3  coordinated by the memorabilia dealer defendants and
4  CAA.  And the signing, number one, was -- impinged on
5  the EMA.  Number two, it's caused Mr. Golladay to --
6  to terminate the SRA.  And, you know, it was -- the
7  signing event itself in terms of involvement has
8  been -- at least in the evidence that's been
9  discovered, has -- you know, there's -- the
10  defendants have lied about the involvement in the
11  signing or they did and -- over a period of two
12  years.  And they're still -- just from the evidence
13  that's been collected since, there's been plenty of
14  inaccuracies and untruths that we've discovered in
15  evidence that you have, that we have, that we've all
16  collected, and it caused the -- you know, that event
17  caused the termination of the SRA.
18      Also, as far as the memorabilia defendants
19  are concerned, they were given notice as far as our
20  representation of Mr. Golladay on the marketing side
21  and as well as on the contract side, the SRA side of
22  it.  And that they -- they were aware of it, they
23  still coordinated with CAA on the signing regardless
24  -- or despite knowing that.  And that's a very
25  general summary of where we're at.

1      Q.  Okay.  Now, you have --
2      A.  It's not inclusive, but a general summary.
3      Q.  You have no personal firsthand knowledge
4  of anything that happened at the signing event,
5  correct?
6      A.  At the actual event, I was not there, so I
7  don't have personal knowledge.
8      Q.  Okay.  Now, you just told me that the
9  signing event caused Kenny Golladay to terminate the
10  SRA and the EMA.
11      So what facts do you have personal
12  knowledge of that the signing event was the cause of
13  Kenny Golladay to terminate the SRA and the EMA?
14      MR. COMERFORD:  Object to the form.
15  BY MR. CLEMENTS:
16      Q.  You can answer.
17      A.  Yeah.  Well, the timing of it certainly is
18  part of it.  The fact that one of the witnesses that
19  you've called or -- called at the arbitration
20  basically explained the timeline of it in terms of
21  when Mr. Golladay made a decision.
22      You have the fact that the defendants have
23  lied about the signing event for now two-and-a-half
24  years.  Or I don't know the exact timetable, but more
25  than two years at this point.  And, you know,

Page 66

1 which you are permitted to ask him per Judge Schwab's
2 order --
3         MR. CLEMENTS:  Okay.
4         MR. COMERFORD:  May I please finish?
5 BY MR. CLEMENTS:
6     Q.   Mr. Bernstein, what personal firsthand
7 knowledge do you have in your possession that
8 Mr. Golladay terminated his SRA and EMA as a result
9 of the signing event?
10    A.   I just -- I believe I answered part of
11 that as to why it caused him to terminate, along
12 with, you know, all the -- all the discoverable
13 evidence that we've collected and all the text
14 messages that you have in your possession between,
15 you know, Mr. Golladay and, you know, myself and
16 Emily Ries and everything that we've presented.
17        My personal knowledge, as far as talking
18 to Kenny, I think you -- I've detailed in length in
19 the last deposition.  I'm happy to answer any
20 questions that you have about my conversations with
21 Kenny, but I think it all goes towards causation and
22 what caused him to terminate as far as the signing is
23 concerned.
24    Q.   And your conversation with Mr. Golladay
25 was when you asked him why he terminated?

Page 67

1     A.   Yeah, my personal knowledge.
2     Q.   You said resources.
3     A.   My personal conversation with Kenny?
4     Q.   Yes.
5     A.   That's the conversation that I had with
6 him, is what's been detailed on the record already.
7     Q.   And is that your answer?
8     A.   Not even asking why, why did you.
9     Q.   Yes, and he --
10    A.   Why it happened.
11    Q.   And he said resources, right?
12    A.   That's correct.
13    Q.   He didn't give you any other explanation?
14    A.   That's correct.  I believe you asked that
15 question, too.  All right.  But, yes.
16        MR. COMERFORD:  We've been here for about
17 two hours, so I would like to take a short break.
18        MR. CLEMENTS:  Just one more question.
19        MR. COMERFORD:  No, we'll take a break
20 now.  Thank you.  You can ask the question when we
21 get back.
22        MR. IACONELLI:  I'll remind you on the
23 record, I'll remind you, Mr. Comerford, that in this
24 district, conferences among counsel and witnesses
25 during a deposition are not permitted.  Mr. Clements

Page 68

1 wanted to ask a question.  You're insisting on taking
2 a break now.  So I'll remind you that there is not to
3 be any communications between yourself and the
4 witness during breaks until the witness is passed.
5        We can go off the record now at 12:01.
6        MR. COMERFORD:  There's no reason to give
7 that instruction because there nothing has happened
8 that would cause you to give it.  Thank you.
9        (Recess.)
10 BY MR. CLEMENTS:
11    Q.   I think there's evidence in the record
12 that --
13        MR. COMERFORD:  Hang on.  Let's note the
14 time on the record.  The court reporter needs to note
15 the time on the record.
16        THE COURT REPORTER:  We are back on the
17 record at 12:11.
18 BY MR. CLEMENTS:
19    Q.   I think there was evidence in the record
20 that prior to going to the signing event,
21 Mr. Golladay received a check for $7,750, and I
22 believe it was made out by MVP to Golladay.
23        Do you have any personal knowledge, as you
24 sit here today, that Mr. Golladay received any
25 compensation in excess of that for attending this

Page 69

1 signing event?
2     A.   No personal knowledge, aside from what has
3 been discovered as evidence.
4     Q.   Well, has any evidence come in that he
5 received anything other than $7,750?
6        MR. COMERFORD:  Objection.  This seeks to
7 invade the attorney-client privilege and asks for
8 attorney-client communications and attorney work
9 product.  It goes beyond asking him for his personal
10 firsthand knowledge of facts, which is what the judge
11 has instructed you're permitted to do, so I instruct
12 him not to answer.
13 BY MR. CLEMENTS:
14    Q.   Okay.  Based on your experience as an NFL
15 agent and also the owner of a marketing company for
16 athletes, have you ever heard of a player firing his
17 agent and hiring a new agent just because he received
18 $7,750 at a signing event?
19        MR. COMERFORD:  Object to the form of the
20 question.
21        THE WITNESS:  Yeah, I don't know why --
22 why clients fire agents, especially those that I
23 don't represent.  So I can't give you personal
24 knowledge as to reasons why other clients fire
25 agents.

Page 70

BY MR. CLEMENTS:

1  Q.   Now, how long have you known Kenny
2  Golladay?  How many years?
3  A.   Since his senior year of college.  So
4  whatever that is.  Might have been 2015 to 2016,
5  whatever that year was.
6  Q.   And in your experience with knowing Kenny
7  Golladay, you believe that because he got $7,750 at
8  an autograph signing event, that he decided to fire
9  you and hire somebody else?
10  A.   That -- I think that question -- it
11  disregards all of the other evidence that's been
12  collected in discovery and -- but I do believe it was
13  a reason, the signing was a reason, yes.
14  Q.   Any other reasons that you have personal
15  knowledge or belief of other than the $7,750 check?
16  A.   I think that mischaracterizes the
17  question, but -- or mischaracterizes what I said.
18  But, yes, the -- I don't have personal knowledge of
19  other reasons aside from what's been put into
20  evidence.
21  Q.   Okay.  Have you ever heard of any player
22  firing their agents because of a single autograph
23  signing event?
24  A.   Again, I think you already asked that

Page 71

1  question.  There's numerous reasons why.  Not that
2  I'm privy to any of the reasons other agents have
3  been fired, but certainly, you know, just in general
4  I think -- I mean, I think there's multiple reasons
5  why -- why clients fire agents.
6  And inducements, that's one -- that's why
7  there's a rule, you know, the NFL-PA regs for
8  inducements because I'm sure it happened in the past.
9  I'm not -- I don't have personal knowledge of why
10  other clients have fired agents.
11  Q.   How difficult would it have been for
12  Clarity Sports to arrange a memorabilia signing event
13  for Kenny Golladay where he would have been paid
14  $7,750?
15  A.   How difficult?
16  Q.   Yes.
17  A.   I don't think they announced his --
18  something that makes it difficult versus not
19  necessarily.  I think signings get arranged.  We
20  arrange signings for them.  I don't -- I think it's
21  kind of a hypothetical, how difficult would it be
22  because I don't know.  We didn't arrange it.
23  Q.   But you've arranged events, marketing
24  events, for Mr. Golladay in the past where he's made
25  more than $7,750, correct?

Page 72

1  A.   I would have to look at the invoices, but
2  I believe -- I believe so.  But I'd have to look to
3  be sure.
4  Q.   I guess I'm just trying to get a feel for,
5  like, how extraordinary is it for someone to have an
6  athlete show up, sign some 600 pieces of memorabilia,
7  and then take a check?  Is that something that
8  requires extraordinary effort or that would impress a
9  professional athlete?
10  A.   I think it certainly -- it certainly can
11  impress a player or -- I mean, you're exemplifying
12  that you can do something.  Regardless of whether
13  it's easy or not to put together, you're putting
14  together a signing to show them -- to show a player
15  that this is what I can offer, this is what I can do
16  for you.
17  So I don't think the amount, again, has
18  anything to do with whether -- you know, whether it
19  influences them.  I'm sure it could, but it's really
20  the act of setting up a -- you know, an event that
21  influences players in general.
22  Q.   Okay.
23  A.   Or could influence a player, you know, in
24  general.
25  Q.   Well, you know Mr. Golladay perhaps better

Page 73

1  than any of us.  Do you think he would be impressed
2  with a $7,750 check to the point that he would want
3  to switch agents?
4  MR. COMERFORD:  Object to the form of the
5  question.
6  THE WITNESS:  Again, it's the act of
7  setting up the signing I think more than -- well, it
8  could be both, but it's more the act of showing that,
9  you know, whether you have resources or showing what
10  you can do.  That's what it -- that's what -- that's
11  what can certainly cause a player to switch, yes.
12  BY MR. CLEMENTS:
13  Q.   And you're not accusing --
14  A.   At least be -- at least be a reason.
15  Q.   And you're not accusing Mr. Golladay of
16  doing anything wrong for deciding to change agents,
17  correct?
18  MR. COMERFORD:  Objection.  Asked and
19  answered.
20  THE WITNESS:  Yeah, I believe you asked
21  that.  What he did that was improper was -- or at
22  least one of the things -- was the setting up a
23  signing without running it by us, without vetting it,
24  certainly, you know, impinges on the EMA.  And
25  anything else that he did that we believe was

Page 74

1 improper, I've talked to my attorneys about it,
2 that's -- to me, that's privileged.
3 BY MR. CLEMENTS:
4   Q.   Okay.  But it's true that you never
5 brought any claim for breach of any agreement against
6 Mr. Golladay?
7   A.   We have not brought any claims for breach
8 of an agreement against Mr. Golladay, no.
9   Q.   And you haven't commenced an NFL
10 arbitration against him for terminating the SRA,
11 right?
12   A.   That's correct.
13   Q.   And everything that Mr. Golladay owes you,
14 you said in your discovery responses, you've been
15 paid, right?
16   A.   As far as I know, yes.
17   Q.   As you sit here today, do you have any
18 facts in your personal possession that any of the
19 defendants, so to speak, badmouthed you or criticized
20 you to Mr. Golladay?
21   A.   Not from personal knowledge.  I wasn't a
22 part of any conversations.
23   Q.   And the same --
24   A.   As far as any other.
25   Q.   The same question for Clarity Sports.  Do

Page 75

1 you have any information that any of the defendants
2 badmouthed you or unfairly criticized Clarity Sports?
3   A.   Not personal knowledge.  Just whatever is
4 in the record is what's in the record.
5   Q.   Okay.
6       MR. CLEMENTS:  Lauren, could you put up --
7 I believe this will be Exhibit 3.  It's Plaintiff
8 Jason Bernstein's Objections and Responses to Second
9 Set of Requests For Admissions from Defendant Boone
10 Enterprises, Inc.
11       (Bernstein Exhibit No. 3 was
12       identified for the record.)
13       MR. CLEMENTS:  Go to 10 and 11.  It's on
14 page 5.
15 BY MR. CLEMENTS:
16   Q.   Mr. Bernstein, you answered these requests
17 for admissions, correct?
18   A.   Yes.  This was -- I did answer.  My
19 attorneys filed this on my behalf.
20   Q.   Okay.  And I'm looking at request for
21 admission 10.  And it says: "To the extent that
22 Jason Bernstein had any direct communications with
23 any of the defendants in this lawsuit, in any way or
24 by any means, and prior to the completion of the
25 Signing Event, such communications were solely with

Page 76

1 Gerry Ochs of Redland Sports."
2       And then the answer is:  "Deny."
3       And that is the same question, except for
4 Clarity, 11:  "To the extent that Clarity had any
5 direct communications with any of the defendants in
6 this lawsuit, in any way or by any means, and prior
7 to the completion of the Signing Event, such
8 communications were solely with Gerry Ochs of Redland
9 Sports."
10       And we've combed the record, and so far
11 the only communications that were testified about by
12 anybody -- and that would include you, Ms. Ries, the
13 memorabilia defendants -- were Ms. Ries'
14 communications with Gerry Ochs of Redland Sports and
15 your communications with Gerry Ochs of Redland
16 Sports.
17       But by denying it, are you saying that you
18 communicated with somebody other than Gerry Ochs, or
19 can you explain the factual basis for your denial of
20 these two requests for admissions?
21   A.   Sure.  Yeah, I have communicated in the
22 past with -- with employees at CAA.  So I don't know
23 if that's what you're asking, but I have communicated
24 with people there.  So --
25   Q.   Okay.  So what you're saying is that

Page 77

1 you've communicated with -- well, then let's go
2 through this.
3       Have you ever communicated with Boone
4 Enterprises or Craig Boone?
5   A.   Not directly.
6   Q.   Okay.  What do you mean by "not directly"?
7   A.   Yeah.  I mean, I haven't had any --
8 besides what's happened in this case, I have not
9 communicated with them.
10   Q.   Okay.  But you've never --
11   A.   Communications.
12   Q.   You've never directly spoken or
13 communicated with Boone Enterprises or Craig Boone?
14   A.   Right.  Because you asked, whether --
15   Q.   Okay.
16   A.   That's why I said, I've never had any
17 direct communications with them.
18   Q.   How about the same question, MVP Sports,
19 Daryl Eisenhour, and Jason Smith?
20   A.   I have not had direct communications.  I
21 mean, aside from what's -- obviously, what's been put
22 into evidence and discovery, I have not had personal
23 direct communications with them.
24   Q.   And would the answer be the same for
25 Clarity Sports with respect to Boone, Boone

---

Page 78

1  Enterprises, MVP, Eisenhour, and Smith?
2      A.   Yes.
3      Q.   Okay.  So, Gerry Ochs.  The only time that
4  either you or Clarity communicated with Gerry Ochs
5  was what's been put into evidence in this case, the
6  communications in the beginning of January 2019,
7  correct?
8      A.   Yeah.  As far as this case is concerned,
9  those are my communications.
10      Q.   Nothing --
11      A.   As far as Emily Ries communicated with
12  them as well.
13      Q.   But nothing before or after that, right?
14      A.   That's correct.
15      Q.   Okay.  And so you're saying that you may
16  have communicated with CAA prior to the signing
17  event.
18          Now, did any of those communications
19  between you, as Jason Bernstein, and anybody at CAA
20  prior to the signing event have anything to do with
21  the signing event?
22      A.   No.
23      Q.   Would the answer --
24      A.   Besides my communications with Gerry Ochs,
25  no.

---

Page 79

1      Q.   Okay.  But that was with Gerry Ochs.  I'm
2  not asking about that.
3      A.   That's correct.
4      Q.   I'm asking about CAA.  You understand
5  that, right?
6      A.   Yes.
7      Q.   Okay.  Would the answer be the same, if
8  Clarity had any communications prior to the signing
9  event with CAA?  They didn't have anything to do with
10  the signing event?
11      A.   That's correct.
12      Q.   What circumstances would you be talking or
13  Clarity -- well, let's go to you.
14          What circumstances would you have
15  discussions with anybody from CAA about?
16      A.   I mean, just -- just passing them at an
17  event, passing any of the employees that I know at
18  events or -- I mean, those events where all the
19  agents are at that, you know, everybody communicates
20  or talks, or a lot of people communicate or talk with
21  each other.
22      Q.   Okay.  And --
23      A.   Nothing -- not -- I wouldn't say anything
24  specific.
25      Q.   The same for Clarity?

---

Page 80

1      A.   Yes.
2      Q.   So nothing to do with this lawsuit?
3      A.   Correct.
4      Q.   Okay.
5          MR. CLEMENTS:  You can put that aside,
6  Lauren, and call up -- I believe the next one, we'll
7  mark that as, I think, Bernstein 3.
8          The next document we'll mark as Bernstein
9  4 is the first set of Jason Bernstein's Objections
10  and Responses to First Set of Requests for Admissions
11  From Defendant CAA Sports.
12              (Bernstein Exhibit No. 4 was
13              identified for the record.)
14          MR. CLEMENTS:  I have just a couple
15  questions about this.
16          Could you put up number 1 on page 3.
17  BY MR. CLEMENTS:
18      Q.   You answered these requests for
19  admissions, right?
20      A.   Yes.  Through my attorneys, yes.
21      Q.   And number 1 just says:  "The SRA is
22  terminable at will by an NFL player for any reason
23  (or no reason at all)."
24          But as you sit here today -- and you're an
25  experienced NFL agent -- you don't know that the SRA

---

Page 81

1  is terminable at will without --
2      A.   I think the answer is that it speaks for
3  itself, that all the -- the rules are all written
4  onto the representation agreement.
5      Q.   Okay.
6      A.   I think you have a copy of it.
7      Q.   But you're saying that's not common
8  knowledge among NFL agents and athletes, that the
9  union -- that standard representation agreement, the
10  union allows it to be terminated by either the agent
11  or the player for any reason or no reason at all?
12          MR. COMERFORD:  Objection.  Asked and
13  answered.
14          THE WITNESS:  The same answer.
15          MR. CLEMENTS:  Can you go to 12.  The same
16  document, Lauren, but number 12.
17  BY MR. CLEMENTS:
18      Q.   And in this one, it asks:  "In
19  communications prior to the completion of the Signing
20  Event from either Clarity or Jason Bernstein to any
21  of the defendants in this lawsuit (including, but not
22  limited, to Gerry Ochs), the specific word/term 'SRA'
23  or 'Standard Representation Agreement' was not
24  mentioned at all."
25          And then there's, like, objections, but it

---

Page 86

1 the Signing Event."
2        And you said: "Deny."
3        What's the factual basis for your denial?
4    A.   I believe we just -- we just answered that
5 question as to why.  I mean, you asked me that, and I
6 gave you a summary as to why -- you know, as to why
7 the decision wasn't made until after.
8        And from a technical standpoint, the
9 termination doesn't occur until after the
10 representation agreement is terminated, and that
11 happened after the signing event.  So that's from a
12 technical standpoint.  But I gave you all the reasons
13 why -- or at least a summary, if not all the reasons,
14 but a summary as to why --
15    Q.   Okay.
16    A.   -- the event was a factor in the
17 termination and was a cause in the termination.
18    Q.   And on 16, it's: "Kenny Golladay's choice
19 to terminate his contractual relationship with
20 Clarity was made prior to the Signing Event."
21        You say: "Deny."
22        Is your answer the same, or do you have
23 some different reason?
24    A.   Yeah, it's the same.
25    Q.   Okay.

Page 87

1        MR. CLEMENTS:  Scroll down to 17 a little.
2 BY MR. CLEMENTS:
3    Q.   Seventeen.  "The Signing Event did not
4 influence Kenny Golladay's choice to terminate his
5 contractual relationship with Jason Bernstein."
6        What's the factual basis for your denial
7 of that?
8    A.   The same answer.
9    Q.   And 18: "The Signing Event did not
10 influence Kenny Golladay's choice to terminate his
11 contractual relationship with Clarity."
12        You denied that.  Is it the same answer?
13    A.   Yeah, the same answer, and everything in
14 the pleadings.
15    Q.   Okay.
16        MR. CLEMENTS:  Lauren, we're done with
17 that.  I think that was Bernstein 4.  Let's mark this
18 Bernstein 5, Objections and Responses to First Set of
19 Requests for Admissions from Defendant MVP
20 Authentics.
21        (Bernstein Exhibit No. 5 was
22        identified for the record.)
23 BY MR. CLEMENTS:
24    Q.   Okay.  Mr. Bernstein, you answered these
25 requests for admissions, correct?

Page 88

1    A.   Yes, from my attorneys.
2        MR. CLEMENTS:  Lauren, could you go down
3 to number 3.  It's on page 3.
4 BY MR. CLEMENTS:
5    Q.   And the request said: "Jason Bernstein is
6 a principal and owner of, and primary decision-maker
7 for, Clarity Sports International, LLC ('Clarity')."
8        "Bernstein objects to this Request because
9 the term 'primary decision-maker' is vague and
10 ambiguous.  Subject to and without waiver of his
11 objections, admit that Bernstein is principal and
12 owner of Clarity, and makes decisions on Clarity's
13 behalf."
14        So my only question is, who else makes
15 decisions on Clarity's behalf other than you?
16    A.   Well, I make decisions.  But I'm sure
17 those decisions made, you know, just in general and
18 everyday business, that someone can decide to -- you
19 know, Emily can decide to reach out and call a client
20 if she wants or text a client if she wants or reach
21 out to a company, you know, without me necessarily
22 being involved every single time with every single
23 communication that she has with any person or
24 company.  It's just a -- you know, in terms of, for
25 Clarity, I think it's --

Page 89

1    Q.   Okay.
2    A.   Like it says in the response.
3    Q.   My understanding is Emily Ries is an
4 independent contractor.  She's not an owner of
5 Clarity.  She's not an actual employee of Clarity.
6    A.   Correct.
7    Q.   So are there any actual employees of
8 Clarity, other than you, that make any decisions for
9 Clarity?
10    A.   I would -- there are no other employees,
11 no.  There are independent contractors.
12    Q.   Are there any other owners of Clarity or
13 members of Clarity -- it's an LLC, but the same
14 difference -- that make decisions for Clarity other
15 than you?
16    A.   There's one other owner.  But in terms of,
17 like, day-to-day decisions, no.  I mean, I guess it
18 depends on what -- I don't have any specific
19 examples, but technically any decision that is made,
20 the other owner could make it.  But day-to-day, it's
21 just me.
22    Q.   Is that other owner Bruce Bernstein, your
23 father?
24    A.   Yes.
25    Q.   Okay.  As far as independent contractors,

Page 114

1  the guaranteed money that's -- that has been
2  negotiated, yes.
3      Q.   Can they cut --
4      A.   And it becomes -- it becomes a lot harder
5  or it becomes almost impossible in some cases -- I
6  wouldn't say 100 percent impossible, but pretty close
7  to that -- to cut a player when they owe them a
8  certain amount of guaranteed cash and when there's a
9  pretty sizeable cash hit from releasing the player
10  early before the end of the contract.
11      Q.   But it has happened?
12      A.   I'm not sure it's happened in certain
13  cases with guarantees like that.  I mean, maybe once
14  or twice that I can remember in 18 years.  Even that,
15  I don't remember any specific cases where --
16      Q.   And even if there is guaranteed money
17  left, they could cut him if they want.
18      A.   Yeah.  They'd still have to pay him, but
19  yes.
20      Q.   Okay.  And if the portion of money that's
21  not guaranteed, if they cut him, Golladay's not going
22  to get paid, right?
23      A.   It depends.  Yeah.  Well, they still have
24  to -- I mean, some contracts are structured where you
25  earn guarantee, might be a partial guarantee in a

Page 115

1  certain year.  That makes it hard for a team to
2  release a player even if the rest of that year is not
3  guaranteed, because they're still giving up the cash
4  and the cap hit.  So those are the protections that
5  the player has that make it pretty hard.
6          And even if a team -- you know, there's
7  other protections like injury protection.  If a
8  future year is not guaranteed and a player gets cut,
9  they can get up to a certain amount of money
10  depending on what their salary is under the CBA,
11  which is, you know, technically considered a
12  negotiated amount and -- but it's, you know, an
13  injury protection provision of the CBA that allows
14  players to get injury guarantees even if the player
15  is cut and doesn't have a future guarantee written
16  into the contract.
17      Q.   And even with that, it could be affected
18  if the player is unable to perform, depending on what
19  the default language of the contract is, with respect
20  to an injury settlement?
21      A.   No.  Well, I think it's more -- the
22  default language is more towards if something that
23  happens off the field, if a player is arrested or
24  something like that or does something outside of
25  the -- outside of a football activity.  That's where

Page 116

1  default language typically applies.  But anything
2  on-field, the player is going to be covered for
3  injury and any future injury guaranteed or under any
4  protection they have.
5      Q.   We can agree that if a player is cut,
6  there is going to be a portion of the money that he
7  might have otherwise been due under that contract had
8  he played his contract out that he's not going to get
9  paid if he gets cut.
10          MR. COMERFORD:  Form.
11          THE WITNESS:  Yeah.  There could be.  I
12  mean, you're speaking pretty generally.  I think
13  there's different scenarios, but yes.  If there's a
14  non-guaranteed portion and a player gets cut, you
15  know, bar -- aside from injury protection and aside
16  from injury guarantees and some of the other
17  protection to put an insurance policy in place for
18  the player, there's a non-guaranteed future and
19  there's a portion that the player might not earn.
20  BY MR. CLEMENTS:
21      Q.   And under an SRA, if the player doesn't
22  get paid by his team, the agent doesn't get paid by
23  his team.  Because the standard compensation for an
24  agent under the SRA is a percentage of what the
25  player gets paid from his team, right?

Page 117

1      A.   Yeah.  The SRA speaks for itself on the
2  terms of the document.
3      Q.   But you should know this, right?  It's how
4  you get paid.  It's not 3 percent of what the guy's
5  contract says.  It's 3 percent of what the guy
6  actually gets paid, right, the player?
7      A.   That's correct.
8      Q.   Okay.
9      A.   Of the negotiated amounts, not the total
10  payment.  Players get bonuses that are part of the
11  CBA that are not negotiated amounts.
12      Q.   But it's the portion of the compensation
13  that a team pays to the player that you capture, you
14  get your 3 percent commission on.  It's not that you
15  get it all up front just because the guy signed an
16  $80 million contract.
17      A.   That's correct.  You get paid as the
18  player gets paid from his -- from the negotiated
19  amounts in his contract.  That's how agents collect
20  their fees.
21      Q.   So as a matter of fact, the rookie deal
22  you got from Mr. Golladay was four years.  You got
23  paid over the four years after Mr. Golladay got paid,
24  and then you'd invoice him or he would remit to you
25  whatever the percentage was, right?

Jason Bernstein

Page 130

1  correct?
2      A.   Yeah.
3      Q.   Not anywhere else.  It's in the SRA?
4          MR. COMERFORD:  Object to form.
5          THE WITNESS:  And the agent's right to
6  terminate the player, yes.
7  BY MR. CLEMENTS:
8      Q.   Also in the SRA?
9      A.   It's all spelled out.
10     Q.   So you don't dispute that the SRA with you
11 and Kenny Golladay was terminable by either of you
12 for any reason or no reason, right?
13         MR. COMERFORD:  Object to the form.  Asked
14 and answered.
15         THE WITNESS:  The same answer.
16 BY MR. CLEMENTS:
17     Q.   And the SRA also contains precise language
18 addressing how agents are compensated, correct?
19     A.   It does.  You could elect what -- how the
20 player and the agent elects or negotiate what the
21 fees are.  There's no set fee.
22     Q.   And it's anywhere from zero -- which I'm
23 sure nobody does -- up to a maximum of 3 percent of
24 what the players gets paid, right?
25     A.   Yes.  Under the SRA, that's correct.

Page 131

1      Q.   And that's all spelled out in the SRA
2  itself, not any other source?
3      A.   That's correct.
4          MR. CLEMENTS:  Can you put the SRA back
5  up, Lauren.  Go to paragraph 4.
6  BY MR. CLEMENTS:
7      Q.   Do you see, "Compensation for Services"?
8  You see that it says, "If a Contract Advisor succeeds
9  in negotiating an NFL Player Contract acceptable to
10 Player and signed by Player during the term hereof,
11 Contract Advisor shall receive a fee as set forth in
12 subparagraph B below.  Contract advisor and player
13 agree and acknowledge that the amount of such fee is
14 freely negotiable between them, except that no agreed
15 upon fee may be greater than," and then it has the 3
16 percent.
17         So you'll agree with me, that's the clause
18 that governs the compensation?
19     A.   Yes, that is the clause that governs the
20 compensation.
21     Q.   And you'll agree with me you successfully
22 negotiated a rookie contract for Mr. Golladay, right?
23     A.   Sorry, can you repeat the question?
24     Q.   You'll agree that you successfully
25 negotiated a rookie contract for Mr. Golladay?

Page 132

1      A.   I negotiated a contract.  I don't know in
2  terms of successful.
3      Q.   Okay.  And it was acceptable.  That rookie
4  contract that you negotiated was acceptable to
5  Mr. Golladay, correct?
6      A.   Yes.  He signed the contract.
7      Q.   And you were paid everything you were due
8  under that contract with the Lions?
9      A.   Yes.
10     Q.   And you'll agree with me that you did not
11 negotiate Mr. Golladay's current contract with the
12 New York Giants?
13     A.   I did not -- under the rules, we are not
14 able to negotiate if we're not the agent on record,
15 that's correct.
16         MR. CLEMENTS:  Okay.  We're going to go
17 off the record briefly, like five minutes or so.
18         (Recess.)
19 BY MR. CLEMENTS:
20     Q.   Mr. Bernstein, do all NFL players keep the
21 same agent they signed with at any point in time
22 during their career for the entire duration of their
23 playing careers?
24         MR. COMERFORD:  Object to the form.
25         THE WITNESS:  Yes.  You say do any?  Yes.

Page 133

1  BY MR. CLEMENTS:
2      Q.   I said every NFL player keeps -- your
3  answer is yes?
4      A.   Not every NFL player.  But I thought you
5  said any.
6      Q.   No, I said do all NFL players keep the
7  same agent throughout their entire playing careers?
8          MR. COMERFORD:  Form.
9          THE WITNESS:  No.
10 BY MR. CLEMENTS:
11     Q.   Based on your firsthand knowledge, are you
12 the only NFL agent who has ever been fired by an NFL
13 football player?
14         MR. COMERFORD:  Form.
15         THE WITNESS:  Yeah, I don't -- I'm not
16 privy to terminations.  You can read things.  And,
17 you know, from what I've read, there's been other
18 terminations, but I don't get the emails when a
19 player terminates another agent.
20 BY MR. CLEMENTS:
21     Q.   That isn't a professional curiosity to
22 you, because it means that a player might be looking
23 for an agent?
24     A.   Yeah.  I've never been curious about that.
25 I think the NFLPA may have a list -- I think they do

Page 134

1 have an active list of players who terminate on the
2 site.  But it's not something that I look at to try
3 to recruit other players, no.
4     Q.   But you have heard of it happening?
5     A.   Say that again.
6     Q.   You have heard of it happening?
7     A.   Where players terminate --
8     Q.   Yes.
9     A.   -- agents?  Yes.
10     Q.   Have you ever signed an SRA with an NFL
11 player who had previously terminated an SRA with
12 another agent?
13     A.   Not an active player.  I think one or two
14 that were inactive and out of the league and -- or
15 hadn't signed a contract or were just out there and I
16 don't think they ever played again.  You know, none
17 that were actively on either contracts or you, know,
18 new free agent players that just finished their
19 previous contract.
20     Q.   And they terminated their agent and then
21 hired you as their new agent?
22     A.   Either -- maybe one did.  By the time they
23 talked to me, they had already terminated an agent
24 and they were inactive, you know, in terms of being
25 on a team.  I think when -- I think when I met --

Page 135

1 yeah.  I think when I met Villanueva, I think he
2 wasn't active and he didn't have an agent, so --
3     Q.   Okay.  Have you ever been informed by a
4 predecessor agent that you were in violation of any
5 regulation because you entered into an SRA with a
6 player?
7          MR. COMERFORD:  Form.
8          THE WITNESS:  No, I've never been.
9 BY MR. CLEMENTS:
10     Q.   So you've never been accused of poaching a
11 player by another NFL agent?
12     A.   Been accused of poaching a player?  No.
13     Q.   Ever informed by the NFLPA that you were
14 in violation of any regulation because you entered
15 into an SRA with a player who had formerly had an
16 agent and terminated that agent?
17     A.   No.  Like I said, there's only been one or
18 two that they were inactive.  And whether they were
19 still signed with an agent, I don't even know.  When
20 they -- I don't think they were.  I don't think
21 that -- and I've never been accused, no.
22     Q.   Okay.
23     A.   I've never signed an active player from
24 another agent.
25     Q.   It's not your contention in this lawsuit

Page 136

1 that you have some contractual right to represent a
2 player who you signed, like Golladay, for his entire
3 playing career, right?
4     A.   Can you repeat the question?
5     Q.   It's not your contention in this lawsuit
6 that you have a contracted-for right, or even a
7 reasonable expectation, that you're going to
8 represent a player like Golladay, who you entered
9 into an SRA with, for the entirety of their playing
10 career, is it?
11     A.   I think the claim speaks for itself as far
12 as what we're claiming here.
13     Q.   But you understand that the player can
14 terminate at any time for any reason?
15     A.   You asked that question.  It's spelled out
16 in the representation agreement -- in the SRA.
17     Q.   I'm just asking you, because it seems like
18 you've accounted for in this claim that you're going
19 to represent the guy -- you would have represented
20 him with this contract with the Giants and then you
21 would have represented him for the contract after the
22 Giants.
23          Is that how you account for when you get
24 these players?  Are you booking that as revenue --
25          MR. COMERFORD:  Form.

Page 137

1 BY MR. CLEMENTS:
2     Q.   -- that you'll represent somebody for 20
3 years?
4     A.   If something improper happens -- yes, you
5 assume you're going to represent the player, that
6 they're not going to terminate, you know, and
7 something improper happens, then you no longer are.
8 But yes, if you look at the vast majority of my
9 clients, I've represented them for all the multiple
10 contracts they've done after their rookie deal and
11 still represent them today even though they're not
12 playing.  So -- and that's the vast majority, so --
13     Q.   But you're not attempting to force
14 Mr. Golladay to use you as his agent right now?
15     A.   No.  The issue here is something improper
16 happened with another -- you know, with parties that
17 caused the relationship to -- caused him to terminate
18 this relationship.
19     Q.   Okay.  Did Mr. Golladay ever communicate
20 to you that you were going to be his agent for the
21 rest of his playing career?
22     A.   I am not sure if he ever said that or not.
23 Not that I can recall.
24     Q.   Did Mr. Golladay ever represent to you or
25 communicate to you that he would never terminate you

Jason Bernstein

Page 138

1 as his agent?

2     A.   No, not until he terminated.

3     Q.   Was there -- think back to calendar year

4 2018, and I believe we examined this from the

5 summer -- I think we examined this from the summer of

6 2018, and then you may have testified that you got a

7 call from Bob Quinn, the general manager of the

8 Detroit Lions, that Mr. Golladay might be looking for

9 other agents.  But was there any time in 2018 where

10 you thought that your SRA with Mr. Golladay was in

11 jeopardy?

12     A.   There was no -- there was no time -- I

13 think you mischaracterized the facts in your

14 question.  Mr. Quinn never asked me or said to me

15 that he was looking to switch agents.

16     Q.   Well, what did Mr. Quinn say to you

17 exactly?

18     A.   He said that there were an agent or agents

19 that were approaching Kenny.

20     Q.   Okay.  And did that cause you to believe

21 that your relationship with Mr. Golladay was in

22 jeopardy?

23     A.   No.  That -- I talked to Kenny, I talked

24 to -- and then right after that I was texting or

25 talking with Mr. Saffold, and neither -- and Kenny

Page 139

1 said that I'm not -- there's nothing to worry about,

2 I don't even look at other agents who approach me.

3         Mr. Saffold said that everything's all --

4 I think it's all documented in text messages.  You

5 can read it yourself.  And there was no -- and then

6 it was business as usual for the next

7 month-and-a-half or until January 22nd or whenever

8 Kenny called me, I think that's the date, to

9 terminate.

10         There was regular communication on text

11 messages, on the phone with him, with Kenny, with his

12 mother, with Mr. Saffold.  So it was really business

13 as usual until he terminated, so I didn't think

14 anything of the call from Mr. Quinn.

15         Sometimes -- there's been times where

16 general managers, just in general -- not necessarily

17 with me, but just in talking with other agents over

18 the years where they try to drive a wedge between

19 clients.  So I thought maybe that was it when he

20 called, that he was trying to, you know, posture as

21 far as negotiation's concerned.  That was my initial

22 thought.  My initial thought after talking to Kenny

23 and Mr. Saffold was not that he thought about

24 terminating.

25     Q.   So stepping back a little bit.  You'll

Page 140

1 agree with me that under the NFL regulations, that a

2 player can contact an agent while he's represented

3 under an SRA by another agent, right?

4         MR. COMERFORD:  Object to the form.

5         THE WITNESS:  I think the regulations

6 spell it out pretty clearly.

7 BY MR. CLEMENTS:

8     Q.   What do they spell out?  Because shouldn't

9 you know that?  Isn't that your bible?

10     A.   Well, you're asking about the initiating

11 contact.

12     Q.   Yes.

13     A.   So if you want to put it in front of me,

14 we can read it together.

15     Q.   Well, let me just ask you a question,

16 because I find it somewhat astounding that you

17 wouldn't know this.  It's basic blocking and

18 tackling.

19     A.   I know it.  I'm just not going to --

20     Q.   As an NFL agent, you are prohibited from

21 soliciting or contacting a player to use your

22 services if you know he's represented by another

23 agent, correct?

24     A.   Unless it's within the 60 days, or

25 whatever the rule is, of them -- of their contract

Page 141

1 expiring.

2     Q.   Okay.  And -- however, on the flip side,

3 at any time a player can reach out to an agent and

4 inquire about that agent's services, correct?

5         MR. COMERFORD:  Object to the form.

6         THE WITNESS:  The regulations?  A

7 player -- if the -- if it's not improperly done where

8 the agent reaches out to the player or puts himself

9 in the position where he's initiating the contact

10 regarding -- I mean, it's spelled out in the rules,

11 but regarding the -- whatever the categories are.

12 BY MR. CLEMENTS:

13     Q.   Basically, it's a right that the union

14 bargained for, for their constituents, so that a

15 player can reach out to an agent.  And once the

16 player reaches out to the agent, the agent can fully

17 inform the player about anything that has to do with

18 the agent's services and the player's football

19 career.  You'll agree with that, right?

20         MR. COMERFORD:  Objection to the form.

21 The NFLPA regulations speak for themselves on this

22 question.

23         MR. CLEMENTS:  Yes, they do.  I mean, he's

24 purporting to be someone who's been doing it since

25 2004, and this is a basic question.

Page 150

1 wanted him to be done with -- or she didn't want
2 Kenny to deal with Racquel.
3         And I think -- yeah. I mean, we were open
4 to if she wanted to help out on social media, but
5 that really wasn't how it played out. I think she
6 wanted to be his overall marketing agent. So he --
7 I mean, it's a question for Kenny. He's the one who
8 quashed it and Mr. Saffold as well.
9      Q.   Okay. So you're saying -- you're saying
10 that you didn't object. Mr. Golladay was the one who
11 said don't use Racquel Douglas?
12      A.   Yeah. Ultimately, it's not my decision to
13 say -- if Kenny was going to do that, he has to make
14 the decision if he wanted to add a social media
15 manager or -- you know. I think it's -- the fact
16 that it was different or her intentions were
17 different than what Mr. Saffold and Kenny had
18 explained what they -- what they -- that they wanted
19 a media manager. And once she wanted to do more on
20 the marketing side, I think they objected to it at
21 the end of the day.
22      Q.   And whatever decisions were made about
23 Kenny Golladay's playing career, Kenny Golladay is
24 the one making that decision, correct?
25      A.   Yeah. I don't know who's going to tell

Page 151

1 him. I mean, every person makes decisions for
2 themselves regardless of whether they're football
3 players or not.
4      Q.   But if Mr. Golladay's mother called you up
5 and told you to do something that affected Mr.
6 Golladay's football career, would you take an order
7 from her without contacting Kenny or clearing it with
8 Kenny?
9         MR. COMERFORD: Form.
10        THE WITNESS: No. His mother told -- I
11 think you're mischaracterizing it. His mother told
12 Kenny not to have her involved when I was in the
13 apartment with them. So she wasn't telling me; she
14 was telling Kenny.
15 BY MR. CLEMENTS:
16      Q.   Okay. But you wouldn't take direction
17 from Mr. Golladay's mother about Mr. Golladay's
18 football career. You took directions from
19 Kenny Golladay, right?
20      A.   You take direction from the client. I
21 mean, I think if the client wants the mother, the
22 mother or the father or any family member involved to
23 make it easier, then they take the direction. But I
24 take the direction of the client.
25      Q.   Or --

Page 152

1      A.   Or whatever the client wants to take
2 direction from.
3      Q.   You wouldn't take directions from Kenny
4 Saffold about Mr. Golladay's career. You would check
5 with Mr. Golladay. If Mr. Saffold called you up and
6 said something, you wouldn't automatically do it,
7 right?
8         MR. COMERFORD: Form.
9         THE WITNESS: If something happened like
10 that, you talk to the client and make sure everyone's
11 on the same page and what the client wants before you
12 do it. But, yeah, the client can take direction from
13 multiple people, and I can certainly listen to -- if
14 the client wants me to communicate with family
15 members or mentors, then I do that and then I
16 communicate with the client. But they make the
17 ultimate decision. But they certainly tell me if
18 they're going to take advice or if they want me to
19 talk to those people and communicate with those
20 people.
21 BY MR. CLEMENTS:
22      Q.   But in your relationship with Golladay, it
23 was always Golladay making the ultimate decision,
24 right? You took direction from Kenny Golladay,
25 correct?

Page 153

1      A.   Yeah, it just depends on what it is.
2 Like, his mother was a part of the recruiting
3 process. Mr. Saffold obviously emailed about
4 Racquel, the social media situation, and had Kenny
5 copied on it. So as long as the client's copied on
6 it and is aware of it, then you're communicating with
7 all of them at the same time. That's how it works.
8 That's how I operate.
9      Q.   And it was only Mr. Golladay on the phone
10 when he called you up and said he was terminating you
11 and Clarity Sports, correct?
12        MR. COMERFORD: Form.
13        THE WITNESS: Yeah. I'm not sure whether
14 he was by himself or not, and I had someone in the
15 car with me as well.
16 BY MR. CLEMENTS:
17      Q.   Okay. How many four-year $70 million plus
18 first veteran contracts have you, Jason Bernstein,
19 secured for any of your clients with the New York
20 Giants in the last 12 months?
21        MR. COMERFORD: Form.
22        THE WITNESS: With the New York Giants?
23 BY MR. CLEMENTS:
24      Q.   Yes.
25      A.   I don't -- I don't think I have. I don't

Jason Bernstein

1 were the functional equivalent or better than Todd
2 France. Do you agree with that statement?
3    A.   That's his statement. I'm not going to
4 characterize what I am or not. I've done plenty of
5 those -- plenty of big deals and veteran deals and
6 dealt with every team. So with 18 years of
7 experience as a certified agent, you tend to get
8 experience doing that. So whether that helps.
9        It's like any other business, the more
10 experience you have, the better you are, or the
11 more -- you know, if you have relationships, that
12 helps. I mean, all that stuff might help or not
13 help, but it's hard to characterize whether I'm
14 better than anyone. I think the report probably
15 speaks for itself as far as what he thinks.
16    Q.   Well, apparently he thinks very highly of
17 you. He said that you could have got a better deal
18 for Golladay with the Giants than France did.
19    A.   If that's what he said -- and, you know,
20 whether Kenny was negotiating with the Lions and had
21 a better deal on the table or not, I don't know of
22 that either. But I'm sure, you know, we can --
23    Q.   Well, how would your expert know? He's
24 not in the room, right?
25        MR. COMERFORD:  Form.

1 BY MR. CLEMENTS:
2    Q.   He's not in the room when France was
3 negotiating with any of these teams, correct?
4    A.   Well, I guess maybe -- I'm sure it's a
5 question that -- or I'm sure it's information that we
6 can find out.
7    Q.   Okay. But you'll agree, even by looking
8 at your interrogatory answers, that Todd France has
9 more players, more experience, and has negotiated
10 more and bigger contracts than you have over his
11 career as an NFL agent.
12        MR. COMERFORD:  Form.
13        THE WITNESS:  I have no idea what he's
14 negotiated or not negotiated. I'd have to look at
15 the NFLPA record, but I'd have to go through every
16 single one. I have no idea.
17 BY MR. CLEMENTS:
18    Q.   Have you ever been named as an NFL super
19 agent?
20    A.   Probably from media articles. They all --
21 media characterizes different people in, you know, in
22 different ways.
23    Q.   In fact, it looks like the most press that
24 you ever got, if I search the internet, is your
25 involvement with Colin Kaepernick.

1    A.   I have no idea. I don't do media searches
2 as far as who's writing about me or not. So --
3    Q.   Okay. Let me just ask you this. I'm sure
4 we could go over it with Clarity, but you had no --
5 there were actually no marketing events that Clarity
6 had scheduled and inked for Kenny Golladay that Kenny
7 Golladay was going to do?
8    A.   I can barely hear you. I don't know if
9 it's the sound.
10    Q.   You'll agree with me that Clarity Sports
11 had not procured any marketing deals where Kenny
12 Golladay would have made any money in year 2020; that
13 there were no marketing deals that were signed up and
14 scheduled and ready to go that everybody had agreed
15 to.
16    A.   That he didn't do?
17    Q.   I'm just asking you.
18    A.   I think he did. I mean, it's all
19 spelled -- it's all in the invoices and what -- you
20 know, what he -- I know he had a card deal that was
21 ongoing. I know he had a Panini deal that was
22 ongoing, which is a trading card deal. I know he had
23 one of the signing deals that we had where the
24 memorabilia dealers still owed us or were still going
25 to do a couple, one or two, signings on that.

1        I mean, there were a couple things that he
2 didn't -- that I don't think that he did that were
3 potentially scheduled to do, but I'd have to look at
4 the whole list.
5    Q.   I'm just asking you --
6        MR. HERBER:  I just want to -- I think
7 we'd like to take a brief break here, if we could,
8 please.
9        MR. CLEMENTS:  Yeah. Let me just ask one
10 last question, though, to clarify that last topic and
11 then we will.
12 BY MR. CLEMENTS:
13    Q.   What I'm trying to get at is the signing
14 events which occurred January 21, 2019, it's my
15 understanding -- and correct me if I'm wrong -- that
16 Clarity Sports did not have any events scheduled that
17 Kenny would attend, sign memorabilia, do a
18 commercial, do anything that he had to show up and do
19 anything after that date. There was no contract. I
20 looked up and down in the documents you produced,
21 there was no event. You had nothing scheduled for
22 him?
23    A.   I don't know if there was anything
24 formally scheduled. But in terms of opportunities
25 that would have happened, I think there were a few.

Page 166

1 There's nothing -- there was nothing like, you know,
2 he was supposed to appear on a certain date at a
3 certain time that was already fully organized at that
4 point. It was just deals being worked on.
5    Q.   Okay.
6    A.   So no date yet, if I remember correctly.
7    Q.   Okay.  So there were opportunities out
8 there, but you didn't have anything inked up like a
9 contract ready to go for him?
10    A.   Well, there was the one memorabilia deal
11 we had that was a previous deal that they owed us
12 signs on.  That was done.  It was just a matter of
13 getting the signings done at some point that we were
14 in, I think, the early stages of talking about when
15 it was going to happen.  Or maybe not the early
16 stages, but we were trying to solidify a date or two.
17    Q.   And how much money was that going to net
18 you?
19    A.   I don't know.  I'd have to look at the
20 contract.  I don't know off the top of my head.
21    Q.   Fifteen percent of what?  How much
22 memorabilia was the guy going to be able to sign?
23 Were you getting 15 percent of 10,000?
24    A.   It's in the agreement.  It was all spelled
25 out in the agreement that I think we submitted to

Page 167

1 you.
2    Q.   In your wildest dreams, did you ever
3 discuss the marketing opportunities for Kenny
4 Golladay or marketing opportunities that would have
5 netted him $500,000 a year to $1 million a year?
6       MR. COMERFORD:  Form.
7       THE WITNESS:  Under the rookie -- under
8 the rookie deal or -- like, as the first four years
9 in Detroit, before you get a big deal or before you
10 go to a market like New York, yeah, I'm not sure
11 that -- well, I wouldn't say it's impossible, but I
12 think we got -- I mean, the numbers are the numbers
13 for 2017 and 2018 when we -- in terms of the total
14 marketing that we were able to get him.
15       When you go to a market like New York, the
16 Jets, the Giants or any of those big markets and
17 you're a receiver who just got one of the -- one of
18 the bigger deals in free agency, you're going to get
19 a lot of attention and you're playing a position that
20 gets a lot of attention.  So I think the
21 opportunities are probably endless at that point.  I
22 mean, I don't know exactly what numbers you might
23 get.
24       MR. HERBER:  Bill, I'm sorry, we have to
25 stop this.  We're going to take a break right now.  I

Page 168

1 need to reserve some time for my own client's
2 questions, and there's not much left on the clock.
3       MR. CLEMENTS:  Hold on J.T.  I have one
4 more question, J.T.
5       MR. HERBER:  I understand one more
6 question means ten more.  One more and that's it.
7 BY MR. CLEMENTS:
8    Q.   Mr. Bernstein, if Mr. Golladay gets any of
9 these supposed marketing opportunities, that's not
10 going to be you getting it; it's going to be somebody
11 else, right?
12    A.   I can barely hear you again.
13    Q.   If Mr. Golladay gets any of these
14 marketing opportunities, that's not going to be you
15 getting them for him.  It's going to be whoever his
16 current marketing agent is, right?  You're not doing
17 any work for him.
18    A.   Yeah.  I would say any work that I've done
19 contributes to what -- to how a player ultimately --
20 like what happens to the player where they sign with
21 another team or they get other marketing deals.
22 There's some -- there's always going to be some work
23 that is a baseline.  We're not doing a deal
24 specifically with a company for him because we don't
25 represent him right now.

Page 169

1    Q.   All right.
2    A.   But I think anything -- work you've done
3 can contribute.
4    Q.   But you've gotten paid.  All the work
5 you've done for Golladay on the agent side and on the
6 marketing side you've gotten paid for.
7    A.   For deals that we did directly as his
8 representative, yeah.
9       MR. CLEMENTS:  Okay.  We'll take a break
10 now.  Off the record for five minutes.
11       (Recess.)
12       MR. CLEMENTS:  I'll pass the witness to
13 Mr. Herber and reserve any time for follow-up, if
14 there is any follow-up.
15       MR. HERBER:  Is everybody ready to
16 proceed?
17       MR. COMERFORD:  As I see it, we've used
18 180 minutes today, so I think that there's 75 minutes
19 left.
20       MR. HERBER:  Well, let me get started
21 then.
22    EXAMINATION BY COUNSEL FOR DEFENDANTS
23       REDLAND SPORTS AND GERRY OCHS
24 BY MR. HERBER:
25    Q.   Good afternoon, Mr. Bernstein.  I just

Jason Bernstein

Page 174

1 portray herself as a memorabilia dealer or purchaser?
2    A.   No.
3    Q.   Did you personally subsequently try to
4 contact Mr. Ochs or Redland Sports?
5    A.   Yes.  I believe I emailed him, I texted
6 him.  I think Emily -- or he said he was going to
7 call Emily back originally, if I can remember.  And
8 then she tried to call him and he didn't pick up
9 because she hasn't heard from him.
10         And then the next day, I believe, maybe
11 later that day or the next day, I -- because we
12 hadn't heard back, I called, texted, and left him a
13 voicemail.
14    Q.   Approximately how long elapsed between the
15 time --
16    A.   Sorry.  Emailed.  I think I might have
17 said called, texted.  Emailed, texted, and left him a
18 voicemail.
19    Q.   So emailed, text, and left him a
20 voicemail.  That's what you're stating?
21    A.   That's correct.
22    Q.   Approximately how long elapsed between the
23 time you originally spoke to Ms. Ries about the
24 memorabilia signing and the time she followed up with
25 you to discuss her efforts at reaching Mr. Ochs?

Page 175

1    A.   Say that again.
2    Q.   How much time elapsed between your initial
3 conversation with Ms. Ochs and the time when she
4 followed up with you about her efforts to reach
5 Mr. Ochs?
6    A.   I don't know how much time lapsed.  I
7 think she talked to Mr. Ochs first, and I know she --
8 she testified to this as well.  But she called --
9 talked to Mr. Ochs, and then he said he was going to
10 call her back and I don't think he did after a
11 certain amount of time.
12         So she tried him again either later that
13 day or the next morning, probably later that day, and
14 then he didn't -- I don't think he picked up.  So the
15 next day I think is when I reached out to him.
16    Q.   How did you obtain Mr. Ochs' contact
17 information?
18    A.   Emily obtained it.  I'm not sure how she
19 found it.  Probably Googled.
20    Q.   And how did you obtain it, though?  That
21 was my question.
22    A.   Oh, she may have told it -- told me the
23 number.  I think that's probably how.
24    Q.   Between the time you initially learned
25 about the memorabilia signing and the time when you

Page 176

1 reached out to Mr. Ochs, were you actively working on
2 any other business matters with Ms. Ries involving
3 other clients?
4    A.   Yeah, I'm always working on -- I mean, she
5 works on every one of my clients, so there's plenty
6 that we discuss and work on.
7         MR. HERBER:  Lauren, could you pull up the
8 document Bates stamped Clarity 60, please.
9 BY MR. HERBER:
10    Q.   Mr. Bernstein, can you see this on your
11 screen?
12    A.   Yes.
13    Q.   Are you familiar with this document?
14    A.   Yes.
15    Q.   I would ask you to read through that
16 simple one paragraph there, if you could, beginning
17 with the words, "This is Jason Bernstein," and then
18 dash "Kenny Golladay's."
19    A.   Do you want me to read the whole
20 paragraph?
21    Q.   Just briefly skim over it, if you're
22 familiar with it.
23    A.   You want me to recite it verbatim?
24    Q.   Oh, no.
25    A.   Okay.

Page 177

1    Q.   Do you agree with me that there's nothing
2 in this email instructing Mr. Ochs to not participate
3 in the autograph signing?
4         MR. COMERFORD:  Objection.  Form.
5         THE WITNESS:  I'm still reading through
6 it, I'm sorry.
7 BY MR. HERBER:
8    Q.   Take your time.
9    A.   Okay.
10    Q.   Do you agree with me, there are no
11 instructions in this email telling Mr. Ochs to not
12 participate in the autograph signing?
13         MR. COMERFORD:  Objection.  Form.  The
14 document speaks for itself.
15         You can answer.
16         THE WITNESS:  Yeah, that's correct.  It
17 looks like I requested that he remove the post and
18 call me or get back to me.  And we -- I think we were
19 trying to get information on the signing since Kenny
20 had mentioned that he didn't know about it at this
21 time.
22 BY MR. HERBER:
23    Q.   And with respect to this email -- I know
24 you mentioned a few moments ago that you had talked
25 about emailing Mr. Ochs.  This is the email that you

Page 178

¹ were referring to, correct?
² A.  Yes, the email.  And then it looks like I
³ referred to the text message that I sent him, and I
⁴ believe I had left him a message either before this
⁵ or after this.
⁶ Yeah, I don't know if I put it in this
⁷ email, but yeah, I left him a message either before
⁸ this email or after.
⁹ Q.  All right.
¹⁰ MR. HERBER:  Lauren, if you could to go to
¹¹ Clarity 61, please.
¹² (Bernstein Exhibit No. 9 was
¹³ identified for the record.)
¹⁴ (Bernstein Exhibit No. 10 was
¹⁵ identified for the record.)
¹⁶ BY MR. HERBER:
¹⁷ Q.  Mr. Bernstein, can you see the item
¹⁸ currently on the screen beginning with the words,
¹⁹ "Hey Gary"?
²⁰ A.  Yes.
²¹ Q.  All right.  Are you familiar with this
²² document?
²³ A.  Yes.
²⁴ Q.  This is the text message that you were
²⁵ referring to a few moments ago, correct?

Page 179

¹ A.  Yes.
² Q.  Do you agree with me that there's nothing
³ in this message stating that Gary Ochs cannot
⁴ participate in the autograph signing event?
⁵ MR. COMERFORD:  Objection.  Form.  The
⁶ document speaks for itself.
⁷ THE WITNESS:  Yeah, I only see half of the
⁸ text message right now.
⁹ MR. HERBER:  Lauren, can you scroll down,
¹⁰ please.  Thank you.
¹¹ THE WITNESS:  Yeah, it's the same answer
¹² as the email.
¹³ BY MR. HERBER:
¹⁴ Q.  So there's no instruction in either the
¹⁵ email or in the text message telling Mr. Ochs to not
¹⁶ participate in the autograph signing, correct?
¹⁷ MR. COMERFORD:  Object to the form.  The
¹⁸ document speaks for itself.
¹⁹ THE WITNESS:  Yeah.  That's my answer.
²⁰ It's the document speaks for itself.
²¹ BY MR. HERBER:
²² Q.  I'm asking a yes-or-no question, sir.  I'm
²³ not asking if the documents speaks for itself.  Your
²⁴ attorney did not instruct you to not answer the
²⁵ question, so I'm going to ask you for an answer.

Page 180

¹ A.  My answer is the document speaks for
² itself.  I think it's laid out right here, you can
³ see what it says.  And I gave you an answer with
⁴ regards to the email, and I said it was the same
⁵ answer that we were collecting information on the
⁶ signing because Kenny said he did not know about it.
⁷ Q.  Did you ever ask or instruct Mr. Ochs to
⁸ not participate in the autograph signing?
⁹ MR. COMERFORD:  Asked and answered.  The
¹⁰ document speaks for itself.
¹¹ THE WITNESS:  No.  As I said, the
¹² documents speak for themselves, and this -- you have
¹³ in front of you what I texted and emailed.  And then
¹⁴ the voicemail, I'm not sure if you have that to play,
¹⁵ but I left him a voicemail as well.  I'm not sure
¹⁶ what specifically I said on that.  But as far as this
¹⁷ text and email, the documents are in front of you and
¹⁸ they speak for themselves, and I think I've answered
¹⁹ that.
²⁰ BY MR. HERBER:
²¹ Q.  All right.  I'm going to ask a broader
²² question.
²³ Have you ever, in any form of
²⁴ communication, instructed Mr. Ochs to not participate
²⁵ in this autograph signing session?

Page 181

¹ MR. COMERFORD:  Object to the form.  The
² documents speak for themselves.  Object to the
³ characterization of the documents.
⁴ You can answer.
⁵ MR. HERBER:  Mr. Comerford, I'm going to
⁶ ask you to refrain from the speaking objections.
⁷ MR. COMERFORD:  That's not a speaking
⁸ objection, Mr. Herber.
⁹ BY MR. HERBER:
¹⁰ Q.  Mr. Bernstein, your answer?
¹¹ A.  Yeah.  Like I said, I think I just
¹² mentioned there was a voicemail, too.  If you'd like
¹³ to play that, we can listen to it.  As far as the
¹⁴ text and the email, that's in front of you what I
¹⁵ said to Mr. Ochs.
¹⁶ There was no additional communication
¹⁷ besides this text, the email that you just put up,
¹⁸ and the voicemail I left him, aside from the
¹⁹ conversation that Ms. Ries had with Mr. Ochs.  That's
²⁰ my answer.
²¹ Q.  Did Mr. Ochs ever tell you that he would
²² take the Facebook post down?
²³ A.  I'm not sure what he told Emily.  I never
²⁴ talked to Mr. Ochs.  He didn't respond to this text,
²⁵ he didn't respond to the email, and he didn't respond

Jason Bernstein

Page 182

1 to my voicemail. So the only conversation that was
2 had was between Emily Ries and Mr. Ochs.
3    Q.   After January 6 of 2020, did you ever
4 visit the Redland Sports Facebook page?
5    A.   I'm not sure if it was on the 6th or the
6 7th or the 8th. I know we -- or Emily -- I think I
7 looked at it, but I know she looked at it and went
8 through -- yeah, we did look at it, yes. I don't
9 know if I did specifically. I remember Emily did,
10 and I think I was -- I may have looked at it a couple
11 times.
12    Q.   Did there ever come a time where you
13 noticed that the post announcing the Kenny Golladay
14 memorabilia signing had disappeared from the Redland
15 Sports Facebook page?
16    A.   I think so. Whether I noticed it or
17 Emily, I think we did, yes.
18    Q.   Do you remember when that occurred?
19    A.   I don't.
20    Q.   Did you ever contact Facebook, as in the
21 company, about the Kenny Golladay autograph signing
22 Facebook message?
23    A.   No.
24    Q.   Did you instruct Ms. Ries to contact
25 Facebook about the autograph signing message that was

Page 183

1 posted to Facebook?
2    A.   No.
3    Q.   Did Ms. Ries ever talk to you about her
4 reaching out to Facebook about the Facebook post?
5    A.   No.
6    Q.   Did you talk to anyone about reaching out
7 to Facebook regarding the Redland Sports Facebook
8 post and memorabilia signing?
9    A.   No. The first time I heard about it was
10 when Mr. Ochs testified -- or somebody testified to
11 it, I think it was Mr. Ochs -- in his deposition.
12    Q.   Did you ever send Mr. Ochs a copy of your
13 SRA?
14    A.   No, I don't believe he asked for it. He
15 didn't respond. So --
16    Q.   But you didn't send it to him, though,
17 either, correct?
18    A.   No, because he didn't ask for it. I'm not
19 going to -- for someone I haven't even gotten
20 communication back from, that's not something that
21 would be proper.
22    Q.   Did you ever send a cease and desist
23 letter to Mr. Ochs?
24    A.   I sent what you just put up, however you
25 characterize that, that text and the email and the

Page 184

1 phone message.
2    Q.   Did you ever send Mr. Ochs a copy of the
3 endorsement and marketing agreement?
4    A.   The same answer as the representation
5 agreement to the SRA question.
6    Q.   The answer is no?
7    A.   Right. He didn't -- he did not ask for it
8 or didn't respond to my inquiries.
9    Q.   Did you ever seek an injunction or any
10 other preemptive legal action to stop the memorabilia
11 autograph session?
12    A.   No. We didn't know that the signing
13 happened because Kenny said he didn't know about it.
14 So we didn't know until, I think, it was a couple
15 days before the Super Bowl or maybe the day before
16 the Super Bowl which, if I remember, was the end
17 of -- the end of January or maybe the beginning of
18 February, something like that.
19        MR. HERBER: Lauren -- I'm sorry, I didn't
20 mean to cut you off.
21        THE WITNESS: In that year, whatever it
22 was, 2018 or 2019.
23        MR. HERBER: Lauren, could you pull up the
24 documents Bates stamped 26 through 30, please.
25 BY MR. HERBER:

Page 185

1    Q.   Mr. Bernstein, are you familiar with this
2 document?
3    A.   I only see the first paragraph of it.
4    Q.   I'm sure -- Lauren is going to scroll
5 through here for you.
6        MR. HERBER: For the court reporter, this
7 is going to be marked as Exhibit 11, if I'm correct?
8        (Bernstein Exhibit No. 11 was
9        identified for the record.)
10 BY MR. HERBER:
11    Q.   All right, Mr. Bernstein. Have you had a
12 chance to scroll through that document?
13    A.   Yeah. I mean, I haven't read the whole
14 thing, but I -- I -- to answer your question, I don't
15 have any firsthand knowledge of it. I believe this
16 was produced in discovery.
17        MR. IACONELLI: Has anybody identified the
18 document yet for the record?
19        MR. HERBER: I'll refer to it as the Boone
20 contract, and I believe it's marked as Exhibit 11, if
21 I'm correct, Mike.
22        MR. IACONELLI: Just for purposes of
23 identification -- we're creating a transcript,
24 right -- it's dated January 8, 2019?
25        MR. HERBER: That is correct.

Jason Bernstein

Page 202

1 and all of the documents that have been produced to
2 this point I think show it pretty clearly.
3         Q.   I'm not asking in general with all
4 defendants.  I'm specifically asking a very narrow
5 question dealing exclusively with Gary Ochs and
6 Redland Sports.
7         How did Gary Ochs or Redland Sports work
8 with Todd France regarding the allegations in
9 paragraph 40?  And, again, excluding everything
10 involving your attorneys.  I'm asking only for
11 personal firsthand knowledge.
12        MR. COMERFORD:  Object to form.
13        THE WITNESS:  They all work together based
14 on the evidence that's come out.
15        My firsthand knowledge is what I believe
16 we've already talked about, which is the -- looking
17 at the Facebook page and it had all -- like, most of
18 the deals that were done or almost all of them that
19 we saw were CAA clients or Todd France's clients,
20 specifically Mr. Ochs mentioning that he worked with
21 -- in a big agency that they do a lot of work with.
22 You know, it was pretty clear.
23        And since the evidence has all come out in
24 terms of discovery, it's been made even -- it's
25 confirmed what we knew before the discovery period.

Page 203

1 BY MR. HERBER:
2         Q.   Do you have any personal firsthand
3 information indicating that Mr. France and Mr. Ochs
4 ever knew one another prior to this lawsuit?
5         A.   I don't have any personal firsthand
6 knowledge that they knew each other directly.
7         Q.   Do you have any personal firsthand
8 knowledge indicating that Mr. France and Mr. Ochs
9 ever negotiated any memorabilia signings or any other
10 agreements?
11        A.   In terms of directly or indirectly
12 through, you know, Jake Silver or anyone else at CAA?
13        Q.   Both.
14        A.   Yeah.  Just what we've gathered in -- all
15 the evidence that we've gathered in discovery.
16 That's my knowledge.  I don't have -- I was never
17 privy to a conversation between Mr. Ochs and anyone
18 else.
19        Q.   Do you have any personal firsthand
20 knowledge that Mr. Ochs and Mr. France ever spoke
21 directly to one another?
22        A.   Mr. France and Mr. Ochs?
23        Q.   Correct.
24        A.   Directly?  Just -- like I said, just what
25 we've uncovered in discovery is my knowledge of their

Page 204

1 dealings.
2         Q.   Do you have any personal firsthand
3 information as to who was present at the memorabilia
4 signing event?
5         A.   Not -- I wasn't at the signing event
6 personally.  So just what has been uncovered in
7 discovery.
8         Q.   Do you have any personal firsthand
9 information as to what, if anything, Mr. Ochs and
10 Mr. Golladay discussed at the memorabilia signing
11 event?
12        A.   Maybe aside from what Mr. Ochs testified
13 to at his deposition, which I can't remember
14 everything, but -- and all the evidence that's been
15 uncovered.  I wasn't at the signing event, so I do
16 not know what they -- or everything that they may or
17 may not have discussed aside from Mr. Ochs'
18 deposition.
19        Q.   For the past few minutes you've referred
20 back to the evidence that's been uncovered a couple
21 of times, and you used the phrase "what's been
22 exchanged during discovery" a few times.  All of that
23 occurred after February 22nd, 2019, correct?
24        A.   Yeah.  I'm not sure of the specific dates,
25 but I'll take your word for it if that's what -- if

Page 205

1 that's what -- when the first discovery production
2 came in, if it was after that date.
3         Q.   I'll rephrase the question.
4         With regard to your references to
5 discovery and evidence that's been uncovered, you're
6 referring to events that occurred after the
7 litigation was commenced.  Is that a fair statement?
8         A.   Not events, no.  I mean, this event
9 happened before the commencement of the litigation,
10 the signing event.
11        Q.   But when you refer to discovery that's
12 been uncovered and evidence that's been uncovered,
13 you're referring to discovery and evidence that came
14 into your possession after the commencement of the
15 litigation, correct?
16        A.   Yeah.  Either that or during the
17 arbitration, you know, whatever evidence was gathered
18 during that period.  That, in combination with the
19 evidence gathered in this case.
20        Q.   Well, the evidence gathered during the
21 arbitration only occurred after the start of this
22 litigation that we're here for today, correct?
23        A.   Yeah.  I can't remember the specific
24 dates.  I'm just clarifying when -- what I'm
25 referring to as far as evidence is concerned, as far