# Exhibit 4

```
 1                IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2

     -----------------------------§
 3   CLARITY SPORTS INTERNATIONAL §
     LLC, and JASON BERNSTEIN,    §
 4                                §
         Plaintiffs,              § Case No. 1:19-CV-00305 (YK)
 5                                §
     vs.                          §
 6                                §
     REDLAND SPORTS, et al.,      §
 7                                §
         Defendants.              §
 8                                §
     -----------------------------§
 9
10                              - - -
11              Thursday, September 23, 2021
12                              - - -
13
14         This is the Remote Deposition of BRUCE
15   BERNSTEIN, commencing at 10:07 a.m. EDT, on the above
16   date, before Susan D. Wasilewski, Registered
17   Professional Reporter, Certified Realtime Reporter,
18   Certified Manager of Reporting Services, Certified
19   Realtime Captioner, and Professional Reporter.
20
21                              - - -
22              GOLKOW LITIGATION SERVICES
23          877.370.3377 ph | 917.591.5672 fax
24                    Deps@golkow.com
25
```

Page 10

1  A.  Where I -- where I work, would you say?
2  When you say business addresses, where I work?
3  Q.  Yes.  Yeah.  I'm not trying to trick you.
4  Trust me.
5  A.  No, I have no other business addresses where
6  I regularly work, other than during the pandemic, I,
7  of course, work at home.
8  Q.  Okay.  Well, that's probably true even if --
9  whether there's a pandemic or not, it seems like we
10 have to work at home, which leads me to my next
11 question.
12      Do you have a residential address?
13 A.  Yes, I do.
14 Q.  And what is that exact address?
15 A.  It's 11624 Twining -- that's
16 T-w-i-n-i-n-g -- Lane in Potomac, Maryland.
17 Q.  Okay.  How long have you resided there?
18 A.  31 years.
19 Q.  And that's your primary address?
20 A.  Correct.
21 Q.  Residential address?
22 A.  Correct.
23 Q.  Have you ever lived in the Commonwealth of
24 Pennsylvania?
25 A.  No.

Page 11

1  Q.  What state do you consider yourself a
2  citizen of?
3  A.  You mean a resident?
4  Q.  As a -- yeah, a resident, citizen, I mean --
5  A.  At present?
6  Q.  Yeah.
7  A.  At present, I would say Maryland.
8  Q.  Okay.  And for how long?
9  A.  42 years, approximately, 42 or 43 years.
10 Q.  Okay.  We'll talk a little bit about your
11 educational background.  I get it.  It's quite a
12 good while for all of us, you maybe longer than some
13 of us, but did you attend college?
14 A.  Yes.
15 Q.  Where did you go?
16 A.  Tufts University.
17 Q.  Did you graduate?
18 A.  Yes.
19 Q.  What year?
20 A.  1973.
21 Q.  What was your degree, and what was it in?
22 A.  It's a bachelor of arts in applied physics.
23 Q.  Oh, okay.  Did you attend graduate school?
24 A.  Yes.
25 Q.  Where?

Page 12

1  A.  I attended Georgetown University Law School.
2  Q.  Okay.  And what -- did you graduate?
3  A.  Yes, I did.
4  Q.  What year did you graduate?
5  A.  1977.
6  Q.  Okay.  And I assume you got a JD?
7  A.  Correct.
8  Q.  Other than -- other than Tufts and
9  Georgetown, any other professional schooling or
10 degrees?
11 A.  No.
12 Q.  Okay.  I just want to ask you about
13 professional licenses; so, for example, your law
14 license.  Like, I don't care about your driver's
15 license or anything.
16     Do you hold any professional licenses?
17 A.  Yes.
18 Q.  What are they?
19 A.  I have a law license in three states, and
20 I'm --
21 Q.  Okay.  I was going to ask the question.  In
22 what state or jurisdiction are they in?
23 A.  Maryland, Virginia, and the District of
24 Columbia.
25 Q.  Okay.  And they're all in good standing, so

Page 13

1  you practice --
2  A.  Yes.
3  Q.  Okay.  And for how long have you had those?
4  You can estimate.
5  A.  Approximately 42, 43 years.
6  Q.  Okay.  I really don't want to go through
7  your résumé, so I'm trying to think of a quicker way
8  to do this, you know.  So I want to talk about your
9  professional background.  Usually when I ask people
10 that are older and have a work history, is maybe --
11 can you walk us through the jobs you've had once
12 you've gotten out of law school?  Like, I don't care
13 about jobs in law school or college or high school,
14 but your professional jobs as a lawyer from the
15 earliest up to the present, you know, generally,
16 like, the name of the law firm, company, or
17 government entity you might have worked for, the
18 approximate years, and what your position and job
19 title was.
20 A.  One other licensure that you should know
21 about, I'm also licensed by the Patent -- US Patent
22 and Trademark Office.
23 Q.  You know, I almost could have guessed that,
24 because you're the only attorney I've ever heard of
25 that has a degree in applied physics, which -- I had

Page 30

 1  check with Jason because I don't check -- I'm not
 2  involved in the day-to-day, so I'm not really
 3  checking on the status.  Emily Ries.
 4     Q.  Okay.
 5     A.  I think it's R-i-e-s.
 6     Q.  Okay.
 7     A.  And to the extent you would call someone who
 8  does the books a 1099, Calvin Luttrell.
 9     Q.  Calvin -- how do you spell that?
10     A.  Calvin Luttrell, L-u-t-t-r-e-l-l.
11     Q.  Okay.  And I'm assuming --
12     A.  Those are the only names that I know, but
13  that doesn't mean that those are the only people.
14     Q.  Okay.  Those are the only names you can
15  recall?
16     A.  Yes.
17     Q.  And you don't know if they're, like, W-2 or
18  1099 employees?
19     A.  No.  I may -- I think I know, but I'm not
20  sure, so I don't want to speculate.
21     Q.  That's fine.  Do you know what Emily Ries's
22  job title is?
23     A.  No.
24     Q.  Calvin Luttrell, I guess he's the -- does he
25  have a job title?  You said he handles the books and

Page 31

 1  records.
 2     A.  Not that I'm aware of.  I don't believe he
 3  has a job title.
 4     Q.  Okay.  Do you know of anybody other than
 5  Calvin Luttrell that would do the accounting or
 6  financial statements for Clarity Sports?
 7     A.  The accountant, the CPA.
 8     Q.  You have an outside accountant?
 9     A.  Correct.
10     Q.  Do you know who that is?
11     A.  The name of the accountant who's done them
12  for several years is Randy Shapiro.  The name of his
13  firm was Murray, Jonsson -- and that's, to my
14  recollection, J-o-n-s-s-o-n -- & White.  But they
15  have merged into a firm called YHB, and I do not
16  remember what the acronym YHB stands for.
17     Q.  That's okay.  Anybody else that you could
18  recall that worked as an accountant -- the outside
19  accountant or that would handle the books and
20  records?
21     A.  No, not that I -- not that I recall.  Not
22  that I recall.
23     Q.  Okay.  Some more general questions about
24  Clarity.  What is Clarity's business address?
25         MR. COMERFORD:  Foundation.

Page 32

 1     Q.  I guess if it has one.
 2     A.  It has a business address, and I don't know
 3  it off the top of my head.
 4     Q.  Okay.  Is it -- its business address located
 5  in your residence?
 6     A.  In my residence, no.
 7     Q.  Is the business address located in Jason
 8  Bernstein's residence?
 9     A.  I believe so.
10     Q.  Okay.  Is the business address located in
11  your law firm?
12     A.  No.
13     Q.  Okay.  So to the best of your knowledge,
14  Clarity's business address is Jason Bernstein's home
15  address?
16     A.  To the best of my knowledge, correct.
17     Q.  Do you know if it has any other offices?
18     A.  Not that I'm aware of.
19     Q.  I think we answered this already.  So you
20  described for me Clarity's business generally.  Just
21  a couple of questions.
22         Are Clarity's clients restricted to football
23  players as opposed to, like, other types of athletes
24  or artists?
25         MR. COMERFORD:  Foundation.

Page 33

 1     A.  I don't think the business -- I don't
 2  think -- to the best of my recollection, there's no
 3  limitation.
 4     Q.  I guess the question I would have, you were
 5  never a -- you personally were never a licensed
 6  agent in anything other than the NFLPA, correct?
 7     A.  Correct.
 8     Q.  And you never represented, have you -- in
 9  connection with your role with Clarity, being a
10  member of Clarity, I'm not talking about your law
11  firm or whatever you might do.
12     A.  Okay.
13     Q.  I don't really care about that, actually,
14  but in your role through Clarity, have you ever
15  represented anybody other than that one athlete that
16  may have -- you know, like, a baseball player,
17  trying to negotiate a baseball contract, a
18  basketball player, an artist, musician, or actor
19  trying to negotiate a contract?
20     A.  Through Clarity, I have not.
21     Q.  Okay.  And in your time with Clarity, which
22  I guess was from the beginning, are you aware of
23  Clarity having any clients that were not football
24  players, like, current or former football players?
25     A.  You have to ask Jason that.  I -- I don't

Page 130

1  that's the entire point.  None of the fact
2  witnesses have firsthand, actual knowledge of
3  anything.  It's all argument.  That's what I'm
4  trying to pin down.
5      Q.  But Mr. Comerford, in his various
6  objections, has made it clear that it's all based on
7  argument, so you don't have to answer that.  We'll
8  move on.
9          Has Clarity Sports ever lost a client other
10 than Kenny Golladay?
11         MR. COMERFORD:  Foundation.
12     A.  I believe so.
13     Q.  So what makes Golladay so special that he
14 would have never terminated Clarity Sports until he
15 was bribed by Todd France?
16         MR. COMERFORD:  Object to the form.  It's
17 argumentative.
18     Q.  Was that client -- was that client that was
19 lost -- did you sue people and accuse -- did Clarity
20 sue people and accuse them of wrongdoing when you
21 lost the client?
22     A.  No.
23     Q.  Well, what distinguished Golladay from that
24 client?
25     A.  You really want me to answer as an expert

Page 131

1  with 42 years in the field of IP law?
2      Q.  No, because 42 years in the field of IP law
3  has absolutely nothing to do with this.  You have
4  very slight experience as an NFLPA agent that placed
5  one person.
6      A.  That's not what you asked me, Mr. Clements.
7  You've been characterizing things all day.  What you
8  asked me is what makes this case different, and I
9  can tell you what makes this case different.
10     Q.  Okay.  Go ahead, Mr. Bernstein, because --
11 here it is, because we want to separate out fact
12 from what you speculate on.  So you tell me what
13 makes it different.
14         I'm going to write down everything you say,
15 and then I'm going to ask you what the factual basis
16 is.  So if you want to engage in this exercise,
17 fine.  We would do it at trial.
18         So go ahead.  Tell me every fact that you
19 know of that makes this case different from the
20 other clients that have terminated Clarity Sports,
21 every fact that makes it different.  You have Client
22 A terminating -- you're saying terminating Clarity
23 Sports.  Every client that ever terminated Clarity
24 Sports, give me the factual distinction between that
25 and Kenny Golladay.

Page 132

1          MR. COMERFORD:  Form.
2      Q.  Go ahead.  Now is your time.
3      A.  Okay.  Would you please stop interrupting
4  me?
5      Q.  Go ahead.
6      A.  Are you finished?  I'll go now.
7          In none of those cases was there a signing.
8  In none of those cases were -- (garbled audio) --
9  before he left.  That's the fact, and that's the
10 difference.
11         THE COURT REPORTER:  Can you repeat that?
12 I'm sorry.  Somebody shuffled papers.  I missed
13 the answer.  I'm sorry.
14         THE WITNESS:  The entire answer?
15         THE COURT REPORTER:  Here's what I have.
16 (The answer was read by the court reporter.)
17     A.  In none of those cases do we know that there
18 was a signing, are we aware that there was a
19 signing.  In none of those cases was there a warning
20 sent.  In none of those cases did the signing go
21 ahead.  In none of the cases did the player change
22 after the signing.
23     Q.  Okay.  So it's fair to say that the entire
24 claim of Clarity Sports and Bernstein hinges on the
25 Signing Event being an act of tortious interference?

Page 133

1          MR. COMERFORD:  Object to form;
2  argumentative --
3      Q.  Do you agree with me on that?
4          MR. COMERFORD:  -- beyond the --
5      A.  No.
6          MR. COMERFORD:  You're asking --
7      Q.  Any other -- other than the Signing Event,
8  do you have personal, firsthand knowledge of any
9  other act by any defendant or third party that forms
10 the basis for your -- that you're alleging is
11 wrongful and entitles you to millions of dollars of
12 damages?
13     A.  Again, your question is wrong.  Other than
14 the signing.  I don't have firsthand knowledge of
15 the signing.
16     Q.  Okay.
17     A.  I only have -- I don't have firsthand
18 knowledge of any of those events, as I've testified
19 repeatedly here, so I can't tell you.  I don't have
20 firsthand knowledge.
21     Q.  Okay.
22     A.  You asked --
23     Q.  Do you have any firsthand knowledge -- oh,
24 go ahead.  I'm sorry.
25     A.  You asked me what the difference was, and