# Exhibit 5

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CLARITY SPORTS INTERNATIONAL, )
LLC and JASON BERNSTEIN       )
                              )
            Plaintiffs,       ) No. 1:19-cv-00305-YK
                              )
      vs.                     )
                              )
CAA SPORTS, et al.,           )
                              )
            Defendants.       )

- - - -

Videotaped Remote Video Conference Deposition of

JAKE SILVER

April 16, 2021

9:06 a.m.

\*\*\*\*  CONFIDENTIAL - ATTORNEY'S EYES ONLY  \*\*\*\*

REPORTER:  Lisa Forlano, CCR, CRR, RMR

Page 6

1  Bernstein is attending remotely as well.
2      MR. IACONELLI: Good morning, for the
3  record, this is Michael Iaconelli with the
4  Klehr Harrison law firm. With me this morning
5  on the deposition is my colleague William
6  Clements. We represent Defendants, MVP
7  Authentics, Jason Smith, Daryl Eisenhour,
8  Boone Enterprises, Craig Boone, and CAA
9  Sports, LLC and I'll note for the record
10 before any questioning gets underway that
11 we're appearing today in connection with a
12 subpoena that Plaintiffs have issued to a
13 former employee of CAA Sports named Jake
14 Silver. It's been noted in prior depositions
15 and in particular in the deposition of CAA
16 Sports designee's deposition that there have
17 been communications by lawyers at CAA with
18 Mr. Silver and I'm just noting for the record
19 now so we don't need to belabor the record
20 once questioning gets underway that CAA is
21 asserting any and all rights associated with
22 the attorney-client privilege, the attorney
23 work product doctrine and comparable law with
24 respect to any questioning that may be
25 interposed by any of the lawyers on this call

Page 7

1  that would seek to invade the privilege
2  pertaining to Mr. Silver's former status as an
3  employee of CAA Sports.
4      MR. MAXIM: Good morning. I'm Kevin
5  Maxim of the Maxim Law Firm in Atlanta. I
6  represent the deponent here today, Jake
7  Silver. Mr. Silver and I are appearing today
8  pursuant to an order of the Northern District
9  of Georgia Court and that is Civil Action No.
10 1:21-CV-00676 MHC-WEJ. By Mr. Silver and I
11 appearing here today, we are not waiving our
12 objection that we have asserted earlier that
13 he is not subject to the jurisdiction of the
14 venue of the Middle District of Pennsylvania
15 Court. Thank you.
16      MR. HERBER: Good morning, this is J.T.
17 Herber appearing on behalf of Gerry Ochs and
18 Redland Sports, along with my co-counsel, Iles
19 Cooper, both of us being with the law firm of
20 Williamson, Friedberg & Jones.
21      VIDEO OPERATOR: Will the court
22 reporter please swear in the witness and we
23 may proceed.
24      JAKE SILVER, having been duly sworn,
25 was examined and testified as follows:

Page 8

1  BY MR. COMERFORD:
2   Q    Good morning, Mr. Silver.
3   A    Good morning.
4   Q    Can you hear me okay?
5   A    I can.
6   Q    We're taking this deposition today
7  using the Zoom videoconferencing platform because of
8  the COVID-19 pandemic.
9        Where are you located, sir?
10  A   I'm sorry, it cut in and out for a
11 second.
12  Q   Where are you located?
13  A   Atlanta, Georgia.
14  Q   And are you in a law office or where
15 are you?
16  A   I'm at Mr. Maxim's law office.
17  Q   Are you in the same room as Mr. Maxim?
18  A   I am not.
19  Q   Is anyone else in the room with you?
20  A   No.
21  Q   Do you have any papers there in the
22 room with you?
23  A   I do not.
24  Q   Did you bring any papers to the
25 deposition?

Page 9

1   A   No, I did not.
2   Q   Do you understand that you were served
3  with a subpoena that asked you to produce certain
4  documents that may be in your possession, custody or
5  control?
6   A   Do I understand that?
7   Q   Yes.
8   A   Yes.
9   Q   And did you produce all of the
10 documents that you still have concerning matters
11 that were listed in the subpoena that you still have
12 in your possession, custody or control?
13  A   I produced all the documents that I
14 could find, yes.
15  Q   Do you understand that you're under
16 oath today just the same as if you were in a court
17 of law?
18  A   I do.
19  Q   Do you understand that the testimony
20 you're giving today, if proven to be false, could
21 subject you to Plaintiff perjury?
22  A   I do.
23  Q   Have you ever been deposed before?
24  A   Have I ever been what? I'm sorry.
25  Q   Have you ever had your deposition taken

3 (Pages 6 to 9)

Page 14

1    believe it seeks to invade the attorney-client
2    privilege.  When you said "about," you're
3    starting to get into the content of the
4    communications.  I don't think that's a proper
5    question and I would instruct the witness not
6    to respond to that.
7         MR. COMERFORD:  So in response, I'm
8    going to say that in my view that would be the
9    sort of thing that would be disclosed on a
10   privileged log if we were to ask it.  I'm not
11   asking for the content, but I'm asking whether
12   communication took place or not.  I'm trying to
13   phrase it in a way that Mr. Silver can answer
14   yes or no.
15        MR. IACONELLI:  And I would join in
16   Mr. Maxim's objection.  I think it's
17   inappropriate question.  Again, I think
18   Mr. Comerford is seeking to invade the
19   privilege.  There's been deposition testimony
20   in this case recently on March 3, 2021,
21   Mr. Comerford asked CAA's corporate designee
22   at pages 38 and 39 questions regarding whether
23   counsel for CAA communicated with Mr. Silver.
24   The witness verified in response to
25   Mr. Comerford's question that he did, in fact,

Page 15

1    have discussions with CAA's counsel.  And
2    specifically I'm referring to CAA's designee
3    deposition testimony on page 38, beginning on
4    line 21 and going through page 39 at line 25,
5    specifically where Miss Shepherd testified, I
6    am of the view that it was a privileged
7    conversation.  Plaintiffs had that deposition
8    transcript for about a month and a half now.
9    They understand and know full way that CAA has
10   not waived privilege.  To the extent that any
11   communications that Mr. Silver had with any
12   lawyer at CAA, in-house or outside counsel,
13   CAA is asserting that those communications are
14   privileged.  They reflect work product.  And
15   Mr. Silver is cautioned to not waive
16   attorney-client privilege that belongs to CAA.
17        With that instruction, Mr. Silver, if
18   you can answer the question, go ahead and try
19   to answer it.
20        THE WITNESS:  I'm not going to waive
21   attorney-client privilege in answering the
22   question.
23   BY MR. COMERFORD:
24        Q    I'm trying to phrase the question as
25   yes or no.  And as I understand it, Mr. Iaconelli is

Page 16

1    saying that you can answer this yes or no.
2         Did you have discussions with Michael
3    Iaconelli in 2019 about these events?
4         MR. IACONELLI:  Objection, asked and
5    answered.  Again, Mr. Silver, counsel is
6    attempting to rephrase questions to invade the
7    privilege.  Again, I would caution you against
8    that.  To the extent that you can answer
9    again, go ahead and answer again, but CAA is
10   not waiving privilege.
11        MR. MAXIM:  I would assert the same
12   objection, as well as observation, an
13   objection that the question, that includes the
14   term "these events" is vague and ambiguous.
15   BY MR. COMERFORD:
16        Q    You can answer, Mr. Silver.
17        A    I'm not going to waive privilege of
18   communication with any attorneys.
19        Q    Just to be clear, I'm asking whether or
20   not you spoke with Mr. Iaconelli.  I'm not asking
21   for the content.
22        MR. IACONELLI:  Objection, asked and
23   answered.
24   BY MR. COMERFORD:
25        Q    Can you answer that?

Page 17

1         A    Wouldn't that be part of the content of
2    what we discussed?
3         Q    I'm asking, Mr. Silver, whether or not
4    you had discussions with Mr. Iaconelli.  I'm not
5    asking for the content.  So can you try to answer
6    that question either yes or no?
7         MR. IACONELLI:  Same objection.  And
8    again, since Mr. Comerford appears to not be
9    following the -- not adhering to the statement
10   that I made on the record earlier, I'm going
11   to read into the transcript Niloofar
12   Shepherd's sworn testimony in response to
13   Mr. Comerford's question concerning this
14   issue, starting at page 38, line 22.
15        Question: Did you speak with Jake
16   Silver to prepare for your deposition?
17        Miss Shepherd said no.
18        Have you ever spoken with Jake Silver
19   about this case?
20        Answer:  Yes, I think I had one
21   conversation with him about it when he was
22   subpoenaed.
23        Question:  Okay, am I right that would
24   have been in or around July of 2020?
25        Answer: I don't remember.

Page 30

1   of '15 would be correct.
2   BY MR. COMERFORD:
3       Q    Did you work with Todd France during
4   those two internships in the summer of 2014 and the
5   summer of 2015 with 1Five Starr Athlete?
6           MR. MAXIM:  Same objection regarding
7   the time frame set for discovery by the
8   courts.
9           MR. IACONELLI:  Yeah, I'm going to join
10  in Mr. Maxim's, the witness' counsel's
11  objection.
12          Mr. Comerford, you're clearly
13  questioning the witness on matters that go
14  beyond the relevant time period set forth in
15  Judge Schwab's order dated March 31, 2020.
16  It's document number 74 on the docket.  You
17  attached it -- you referenced it in the
18  subpoena that you issued to Mr. Silver, you
19  attached it to the subpoena that you issued to
20  Mr. Silver, and I'd also note that during the
21  deposition that we took of your client, Emily
22  Ries, on November 19, 2020 in this matter,
23  when counsel for the Redland defendants sought
24  to ask Miss Ries questions that went beyond
25  the scope of the time period set forth in the

Page 31

1   order, you objected at page 15, lines 6
2   through 12, and I quote, the question was, At
3   any given time during that time period,
4   approximately how many players did you provide
5   services for?  And your response,
6   Mr. Comerford, was starting at line 6, quote,
7   So, J.T., I'm going to object again and I
8   think your question is asking the witness to
9   go beyond the time period that Judge Schwab
10  has set for discovery in this case, which as I
11  understand it, goes back to January 1, 2018.
12  If you could limit the time period to satisfy
13  the Court, I would appreciate it.  Mr. Herber
14  said all right and then rephrased his
15  question.
16          So again, I'm going to join in
17  Mr. Maxim's objection.  I'm going to state
18  again, for the record, that I believe this
19  type of questioning that goes beyond the
20  relevant time period set forth in Judge
21  Schwab's order and in the notice that was sent
22  to the witness and the subpoena and the order
23  that was attached to the subpoena is improper.
24  And I would ask that Plaintiff's counsel
25  follow the terms of Judge Schwab's order in

Page 32

1   conducting the examination in accordance with
2   the terms of the appropriate orders that had
3   been entered in this case.
4   BY MR. COMERFORD:
5       Q    You can answer, Mr. Silver.
6           MR. HERBER:  J.T. Herber here on behalf
7   of the Redland -- sorry, Gerry Ochs and
8   Redland Sports defendants.  I'm also going to
9   join in this objection, as well, John.  You've
10  going outside the time frame.  You held us to
11  that.  You need to hold yourself to the same
12  standard.
13          MR. MAXIM:  I join in these objections
14  as well.  Mr. Silver is a non-party.  This is
15  during his workday.  I think we should limit
16  it to the scope and time frame of discovery
17  that was served upon him and is the order of
18  the two Federal courts.
19          MR. COMERFORD:  I understand the
20  objections, but I would like an answer, Mr.
21  Silver.
22  BY MR. COMERFORD:
23      Q    Did you work for Todd France in the
24  summer of 2014 and 2015 at Five Star Athlete
25  Management?

Page 33

1           MR. MAXIM:  Same objection.
2           MR. IACONELLI:  We restate the
3   objection, Mr. Silver.  It's on the record.
4           MR. HERBER:  We also restate the
5   objection.
6           THE WITNESS:  I interned for Five Star
7   Management.  I did not have a lot of
8   communication with Todd France, but did he
9   work there, yes.
10  BY MR. COMERFORD:
11      Q    Was that in Atlanta?
12      **A    Yes.**
13      Q    How did you get that internship with
14  Five Star Athlete Management?
15      **A    I had a cousin that interned the summer**
16  **prior and e-mailed a woman who worked there and got**
17  **an interview and that's basically how it went.**
18      Q    Before you started working at Five Star
19  Athlete Management, did you know Todd France?
20          MR. IACONELLI:  Same objection.
21          THE WITNESS:  Not at all.
22          MR. MAXIM:  Same objection.
23          MR. HERBER:  Same objection.
24          MR. IACONELLI:  I'm going to note for
25  the record that it's 10:37 eastern standard

9 (Pages 30 to 33)

Page 38

1  by "in charge."
2      Q    I mean, was there anyone who you had
3  considered to be the head of the office or in charge
4  of the office?
5           MR. IACONELLI:  Objection to form.
6           THE WITNESS:  There was like an office
7      manager.  Is that what you mean?
8  BY MR. COMERFORD:
9      Q    No.  That's sort of an administrative
10 person, right?
11     A    Sure.
12     Q    So who was the head of the office for
13 CAA Sports in Atlanta?
14          MR. IACONELLI:  Objection.  Objection
15     to form, vague, ambiguous.
16          MR. MAXIM:  Same objection.
17          THE WITNESS:  I think it's tough to
18     answer because there's multiple divisions
19     within that Atlanta office.  So like there was
20     not really one head of the entire Atlanta
21     office.
22 BY MR. COMERFORD:
23     Q    Did everyone in the Atlanta office
24 report to Todd France?
25     A    I did not report to Todd France.

Page 39

1      Q    In 2018, who did you report to?
2      A    I believe in '18 it was Bob Philp, who
3  was not in the Atlanta office.
4      Q    In 2019, who did you report to?
5      A    I think the same, Bob Philp.
6      Q    And up until September of 2020 when you
7  left, did it change or was it still Bob Philp?
8      A    He was -- he had left CAA. I don't know
9  exactly what month, so between that period of him
10 leaving and myself leaving, I don't know if there
11 was technically a head in the marketing division or
12 something, I think.  I don't know today what the
13 deal is, but I don't think there was necessarily
14 someone that was promoted as head of marketing at
15 that time.
16     Q    So describe your role at CAA Sports as
17 of September 2018.
18     A    It was to provide marketing
19 opportunities for our football clients off the
20 field.
21     Q    Did you -- what did you do for Todd
22 France as of September 2018?
23     A    Can you be more specific?
24     Q    Yeah.  Did you do anything for Todd
25 France like manage his events, coordinate his

Page 40

1  schedule, make flight reservations for him?
2           MR. IACONELLI:  Objection, vague,
3      compound.
4           THE WITNESS:  I did marketing on behalf
5      of some of his clients along with the rest of
6      CAA Sports' football clients.  I did not do --
7      the services that you were asking me if I did
8      I don't believe.  That was not the scope of my
9      job.
10 BY MR. COMERFORD:
11     Q    Were you responsible for managing Todd
12 France's calendar in 2018?
13     A    Not at all.
14     Q    Were you responsible for arranging for
15 him to attend marketing events?
16     A    No, never.
17     Q    Did you have someone that you
18 considered your assistant?
19     A    I did not have an assistant, no.
20     Q    Did Todd France have an assistant at
21 the Atlanta office of CAA Sports starting in
22 September of 2018?
23     A    I don't know during that time period.
24 I know at some time period that he had an assistant,
25 yes, but I'm not exactly sure when that was because

Page 41

1  I know for a good period of time he didn't have an
2  assistant.
3      Q    Who was his assistant, to your
4  knowledge?
5           MR. IACONELLI:  Objection, time frame.
6  BY MR. COMERFORD:
7      Q    In late 2018.
8      A    I don't know if he had an assistant
9  during that time.
10     Q    At any point in time was there someone
11 that you considered to be Todd France's assistant?
12          MR. IACONELLI:  Objection to the term
13     any point in time.  Outside the scope of Judge
14     Schwab's March 31, 2020 order.
15          MR. MAXIM:  I'll join in that
16     objection.
17 BY MR. COMERFORD:
18     Q    Go ahead.
19     A    I'm sorry, what was the question?
20     Q    I'm trying to get to whether Todd
21 France had an assistant.
22     A    Right.  At some point, he did.  He
23 actually had -- there was a point in time that he
24 had an assistant and then not an assistant and again
25 an assistant, but I know for a long period he didn't

Page 50

1    MR. MAXIM: Objection as to time frame,
2  scope of discovery.
3    THE WITNESS: I'm not sure where he is.
4  BY MR. COMERFORD:
5    Q    When did he leave the Atlanta office of
6  CAA Sports?
7    **A    I do not know timing of when that was.**
8    Q    Well, can you do your best to estimate
9  it?
10   MR. IACONELLI: Objection to the extent
11  it calls for speculation.
12   MR. MAXIM: Same objection.
13   THE WITNESS: I can't guess. I really
14  can't. I don't know. I don't even know when
15  for sure he started there, how long he was
16  there or when he left. I couldn't guess.
17  BY MR. COMERFORD:
18   Q    Do you know whether he's still in
19  Atlanta?
20   **A    I don't believe he is.**
21   Q    Where is he located, to your knowledge?
22   **A    To the best of my knowledge, but I'm**
23  **not 100 percent in this, I think he's in New York**
24  **City.**
25   Q    In September of 2018, where was your

Page 51

1  office in relation to Todd France's office in the
2  physical layout of the Atlanta office?
3    **A    I changed offices four separate times,**
4  **so I'm actually not sure during that period. I was**
5  **the younger one in the office, so I got kicked**
6  **around a lot. So in 2018 and the time you're**
7  **explaining, I am not sure where I was.**
8    Q    Okay. How about January of 2019, where
9  were you physically located in the office?
10   **A    I'm not sure.**
11   Q    Did you have an office or did you have
12  a cubicle?
13   **A    I had an office the majority of the**
14  **time, but there was a time that I was at a cubicle.**
15   Q    Okay. Was that in the beginning or in
16  the middle or in the end?
17   **A    The cubicle?**
18   Q    Yes.
19   **A    Beginning.**
20   Q    So was your office close to Todd France
21  in January of 2019 or far?
22   MR. IACONELLI: Objection. Excuse me,
23  objection, vague and ambiguous particularly
24  with respect to the terms "close" and "far."
25  BY MR. COMERFORD:

Page 52

1    Q    Go ahead.
2    **A    The office is not a huge office. It's**
3  **a smaller satellite office. I would guess it's 15**
4  **to 20 offices, so I couldn't sit here and say**
5  **anything was too far.**
6    Q    Did you ever arrange for Todd France to
7  travel to meet with football players or their
8  families?
9    MR. IACONELLI: Objection, asked and
10  answered.
11   THE WITNESS: I've never arranged for
12  Todd France's travel ever.
13  BY MR. COMERFORD:
14   Q    Were you familiar with Todd France's
15  schedule in December of 2018?
16   MR. IACONELLI: Objection, asked and
17  answered.
18   MR. HERBER: I'll join in that
19  objection.
20   THE WITNESS: I was not.
21  BY MR. COMERFORD:
22   Q    Let's start at the beginning of 2018
23  and go until February of 2019. So just a little bit
24  over a year. Okay? We'll try to focus on that time
25  frame.

Page 53

1    During that year, how many times did
2  you access Todd France's e-mails?
3    MR. MAXIM: Objection because that
4  question is deliberately focused to be outside
5  the scope of the Court ordered discovery
6  period.
7    MR. IACONELLI: We join in that
8  objection. Judge Schwab's March 31, 2020
9  order that I've repeatedly referred to in this
10  case specifically states, It is ordered that
11  the applicable time period for discovery is
12  January 21, 2018 through January 21, 2020.
13  The question that was just put to the witness
14  goes beyond that time frame. We again object
15  to this improper line of questions and would
16  request that Plaintiff's counsel take the
17  deposition in accordance with the orders that
18  have been entered in this case.
19   MR. COMERFORD: Did you say the time
20  frame in Judge Schwab's order is January 2018
21  through January 2020?
22   MR. IACONELLI: I read it into the
23  record. It's attached to the subpoena that
24  you issued to Mr. Silver. I presume you have
25  a copy of it.

14 (Pages 50 to 53)

Page 126

1  Q   Okay. Let's focus on the time period
2  before January 30, 2019. We know that you arranged
3  this memorabilia signing for Kenny Golladay that
4  took place in the Chicago area on January 21, 2019,
5  right?
6       MR. IACONELLI: Objection.
7       MR. MAXIM: I object.
8       MR. IACONELLI: Mr. Comerford, you
9       continually use a word, you used the word
10      arranged this time and that not only
11      mischaracterizes the witness' testimony, but
12      you know to be an inaccurate resuscitation of
13      what his statements under oath have been. Why
14      are you mischaracterizing the prior testimony?
15 BY MR. COMERFORD:
16 Q   Mr. Silver, let me just ask you a
17 question. Did you arrange a memorabilia signing for
18 Kenny Golladay that took place on January 21, 2019?
19 A   I participated in it.
20 Q   Okay. What was your participation?
21 A   Can you ask me a more specific
22 question?
23 Q   Describe the nature of your
24 participation in the memorabilia signing that took
25 place on January 21, 2019 involving Kenny Golladay.

Page 127

1  A   I understand the question, but it's
2  like a broad -- it's a broad question, so I'm just
3  asking if you can ask me something more specific?
4  Q   Just do your best and please describe
5  your participation.
6       MR. IACONELLI: Objection.
7  BY MR. COMERFORD:
8  Q   What was your role and what did you do?
9       MR. IACONELLI: Thank you because at
10      the beginning of the deposition you told him
11      that if he didn't understand a question or if
12      he asked for help that you would agree to
13      rephrase your question.
14 BY MR. COMERFORD:
15 Q   Go ahead, Mr. Silver.
16 A   Okay. There was communication -- I
17 participated in communication, in discussions of the
18 details. A lot of the middleman of the
19 communications of the details, I would say.
20 Q   Okay. You contacted Kenny Golladay and
21 asked him if he would be interested in doing the
22 memorabilia signing, right?
23 A   Yeah, that's correct.
24 Q   You provided the contract that Kenny
25 Golladay and Craig Boone signed, right?

Page 128

1  A   That's correct. I'm sorry, I provided,
2  I edited an agreement that we had used in the past
3  for this signing.
4  Q   You were involved in the drafting of
5  the contract between Craig Boone's company and Kenny
6  Golladay for this signing, right?
7  A   Yeah. I don't know if I would use the
8  word drafting just because I plugged and played with
9  some of the terms from a former contract we used.
10 Q   And you were involved in helping Kenny
11 Golladay and Craig Boone execute the contract for
12 the signing, right?
13 A   In communications I was.
14 Q   Other than the January 21, 2019
15 signing, did you have any other topics that you
16 communicated with Kenny Golladay on prior to
17 January 30, 2019?
18 A   Prior to January -- not to my
19 knowledge. Outside of the scope of this signing?
20 Q   Yeah.
21 A   I don't believe so.
22 Q   Okay. So this memorabilia signing that
23 took place on January 21, 2019 is the only thing you
24 ever communicated with Kenny Golladay about prior to
25 January 30, 2019, do I have that right?

Page 129

1  A   To the best of my recollection, I
2  believe that's correct.
3  Q   Do you know whether CAA did any
4  marketing-related work for Kenny Golladay or with
5  Kenny Golladay, other than this memorabilia signing
6  prior to January 30, 2019?
7  A   Not that I have knowledge of.
8  Q   Do you know who Mr. Golladay was dating
9  in late 2018?
10 A   No.
11 Q   Did you ever communicate with anybody
12 that Mr. Golladay was dating in that time period,
13 late 2018 or early 2019?
14 A   Did I communicate with the person that
15 he may have been dating, is that the question?
16 Q   Yes.
17 A   No, I don't believe so.
18 Q   Did you communicate with Mr. Golladay's
19 mother, Stacy Wright-Whitaker, at any point prior to
20 January 30, 2019?
21 A   I did not.
22 Q   And I'm including either by phone or
23 text or e-mail.
24 A   I don't have any recollection of that,
25 no.

33 (Pages 126 to 129)

PohlmanUSA Court Reporting
(877) 421-0099    PohlmanUSA.com

Page 134

1  December 2018?
2          MR. IACONELLI:  Objection, foundation.
3          THE WITNESS:  I have not.
4  BY MR. COMERFORD:
5      Q    Have you ever talked with Todd France
6  about the trip he made to Detroit in early
7  October 2018?
8      A    Sorry, will you say that one more time?
9      Q    Have you ever spoken with Todd France
10 about a trip that he took to Detroit to meet with
11 Kenny Golladay in early October 2018?
12     A    No.
13         MR. IACONELLI:  Objection, foundation
14     and to the extent that it calls for
15     speculation.
16         THE WITNESS:  The answer is no.
17 BY MR. COMERFORD:
18     Q    How did you first hear about Kenny
19 Golladay being affiliated with CAA?
20     A    Sometime, I think it was early
21 December, Todd had told us that he signed him or is
22 signing him.  I don't remember exact verbiage and
23 this, like I said, was early December that he
24 just -- I wouldn't say an announcement.  It wasn't
25 anything formal, but was sharing with the group and

Page 135

1  the office, whoever was there.  And, you know,
2  that's all I can remember.
3      Q    Who else was present, other than you,
4  when Todd France made this statement?
5      A    I have no recollection of who exactly
6  was in the office at the time.  I do know that there
7  were other people there, though.
8      Q    And can you identify any of them?
9      A    I can't remember who was specifically
10 there at that time.  It's over two years ago.  No, I
11 can't remember.
12     Q    Where were you standing when you heard
13 Mr. France say this?
14     A    I don't know if I was sitting in my
15 office with the door open, if I was standing out.
16 If I was sitting at a cubicle.  I have no idea.
17     Q    Where was Mr. France standing when he
18 made this statement that you heard?
19     A    I have no recollection.  I would
20 assume -- well, I shouldn't make an assumption, so
21 I'll leave it at I don't know.
22     Q    Was he in his office?  Was he in the
23 hallway or some kind of common area?  Do you have
24 any recollection?
25     A    I don't have a recollection.  Most

Page 136

1  people are not, you know, right by his office, so I
2  would say probably a common area.  But like I said,
3  it could have been in his office.  I don't think
4  that was the case.  I think it was an informal thing
5  out in the open, so -- but I can't tell you
6  100 percent.
7      Q    As best you can recall, how many people
8  were able to hear Mr. France's statement that he had
9  signed or was going to sign Kenny Golladay?
10     A    I'm not sure on that.
11     Q    Can you remember anything else that
12 Mr. France said during this statement?
13     A    I think that was -- I mean, I don't --
14 yeah, I can't remember exactly what he said or
15 anything else that he added to it at this time, no.
16     Q    Did he say, we can start doing
17 marketing events for Mr. Golladay now?
18         MR. IACONELLI:  Objection.
19         THE WITNESS:  I don't remember, but I
20     would not assume so.  I'm not sure, though.  I
21     would not assume that would follow after his
22     statement about that.  I don't have a
23     recollection of the conversation,
24     unfortunately.
25 BY MR. COMERFORD:

Page 137

1      Q    So have you told me everything that you
2  can recall about the statement that you overheard
3  Mr. France make?
4          MR. IACONELLI:  Objection, foundation
5      and argumentative.
6          THE WITNESS:  I believe I've answered
7      all of your questions to the best of my
8      ability.
9  BY MR. COMERFORD:
10     Q    Have you told me everything you can
11 remember about it?
12         MR. IACONELLI:  Objection, asked and
13     answered.
14         MR. MAXIM:  Objection, asked and
15     answered.
16         THE WITNESS:  I think so.  I think I've
17     tried to give you as much information from
18     what I remember from the questions that you
19     asked me.
20 BY MR. COMERFORD:
21     Q    I'm not asking you whether you answered
22 the questions that I asked earlier.  My question now
23 is different than that.
24     A    Okay.
25     Q    My question now is, have you told me

35 (Pages 134 to 137)

Page 138

1  everything that you can remember about the statement
2  that Todd France made about Kenny Golladay in the
3  office in early December 2018?
4          MR. IACONELLI:  Objection, asked and
5      answered three times.
6          THE WITNESS:  I believe so.
7  BY MR. COMERFORD:
8      Q   Who was Mr. France speaking to when he
9  made this statement?
10     A   I don't think it was directed to one
11 person. I think it was overall just an informal
12 thing to whoever was standing around or sitting
13 around their office or their cubicles at that time.
14 I'm not exactly sure of the details.
15     Q   Did he say, hey, everyone, great news,
16 I've signed Kenny Golladay or I'm going to be
17 signing Kenny Golladay or how did it come across to
18 you?
19         MR. IACONELLI:  Objection to form,
20     compound.  To the extent it calls for
21     speculation.
22         MR. MAXIM:  Same objections.
23         THE WITNESS:  Like I said, I don't know
24     the specifics of what he said and I don't --
25     and I said this before, I don't know if he

Page 139

1      said signed, signing.  I don't remember the
2      exact verbiage or exactly what he said.  To
3      the extent I obviously don't know anything
4      else outside of that.
5  BY MR. COMERFORD:
6      Q   Was he making an announcement to
7  multiple people at once?
8      A   I would assume -- I would say that it
9  was directed to multiple people. I don't think I
10 overheard him say to one person, by the way this,
11 and I just took that news and ran with it. I think
12 it was directed to the group of people who were
13 around him at that certain specific time.
14     Q   Was this something Mr. France would do
15 whenever he was developing a new relationship with a
16 football player?
17         MR. IACONELLI:  Objection, speculation.
18         THE WITNESS:  I don't like calling out
19     of like -- this one-time thing.  I mean, I
20     don't think there's any one way that he would
21     go about, you know, telling us or sharing that
22     news.  I'm not sure.
23 BY MR. COMERFORD:
24     Q   Had you heard of Mr. Golladay as a
25 football player before Mr. France made this

Page 140

1  statement?
2      A   I believe so.  I can't say 100 percent.
3      Q   You knew that he --
4          MR. MAXIM:  He wasn't finished.
5          THE WITNESS:  I believe so.  My
6      assumption would be that I would have
7      remembered or I would have known who he was at
8      that time.
9  BY MR. COMERFORD:
10     Q   You believe that you knew that he was
11 an active football player in the NFL and was already
12 on an NFL team when you heard Mr. France make this
13 statement in December of 2018, right?
14     A   I think so.  I can't take myself, you
15 know, back to remembering if I knew who he was, but
16 I think I would have known who he was.
17     Q   Did Mr. France say anything
18 specifically to you about Kenny Golladay in December
19 of 2018?
20     A   Specifically, like directed only to me?
21     Q   Yes.
22     A   No.  No, not to my recollection.  I
23 think this is the only encounter of anything having
24 to do with Kenny Golladay.
25     Q   When did you first make contact with

Page 141

1  Kenny Golladay?
2      A   It would have been towards the end of
3  December, early January, I think.
4      Q   Did you ask Mr. Golladay whether he had
5  signed a marketing agreement with CAA?
6      A   I did not.
7      Q   Did you ask Todd France whether Kenny
8  Golladay had signed a marketing agreement with CAA?
9      A   I did not.
10     Q   Would it be fair to say that when you
11 set up this memorabilia signing for Kenny Golladay,
12 you did that without confirming that he had signed a
13 marketing agreement with CAA?
14         MR. MAXIM:  Object to the form, assumes
15     facts not in evidence.
16         MR. IACONELLI:  And I would just
17     interpose an objection to the extent that it
18     mischaracterizes yet again his prior
19     testimony.
20         THE WITNESS:  Yeah, I wouldn't say
21     that.  It kind of makes it sound like a
22     reckless, you know, doing something, you know,
23     way off of what I would have been from hearing
24     that news in early December, especially weeks
25     later if he said signing or signed.  That was

36 (Pages 138 to 141)

Page 142

1  my complete assumption that he had signed, so
2  no, I didn't go and see any, you know, proof
3  of that.  But also I think it's helpful to
4  understand at that time or most of my career
5  I've never, you know, when CAA had signed new
6  clients or anything, any sort of paperwork,
7  whether it is, I think on the field contract
8  side or even the marketing side.
9  BY MR. COMERFORD:
10     Q    We agree now that you know that when
11  this memorabilia signing took place on January 21,
12  2019 that Kenny Golladay did not have a marketing
13  agreement in place with CAA Sports on that day, do
14  we agree on that?
15          MR. IACONELLI:  Objection to the form
16     and lacks foundation.
17          MR. MAXIM:  Object to the form as well.
18          THE WITNESS:  I understand that that is
19     the allegation today and all I can say is at
20     that time they were the facts that I knew at
21     hand.
22  BY MR. COMERFORD:
23     Q    Did anyone tell you that Kenny Golladay
24  had entered into a marketing agreement with CAA
25  prior to January 21, 2019?

Page 143

1     A    No, no one ever told me at any point
2  that he officially did or did not.
3     Q    You now know that as of January 21,
4  2019, Kenny Golladay had a marketing agreement in
5  place with Clarity Sports, right?
6          MR. IACONELLI:  Objection to the form.
7          THE WITNESS:  You're saying as of now,
8     today, but you added January -- you added
9     something about January.
10 BY MR. COMERFORD:
11    Q    Yeah.  You know, as you sit here today,
12 that Kenny Golladay had a marketing agreement in
13 place on January 21, 2019 with Clarity Sports,
14 right?
15         MR. IACONELLI:  Objection to the form.
16         THE WITNESS:  I understand that as part
17    of this lawsuit.
18 BY MR. COMERFORD:
19    Q    And so can you think of any other time
20 that you have participated in a marketing event for
21 a football player who was not under a marketing
22 agreement with CAA and was under a marketing
23 agreement with another sports agency?
24         MR. IACONELLI:  Objection, vague and to
25    the extent it calls for speculation.

Page 144

1         THE WITNESS:  Just so I understand
2    correctly, you're asking do I know of any
3    examples of when I personally would have done
4    a deal?
5  BY MR. COMERFORD:
6     Q    Yeah.
7     A    With anybody that didn't have a
8  marketing agreement with CAA?
9     Q    Yep.
10    A    So, like I said before, with all of the
11 agreements at CAA, I guess technically I wouldn't
12 have any first-hand knowledge that any of those
13 clients had agreements with CAA and I can't think of
14 specific examples, but unfortunately, I feel like I
15 hear about this a lot in this industry and we've
16 had, you know, clients at our own agency where we
17 see on their social that they did a brand deal or
18 posting about a brand deal or had an appearance that
19 are not through us.  So does it happen everyday, I
20 don't know, but I can't say that it doesn't happen.
21    Q    Okay.  You understand that my view of
22 the facts is that on January 21, 2019, Kenny
23 Golladay did a memorabilia signing that CAA Sports
24 participated in setting up and at the time it
25 happened he did not have a marketing agreement with

Page 145

1  CAA and he did have a marketing agreement with
2  Clarity Sports.
3          You understand that's the allegation,
4  right?
5     A    I understand that's the allegation.
6          MR. IACONELLI:  Objection.  Objection.
7     Argumentative, compound, not reasonably
8     calculated to lead to the discovery of
9     admissible evidence.
10         MR. MAXIM:  Join in those objections.
11 BY MR. COMERFORD:
12    Q    Are you personally aware of any similar
13 situations that you've been involved in where a
14 football player is under a marketing agreement with
15 one sports agency, but then does a marketing event
16 that another sports agency has participated in and
17 helped set up?
18         MR. MAXIM:  Objection, asked and
19    answered.
20         MR. IACONELLI:  Also object to the
21    extent it goes outside the relevant time
22    frame.
23         THE WITNESS:  As I sit here right now,
24    I'm doing my best to try to think of like a
25    specific example I can give you, other than I

37 (Pages 142 to 145)

Page 162

1  MR. IACONELLI: Objection, asked and
2  answered.
3  MR. HERBER: I join in the objection,
4  John. That's at least the third, fourth time
5  you've asked the same question.
6  MR. COMERFORD: I just want to make
7  sure I have it right.
8  MR. IACONELLI: I think you have it
9  right, Mr. Comerford. It's in the transcript.
10  You're running out the clock. We have
11  questions for this witness. Okay. It's coming
12  up on 2:30. Please not ask him the same
13  questions more than once. You have a
14  transcript. You have his answer. Please ask
15  him a new question.
16  BY MR. COMERFORD:
17  Q  Other than Mr. Golladay, did you speak
18  with anyone else about this call that you got from
19  Craig Boone about somebody maybe objecting to the
20  signing?
21  A  I did not. I don't believe so.
22  Q  Tell me what you remember Mr. Golladay
23  saying to you when you contacted him with this
24  issue.
25  A  What he said to me?

Page 163

1  Q  Yes.
2  A  Something along the lines of I think I
3  said before that he was okay to do -- he's done
4  these type of signings before and he's okay to do
5  this signing.
6  Q  Why did you not check with Mr. France?
7  MR. IACONELLI: Objection,
8  argumentative, lack of foundation.
9  THE WITNESS: I did not think it was
10  necessary.
11  BY MR. COMERFORD:
12  Q  As you look back now, do you think that
13  you should have informed Mr. France that an
14  objection had been voiced to this memorabilia
15  signing?
16  MR. IACONELLI: Objection, misleading,
17  argumentative, calls for speculation.
18  MR. MAXIM: I have the same objection.
19  Go ahead, Mr. Silver.
20  THE WITNESS: At the time of this all
21  happening, I did what I thought was best with
22  the facts that I knew and I just can't
23  speculate or, you know, change what I would
24  have known then to today, unfortunately.
25  BY MR. COMERFORD:

Page 164

1  Q  Right. And now what I'm talking about,
2  as you sit here today, are you of the view that you
3  should have reached out to Mr. France and informed
4  him of this objection that had been made to the
5  memorabilia signing that you were participating in
6  setting up for Mr. Golladay?
7  MR. IACONELLI: Objection, asked and
8  answered.
9  MR. MAXIM: Same objection.
10  MR. IACONELLI: I would join again,
11  it's misleading, argumentative, calls for
12  speculation and mischaracterizes his prior
13  testimony.
14  BY MR. COMERFORD:
15  Q  You can answer.
16  A  Yeah, I'm just going to, you know, stay
17  with the same answers. Obviously, you know, the
18  facts I knew at that time I couldn't change, so I
19  don't want to speculate today to say what I would
20  have done then because that's just not the situation
21  that occurred.
22  Q  When you received the subpoena from the
23  Plaintiffs in this case, did you go and check your
24  text messages to see if you had any texts with Craig
25  Boone?

Page 165

1  A  That had something to do with this
2  signing?
3  Q  I'm sorry, I couldn't hear you. Could
4  you please say that again?
5  A  You're asking if I went and checked if
6  I had communicated or texts with Craig Boone in like
7  -- in relation with the signing?
8  Q  Yeah.
9  A  I did.
10  Q  Okay. Did you have any?
11  A  I did not.
12  Q  Do you have any at some point that were
13  just no longer on your phone?
14  MR. IACONELLI: Objection, time frame.
15  BY MR. COMERFORD:
16  Q  I mean, let's focus on the, you know,
17  text from the 2018 -- December 2018 and January 2019
18  time frame, did you have -- did you exchange text
19  messages with Craig Boone about the Golladay signing
20  in those months?
21  A  I believe you asked me that earlier and
22  I wasn't -- I wasn't sure. I had no recollection of
23  if we exchanged texts or the full, you know, scope
24  of communication between us, so I'm not entirely
25  sure.

42 (Pages 162 to 165)

PohlmanUSA Court Reporting
(877) 421-0099    PohlmanUSA.com

Page 170

```
 1   objections.
 2          THE WITNESS:  The only thing I would
 3   say, it's not fair because I don't know where
 4   else I would have gotten it from, but yes,
 5   sure, I can -- yes, it's speculation because I
 6   don't fully remember.
 7  BY MR. COMERFORD:
 8      Q    Did you ever communicate with Mr.
 9  Golladay from your -- well, strike that.
10          Did you have a landline that you used
11  in the office?
12      A    Did I have one?  Sorry, you cut out for
13  a second.  Did we have a landline?
14      Q    Yes, did you have a landline at your
15  desk?
16      A    I did.
17      Q    Okay.  Did you use that landline to
18  communicate with Mr. Golladay?
19          MR. IACONELLI:  Time frame?
20  BY MR. COMERFORD:
21      Q    In December 2018 or January 2019.
22      A    I have no recollection of how I
23  communicated with Kenny Golladay.
24      Q    Okay.  I think my question is a little
25  different, do you know whether or not you used your
```

Page 171

```
 1  landline to communicate with Mr. Golladay?
 2      A    I do not know.
 3          MR. IACONELLI:  Objection,
 4      argumentative, mischaracterizes his prior
 5      testimony, asked and answered.  The witness
 6      said I have no recollection of how I
 7      communicated with Mr. Golladay.
 8  BY MR. COMERFORD:
 9      Q    Okay.  Let me see here.
10          I'm going to share my screen and I'm
11  going to show you what I am marking as Exhibit 3.
12          Can you read that, Mr. Silver?
13      A    Do you mind zooming in just a bit?
14      Q    Sure.
15      A    Thank you.
16      Q    So this is an e-mail from you to --
17          MR. IACONELLI:  What are you marking
18      this as, Mr. Comerford?  Is this Exhibit 3?
19          MR. COMERFORD:  Exhibit 3.
20          MR. IACONELLI:  Thank you.
21          (e-mail from Jake Silver to Boone
22      Enterprises, Inc., CAA 13 was marked Exhibit 3
23      for identification.)
24  BY MR. COMERFORD:
25      Q    This is an e-mail from you to
```

Page 172

```
 1  BooneEnterprisesInc@gmail.com, right?
 2      A    Yes.
 3      Q    Did you send this e-mail?
 4      A    Yes.
 5      Q    And it's dated Tuesday, January 8, 2019
 6  at 6:53 a.m.  Is that the time that you sent this
 7  e-mail in Atlanta local time as best as you can
 8  recall?
 9      A    As best as I recall.  I mean, because
10  it says it right there, but I have no other
11  knowledge -- I mean, I just don't remember a timing
12  of when I sent it, but if it says it.
13          MR. IACONELLI:  Mr. Comerford, I wanted
14      to wait for the witness to answer.  Would you
15      please identify the document by Bates number
16      for the record, please?
17          MR. COMERFORD:  It starts with CAA 13.
18  BY MR. COMERFORD:
19      Q    And the subject is Kenny G. contract,
20  right?
21      A    Yes, I'm sorry, what time did you say?
22  That's 6:53, that's p.m. Atlanta time?
23      Q    It looks a.m. to me.
24          MR. IACONELLI:  Objection, foundation.
25  BY MR. COMERFORD:
```

Page 173

```
 1      Q    Because it says 06.  Do you know what
 2  time this e-mail was sent?
 3      A    I don't know what time this e-mail was
 4  sent.  It would surprise me that I was up, you know,
 5  sending a contract that early, but I don't know.  I
 6  have no basis on either/or.
 7      Q    Okay.  And you sent a document to
 8  Mr. Boone called Golladay - Kenny Enterprises
 9  Autograph Signing, right?
10      A    That's what the attachment was called?
11      Q    Yeah.  That attachment line right
12  there.
13      A    Right.
14      Q    And did you create that Word document
15  that's on the attachment line?
16      A    Like I said before, it's a contract
17  that we had used in the past between the player of
18  CAA and Craig Boone, like an approved form, I would
19  say, and I just plugged in, you know, took out
20  whatever the old contact or the details of the
21  signing, whatever, you know, was necessary and just
22  changed it, so it was easy for his review.  That's
23  what I did.
24      Q    Okay.  Is that the cell number that you
25  had at the time there?
```

Page 242

1  Q   Okay. Mr. Silver, I think when we took
2  a break we were talking about the morning of
3  January 21, 2019. You started receiving
4  communications from Kenny Golladay that he had
5  missed his flight, correct?
6  A   Correct. Delayed or missed it.
7  Something to push it back.
8  Q   Okay. Do you know what time he
9  eventually flew?
10 A   No, I don't. I don't know the specific
11 time. I don't know exactly.
12 Q   What time was he supposed to arrive at
13 the signing in Chicago?
14 A   I would be guessing, morning time.
15 That's all I remember.
16 Q   What time did he actually end up
17 arriving?
18 A   I don't how -- all I know it was that
19 day and I think that the signing was probably late
20 afternoon, evening time, so -- I don't know exactly,
21 but later in that day.
22 Q   Did Mr. Golladay say anything that he
23 wanted to reschedule the signing because of his
24 travel problems?
25 A   I don't think so.

Page 243

1  Q   Did you communicate with anybody at CAA
2  about the travel issues that Mr. Golladay was
3  having?
4  A   I did not.
5  Q   You told me that you reported directly
6  to Bob Philp at the time of the signing in January
7  of 2019; is that correct?
8  A   I believe so, yes.
9  Q   Did you ever tell Bob Philp that you
10 were participating in the arrangement of this
11 signing?
12 A   I did not.
13 Q   Why not?
14 A   It's not really typically what we did.
15 He oversaw the marketing department, but it wasn't
16 like every single deal that we're working on was
17 being communicated.
18 Q   Did Howard Skall work on memorablia
19 signings for CAA Sports?
20 A   Yes.
21 Q   Why wasn't Howard Skall included in
22 that memorabilia signing?
23 A   Every marketing person, at least I can
24 speak for football, worked in some form of
25 memorablia signings and deals. We weren't all

Page 244

1  involved in each other's -- other, you know,
2  dealings that were going on at the time. Sometimes
3  there are cases I think that multiple people were
4  working together.
5  Q   Have you, during the time that you
6  worked at CAA, were there any other signings that
7  you participated in setting up where you were the
8  only person at CAA who was aware of it?
9      MR. MAXIM: Object to the form.
10     THE WITNESS: I'm sure there were. I
11  can't give you a specific example, but I
12  wouldn't see why not.
13 BY MR. COMERFORD:
14 Q   I mean that is exactly what I'm asking
15 for is an example. Can you give me an example of
16 another memorabilia signing that you participated in
17 in any way while you were at CAA that nobody else at
18 CAA knew about?
19 A   I'm going to sit here and try to think
20 and I will. Yeah, as I think back, I don't -- oh,
21 that person knew about this and that person didn't.
22 It's not what I think about. I mean, like I said
23 before, memorabilia is like, I don't want to say it
24 in a negative way, but it's an easier type of deal
25 that most people get and, you know, athletes get.

Page 245

1  It's like one of the easiest first type of deals
2  they get. It's not like a big endorsement or TV
3  commercial to be celebrated and known, you know,
4  around. Yeah, I can't give you a specific example
5  other than I don't see why. There would be probably
6  other cases like this.
7  Q   Did you speak with Kenny Golladay when
8  he was done with the memorabilia signing?
9  A   I don't know if I spoke with Kenny. I
10 know that Craig in some way told me that it had
11 wrapped and it was finished. I don't know if I
12 heard from Kenny after the fact.
13 Q   To your knowledge, who were the people
14 who attended the signing in person?
15 A   I know, obviously Kenny was there.
16 Gerry was helping facilitate signing. Kenny had a
17 female with him and anybody else I don't think I
18 would have known about. At least I can't remember
19 at this time.
20 Q   Was anybody from CAA there?
21 A   No. Not that I'm aware of. I
22 obviously wasn't there, but no, not to my knowledge.
23 Q   At any point after the signing, did Mr.
24 Golladay view any feedback about the signing?
25 A   Not that I can remember.

Page 302

1  A  No.
2  Q  Has it ever been part of your job
3  duties at CAA to go out and recruit NFL players to
4  use the services of an NFL PA registered contract
5  advisor that works for CAA?
6  A  No.
7  Q  Were you part of any plan or process
8  through which CAA was trying to recruit Mr. Golladay
9  to terminate his relationship with his current agent
10 as of January 21, 2019, Mr. Bernstein, and hire an
11 agent employed by CAA?  In fact, let me withdraw the
12 question.  I'll see if I can ask it more directly.
13 Were you ever part of any plan or process through
14 which CAA was trying to recruit Mr. Golladay to
15 terminate his relationship with his current agent,
16 Mr. Bernstein, and hire an agent employed by CAA?
17 A  No.  And like I said earlier, I did not
18 know about the relationship or any prior
19 relationship like that.
20 Q  Okay.  Were you ever part of any plan
21 or process through which Mr. France was trying to
22 recruit Mr. Golladay to terminate his relationship
23 with Mr. Golladay's former agent, Jason Bernstein,
24 and hire Mr. France as his current agent?
25 A  No.

Page 303

1  Q  Was it your job when you were employed
2  by CAA to find marketing opportunities for NFL
3  athletes who were clients of CAA?
4  A  Yes.
5  Q  Okay.  And focusing on the end of
6  December 2018, at the time you mentioned Mr.
7  Golladay's name on the call that you had with
8  Mr. Boone as being someone potentially interested in
9  doing a memorabilia signing event with Mr. Boone,
10 did you believe that Mr. Golladay was a client of
11 CAA?
12 A  I did.  I think I testified to that
13 earlier.
14 Q  And at that time had you formed this
15 belief based on what you previously heard close to
16 the beginning of December of 2018 about how
17 Mr. France had already obtained Mr. Golladay as a
18 new client?
19 A  Sorry, say it one more time.
20 Q  Sure.  Have you formed this
21 understanding that you described in response to my
22 last question based on what you previously heard
23 close to the beginning of December 2018 about how
24 Mr. France had already obtained Mr. Golladay as a
25 new client?

Page 304

1  A  Yes.
2  Q  And prior to having the telephone
3  conversation with Mr. Boone that you testified to
4  earlier, where you mentioned Mr. Golladay --
5  A  You just cut out.  I'm sorry.  You just
6  cut out for a second.
7  Q  We're doing this over the Internet, so
8  please let me know at any point if any part of my
9  question gets garbled.  I want to make sure you hear
10 all of it.
11 A  Okay.
12 Q  Prior to you participating in the
13 telephone conversation that Mr. Comerford asked you
14 about with Mr. Boone where you first mentioned Mr.
15 Golladay's name and I think you said the time frame
16 for that was the end of December 2018.
17 Had Mr. France or anyone else at CAA
18 instructed you to obtain marketing opportunities or
19 memorabilia signing events for Mr. Golladay for the
20 purpose of convincing Mr. Golladay to sign on as a
21 client of Mr. France?
22 A  No.
23 Q  And let me ask you a slightly different
24 question.  Prior to that telephone conversation that
25 you described with Mr. Boone during the end of

Page 305

1  December 2018 when you first mentioned Mr.
2  Golladay's name to him, had Mr. France or anyone
3  else at CAA instructed you to obtain marketing
4  opportunities, or memorabilia signing events for Mr.
5  Golladay for the purpose of convincing Mr. Golladay
6  to sign on as a client of CAA?
7  A  No.
8  Q  In any communications you may have had
9  with Mr. Boone, or any of the other memorabilia
10 dealers being sued by the Plaintiffs in this
11 lawsuit, were there ever any statements made by
12 anyone that CAA or Mr. France wanted to schedule the
13 January 21, 2019 signing event that Mr. Comerford
14 has been asking you about today for the purpose of
15 convincing Mr. Golladay to terminate Mr. Bernstein
16 as his agent and to hire Mr. France as his new
17 agent?
18     MR. COMERFORD:  Form.
19     THE WITNESS:  No.
20 BY MR. IACONELLI:
21 Q  I'll ask you a slightly different
22 question.  In any communication that you may have
23 had with Mr. Boone or any of the other memorabilia
24 dealers, defendants being sued in this lawsuit, was
25 there ever any statement made by anyone that CAA or