# Exhibit 15



# PohlmanUSA®

## Court Reporting and Litigation Services

---

Kenneth Golladay - CONFIDENTIAL
ATTORNEY'S EYES ONLY

August 30, 2021

---

Clarity Sports International, LLC, et al.

vs.

CAA Sports, LLC, et al.

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF PENNSYLVANIA


CLARITY SPORTS INTERNATIONAL,
LLC, and JASON BERNSTEIN,

      Plaintiffs,

  vs.          Case No. 1:19-cv-00305-YK

CAA SPORTS, LLC, et al.,

      Defendants.




Remote Videotaped Deposition of
KENNETH GOLLADAY

CONFIDENTIAL - ATTORNEYS' EYES ONLY




Monday, August 30, 2021
10:05 a.m.




Reporter:  Stephanie R. Dean, RPR

## Page 2

REMOTE APPEARANCES:

On behalf of the Plaintiffs:
   JOHN D. COMERFORD, ESQ.
   Dowd Bennett LLP
   7733 Forsyth Boulevard, Suite 1900
   St. Louis, MO 63105
   314.889.7300
   jcomerford@dowdbennett.com

On behalf of Defendants MVP Authentics, LLC,
Daryl Eisenhour, Jason Smith, Boone Enterprises,
Inc., d/b/a Boone Enterprises Authentic
Autographs and Craig Boone:
   WILLIAM J. CLEMENTS, ESQ.
   MICHAEL A. IACONELLI, ESQ.
   Klehr Harrison Harvey Branzburg, LLP
   1835 Market Street, 14th Floor
   Philadelphia, PA  19103
   215.569.2700
   wclements@klehr.com
   miaconelli@klehr.com

On behalf of Defendants Redland Sports and Gerry
Ochs:
   ILES COOPER, ESQ.
   J.T. HERBER, ESQ.
   Williamson, Friedberg & Jones, LLC
   10 Westwood Road
   Pottsville, PA  17901
   570.622.5933
   - - - - -

ALSO PRESENT:
   Matt Schnorf, Videographer
   Jason Bernstein
   Susan Wasilewski
   Lauren Marsh
   - - - - -

## Page 3

I N D E X
EXAMINATION OF KENNETH GOLLADAY
BY MR. COMERFORD          5
BY MR. CLEMENTS          166
BY MR. HERBER          180
BY MR. COMERFORD          184
BY MR. CLEMENTS          189

EXHIBITS
Plaintiff's Exhibit 1          13
Plaintiff's Exhibit 2          13
Plaintiff's Exhibit 3          35
Plaintiff's Exhibits 4 and 5          37
Plaintiff's Exhibit 6          55
Plaintiff's Exhibit 7          56
Plaintiff's Exhibit 8          69
Plaintiff's Exhibit 9          74
Plaintiff's Exhibit 10          86
Plaintiff's Exhibit 11          88
Plaintiff's Exhibit 12          91
Plaintiff's Exhibit 13          94
Plaintiff's Exhibit 14          103
Plaintiff's Exhibit 15          105
Plaintiff's Exhibit 16          112
Plaintiff's Exhibits 17 and 18          118
Plaintiff's Exhibit 19          123
Plaintiff's Exhibit 20          155
Plaintiff's Exhibit 21          164
Plaintiff's Exhibit 22          164
Defendant's Exhibit 23          165
Plaintiff's Exhibit 24          165
Plaintiff's Exhibit 25          179
Plaintiff's Exhibit 26          184!

- - - - -

## Page 4

MR. COMERFORD:  So we're on the record. Today is August 30th 2021.  It's 10:05 a.m. Eastern time.  This is John Comerford, counsel for Plaintiffs.  Mr. Golladay, the witness, has not appeared on the Zoom videoconferencing.  His attorneys are not here and the attorneys for the Defendants are not here.  On Friday I received an email from Mr. Golladay's attorneys saying that they were refusing to produce him at the noticed time of 10:00 a.m. Eastern and instead will produce him at 2:00 p.m. Eastern.  Plaintiffs made clear that we object to that and because we have a full day of questioning, we want to start at 10:00 a.m. Eastern.  We're here and neither Mr. Golladay, nor his attorneys nor the attorneys for the Defendants are here, so at this time we will adjourn the deposition and reconvene it at 2:00 p.m. Eastern as per Mr. Iaconelli's email on Friday.  Plaintiffs reserve all of our rights with this issue.

(Off the record.)

* * * * * * *

## Page 5

THE VIDEOGRAPHER:  We are on the record. This is the videotaped deposition of Kenneth Golladay.  Today's date is August 30, 2021, and the time is 2:12 p.m. Eastern time.  This is in the case of Clarity Sports International, LLC and Jason Bernstein versus Redland Sports, et al.  Case Number 1:19-cv-00305-YK pending in the United States District Court for the Middle District of Pennsylvania.  All counsel will be reflected on the stenographic record.  Will the court reporter please swear in the witness?

KENNETH GOLLADAY, of lawful age, called for examination, being by me first duly sworn, as hereinafter certified, deposed and said as follows:

EXAMINATION OF KENNETH GOLLADAY
BY MR. COMERFORD:

Q.  Good afternoon.

A.  How are you doing?

Q.  Will you please state your full name for the record?

A.  Kenneth Kasey Golladay.

Q.  Mr. Golladay, my name John Comerford.  I represent Jason Bernstein and Clarity Sports International, LLC.  We've never spoken with each other, right?

Page 6

1    A.   No.
2    Q.   Have you ever had your deposition taken
3    before?
4    A.   No.
5    Q.   Have you ever testified in court before?
6    A.   No.
7    Q.   Do you understand that you're under oath
8    today in this proceeding as I ask you questions
9    just like you would be in a court of law?
10    A.   Yes.
11    Q.   If you don't understand any of the
12    questions that I've asked, can you please let me
13    know and I'll try to ask it a different way or do a
14    better job, okay?
15    A.   Okay.
16    Q.   Try to answer questions yes or no whenever
17    you can or feel free to explain your answer.  We
18    can take a break whenever you need to to use the
19    restroom or something like that.  Generally I like
20    to go for about an hour or hour and a half or
21    however long you want to go, but...
22    A.   I'll just state this right now.  This
23    whole thing won't be that long.  I still have
24    obligations and everything.  I'm in camp right now,
25    I still have stuff going on as well, so I have,

Page 7

1    like, two or three hours, that's max.
2    Q.   And so are you saying that you've got two
3    or three hours today and then we can finish the
4    questioning on another day?
5    A.   I'm just going to be done with it.
6    Q.   Okay.  We might have to take that up with
7    the court then because we're entitled to ask you
8    questions until we're finished, up to a maximum of
9    seven hours.  Are you aware of that?
10    A.   No.
11    Q.   All right.  The one thing I would ask is
12    that if you ask to take a break, that you answer
13    whatever question I've asked before we take a
14    break, okay?  Is that okay?
15    A.   All right.
16    Q.   Where are you now, sir?
17    A.   I'm in New Jersey.
18    Q.   Are you in a house or in an office?
19    A.   House.
20    Q.   Whose home is it?
21    A.   Mine.
22    Q.   Okay.  And who is there in the room with
23    you?
24    A.   I have my lawyers.
25    Q.   What are their names?

Page 8

1    A.   Mike and Bill.
2    Q.   Is there anyone else in the room there
3    with you?
4    A.   No.  I have other people as well working
5    on my house.  I just signed a new deal here to the
6    New York Giants.  I just bought a house and I have
7    construction going on right now.
8    Q.   But as far as sitting there listening to
9    the deposition, it's you and Michael Iaconelli and
10    William Clements?
11    A.   Yes.
12    Q.   Do you have any papers there in front of
13    you?
14    A.   No.
15    Q.   What did you do to prepare for the
16    deposition?
17    A.   Not much.
18    Q.   What did you do?
19    A.   I didn't do much.
20    Q.   Did you meet with Mr. Iaconelli and
21    Mr. Clements?
22    A.   Not really.
23    Q.   Did you meet with them, yes or no?
24    A.   They got here today, so I met with them
25    before we got on this.

Page 9

1    Q.   What time did you begin meeting with them
2    today?
3    A.   I don't know.  What time is it?  Two
4    something.  An hour ago maybe.
5    Q.   Did you have any appointments this morning
6    or obligations that made you unable to do this
7    deposition this morning?
8    A.   Yes.
9    Q.   What was that?
10    A.   I'm in training camp right now.  I did a
11    little injury.  I'm getting ready for week one,
12    just trying to get my body right, take care of my
13    body.
14    Q.   How long did you meet with Mr. Iaconelli
15    and Mr. Clements today?
16    A.   I already answered that.
17    Q.   How long was your meeting?
18    A.   I already answered that.
19    Q.   I don't remember the answer.
20    A.   I answered it.  It started at two.
21    They've been here for like an hour.
22    Q.   One hour.  Understood.
23         Have you ever met Mr. Iaconelli and
24    Mr. Clements in person before?
25    A.   No.

3  (Pages 6 to 9)

1    Q.  Have you spoken to them on the phone
2   before today?
3    A.  Yeah.
4    Q.  When was the first time you spoke with
5   Mr. Iaconelli and Mr. Clements?
6    A.  I don't remember.
7    Q.  Can you tell me what year it was?
8    A.  2021.
9    Q.  Do you remember being served with a
10   subpoena in January of 2021?
11    A.  I don't.
12    Q.  We can show that to you if you want.  Do
13   you remember the Lions' general counsel accepted
14   service of a subpoena for you?
15    A.  I don't.
16    Q.  Were you aware of that happening?
17    A.  I don't remember.  I was with the Lions
18   last year.  I was actually dealing with an injury.
19   I have better things to focus on, to be honest.
20    Q.  Are you taking any medications that might
21   affect your ability to recall events in the past,
22   your memory?
23    A.  No, sir.
24    Q.  Other than Mr. Iaconelli and Mr. Clements,
25   did you speak with anybody else about your

1   deposition?
2    A.  I don't remember.
3    Q.  Did you speak with Todd France about your
4   deposition?
5    A.  We spoke about it.
6    Q.  Tell me about that conversation.
7    A.  Pretty much -- he pretty much just told me
8   to tell the truth, and that's why I'm on this Zoom
9   right now.
10    Q.  And when did you have that conversation
11   with Mr. France?
12    A.  I don't remember.
13    Q.  Was it this week or before this week?
14    A.  I don't remember.
15    Q.  Was it this year, 2021?
16    A.  I'm pretty sure we've spoke about it.
17    Q.  Have you spoken with Mr. France more than
18   once about your deposition?
19    A.  I don't remember.
20    Q.  Did you look at any documents to prepare
21   for your deposition today?
22    A.  No.
23    Q.  Other than Mr. France and the two lawyers,
24   have you spoken with anyone else about the fact
25   that you were being deposed in this case?

1    A.  My mom maybe.
2    Q.  Anybody else?
3    A.  No.
4    Q.  Let's bring up the deposition notice for
5   today, August 30th.  I've got a colleague who is
6   working with me and he's going to share his screen
7   and show you some documents.
8      Mr. Golladay, are you able to see that
9   document on the computer screen?
10    A.  Yes.
11    Q.  This is an amended notice of videotaped
12   deposition for you to start at 10:00 a.m. Eastern.
13   Do you see that?
14    A.  Yes, I see that.
15    Q.  Why were you not able to start 10:00 a.m.?
16      MR. CLEMENTS:  Objection, asked and
17   answered.
18      You can answer again.
19    Q.  Go ahead, Mr. Golladay.
20    A.  I'm a pro athlete and I had obligations to
21   attend to my body.
22    Q.  What did you have going on this morning
23   that made you unable to start at 10:00 a.m.?
24    A.  I just answered that.
25    Q.  You had to attend to your body?  Is that

1   your answer?
2    A.  Massage, yes.  Body maintenance, yes.
3    Q.  Other than a massage, did you have any
4   other things that involved other people that dealt
5   with your body --
6    A.  Massage was an example.  I was taking care
7   of my body.  That varies.  Massage, active
8   recovery, anything.  I had obligations to attend to
9   my job.  My body is part of my job, yes.
10    Q.  That will be marked as Exhibit 1.
11   (Thereupon, Plaintiff's Exhibit 1 was marked for
12   purposes of identification.)
13    Q.  Let's bring up the deposition notice for
14   August 23rd, which will be Exhibit 2.
15   (Thereupon, Plaintiff's Exhibit 2 was marked for
16   purposes of identification.)
17    Q.  Sir, do you see that?  We noticed your
18   deposition for a week ago Monday, August 23rd.  Are
19   you aware of that?
20    A.  Yes, I see that.
21    Q.  Why were you unable to do the deposition
22   on that day?
23    A.  This was in the heart of the NFL training
24   camp and that's what my main focus is.  I'm new to
25   a brand new team, New York Giants and that's my

Page 14

1    main focus right now.  They're paying me a lot of
2    money, and I want to make sure I'm available at all
3    times.
4         Q.   So my understanding is you have Mondays
5    kind of off from team activities during the
6    preseason; is that right?
7         A.   No, I'm actually dealing with an injury.
8    I'm actually dealing with an injury right now and I
9    have treatment outside them by myself, so -- and
10   there's training camp on top of that.
11        Q.   Sir, were you aware that I was sending
12   emails to your email address with the subpoena and
13   deposition notices over the past year?
14        A.   I don't even check my email.
15        Q.   Did you become aware of any of those
16   emails?
17        A.   I have no clue.
18        Q.   What do you do for a living?
19        A.   I'm an NFL wide receiver.
20        Q.   When did you meet Jason Bernstein?
21        A.   I don't remember.  Maybe my junior year,
22   start of my senior year of college with Northern
23   Illinois.
24        Q.   Did Mr. Bernstein negotiate your rookie
25   contract in the NFL?

Page 15

1         A.   Yes.
2         Q.   Did you think that the contract that he
3    negotiated for you was fair for you?
4         A.   Well, I got drafted in the third round
5    and, I mean, I'm pretty sure all that is already
6    slated.  I'm not sure as far as what negotiations
7    is really going on.
8         Q.   Did you ever have any problems with the
9    contract that Mr. Bernstein negotiated for you in
10   the NFL?
11        A.   No.
12        Q.   In the 2019 NFL season you had the most
13   touchdowns of any player in the league; is that
14   right?
15        A.   I think so.
16        Q.   And you made the Pro Bowl in the 2019
17   season?
18        A.   Yes.
19        Q.   I looked up your career stats.  I think
20   you've got 21 touchdowns in the NFL.  Is that still
21   about right?
22        A.   To be honest, I don't even know.  I don't
23   know.
24        Q.   In 2019 you had 11 receiving touchdowns,
25   which led all the NFL receivers, right?

Page 16

1         A.   Yep.
2         Q.   Who is your agent now?
3         A.   Todd France.
4         Q.   Let's pull up the arbitration hearing day
5    one and go to page 272.  Mr. Martin will show it on
6    the screen.
7              Mr. Golladay, did Todd France ever tell
8    you that he felt you were a star player in the NFL?
9         A.   I don't remember.
10        Q.   I'm showing a transcript of the
11   arbitration hearing that was held in late 2019
12   during the 2019 season, and that's me talking there
13   where it says "By Mr. Comerford," and I'm asking
14   Todd France questions, and I said:  "Do you agree
15   that Kenny Golladay is a star?"
16              And Todd France said "No."
17              And I said, "Okay.  Why not?"
18              And Todd France said, "Because he's not a
19   star.  It's not a word I would use to describe
20   Kenny Golladay."
21              Have you ever had conversations with Todd
22   France about whether you're a star player in the
23   NFL?
24        A.   No.
25        Q.   In your view are you a star?

Page 17

1         A.   My contract might speak it.
2         Q.   Yes.
3         A.   My contract might speak that I'm a star.
4    What do you think?
5         Q.   I think you are.
6         A.   Okay.  So I guess I am.
7         Q.   A lot of stuff I read about you says that
8    you are.
9         A.   Thank you.
10        Q.   Have you ever heard Todd France tell you
11   you're not a star?
12              MR. CLEMENTS:  Objection, asked and
13   answered.  He said he didn't have any discussions
14   with him about it.
15        Q.   You can answer, Mr. Golladay.
16        A.   I already answered it.
17        Q.   We served you with a subpoena, sir, and we
18   asked you for any documents that you had about, you
19   know, leaving Mr. Bernstein and going with
20   Mr. France, text messages, emails.  Are you aware
21   of that?
22        A.   I don't know.
23        Q.   Did you look at the subpoena?
24        A.   Yeah.
25        Q.   Do you have any emails from the 2018 or

CONFIDENTIAL TRANSCRIPT
PohlmanUSA Court Reporting    (877) 421-0099    PohlmanUSA.com

Page 18

```
 1    2019 time period about Mr. Bernstein or Mr. France?
 2        A.  I don't know.  I don't check my emails.
 3        Q.  Did you or did anybody else look at your
 4    email to see if there were emails there in response
 5    to the subpoena?
 6        A.  No.
 7        Q.  No one checked?
 8        A.  No, I don't have anyone check my email for
 9    me.
10        Q.  I just want to make sure that I understand
11    what you're saying.  After you were served with the
12    subpoena in January of 2021 you didn't check your
13    email accounts to see if there any were any emails
14    there and nobody else checked your email accounts
15    as far as you know.  Do I have that right?
16        A.  Yes.
17        Q.  How about text messages?  We understand
18    that you have exchanged text messages with
19    Mr. Bernstein in the past and with Todd France in
20    the past.  Did you look for any text messages in
21    response to that subpoena?
22        A.  I don't have any text messages about it.
23        Q.  Do you know what happened to your text
24    messages with Jason Bernstein and Todd France from
25    2018 and 2019?
```

Page 19

```
 1        A.  I don't know.  I done went through so many
 2    phones, I have no clue.
 3        Q.  Did you look to see if you had any after
 4    you got served with the subpoena?
 5        A.  I didn't have any.
 6        Q.  Did you check, though?
 7        A.  Yeah.  I didn't have any.
 8        Q.  Did you speak with anyone about emails or
 9    text messages that might be responsive to the
10    subpoena?
11        A.  No.
12        Q.  Have you ever talked to Todd France about
13    the emails and text messages that you exchanged
14    with him back in 2018 and 2019?
15        A.  No.
16        Q.  As I understand it, you've got two email
17    addresses, one is KennethGolladay19@gmail.com; is
18    that right?
19        A.  Yep.
20        Q.  And then you've got one
21    KennyGolladay@yahoo.com; is that right?
22        A.  Yes.
23        Q.  Tell me what the difference is between
24    those.  Do you use one for some things and one for
25    another or how does it work?
```

Page 20

```
 1        A.  To be honest, one of them was made in
 2    maybe high school, freshman year.  I mean, I don't
 3    even know who use Yahoo anymore.  One is a gmail.
 4    That's the answer to that pretty much.
 5        Q.  Do you still control those email accounts
 6    and use them from time to time?
 7        A.  I have them.
 8        Q.  Did you delete any emails that you might
 9    have received from Todd France or anybody else at
10    CAA in January of 2019?
11        A.  I don't even check emails.  I actually
12    hate emails.
13        Q.  Let me ask you about phone numbers.  What
14    is the phone number that you're currently using for
15    your personal stuff or to talk to Mr. France?
16        MR. CLEMENTS:  We'll mark this
17    confidential, just the number itself.  It shouldn't
18    be out there, but you can answer.
19        A.  I'm going to keep that confidential.
20        Q.  That's fine, and your attorney is saying
21    that that's going to be marked confidential.
22        MR. CLEMENTS:  We have an agreement in
23    place.
24        THE WITNESS:  So I can say it?  I don't
25    have to, right?
```

Page 21

```
 1        MR. CLEMENTS:  We request it be attorneys'
 2    eyes only.  Mr. Bernstein could drop off for a
 3    second.  I mean, they subpoenaed phone records of
 4    everybody so they have all the numbers.
 5        A.  773-964-9486.
 6        MR. CLEMENTS:  And as long as the number
 7    isn't mentioned again, we're back into the
 8    non-confidential portion.
 9        Q.  So that number you just mentioned, that's
10    a number that you used for your personal affairs?
11        A.  I have two numbers, and to be totally
12    honest, I don't even know my second number by
13    heart.  That's the crazy part.  I use whatever
14    phone I feel like at the time.
15        Q.  So is it okay with you if I refer to the
16    number that you just gave me by the last two
17    digits?
18        A.  Okay.
19        Q.  So if that's okay with you, I'm going to
20    call that the 86 number.
21        A.  Yes.
22        Q.  That 86 number, is that your primary
23    phone?
24        A.  Yes.
25        Q.  Does your mom use that phone or is that
```

Page 22

1    your phone?
2        **A.  I just gave you my phone number.**
3        Q.   Okay.  So am I right that your mother has
4    not used that phone, it's yours?
5        **A.  My mom don't live with me.**
6        Q.   And then I've got another phone number for
7    you.  Do you mind if I say it and --
8            MR. CLEMENTS:  Let's mark it confidential,
9    attorneys' eyes only.
10           MR. COMERFORD:  That's agreed.
11       Q.   So the other number that we have for you
12   is 773-556-4698.
13       **A.  Like I said, I don't even remember that**
14   **number.  I know it starts with a 5.**
15       Q.   And what do you use that number for?
16       **A.  Whatever I feel like using it for.**
17       Q.   Which of those two numbers did you
18   communicate with Mr. Bernstein on?
19       **A.  I don't remember.  Both maybe.  I mean,**
20   **whichever phone I feel like using, that's the one**
21   **I'm going to use.**
22           MR. CLEMENTS:  As long as the numbers
23   aren't mentioned we can go back on no
24   confidentiality.
25       Q.   And then the 86 number, is that the number

Page 23

1    that you used to communicate with Todd France?
2        **A.  Whichever number I feel like using, that's**
3    **the number I am going to use that day or at that**
4    **time.**
5        Q.   Did your mom pay the bills for those
6    numbers or did you pay the bills?
7        **A.  I'm a grown man, John.**
8        Q.   So you paid the bills, correct?
9        **A.  Yes.**
10       Q.   Dating back probably the whole time you're
11   in the NFL at least?
12       **A.  Yes.**
13       Q.   Any other phone numbers other than those
14   two that we've mentioned that you used?
15       **A.  No, sir.**
16       Q.   And have you deleted any text messages
17   relating to Todd France or Jason Bernstein from the
18   86 phone number?
19       **A.  No.**
20       Q.   How about social media, have you used any
21   social media platforms to communicate with either
22   Jason Bernstein or Todd France?
23       **A.  No.**
24       Q.   Like Facebook messenger or Instagram, any
25   messages on those platforms?

Page 24

1        **A.  No.**
2        Q.   How about Jake Silver, do you know a man
3    by the name of Jake Silver?
4        **A.  I know Jake.**
5        Q.   In 2018 and 2019, how would you
6    communicate with Jake Silver?  Would it be by text
7    message or phone call or both?
8        **A.  FaceTime, FaceTime audio, DM maybe.**
9        Q.   And DM is direct message?
10       **A.  Yes.**
11       Q.   So what would the platform be for a DM?
12       **A.  I mean, you would have direct message, all**
13   **the social medias.**
14       Q.   So did you use any social media accounts
15   to ever direct message with Jake Silver?
16       **A.  I think he direct messaged me.**
17       Q.   What platform would that have been on?
18       **A.  I have no clue.  I don't remember.**
19       Q.   Have you deleted any of the direct
20   messages on social media platforms?
21       **A.  No.**
22       Q.   Which social media platforms do you use
23   for direct messaging?
24       **A.  To be honest, I don't even direct message,**
25   **but I have -- I mean, I'm in the NFL.  I have a lot**

Page 25

1    of direct messages coming at me.
2        Q.   You think Jake Silver might have direct
3    messaged you or do you know that he did or did
4    somebody tell you that he did?
5        **A.  I don't remember.**
6        Q.   So as we sit here, is it fair to say that
7    you have no memory of Jake Silver sending you a
8    direct message on social media platforms, correct?
9        **A.  Yes.**
10       Q.   Let's talk about 2018.  You had a contract
11   in place with Jason Bernstein called a standard
12   representation agreement, right?
13       **A.  Right.**
14       Q.   And that dated back to when you were a
15   rookie, right?
16       **A.  Yes.**
17       Q.   And then you also had a contract in place
18   with Clarity Sports for the endorsement marketing
19   work, correct?
20       **A.  Right.**
21       Q.   So let's start around the time frame of
22   July 2018.  Did you have any major concerns with
23   Mr. Bernstein and the work he was doing for you?
24       **A.  I mean, to be honest, I just felt like I**
25   **needed better.  I wanted better.**

7 (Pages 22 to 25)

Page 26

1    Q.  Let's bring up the Document 2018712.
2  We're going to show you some emails.  It's going to
3  be page 8, and there's an email here that I want to
4  ask you to look at involving Kenneth Saffold.
5  First of all, who is Kenneth Saffold?
6    **A.  Friend of the family, kind of like a**
7  **mentor to me, big brother.**
8    Q.  How long have you known him?
9    **A.  For a while.**
10    Q.  Since you were young?
11    **A.  Yeah, since I was probably in high school**
12  **maybe.**
13    Q.  And as you understand he's, what, four or
14  five years older than you are?
15    **A.  I don't know.  I don't know how old Ken**
16  **is.**
17    Q.  So you can see there that on July 12,
18  2018, Kenneth Saffold is writing an email to Emily
19  Ries from Clarity; do you see that?
20    **A.  I see that.**
21    Q.  Picking up in the email, he writes:  "I
22  appreciate your thorough response to the inquiry.
23  I also very much appreciate having both Jason and
24  Kenny included in our correspondence.  Kenny and I
25  want to ensure he is receiving maximum exposure and

Page 27

1  support required to take his brand to the next
2  level.  There are no major concerns.  However,
3  Kenny is strategizing and considering what methods
4  and resources he'd like to take advantage of to
5  help meet his goals."
6    Is that an accurate depiction of how you
7  felt in July of 2018?
8    **A.  Ken had his own opinion.  I'm my own man.**
9    Q.  In July of 2018, did you have the view
10  that there were no major concerns with Jason
11  Bernstein and Clarity Sports?
12    **A.  Well, I clearly decided to change agents,**
13  **so clearly something was going on that I wasn't**
14  **happy about.**
15    Q.  So what were you unhappy about in July of
16  2018?
17    **A.  I knew I wanted the total package, and**
18  **that comes with everything and I wanted a monster**
19  **deal.  I felt like I was worthy for a monster deal,**
20  **and to be honest, no hard feelings to Jason, I**
21  **didn't feel like he would be able to do that for**
22  **me, and I found an agent that was able to do that**
23  **and I thought would be able to do it, and Todd**
24  **France was the guy, and, I mean, $72 million later,**
25  **here we are.**

Page 28

1    Q.  What caused you to feel that Jason
2  Bernstein was not able to get you that kind of a
3  deal?
4    **A.  That's personal.  It was a gut feeling and**
5  **I'm glad I went with my gut.**
6    Q.  Okay.  Anything else that you had in terms
7  of concerns in July of 2018?
8    **A.  I knew -- at the end of the day I knew**
9  **what I wanted and I wanted what was best for me and**
10  **my family and that's what I got with Todd France, a**
11  **big deal, super agent and that's what I received**
12  **with him.**
13    Q.  Did you know why Kenneth Saffold felt that
14  there were no major concerns in July of 2018?
15    MR. CLEMENTS:  Objection, speculation.
16    You can answer.
17    **A.  I don't.  You can ask him, though.**
18    Q.  Right.  We did ask him about this, and
19  he -- as I recall he said, "I felt like there were
20  no major concerns."
21    Any idea why he felt that way?
22    MR. CLEMENTS:  Objection, asked and
23  answered.  He's answered it.  Speculation.
24    **A.  I mean, that's pretty much how he felt.**
25  **That's not what Kenny Golladay felt.**

Page 29

1    Q.  Does Mr. Saffold give you advice from time
2  to time?
3    **A.  And I take it into consideration.**
4    Q.  Do you typically follow his advice?
5    **A.  I take it into consideration.**
6    Q.  Who is Raquel Douglas?
7    **A.  A friend of mine.  I actually met her, I**
8  **want to say, my rookie year at the NFL PA with the**
9  **rookies in LA somewhere, yeah, and I want to say**
10  **she started -- she was with a friend of mine and I**
11  **looked into it.**
12    Q.  And that was in the summer of 2018?
13    **A.  I don't remember.**
14    Q.  Did you ever do any work with her?
15    **A.  I'm sure when I was at the NFL PA event I**
16  **did some work with her.**
17    Q.  So in the summer of 2018 you were talking
18  with Raquel Douglas, and I think Mr. Saffold was in
19  touch with her as well.  Can you tell me what you
20  remember about those discussions, like what she was
21  trying to do?
22    **A.  I don't remember.**
23    Q.  2018, do you remember you and Mr. Saffold
24  making a decision to sort of table your discussions
25  with Raquel Douglas?

8  (Pages 26 to 29)

1    A.  I can't remember.
2    Q.  Do you remember having any discussions
3  with Jason Bernstein about using Raquel Douglas for
4  some work for you?
5    A.  Yes.  And I also remember Jason saying, "I
6  can go through third party, you know, without them
7  and everything will be all right and they will look
8  over it if need be.  No harm, no foul."
9    MR. CLEMENTS:  And --
10    THE REPORTER:  I didn't hear you,
11  Mr. Iaconelli.
12    MR. CLEMENTS:  I just asked by "they," do
13  you mean Clarity Sports?
14    Q.  Do you remember your mom telling you to
15  not use Raquel Douglas with Jason Bernstein
16  standing there in Detroit?
17    MR. CLEMENTS:  Objection, hearsay.
18    You can answer.
19    A.  That all goes into me being a grown man
20  and that's their advice and I take it into
21  consideration.
22    Q.  Did your mom tell you that in her view you
23  should not use Raquel in the summer of 2018?  Do
24  you remember that?
25    A.  I don't remember, to be honest.  You said

1  that was 2018.  It's 2021.  I don't remember.
2    Q.  Are you doing any work with Raquel Douglas
3  now?
4    A.  No.
5    Q.  Why not?
6    A.  My choice.
7    Q.  And so from the summer of 2018 forward,
8  when you were having those discussions about using
9  Raquel, did you ever use her for anything?
10    A.  Don't remember.
11    Q.  After the summer of 2018 you worked with
12  Clarity Sports to do a bunch of marketing for you,
13  right?  Do you remember that?
14    MR. CLEMENTS:  Objection, vague.
15    A.  Can you repeat the question?
16    Q.  Sure.  Do you remember that Jason
17  Bernstein and Clarity Sports did work with you and
18  for you in 2018 for marketing?
19    MR. CLEMENTS:  Same objection.
20    Go ahead.
21    A.  I wouldn't put it past them.  I don't
22  remember.
23    Q.  Do you remember that they formed an LLC
24  for you to handle your off-the-field income?
25    A.  Yeah, I don't remember.

1    Q.  Do you remember that they did a logo
2  redesign for you?
3    A.  A logo I didn't even pick.  They showed me
4  logos.  I do remember that.  A logo I don't have to
5  this day.
6    Q.  Did you approve a logo with Jason
7  Bernstein and Clarity Sports?
8    A.  I don't have a logo to this day.  I just
9  answered that.
10    Q.  Did they launch your Twitter account and
11  get it verified?  Do you remember that?
12    A.  A lot of agents do that with a rookie
13  coming in.
14    Q.  Did Mr. Bernstein and Clarity do that for
15  you?
16    A.  Yes.
17    Q.  Did they set up events for you?
18    A.  What event?
19    Q.  There was like a pro camps event.  Do you
20  remember that?
21    A.  I haven't attended a pro camp event.
22    Q.  Do you remember Clarity setting that up
23  for you, though?
24    A.  I don't remember.
25    Q.  Do you remember a Vizio promotion?  I

1  think they make TVs.
2    A.  I don't remember.
3    Q.  Let's pull up the arbitration hearing day
4  one transcript.  I want to show you some things
5  Mr. Safford told us.  Let's pull up that
6  arbitration hearing day one, page 71.
7    Now, this is Mr. Safford testifying, and
8  you see there on page 71, line 8, the question is:
9  "I've looked through all your text messages with
10  Mr. Bernstein that we've collected from
11  Mr. Bernstein's phone.  I've also looked at emails
12  that Mr. Bernstein and Ms. Emily Ries had that they
13  exchanged with you, and we produced all those in
14  this arbitration.  I've not seen any text messages
15  from you or any emails from you where you are
16  expressing displeasure with Mr. Bernstein or
17  telling him that you're not happy with the job he's
18  doing.  Does that sound right to you?"
19    And Mr. Safford said, "Yes."
20    Do you see that?
21    A.  Okay.
22    Q.  Did you send any emails or text messages
23  to Mr. Bernstein telling him that you were not
24  happy with the job he was doing for you?
25    A.  No.

Page 34

1      Q.  Did you send any emails or text messages
2  to Emily Ries telling her that you were not happy
3  with the job Clarity Sports was doing for you?
4      A.  No.
5      Q.  Let me ask you about the next question
6  that I asked Mr. Saffold.  I said, "Did you ever
7  tell Mr. Bernstein that you wanted him to do
8  anything differently and he didn't do it?"  And
9  then the response was, "No" there at the top of
10 page 72.
11         So let me ask you that question,
12 Mr. Golladay:  Did you ever tell Mr. Bernstein that
13 you wanted something done differently and he didn't
14 do it the way you wanted?
15     A.  No.
16     Q.  Did you ever tell Emily Ries of Clarity
17 Sports that you wanted her to do something
18 differently and she didn't do it right?
19     A.  No.
20     Q.  Do you remember referring some football
21 players to Jason Bernstein so he could talk to them
22 about maybe being an agent for them?
23     A.  I don't know.
24     Q.  Do you remember that you did that at least
25 for some people?

Page 35

1      A.  No.
2      Q.  Were you aware that --
3         MR. HERBER:  This is J.T. Herber here.
4  You're using a whole bunch of exhibits here and I
5  don't think any of them have been marked.  So for
6  clarity, could we have these marked before we
7  proceed on?  I'd rather clean that up now before we
8  get into doing more exhibits.
9         MR. COMERFORD:  Sure.  We can mark the
10 arbitration hearing transcript as Exhibit 3.
11 (Thereupon, Plaintiff's Exhibit 3 was marked for
12 purposes of identification.)
13        MR. HERBER:  Can you also identify the
14 Bates number for the record as we go?
15     Q.  Mr. Golladay, were you aware of the fact
16 Mr. Saffold was referring football players to Jason
17 Bernstein so he could talk to them about being an
18 agent for them?
19        MR. CLEMENTS:  Objection, not reasonably
20 calculated to lead to discoverable admissible
21 evidence, but you can answer.
22     A.  That's their business.
23     Q.  Were you aware that that was going on?
24     A.  No, I'm not aware of that.  I wasn't aware
25 of that.  That's their business.

Page 36

1      Q.  Do you know a person named Albert Smalls?
2      A.  Yes.
3      Q.  Did you refer Albert Smalls to Jason
4  Bernstein in October of 2018?
5      A.  No.
6      Q.  Did you ever refer Albert Smalls to Jason
7  Bernstein?
8      A.  No.
9      Q.  Do you know whether or not Kenneth Saffold
10 referred Albert Smalls to Jason Bernstein?
11     A.  I have no clue.  Ask him.
12     Q.  When did you first meet Todd France?
13     A.  I met him at one of my old teammate's --
14 Golden Tate's foundation event my rookie year or my
15 second year, one of those years.  I don't remember.
16        MR. COMERFORD:  Let's bring up the 2018
17 924 document, Mr. Martin.
18     Q.  As I understand it you met with Mr. France
19 at a bowling event; is that right?
20     A.  It maybe was a bowling event.  I was just
21 there for support.  There we go.
22     Q.  Was that the event where you met
23 Mr. France?
24     A.  Yes.
25     Q.  Had you ever heard of Mr. France before

Page 37

1  this night?
2      A.  No.
3         MR. CLEMENTS:  Are you marking this as an
4  exhibit?
5         MR. COMERFORD:  Yeah.  This will be
6  Exhibit 4.
7         MR. HERBER:  I think the 2018 summer email
8  should be Exhibit 4 and this will be Exhibit 5.
9  (Thereupon, Plaintiff's Exhibits 4 and 5 were
10 marked for purposes of identification.)
11     Q.  And so this was at the Lucky Strike in
12 Novi, Michigan; do you see that?
13     A.  Yep.
14     Q.  Do you remember the evening?
15     A.  That was -- I don't remember.  I mean,
16 that was a few years ago.
17     Q.  Did you drive out there with anybody?
18     A.  I don't remember.
19     Q.  Did you drive home with anybody?
20     A.  I don't remember.
21     Q.  Do you remember talking with Mr. Saffold
22 before this event about the fact that you were
23 going to go?
24     A.  I don't remember.
25     Q.  Do you remember talking with Mr. Saffold

10  (Pages 34 to 37)

Page 38

1  after the event about what happened there?
2  **A.  I don't remember.**
3  Q.  Why did you go to this event?
4  **A.  To help support one of the older vets over**
5  **me at that time.**
6  Q.  And what's that gentleman's name?
7  **A.  Golden Tate.**
8  Q.  And he was a wide receiver for the Lions
9  at the time?
10  **A.  Yes.**
11  MR. COMERFORD:  Let's bring up the
12  arbitration hearing transcript, Exhibit 3.  I want
13  to go to page 166.
14  Q.  I'm going to show you a little bit more of
15  what we talked about with Mr. Saffold.  This is me
16  asking questions of Mr. Saffold, and I said,
17  "Right, and before -- as I understood what you said
18  earlier, before that Golden Tate event on
19  September 24th 2018, Mr. Golladay hadn't told you
20  that he was interested in talking to other agents
21  or looking at other agents, do I have that right?"
22  And Mr. Saffold's answer was: "You were
23  kind of stuck on the words and what I'm saying is
24  that the entirety of the time, from January --
25  excuse me, from July summer of 2018 until his

Page 39

1  decision to change, we constantly and
2  continually -- we do it now -- look for other
3  opportunities, and so an agent wasn't a specific
4  interest at this time before the September 24th
5  meeting, it was just more opportunities to, like,
6  get out and brand himself.  So before he met Todd,
7  it was Raquel in the marketing.  We've looked at a
8  number of other marketing agencies to help
9  represent him.  And then following the dinner it
10  kind of shifted from marketing to, hey, let's look
11  into the new agent."
12  Do you see all that?
13  **A.  Yes.**
14  Q.  So let me ask you a few questions about
15  that.  Before the bowling event on September 24,
16  2018, you had not told Mr. Saffold that you were
17  interested in talking to other agents besides
18  Mr. Bernstein, correct?
19  **A.  Well, first, I don't talk to Mr. Saffold**
20  **about everything, so sometimes I might want to talk**
21  **to him about something, sometimes I might not.**
22  Q.  Understood.  Is the way I said it correct,
23  though?
24  MR. CLEMENTS:  Objection, it's
25  argumentative.

Page 40

1  You can answer.
2  Do you need the question read back?
3  THE WITNESS:  Yeah.
4  Q.  Sure.  I'll just ask the question again,
5  Mr. Golladay.  I think that will be easier.
6  Before the bowling event that took place
7  on September 24, 2018, you had not told Mr. Saffold
8  that you were interested in talking with other
9  agents besides Mr. Bernstein, correct?
10  **A.  Right, because I don't talk to him about**
11  **everything.**
12  Q.  Before the bowling event on September 24,
13  2018, had you told anybody that you were interested
14  in maybe talking with other agents besides
15  Mr. Bernstein?
16  **A.  I'm not an open book.  I mean, I don't**
17  **have to go telling everybody everything.  I keep it**
18  **to myself.**
19  Q.  So would I be correct if I said that
20  before September 24, 2018 you had not told anybody
21  that you were interested in talking with other
22  agents?  Is that right?
23  **A.  Right.**
24  Q.  Now, when Mr. Saffold testified, he talked
25  about a dinner.  He says, "following the dinner, it

Page 41

1  kind of shifted from marketing to, hey, let's look
2  into this new agent."
3  What's your understanding of the dinner
4  that he was talking about there?
5  **A.  Okay, John, so this is how it went.  I**
6  **went to the bowling event, Golden, you know thanked**
7  **everybody for coming, he shouted out his agent,**
8  **Todd France, I went over there, introduced myself,**
9  **asked for his number, I texted him, we linked up in**
10  **Detroit, not sure where we went, what we ate.  The**
11  **meeting went really good.  To be honest, I loved**
12  **the meeting, loved everything about it or I**
13  **wouldn't be with him.  The season went on and in**
14  **the beginning of December, he went out to visit my**
15  **mom.  I mean, my mom has a big influence on my**
16  **life, she's a big part of it, this whole thing, she**
17  **helps everything go, and the meeting went great**
18  **with her.  I had feedback from her and me and her**
19  **had the same feeling and that was pretty much the**
20  **cherry on top and I pretty much had made up my mind**
21  **back when I first met him.  And when my mom pretty**
22  **much said what she had to say, like I said, it was**
23  **the cherry on top and I knew in December, "this is**
24  **going to be my agent," so I knew Jason was no**
25  **longer going to be my agent, with or without Todd,**

Page 42

1    but once me and my mom got to the same page, Todd
2    was the guy, period.
3        Q.  Let's go back to the bowling event then.
4    I had an understanding from Mr. Saffold that you
5    were kind of walking around introducing yourself to
6    people and you had another gentleman there with you
7    as your guest.
8        MR. CLEMENTS:  Objection, foundation.
9    Everybody knows that Saffold was not at the bowling
10   event.  Can't you just ask him the question about
11   what he was doing without constantly saying
12   Mr. Saffold this and Mr. Saffold that?
13       A.  Ken was not at the bowling event.  And at
14   the same time I'm around teammates, so, of course,
15   we're all laughing, throwing the ball down the
16   lane.  Yeah, it was years ago.  I don't remember.
17   We were having a good time.
18       Q.  Were you there with Mr. Saffold's brother
19   or somebody like that?
20       A.  I don't remember.
21       Q.  So at some point you -- did you approach
22   Todd France or did he approach you?
23       MR. CLEMENTS:  Objection.  It was asked
24   and answered.  He just told you.
25       A.  I approached him.

Page 43

1        Q.  And --
2        A.  I asked for his number.
3        Q.  What did you say to him when you
4    approached him?
5        A.  I don't remember.  I had a conversation, I
6    asked for his number, he gave it to me, I texted
7    him.
8        Q.  And why did you approach him?
9        A.  Because I was thinking about an agent
10   change.
11       Q.  And so, I mean, do I understand right that
12   you approached him because --
13       A.  I approached him because I knew he was an
14   agent and I was thinking about an agent change.
15       Q.  How did you know he was an agent?
16       A.  I answered that already.  Golden pretty
17   much addressed everyone at the bowling event, he
18   thanked everybody for coming out, and he also
19   shouted his agent out, Todd France, for coming.  I
20   walked over there and I introduced myself, I asked
21   for his number and texted him.
22       Q.  And do you remember anything that he said
23   to you?
24       A.  I don't.
25       Q.  Do you remember anything you said to him

Page 44

1    other than asking him for his number?
2        A.  I don't remember.  I know I got his job.
3    Happy I got his number.  Look how life is now.
4        Q.  Did anybody suggest to you that you should
5    speak with Todd France?
6        A.  I went under my own will.  Wanted to.
7    Glad I did.
8        Q.  But did -- what I'm getting at is did
9    Golden Tate say, "Ken, you ought to talk to my
10   agent, Todd France"?
11       A.  I went under my own will.
12       MR. CLEMENTS:  It's been asked and
13   answered.
14       Q.  So the specific question is did Golden
15   Tate --
16       A.  I went under my own will.  That's the
17   third time.  I went under my own will.  Sorry,
18   John.
19       Q.  That's okay.  Am I right that Golden Tate
20   did not suggest to you that you talk to Mr. France?
21       MR. CLEMENTS:  Objection.  It's been asked
22   and answered three times.
23       THE WITNESS:  Let's give him a fourth
24   time.
25       A.  I went under my own will.  No one had to

Page 45

1    ask me.  I'm my own man.  I went under my own will.
2        Q.  I just wanted to make sure you're not
3    making a distinction between doing 1something under
4    your own will and somebody suggesting that maybe
5    you should do something and then you decide to do
6    it under your own will.
7        MR. CLEMENTS:  That question,
8    Mr. Comerford, is not reasonably calculated to lead
9    to discovery of admissible evidence because it
10   doesn't matter who suggested it or not so long as
11   it wasn't Todd France under the NFL regulations.
12       A.  For the fifth time, I went under my own
13   will.
14       Q.  Right.  Did you have any conversations
15   with Golden Tate that evening about Todd France?
16       A.  No.
17       Q.  Had you had any conversations with Golden
18   Tate prior to that evening about Todd France?
19       A.  No.
20       Q.  Had you had any conversations with anybody
21   either prior to that meeting or at that event about
22   Todd France before you first spoke with him?
23       A.  No.
24       Q.  Did you ask any of the other players at
25   the event about Todd France?

12  (Pages 42 to 45)

Page 46

1  A.  No.
2  Q.  Were you talking with any other agents at
3  this time period, September 2018?
4  A.  I don't remember.
5  Q.  Did Mr. France tell you what agency he was
6  with?
7  A.  I already knew, to be honest.
8  Q.  And how did you know?
9  A.  Golden's locker was right next to me.  He
10 gets CAA packages of everything, and then Matthew
11 Stafford, I would say, in my opinion, is one of the
12 best quarterbacks in the league is with CAA.
13 Glover Quin, another, is with CAA, and Golden is
14 CAA and that's his agent, so I wanted to go over
15 there and introduce myself to a CAA rep and that's
16 what I did.  Just so you know, the vets who had
17 long careers and great careers and who they were
18 with, who were representing them, and I felt like
19 me just needing to be the player that I am, I take
20 great pride in what I put out there in the field
21 and I wanted to be represented by somebody like
22 that, period.
23 Q.  From the time you met Todd France until
24 you signed with him in January of 2019, were there
25 any other potential agents that you spoke with?

Page 47

1  A.  I answered that.  I don't remember.
2  Q.  What happened next after this bowling
3  alley event in terms of you talking with Todd
4  France?
5  A.  I texted him, he came to Detroit, we went
6  out to eat, yeah.
7  Q.  Was there anybody else there when you had
8  dinner with Mr. France the first time?
9  A.  I don't remember it was so long ago.
10 Q.  How long did you wait to contact Todd
11 France?
12 A.  Not long.  I don't remember.
13 Q.  How did you communicate with him about all
14 the details of that first meeting, like where are
15 we going to meet, what time are we going to meet?
16 Was that text messages?
17 A.  It could have been text, call, FaceTime,
18 FaceTime audio.  I don't remember.
19 Q.  So how did Mr. France recruit you?  How
20 did he talk about becoming your agent?
21     MR. CLEMENTS:  Objection.  It's not
22 reasonably calculated to lead to the discovery of
23 admissible evidence because once -- under the NFL
24 regs once Mr. Golladay approaches Todd France, Todd
25 France can say whatever he wants about

Page 48

1  Mr. Golladay's football career, but you can answer.
2  A.  As far as recruiting me, I mean, first
3  off, it was my decision.  I don't remember what we
4  talked about.  I mean, it was, what, two,
5  three years ago.  Clearly the conversation went
6  really well.  I was pleased with the conversation.
7  Yeah, I don't remember.
8  Q.  Did Mr. France talk about contracts that
9  he had done for other players?
10 A.  No.
11 Q.  Were you curious about contracts he had
12 done with other players?
13 A.  No.
14 Q.  I mean, I understood the reasoning for
15 going with Mr. France was that you wanted a monster
16 deal, right?
17 A.  Right.
18 Q.  And so what did you do to satisfy yourself
19 that Todd France could do a monster deal for you?
20 A.  Look at the track record.  I know the
21 players who are under him.  Of course, I did my own
22 research, so I know who he had represented.  I
23 don't need to ask him about, "So what deals have
24 you done?  I know the players who he has and now
25 I'm one of them.

Page 49

1  Q.  What did you guys talk about at that first
2  dinner?
3  A.  I don't remember.  It was so long ago.
4  Q.  Do you remember anything you talked about
5  at that dinner?
6  A.  I don't remember not one single thing at
7  that dinner.
8  Q.  Did Mr. France bring you any papers for
9  you to look at, anything to put in front of you?
10 A.  No.
11 Q.  Did Mr. France talk about marketing that
12 he and his agency would be able to do for you?
13 A.  No.
14 Q.  So tell me why you thought Mr. France
15 would do a better job marketing than Mr. Bernstein
16 and his agency were able to do.
17     MR. CLEMENTS:  That is not reasonably
18 calculated to lead to the discovery of admissible
19 evidence, but you can answer.
20 A.  I never even talked about marketing.
21 Q.  Were you worried about marketing?
22 A.  I never once talked about marketing.  What
23 I was worried about is making sure me and my family
24 and rest of my generation would be good, and that's
25 what happened when I signed with Todd France.

13  (Pages 46 to 49)

Page 50

1    Q.  Why didn't you talk with Mr. France about
2  marketing if that was something that you were
3  concerned about in the summer of 2018?
4    **A.  I never said that.**
5    Q.  So do I -- help me understand.  I think I
6  have it wrong then.
7    **A.  What did you have --**
8    Q.  Were you concerned about your marketing
9  when you were with Jason Bernstein and Clarity?
10   **A.  No, I was more concerned about everything.**
11   Q.  What do you mean by that?
12   **A.  The total package.  What I wanted -- this**
13  **whole thing is about me and my family and that's**
14  **the contract, that's what I was worried about.  I**
15  **wanted a big deal, I felt like I deserved a big**
16  **deal in the future and the future is now.  I didn't**
17  **feel like Jason Bernstein would be able to get that**
18  **for me, no hard feelings to him.  To be honest, I**
19  **didn't even have to give him a call, I could have**
20  **just shot him an email, but just out of respect for**
21  **him I called him and told him, and I wanted a big**
22  **agent, and that's what I feel like I got in Todd.**
23  **That's what I got in Todd, and, like I said, this**
24  **is where I'm at now.  I'm a New York Giant, I'm**
25  **happy with what I got with Todd, and that was the**

Page 51

1  **best decision I've made in my life to this day.**
2    Q.  Why do you feel that Mr. Bernstein would
3  not have been able to get you a $72 million deal
4  with the Giants or with any other team?
5    **A.  That's just my feeling and clearly I made**
6  **the right decision.**
7    Q.  Did Mr. France talk to you at all before
8  you signed with him about the resources that he and
9  his agency could offer you?
10   **A.  No.**
11   Q.  Do you remember having any conversation
12  with Jason Bernstein where you told him that the
13  reason you were switching was resources?
14   **A.  To be honest, I didn't even have to tell**
15  **him anything, I could have just sent him an email.**
16  **Out of respect, I gave him a phone call.**
17   Q.  And so on that phone call, do you remember
18  saying to him that you were switching because of
19  resources?
20   **A.  On that phone call I do remember that I**
21  **said I would no longer be working with him or he**
22  **doesn't have to work for me.  That's what I**
23  **remember.**
24   Q.  Do you remember saying anything about
25  resources in that conversation?

Page 52

1    **A.  On the phone call, I remember me telling**
2  **him that I would no longer need his assistance.**
3    Q.  When you called him -- when you called
4  Mr. Bernstein to let him know, my understanding is
5  the date you did that was January 22, 2019; is that
6  right?
7    **A.  I don't remember the date.**
8    Q.  When you called Mr. Bernstein, was anybody
9  there with you?
10   **A.  I was at my mom's house.  I don't remember**
11  **if she was there or not.**
12   Q.  Was Mr. France there with you when you
13  called Mr. Bernstein to terminate him?
14   **A.  No.**
15   Q.  But you were at your mother's house in
16  Chicago?
17   **A.  Yes.**
18   Q.  Did Mr. France come to Chicago to meet
19  with you around that same time either that day or
20  right around there?
21     MR. CLEMENTS:  Objection, vague.  You said
22  that day, January 22, 2019, when he called
23  Mr. Bernstein or --
24   **A.  I don't remember the date.**
25   Q.  We can look at some stuff that might help.

Page 53

1  All right.  You said that you spoke with your
2  mother about possibly changing agents.  Her name is
3  Stacy Wright Whitaker, correct?
4    **A.  Yes.**
5    Q.  Do you know if Mr. France provided
6  references to your mother?
7    **A.  About what?**
8    Q.  About other players that he had worked
9  with?
10   **A.  Ask them.  I don't know.**
11   Q.  That's my question, did --
12   **A.  I don't know.  I don't know.  Ask them.**
13   Q.  Do you know whether Mr. France provided
14  any references to Kenneth Saffold?
15   **A.  Ask him.  I don't know.**
16   Q.  Did Mr. France provide any references to
17  you?
18   **A.  No.**
19   Q.  You know what I mean, like, did he say
20  "talk to so and so about" --
21   **A.  No to me.  For them, I don't know.  You**
22  **can ask those people.**
23   Q.  Who would those people be that I should
24  ask?
25   **A.  The people that you just asked about.**

Page 54

1    Q.  So your mom and Ken Saffold?
2    **A.  I think those are the people you just**
3    **asked about, right?**
4    Q.  Yeah.  Now I'm asking about whether there
5    were any references like Golden Tate or anybody
6    else who is a --
7    **A.  Yeah, ask them, John.  You can ask all**
8    **these other ways, but ask them.  I don't know.**
9        MR. CLEMENTS:  He's asked and answered as
10   far as his facts and knowledge.
11   **A.  He can ask them.**
12   Q.  What did your mother say to you about
13   potentially switching agents in that
14   December 2018/January 2019 time frame?
15       MR. CLEMENTS:  Objection, hearsay.  It's
16   not reasonably calculated to lead to discovery of
17   admissible evidence, but you can answer it.
18   **A.  Can you ask the question again, please?**
19   Q.  What did your mother say to you in
20   December 2018 or January 2019 about the idea that
21   you were potentially going to switch from Jason
22   Bernstein to Todd France?
23       MR. CLEMENTS:  Same objection.
24   **A.  Like I said, I'm my own man.  I don't**
25   **remember what she said to me, but I know when her**

Page 55

1    **and Todd met, the conversation went very well, it**
2    **went very well when me and him met, and that's why**
3    **I signed to him.  If I'm signed with him right now,**
4    **it went great.**
5        MR. COMERFORD:  Let's pull up the
6    2018-12-06 text between Mr. Saffold and Mr. France.
7    Q.  We're going to show you a text message.
8    This was produced by Mr. France, and this is a text
9    message dated December 6, 2018 between Mr. France
10   and Kenneth Saffold.  Can we go down a little bit?
11   This is Kenneth Saffold talking to Mr. France.  It
12   says, "Also I failed to ask, would you be able to
13   provide Kenny and I with a referral?  Looking to
14   talk to a current or former client of yours to get
15   their perspective on working with you and your
16   team."
17       Do you see where I read all that?
18       MR. HERBER:  Could we mark this as an
19   exhibit?
20       MR. COMERFORD:  Sure.  I think this will
21   be Exhibit 6.
22   (Thereupon, Plaintiff's Exhibit 6 was marked for
23   purposes of identification.)
24   Q.  And, Mr. Golladay, did you have any
25   conversations with Mr. Saffold about any referrals

Page 56

1    or references that he got from Todd France?
2    **A.  I don't remember.**
3    Q.  I want to bring up another text.  This is
4    going to be dated the same date, December 6, 2018,
5    and this is going to be a text message between
6    Mr. Bernstein and Mr. Saffold, and I want to go to
7    the page marked Clarity 667 at the bottom.
8    **A.  I'm sorry, I can't really read that.**
9    Q.  We'll zoom in on it.  So this will be
10   Exhibit 7.
11   (Thereupon, Plaintiff's Exhibit 7 was marked for
12   purposes of identification.)
13   Q.  I want to ask you about this.  These are
14   texts between Kenneth Saffold and Jason Bernstein
15   on that same day, December 6, 2018, and
16   Mr. Bernstein writes and says:  "Spoke with Kenny
17   for a while tonight.  All good.  There are no
18   issues.  It looks like the GM is just starting his
19   posturing a year early."
20       Do you see where I read that?
21   **A.  Yes.**
22   Q.  And then Mr. Saffold responds and says,
23   "Sounds good.  I'll let you know if any new news
24   comes up my way."
25       Do you see that?

Page 57

1    **A.  Right.**
2    Q.  So Mr. Bernstein had gotten a message from
3    the GM of the Lions around this time saying, "Hey,
4    Mr. Golladay might be talking to another agent or
5    another agent might be talking to Mr. Golladay," or
6    something along those lines.  Did you become aware
7    of that?
8    **A.  I don't remember.**
9    Q.  Did you have any conversations with the
10   general manager of the Lions around that time, late
11   2018 about maybe another agent?
12   **A.  No.**
13   Q.  And so Mr. Bernstein was reaching out to
14   Mr. Saffold and he's basically saying to
15   Mr. Saffold that Mr. Bernstein talked with you and
16   you said everything is good, there are no issues.
17       Do you remember having a conversation like
18   that with Mr. Bernstein around December 6, 2018?
19       MR. CLEMENTS:  Objection.  It's hearsay
20   within hearsay and it's also you editorializing
21   what a document says, but you can answer.
22   **A.  I don't know.  December 6th of what year?**
23   Q.  2018.
24   **A.  Yeah, I don't know.**
25   Q.  Do you remember Mr. Bernstein being on the

15  (Pages 54 to 57)

Page 58

1    phone with you in early December 2018 saying, "Hey,
2    Kenny, I'm hearing that another agent might be
3    talking with you or you might be talking with
4    another agent," and you told Mr. Bernstein, "It's
5    all good, there are no issues."  Do you remember
6    that conversation?
7        A.  I don't.
8        Q.  Did you have any conversations around this
9    time with Mr. Saffold about whether you should let
10   Mr. Bernstein know that you were talking with Todd
11   France?
12       A.  I don't remember.
13       Q.  So let's just focus on this period of
14   time, December 6, 2018.  By this time you've met
15   Todd France and you had dinner with him in Detroit,
16   and then Mr. France had come to Chicago and met
17   with your mom, right?
18       A.  Right.
19       Q.  And then from these text messages, it
20   looks to me like you had a conversation with
21   Mr. Bernstein that led Mr. Bernstein to write this
22   text message and say, "Hey, I spoke with Kenny for
23   a while tonight.  All good, there are no issues.
24   It looks like the general manager is just starting
25   his posturing a little early."

Page 59

1             What was your thinking at this point in
2    time about letting Mr. Bernstein know that maybe
3    you were going to switch?
4        A.  Well, like I said already, in September I
5    had already made my mind up, and then in December,
6    that's when I let Todd know I would be going with
7    him.
8        Q.  So why didn't you let Mr. Bernstein know?
9        A.  Was it any of his business?  And then on
10   top of that I didn't want it to become a
11   distraction to me or the team at the time so I
12   played the rest of the year out.
13       Q.  Do you feel it was okay to just tell
14   Mr. Bernstein something that wasn't true?
15           MR. CLEMENTS:  Objection, argumentative.
16   I'm not sure there was any -- you're saying
17   somebody -- an email that people wrote that aren't
18   Kenny Golladay.  Are you accusing Mr. Golladay of
19   lying about what was in that email?  I don't
20   understand.  It's an improper question, but if you
21   want to rephrase it.
22           You can answer, Mr. Golladay.
23       A.  What was the question?
24       Q.  So the way it looks to me is that you're
25   in touch with Todd France by this point in time and

Page 60

1    then you have a conversation with Mr. Bernstein and
2    you tell him, "Hey, it's all good, there are no
3    issues," and it looks to me like you're just trying
4    to keep both of these guys, Jason Bernstein and
5    Todd France on track; is that fair?
6            MR. CLEMENTS:  Objection, it's
7    speculation, it's based on hearsay given these
8    texts that he didn't write or wasn't a party to.
9    It's an incomplete hypothetical, so I don't even
10   know how he could opine on whether it's true or
11   not.  That wasn't your original question.  I
12   don't know if you can answer.
13       A.  I don't know if I can answer that.
14       Q.  Do you want me to ask it again,
15   Mr. Golladay?
16           MR. CLEMENTS:  We would like you to ask it
17   without all the editorializing and the references
18   to the email.  That's what's getting confusing.
19   You're looking at these text messages,
20   Mr. Comerford, but there's no foundation that
21   Mr. Golladay ever saw them and he's certainly not
22   party to them, so he has no factual knowledge about
23   the text messages.  I'm not sure what you're
24   getting at.  It's just an argumentative question
25   with you trying to characterize something in your

Page 61

1    client's favor and trying to trick the witness into
2    agreeing with you when he has no factual knowledge.
3    Now if you want to ask him about his factual
4    knowledge or his state of mind, irrespective of
5    this, at this time period, that's a fair question.
6    I think that's what's confusing him is these aren't
7    his texts, right?
8            Are these your text messages,
9    Mr. Golladay?
10           THE WITNESS:  No.
11           MR. COMERFORD:  Mr. Clements --
12           MR. CLEMENTS:  Mr. Comerford, there's no
13   foundation.
14           Have you ever seen these text messages
15   before?
16           THE WITNESS:  No.
17           MR. CLEMENTS:  So that's our objection.  I
18   don't want to instruct him not to answer the
19   question, but I believe it's an unfair,
20   argumentative question.
21           MR. COMERFORD:  Mr. Clements, you've
22   already been sanctioned by the court for making
23   long speaking objections --
24           MR. CLEMENTS:  I got sanctioned by the
25   court for being a little obnoxious.  But if you

16  (Pages 58 to 61)

Page 62

1    want to ask your questions, ask your questions.  I
2    don't see this as being any different than your
3    obstructionist objections during Mr. Bernstein's
4    where you said it's an incomplete hypothetical,
5    et cetera, et cetera, and you wouldn't let him
6    answer.  Can you just ask the question?  We're not
7    stopping you from asking the question.  You can
8    even ask it with references to the texts, but we're
9    all confused about what you meant.
10        MR. COMERFORD:  Mr. Clements, I'm going to
11   ask you to please stop making long speaking
12   objections and long commentary and let me ask the
13   questions in the deposition.
14        MR. CLEMENTS:  Go ahead.
15   Q.  Now, Mr. Golladay, is it true that in
16   early December 2018 you were not being completely
17   forthcoming with Mr. Bernstein about the fact that
18   you were in contact with Todd France?  Is that fair
19   to say?
20   A.  I didn't have to tell Jason anything.
21   Q.  Am I correct --
22   A.  He worked for me.  I don't have to tell
23   him anything.
24   Q.  Am I correct that you were not sharing all
25   the information with Mr. Bernstein in

Page 63

1    December 2018?  Is that fair?
2    A.  I didn't have to.
3    Q.  So what I said is correct, though, right?
4    A.  I told you what I said.  I didn't have to
5    tell him anything.  He works for me, I don't work
6    for him.
7    Q.  And so one of the reasons that you were
8    not telling Mr. Bernstein that you were in touch
9    with Mr. France is because there was a chance that
10   you might stick with Mr. Bernstein and you didn't
11   want to mess up your relationship with
12   Mr. Bernstein; is that fair?
13        MR. CLEMENTS:  Objection, argumentative.
14   You can answer.
15   A.  The reason I didn't tell him is because I
16   don't have to tell him anything.
17   Q.  Is another reason you didn't tell
18   Mr. Bernstein because you didn't want to mess up
19   your relationship with him?
20        MR. CLEMENTS:  Objection, argumentative.
21   You can answer.
22   A.  I didn't have to tell him anything.
23   Q.  Let's bring up Exhibit 3, the arbitration
24   hearing transcript, and let's go to page 99,
25   starting at line 19.  This is Mr. Saffold answering

Page 64

1    questions, and the question was, "Okay, so as of
2    January 3, 2019, I think we agree that you did not
3    know that Mr. Golladay was going to change his
4    representation from Mr. Bernstein to Mr. France; is
5    that fair?
6    A.  And Mr. Golladay responded, "Yeah, I had
7    an idea, but" --
8         MR. CLEMENTS:  You misquoted.
9    Mr. Golladay did not testify at the hearing.
10        MR. COMERFORD:  Let's go back to page 99
11   and I'll start again because of Mr. Clements'
12   interruption.
13        MR. CLEMENTS:  No, it's because you said
14   Mr. Golladay instead of Mr. Saffold.  Mr. Golladay
15   didn't testify at this hearing so you're
16   mischaracterizing this as being his testimony.
17        MR. COMERFORD:  All right.
18   Q.  Mr. Golladay, I'm going to read from this
19   transcript where Mr. Saffold was answering
20   questions, and the question Mr. Saffold was:
21   "Okay, so as of January 3rd I think we agree that
22   you did not know that Mr. Golladay was going to
23   change his representation from Mr. Bernstein to
24   Mr. France; is that fair?"
25        And Mr. Saffold's answer was:  "Yeah, I

Page 65

1    had an idea, but he hadn't made a decision yet."
2         And then the question was:  "Okay.  And
3    you're certainly still keeping up a good
4    relationship with Mr. Bernstein because it's not
5    clear which way this is going to go; is that fair?"
6         And Mr. Saffold said "Correct."
7    Do you see all that?
8    A.  Yes.
9    Q.  So what I'm asking you, do you sort of
10   agree with that general idea from Mr. Saffold?
11   A.  He is his own man.  He can think whatever
12   he want to think.  I don't know if they have a
13   relationship to this day.  Who cares?  At the end
14   of the day I'm my own man and I made the decision
15   that I made.  I didn't have to tell Ken anything.
16   Q.  I understand.  Was Mr. Saffold correct
17   when he said that as of January 3, 2019, you hadn't
18   made a final decision yet?
19   A.  Like I said already, in my mind, back in
20   September, I knew the route I wanted to go.  In
21   December, that's when I told Todd, "I want to be
22   with you," and I decided to wait until the end of
23   the season.  I didn't want to be distracted, or the
24   team.
25   Q.  So Mr. --

CONFIDENTIAL TRANSCRIPT
PohlmanUSA Court Reporting   (877) 421-0099   PohlmanUSA.com

Page 66

1    A.  So I don't really know about what Ken had
2  to say or anything.  Ask him.  Ask him.  Ask Ken.
3    Q.  Yeah.  And that's what I'm trying to do is
4  ask you about --
5    A.  But ask him, though.  I already told you.
6    Q.  Right.  I get it.  And we asked
7  Mr. Saffold in this transcript that you're looking
8  at on the screen there.
9    A.  Back in September, I had already made my
10  mind up that I was going with an agent change, and
11  in December I told Todd that I wanted him to be my
12  agent, so that's the answer right there.  So I see
13  the dates, but I don't know anything about those
14  dates.  I know in my mind back in September I
15  wanted to make an agent change.  In December,
16  that's when I told Todd I want him to be my agent,
17  point blank, period.
18    MR. CLEMENTS:  And you're speaking of
19  September and December 2018.
20    THE WITNESS:  Yes.
21    Q.  Here is my question, Mr. Golladay:  You
22  can see that Mr. Saffold said that in --
23    A.  Who cares what Kenny said?  It doesn't
24  matter.  That's what he said, that's not what I
25  said.

Page 67

1    Q.  Right.  I'm just trying --
2    A.  Yeah, yeah, yeah.  I see these highlighted
3  yellow -- yeah, I see what he said.  I don't care
4  what he said.
5    Q.  Right.
6    MR. CLEMENTS:  Also, object that
7  everything that Mr. Saffold said is hearsay in
8  connection with this proceeding.
9    Q.  So, Mr. Golladay, we can say that
10  Mr. Saffold felt as of January 3, 2019 that you and
11  he were keeping up a good relationship with
12  Mr. Bernstein because it's not clear which way this
13  is going to go.
14    A.  That's what Kenny feel like.  I don't care
15  what he feels like.  That's how he felt at the
16  time.  That's not what I felt like, period.
17    Q.  That's what I'm trying to lead up to.
18    A.  I didn't feel the same way he felt.
19    Q.  Let me ask the question, though.
20    MR. CLEMENTS:  It's been asked and
21  answered.
22    Q.  Do you have any understanding as to why
23  Mr. Saffold felt that?
24    A.  You will have to ask Mr. Saffold again why
25  he felt that way because I didn't feel that way.

Page 68

1    Q.  Let me get the whole question out and then
2  you can answer it.
3    Do you have any idea why Mr. Saffold felt
4  that --
5    A.  I have no idea.
6    MR. CLEMENTS:  Let him ask his question.
7  Let him finish his question and then you can
8  answer.  Don't anticipate.  It's going to take
9  longer.
10    A.  I've got stuff to do.  I won't be on this
11  call too much longer.
12    Q.  So I appreciate that, Mr. Golladay.  I
13  just need to get the whole question out before you
14  start answering so that the written transcript that
15  results from what we're doing here today makes
16  sense, so let me get the whole question out and
17  then you can answer.
18    Do you have any idea why Mr. Saffold felt
19  that you and he should keep up a good relationship
20  with Mr. Bernstein because it wasn't clear which
21  way this was going to go as of January 3, 2019?
22    A.  I have no idea, John.  Ask Mr. Saffold.
23    Q.  Okay.  Let's bring up another document.
24    A.  I need a break.  I've got to use the
25  bathroom.

Page 69

1    MR. COMERFORD:  We'll make it as short as
2  we can so we can get this done as soon as possible.
3    THE VIDEOGRAPHER:  Off the record at 3:31.
4  (Thereupon, a recess was taken.)
5    THE VIDEOGRAPHER:  We're back on the
6  record at 3:48 p.m.
7  BY MR. COMERFORD:
8    Q.  Mr. Golladay, I want to show you some text
9  messages from -- they're going to be dated around
10  December 17, 2018.
11    MR. COMERFORD:  Mr. Martin, it will be a
12  document called 2018-12-17, and the page 049 --
13  this is a text message from Todd France to you
14  December 17, 2018.  He says, "Had great convo with
15  Mom."  It goes on from there.  And can we scroll
16  down?
17    MR. HERBER:  John, can you please mark
18  this as an exhibit?
19    MR. COMERFORD:  This will be exhibit -- is
20  it Exhibit 8?
21    MR. HERBER:  Yeah, it will be Exhibit 8.
22  (Thereupon, Plaintiff's Exhibit 8 was marked for
23  purposes of identification.)
24    MR. HERBER:  And Exhibit 7 will be the
25  December 6, 2018 Bernstein text with Saffold.

18  (Pages 66 to 69)

Page 70

1    Q.  And, Mr. Saffold -- it looks like you
2 didn't respond to the text from Todd France on
3 December 17, 2018.  Do you see that?
4    **A.  Yeah, I did see that.**
5    Q.  Do you remember why you didn't respond to
6 Mr. France?
7    **A.  Yeah, I mean, I have no clue.  Maybe we**
8 **talked on the phone.  I don't know.**
9    Q.  So on December 18, 2018, the following
10 evening, Mr. France texted you again and says,
11 "What up?  Making sure you saw my late text last
12 night.  Great convo with Mom last night."
13    And then you respond and say, "What's up,
14 Todd?"
15    He says, "What up, KG."  And then you say,
16 "Yeah, I saw your message."
17    Do you remember this exchange?
18    **A.  I don't.  I mean, I guess, I see it.**
19    Q.  Do you remember why you weren't responding
20 more positively to Mr. France at this point?
21    MR. CLEMENTS:  Objection, argumentative.
22    **A.  I mean, I guess it's just me.  I have no**
23 **clue.  I'm a pretty nonchalant guy, pretty dry.  I**
24 **don't know.**
25    Q.  I looked at all the text messages that

Page 71

1 Todd France has produced and I have not seen any
2 text messages from you to Todd France where you
3 say, "Todd, I've decided to hire you."
4    Do you know if you sent any text messages
5 like that?
6    **A.  I don't remember.**
7    Q.  And I haven't seen any emails either from
8 you to Todd France where you say, "Todd, I've
9 decided to hire you."
10    Do you remember sending any emails about
11 that?
12    **A.  I don't.  But at the end of the day, I**
13 **mean, he's my agent now, so the conversation must**
14 **have happened some way somehow.  It just can't**
15 **appear that he's my agent without some type of**
16 **communication.**
17    Q.  Right.  Do you remember when that
18 communication took place?
19    **A.  No.**
20    Q.  Let's go back to Exhibit 3, the
21 arbitration hearing transcript, page 139.  This is
22 Mr. Saffold again, and he's answering a question,
23 and then I highlighted the part I want to ask you
24 about.  Mr. Saffold testified, "and I just kept
25 saying, all right, let's take our time.  There's no

Page 72

1 rush.  Let's you get through, let's see what
2 opportunities that Jason and his team may bring,
3 because we were still talking about some
4 opportunities around the Superbowl time.  I was,
5 like, let's see what may come to see if it helps
6 shape your decision, and then that was enough for
7 him to say 'All right, I'll wait until after
8 Christmas.'"
9    Do you see all that?
10    **A.  Yeah.**
11    Q.  Do you remember Mr. Saffold telling you in
12 December 2018 to -- on the issue of changing
13 agents, take your time, there's no rush?
14    **A.  I don't remember that.**
15    Q.  Do you remember Mr. Saffold saying in
16 December of 2018 or January of 2019, let's see what
17 opportunities that Jason Bernstein and his team at
18 Clarity may bring because you guys were still
19 talking about some opportunity around the Superbowl
20 time?
21    **A.  I don't remember.**
22    Q.  Do you remember that the Superbowl took
23 place in late January 2019?
24    **A.  Isn't the Superbowl in February.**
25    Q.  Or maybe February 3rd 2019.  I think

Page 73

1 you're probably right.
2    Do you remember any discussions with Jason
3 Bernstein and the folks at Clarity about some
4 marketing opportunities around the Superbowl
5 February 2019?
6    **A.  I mean, I don't remember.  That's so long**
7 **ago.**
8    Q.  Do you remember -- so going back to
9 Mr. Saffold's testimony here, at the very end he
10 says, "and then that was enough for him to say,
11 'All right, I'll at least wait until after
12 Christmas.'"
13    Do you remember having conversation with
14 Ken Saffold where you said, "I'll wait on this
15 decision about whether I'm going to change agents
16 at least until after Christmas"?
17    **A.  I don't remember having a conversation**
18 **with him.**
19    Q.  Do you know whether that is something that
20 you would have said, or you just don't remember
21 either way?
22    **A.  I don't remember either way.  I don't**
23 **remember if we even had the conversation.**
24    Q.  So Mr. Saffold may be right about all
25 these things that he testified to, and what you're

19  (Pages 70 to 73)

Page 74

1    telling me is you don't remember one way or the
2    other; is that fair?
3          MR. CLEMENTS: Objection, argumentative.
4    Also calls for speculation, but you can answer.
5          **A. Yeah, I mean, I'm not agreeing to that. I**
6    **don't remember having that conversation with Ken**
7    **about that.**
8          Q. Let's pull up a document dated 2019-01 --
9    let's see, it's going to be -- 2019-01-24 is the
10   Stacy Wright Whitaker text with Mr. Bernstein.
11   This will be Exhibit 9.
12   (Thereupon, Plaintiff's Exhibit 9 was marked for
13   purposes of identification.)
14         Q. I want to ask you about -- these are some
15   texts between Jason Bernstein and your mom, Stacy
16   Wright Whitaker. The first one -- we can zoom in a
17   little bit, the first one is January 4, 2019.
18   Jason Bernstein writes and says: "Hey, Stacey, I'm
19   going to plan to come in for Kenny's surgery to
20   make sure everything goes smoothly. Will plan to
21   fly in Tuesday morning for the eval."
22         Do you remember Mr. Bernstein going to be
23   with you when you had surgery in January 2019?
24         **A. Can you ask the question again?**
25         Q. Do you remember that Jason Bernstein went

Page 75

1    to you and spent time with you when you had surgery
2    in January of 2019?
3          **A. Yes.**
4          Q. And where was that surgery?
5          **A. Ann Arbor, Michigan.**
6          Q. And was Mr. Bernstein helpful to you when
7    you were having surgery in January of 2019?
8          **A. He took me to the surgery and dropped me**
9    **back off at home.**
10         Q. Do you remember anything else that he did
11   for you during that surgery?
12         **A. No.**
13         Q. Did you ask Mr. Bernstein for advice about
14   which doctor you should use for your surgery?
15         **A. I don't remember.**
16         Q. If Mr. Bernstein says that you did ask him
17   for advice, would you have any reason to disagree
18   with that?
19         **A. No, I wouldn't. I was paying him, so I've**
20   **got the right to ask him for advice.**
21         Q. Why were you still asking Mr. Bernstein
22   for advice in December 2018 and January 2019?
23         **A. Because I was paying him.**
24         Q. Why weren't you just asking Mr. France for
25   advice instead?

Page 76

1          **A. I don't think it really matter who I ask**
2    **for advice.**
3          Q. Is it possible that you were asking
4    Mr. Bernstein for advice and you were also asking
5    Mr. France for advice on the same topics because
6    you wanted to see what both of them had to say?
7          MR. CLEMENTS: Objection, argumentative.
8          You can answer.
9          **A. I mean, I really don't think it matters**
10   **who I ask for advice. I went to the right surgeon,**
11   **the surgery went well, I went on to have a Pro Bowl**
12   **season after that. It don't matter.**
13         Q. Right. What I'm getting at is, one way to
14   look at this is you were asking Jason Bernstein for
15   advice in December 2018 and January 2019 because
16   you didn't know if you were going to terminate him
17   for sure. You hadn't fully and finally made up
18   your mind, and you were also asking Todd France for
19   advice on the same topics. Do you see what I'm
20   saying?
21         **A. Well, like I already said, I had pretty**
22   **much made my mind up in September, and then I told**
23   **Todd that he will be my agent, that I will hire**
24   **him, but at the time I was still paying Jason, so**
25   **why not ask him for advice. I mean, I could ask**

Page 77

1    **you for advice. That doesn't mean I'm going to go**
2    **and do it. I want to feel out your opinion on it.**
3          Q. As I understand it you signed an SRA with
4    Todd France around January, I think it's dated 24th
5    2019. Does that sound right?
6          **A. Yeah, I don't remember the date.**
7          Q. Do you agree with me that up until the
8    moment you signed the SRA with Todd France you can
9    change your mind and decide to not do it at any
10   time.
11         **A. Say it again, please.**
12         Q. Do you agree with me that up until the
13   moment you signed the SRA with Todd France in late
14   January 2019, you could have changed your mind and
15   you could have decided to not switch agents, right?
16         MR. CLEMENTS: Objection, calls for a
17   legal conclusion.
18         You can answer.
19         **A. I guess you could say I could have changed**
20   **my mind, but I wasn't going to change my mind.**
21         Q. Right. But up until you signed that SRA,
22   you've got no obligation to go through with it if
23   you decided you don't want to, agree?
24         MR. CLEMENTS: Objection, calls for a
25   legal conclusion.

20  (Pages 74 to 77)

Page 78

1    You can answer.
2    **A.  Either way it goes, I mean, that never**
3  **happened, and to be honest, I don't really think it**
4  **matters.  I did sign with Todd and that's all that**
5  **matters.**
6    Q.   Right.  And let me ask you about these
7  texts with your mom and Mr. Bernstein.  If we go to
8  the second page, your mother and Mr. Bernstein are
9  talking about your surgery, and then you see
10  January 8, 2019, she starts saying, "I haven't
11  talked to him.  He's been acting funny.  Not sure
12  if he really wants me to come.  He came by
13  yesterday, mentioned my flight, still never got an
14  itinerary, so I never checked in."
15    Do you remember that happening?
16    **A.  I don't.  Who were these conversations**
17  **between?**
18    Q.   Your mom, Stacy Wright Whitaker, is in the
19  gray box and Mr. Bernstein is in the blue box.
20    **A.  Okay.  Okay.**
21    Q.   Do you remember whether you wanted your
22  mom to come to your surgery in Ann Arbor or not?
23    MR. CLEMENTS:  Objection.  Not reasonably
24  calculated to lead to discovery of admissible
25  evidence, but you can answer.

Page 79

1    **A.  I don't remember.**
2    Q.   You were dating someone at the time that
3  this was going on December 2018, January 2019.  Do
4  you remember that person's name?
5    **A.  Yes.**
6    Q.   Who was that?
7    MR. CLEMENTS:  We'd like to mark this
8  confidential as well.
9    **A.  Is that necessary?**
10    MR. CLEMENTS:  We'll be out of here
11  quicker if you answer his questions.
12    **A.  Her name was Araina.**
13    Q.   Araina James; is that right?
14    **A.  Yeah.**
15    MR. CLEMENTS:  If you just refer to her as
16  the girlfriend, then we can go back on no
17  confidentiality.
18    MR. COMERFORD:  Sure.
19    Q.   So I'm going to refer to her as your
20  girlfriend at the time and we'll understand that
21  we're talking about Araina James, okay?
22    **A.  Give me one second, John.  I'm actually**
23  **having some construction going on.**
24    **Okay, we can go.  There was a lot of noise**
25  **in my background.  I'm sorry.**

Page 80

1    Q.  It's okay.
2    Did you ever talk with the woman you were
3  dating at the time about Todd France or Jason
4  Bernstein or whether you should switch?
5    **A.  I don't remember.**
6    Q.   Did the woman that you were dating at the
7  time have any input into your decision?
8    **A.  I'm no longer with her.**
9    Q.   Did she attend a memorabilia signing that
10  you went to in Chicago on January 21st 2019?
11    **A.  Yeah.**
12    Q.   Did she attend the dinner that you had
13  with Todd France in Detroit back in I think it was
14  September or October 2019?
15    **A.  I don't remember.**
16    Q.   Let's talk about this autograph signing
17  that took place in the Chicago area, Lombard,
18  Illinois?
19    **A.  I don't know.**
20    Q.   It took place on January 21, 2019.  How
21  did you first hear about this possibility of doing
22  a signing on that day in Chicago?
23    **A.  Jake hit me up from maybe -- I don't**
24  **remember how I even received it.  Maybe DM maybe.**
25    Q.   And what do you remember him saying?

Page 81

1    **A.  No clue.  I don't remember.**
2    Q.   And why did you talk with him?
3    **A.  To be honest, I have no clue, but I'm glad**
4  **I did.  Yeah, make some quick little cash.**
5    Q.   Did you have any idea how he got your
6  contact information?
7    **A.  Like I said, I think he hit me up on DM or**
8  **something.**
9    Q.   And so what do you remember him saying?
10    **A.  Go ahead, finish.**
11    Q.   How did he identify himself?
12    **A.  I don't remember.  I mean, that was, what,**
13  **how many years ago?  I don't know.**
14    Q.   Did you understand that Jake Silver was
15  reaching out to you from CAA Sports?
16    **A.  No harm, no foul there.  I was able to go**
17  **through a third party for marketing on my own**
18  **without Clarity and Jason knowing about it.  That**
19  **was what was agreed.**
20    Q.   What did Todd France tell you about that
21  issue, about being able to do the same?
22    **A.  I've never talked to Todd about that.**
23    Q.   What did Todd France tell you about Jake
24  reaching out to you, Jake Silver?
25    **A.  Yeah, I never talked to Todd about any of**

Page 82

1    that.  I never talked to Todd about Jake reaching
2    out or anything.
3        Q.  Did you talk to Todd about the idea that
4    somebody from CAA might be reaching out to you with
5    marketing opportunities?
6        A.  I don't even talk to Todd now, to this
7    day, now that he's my agent, about marketing, so,
8    no.
9        Q.  Did you believe that Todd France knew
10   about this memorabilia signing on January 21, 2019?
11       A.  I didn't care if he did or didn't.
12       Q.  Did you think that he knew about it?
13       A.  It never even crossed my mind.  I didn't
14   care if he knew.  It had nothing to do with him.
15       Q.  Did you think that Mr. France was involved
16   in setting this up for you?
17       A.  No, I didn't think about that.  It didn't
18   matter to me.
19       Q.  Did you ever have any communications with
20   Mr. France about that January 21, 2019 memorabilia
21   signing?
22       A.  Yeah, I pretty much answered that me and
23   Todd, still to this day, now that he is my agent,
24   don't talk about marketing, period, so, no, I
25   didn't talk to him about that.

Page 83

1        Q.  Did you ever get any text messages or
2    emails from Todd France about the January 21, 2019
3    memorabilia signing?
4        A.  I don't know.
5        Q.  Were you aware that Todd France was trying
6    to communicate with you about that or that you were
7    receiving emails from him about that?
8        MR. CLEMENTS:  Objection, foundation.
9        You can answer.
10       A.  I don't know if Todd hit me up about a
11   marketing deal or a signing at all.  Like I said,
12   me and Todd don't talk about marketing.
13       Q.  Other than Jake Silver, did you have any
14   conversations with anybody else at CAA about that
15   January 21, 2019 signing?
16       A.  No.
17       Q.  Did Jake Silver ever say, "Hey,
18   Mr. Golladay, I'm having trouble hearing back from
19   you or getting your attention about this
20   January 21, 2019 signing"?
21       A.  I don't remember.
22       Q.  Do you know that Mr. France has told us
23   that he had nothing to do with arranging that
24   signing for you.  Do you know that?
25       A.  Yes.  I mean, that's the conversation you

Page 84

1    guys had.
2        Q.  Right.  So do you know, did Mr. France
3    know about the signing before it took place?
4        MR. CLEMENTS:  Objection.  It's been asked
5    and answered, but you can answer.
6        A.  I have no clue.  You can ask Todd.  I
7    don't know.
8        Q.  Before you went to that signing, did you
9    think that Mr. France knew about it?
10       A.  I could care less if he knew about it or
11   not.
12       Q.  But understanding that you could care
13   less, what was your understanding, he did or he
14   didn't know about it?
15       A.  It didn't matter if he knew about it or
16   not.
17       Q.  Right.  But did you think that he knew
18   about it or did you think he did not know about it?
19       A.  I didn't care if he knew about it or not.
20       Q.  I'm asking a different question, and I
21   understand that you don't care and I understand it
22   doesn't matter to you, but my question is:  Did you
23   think that Todd France knew that CAA was arranging
24   an autograph signing for you to take place on
25   January 21, 2019?

Page 85

1        A.  I went to the signing to knock out the
2    signing.  It didn't matter who arranged the signing
3    or not.  It's something -- it was a signing for me
4    to sign jerseys or autographs, whatever it was,
5    footballs.  You could have signed -- you know, you
6    could have gave me the opportunity to go do it and
7    I would have did it.  It doesn't matter if Todd did
8    it or not.  I don't know whether or not CAA did it,
9    I would have done it.  I'm glad I did it.  I have
10   people come to me to do signings all the time.
11   Either I'm going to go or not.  It don't matter who
12   sets it up.
13       Q.  I'm going to ask the court reporter to
14   read my question back and I want you to listen to
15   it closely and then try to answer it because I feel
16   like you're not answering exactly, so can the court
17   reporter go ahead and read it back?
18           (Question read.)
19       A.  I never once thought about it.
20       Q.  Okay.
21       MR. CLEMENTS:  I think the record readback
22   was a little incorrect because you said October 21,
23   2019.  I think it's January 21, 2019.
24       Q.  Let's bring up the 2019 January 3rd
25   Facebook post for this signing.

CONFIDENTIAL TRANSCRIPT
PohlmanUSA Court Reporting    (877) 421-0099    PohlmanUSA.com

Page 86

1   (Thereupon, Plaintiff's Exhibit 10 was marked for
2   purposes of identification.)
3       Q.  Mr. Golladay, this says that Redland
4   Sports is putting on a signing for you in
5   conjunction with Boone Enterprises and MVP
6   Authentics.  Do you see that?
7       A.  Yes.
8       Q.  And it's our understanding that this
9   Facebook post came out January 3, 2019.  Did you
10  have any discussions with anybody at Redland Sports
11  about this?
12      A.  No.
13      Q.  Did you have any discussions with anybody
14  at Boone Enterprises about this?
15      A.  No.
16      Q.  And did you have any discussions with
17  anybody at MVP Authentics about this?
18      A.  No.
19      Q.  When did you first talk to Jake Silver
20  about doing the signing on January 21st?
21      A.  I don't remember.
22      Q.  Do you remember if it was December 2018 or
23  after New Year's, January of 2019?
24      A.  I don't remember a date at all.
25      Q.  Do you remember how you agreed to the date

Page 87

1   of January 21st for the signing?
2       A.  No.
3       Q.  Who did you talk with about setting that
4   date?
5       A.  I don't remember.  I mean, Jake proposed
6   it to me.  I don't remember.
7       Q.  How did you communicate with Jake Silver
8   about setting that date?  Was it over text or
9   emails?
10      A.  It could have been DM, FaceTime, FaceTime
11  audio.  I don't remember.  It was so long ago.
12      Q.  Would it have been, like, on the phone?
13      A.  FaceTime is on the phone, so, yeah, that's
14  the only way I could FaceTime.
15      Q.  And how did you arrive at the location
16  where this was going to take place?
17      A.  Uber.
18      Q.  No, I mean, how did you decide on it?  Did
19  Mr. Silver propose the location or did you or what?
20      A.  I don't remember.  I'm from Chicago --
21  well, I'm from Illinois.  Where did you say this
22  spot was at?  I don't even remember what spot we
23  were at to do it.
24      Q.  Do you know if it was in the Chicago area
25  or was it in another city or you just don't

Page 88

1   remember?
2       A.  You said Illinois.  It was in Illinois.
3   I'm from there.
4           MR. CLEMENTS:  He said Lombard, Illinois.
5           THE WITNESS:  Yes.
6       A.  What was the question?
7       Q.  Was it your idea to do it in Illinois
8   instead of Detroit or some other place?  Whose idea
9   was that?
10      A.  I don't remember.
11      Q.  You don't remember if you suggested what
12  state or if CAA suggested?
13      A.  I don't remember how we came up on the
14  location.
15  (Thereupon, Plaintiff's Exhibit 11 was marked for
16  purposes of identification.)
17      Q.  Let's look at another document.  This will
18  be Exhibit 11.  This will be dated January 6, 2019.
19  Can we zoom in on that a little bit?  This is a
20  text between you and Emily Ries.  It looks like you
21  wrote, "Hey, Emily!"
22          She writes, "Checking in, how's it going?"
23          And then Sunday, January 6, 2019,
24  4:03 p.m., she sends you a screenshot of that
25  Facebook post we just looked at.  Do you see that?

Page 89

1       A.  Yes.
2       Q.  Do you remember this text message exchange
3   between you and Emily Ries?
4       A.  I don't remember the exchange.
5       Q.  She writes, "This is the post."  And then
6   she says, "I'll hit them up."  She testified that
7   says, "I'll hit them up."
8           Do you see that?
9       A.  I see "7P."
10      Q.  She said it says "7P," but it should say
11  "UP."
12      A.  Okay.
13      Q.  And then you responded and said, "Yeah I
14  don't know about that."
15          Do you see that?
16      A.  Yes.
17      Q.  Now, was that true when you wrote it to
18  Emily Ries?
19      A.  Yes.
20      Q.  Did you know that these memorabilia
21  dealers were planning for you to do a signing on
22  January 21, 2019?
23      A.  I don't remember the day or whatever.
24  Yeah, I knew about the signing, okay.
25      Q.  Why did you say to Emily Ries, "Yeah, I

23 (Pages 86 to 89)

Page 90

1   don't know about that"?
2       A.  It kind of goes back to the contract, you
3   know, they don't have to be involved with any third
4   parties, deals that come across my way and it
5   wasn't any of her business.
6       Q.  So do you and I agree that you said
7   something here to Emily Ries that was not
8   100 percent accurate?
9       MR. CLEMENTS:  Objection, argumentative,
10  asked and answered.
11      You can answer.
12      A.  Like I said, it wasn't any of her
13  business.  Who cares if I have a signing to do?  If
14  they didn't set the signing up, I could do whatever
15  I like.
16      Q.  Why didn't you just tell her that?
17      A.  I didn't have to.
18      Q.  Right, but why not be truthful to Emily
19  Ries at this point in time?
20      MR. CLEMENTS:  Objection, argumentative.
21  You are harassing the witness.
22      You can answer one more time.
23      A.  I didn't have to.
24      Q.  Do you remember any phone conversations
25  you had with Emily Ries about whether this signing

Page 91

1   was authorized by you?
2       A.  No.
3       Q.  Do you remember having a phone
4   conversation with Jason Bernstein about whether the
5   signing had been authorized by you?
6       A.  I don't.
7       Q.  Did Mr. Bernstein reach out to you about
8   this signing before it happened?
9       A.  I don't remember.
10      Q.  Did Emily Ries reach out to you before
11  this signing happened?
12      A.  I guess text messages shows it, right?
13      Q.  Yes.  Anything else like phone calls with
14  Emily Ries that you recall?
15      A.  Yeah, I don't remember.
16  (Thereupon, Plaintiff's Exhibit 12 was marked for
17  purposes of identification.)
18      Q.  Let's bring up another document.  It will
19  Exhibit 12, and this is going to be dated
20  January 8, 2019, it's an email from Jake Silver to
21  Todd France, and this shows that Jake Silver of CAA
22  is writing an email to ToddFrance@CAA.com, dated
23  January 8, 2019 and it attaches a
24  Golladay_KennyBoone Enterprises private contract
25  PDF document, Jake Silver writes, "Contract

Page 92

1   attached, already signed by Boone Enterprises."
2       Did you know that these communications
3   were going on between Jake Silver's email account
4   and Todd France's email account?
5       MR. CLEMENTS:  Objection, foundation.
6       A.  I mean, that's between those two guys.
7   I'm not cc'd in there anywhere.  I wouldn't know
8   about that.
9       Q.  Did Jake Silver tell you that Todd was on
10  board with this?
11      MR. CLEMENTS:  Objection, foundation,
12  hearsay.
13      You can answer.
14      A.  Jake never brought Todd up about it.
15      Q.  Did you know that Todd France was getting
16  emails sent to his account about this signing that
17  you were going to do?
18      MR. CLEMENTS:  Objection, foundation.
19      A.  How would I know what Todd gets to his
20  email?
21      Q.  Yeah, that's what I'm asking.  Did you
22  have any conversations with Jake Silver or with
23  Todd France or with anybody else about the idea
24  that Todd France had this signing contract sent to
25  his email account?

Page 93

1       MR. CLEMENTS:  I think it's been asked and
2   answered.
3       A.  Yeah, I don't know what gets sent to
4   Todd's email.  I don't know how.
5       Q.  Yeah, and I'm asking you a different
6   question, which is, did you have any conversations
7   with either Jake Silver or Todd France about the
8   idea that Todd France had this signing contract
9   sent to his email account?
10      A.  Me and Jake never once talked about Todd,
11  and I don't know what gets sent to Todd's email.  I
12  don't know what emails Todd receives.
13      Q.  Did you and Mr. France talk about the
14  contract for the signing?
15      MR. CLEMENTS:  Objection, this has been
16  asked and answered numerous times, but you can
17  answer again.
18      A.  Todd is my agent now and still, to this
19  day, we do not talk about marketing.
20      Q.  I understand.  Did you talk about this
21  marketing event, this January 21, 2019 marketing
22  event?
23      A.  We've never talked about marketing.
24      Q.  Does that include this event?
25      A.  Ever.

24  (Pages 90 to 93)

Page 94

1    Q.  Is that a yes or a no, Mr. Golladay?
2    **A.  We've never talked about marketing, no.**
3    **We haven't talked about this event, no event.**
4    **(Thereupon, Plaintiff's Exhibit 13 was marked for**
5    **purposes of identification.)**
6    Q.  Let's bring up the next email from this
7    date.  It's going to be an email from Mr. France to
8    you dated January 8, 2019.  So this was produced by
9    CAA Sports and they redacted off your confidential
10   email address, but it says that this message is
11   from Todd France at CAA.com.  Do you see that?
12   **A.  Yes.**
13   Q.  And it's dated January 8, 2019.  It says
14   that there's an attachment Golladay_Kenny Boone
15   Enterprises private contract PDF.
16       Did you receive this email from Todd
17   France?
18       MR. CLEMENTS:  Objection, foundation, but
19   you can answer.
20   **A.  I see what you've got right here on the**
21   **share screen.  I don't remember receiving that**
22   **email.**
23   Q.  Did you receive the contract for the
24   signing that took place on January 21st 2019 from
25   any source?

Page 95

1    **A.  I did the signing so I had to sign some**
2    **type of contract, so I guess so.**
3    Q.  And this email from Todd France's email
4    account, is this how you received the contract for
5    the signing?
6    **A.  I don't even know if that's his email.  I**
7    **don't know.  I don't remember receiving the email.**
8        MR. CLEMENTS:  Late objection, foundation.
9    Q.  So what's written here says, "Please sign
10   this and send back.  If easier, I can text to you
11   also."
12       Did Mr. France send you any texts about
13   this signing event?
14   **A.  No.  Me and Todd did not talk about**
15   **marketing.**
16   Q.  Other than this email that we're looking
17   at here from Todd France's email account to your
18   personal email address, are there any other emails
19   from Todd France to you about the January 21, 2019
20   signing?
21       MR. CLEMENTS:  Objection, foundation.
22       You can answer.
23   **A.  Me and Todd never talked about the signing**
24   **event.**
25   Q.  Is this email still on your personal email

Page 96

1    account?
2    **A.  I have no clue.**
3    Q.  When you received the subpoena in this
4    case, did you go look to see if you had any emails
5    like this one on your email account?
6    **A.  I didn't see an email on the account.  I**
7    **don't remember getting this email.**
8    Q.  And then what's written here is, "If you
9    want Mom to get a copy, let me know.  I can send to
10   her also."  Can you see that?
11   **A.  Yeah.**
12       MR. CLEMENTS:  Objection, foundation.
13   Q.  Did you respond to Mr. France about this?
14   **A.  I don't remember even seeing this email.**
15   Q.  Did you ever tell your mom about the
16   signing before it happened?
17   **A.  No.**
18   Q.  Do you know if anybody talked to your mom
19   about the signing before it topped?
20       MR. CLEMENTS:  Objection, speculation.
21       You can answer if you know.
22   **A.  You will have to ask her.**
23   Q.  Did your mom have any role in the signing?
24   **A.  No.**
25   Q.  Was she listed as somebody where notice

Page 97

1    about the signing should be sent?
2    **A.  No.**
3    Q.  If she is listed in the contract as the
4    person who should receive notices about the
5    contract on your behalf, do you have any
6    explanation for how that would happen?
7    **A.  Can you repeat the question?**
8    Q.  Sure.  If your mother, Stacy Wright
9    Whitaker, is listed in the contract as being the
10   person who should receive notices on your behalf,
11   do you have any explanation for how that happened?
12       MR. CLEMENTS:  Objection.  Not reasonably
13   calculated to lead to discovery of admissible
14   evidence, but you can answer if you have any
15   knowledge.
16   **A.  Can you repeat the question again?  I**
17   **really don't know what you're trying to ask me**
18   **right now.**
19   Q.  Yeah.
20   **A.  Or rephrase the question.**
21   Q.  Sure.
22       MR. COMERFORD:  Let's just have the court
23   reporter read it back, please.
24       (Question read.)
25   **A.  I don't.**

Page 98

```
1          MR. CLEMENTS:  Same objection, calls for
2   speculation.
3       Q.  Before the signing took place, did anybody
4   reach out to you and tell you that someone had
5   contacted one of these memorabilia dealers and
6   objected to the signing?
7       A.  No.
8       Q.  Did Jake Silver ever reach out to you and
9   tell you, "Hey, someone reached out to the
10  memorabilia dealers and they're saying they're your
11  exclusive marketing agent"?
12      A.  No.
13      Q.  Did you ever have any conversations with
14  Jake Silver before the signing took place about the
15  idea of whether or not it was okay for you to do
16  this signing under the marketing contract that you
17  had with Clarity?
18      A.  No, because in the contract I was able to
19  do any marketing from a third party.  That's in the
20  contract.  And I actually came from Jason and Emily
21  saying that I can do any marketing outside of them
22  and they will look it over, if I want them to, to
23  see if everything is accurate.  So I was able to do
24  anything I wanted to outside of them as far as
25  marketing.
```

Page 99

```
1       Q.  I'm sorry, could you say that again?
2       A.  I don't know what's the big issue about
3   the signing if I was able to do another signing
4   outside of Clarity.
5       Q.  Right.
6           Did you know from any source that Jason
7   Bernstein and Emily Ries had reached out to a
8   memorabilia dealer and objected?
9       A.  I don't.  I mean --
10      Q.  Did you say you just don't know or you
11  don't remember?
12      A.  I don't know if they reached out to the
13  memorabilia people at all.  How about you ask them
14  to see if they reached out to them?
15      Q.  What asking is, did you know that they
16  reached out to the memorabilia dealers?
17      A.  I just said I don't.
18      Q.  So I just want to make sure I understand,
19  you didn't have any conversations with Jake Silver
20  about whether it was okay for you to do this
21  signing or not, correct?
22      A.  Right.
23      Q.  Did you have any conversations with Todd
24  France about whether it was okay for you to do this
25  signing before it took place?
```

Page 100

```
1          MR. CLEMENTS:  Asked and answered.
2       A.  Me and Todd never talked about marketing
3   and still, to this day, we don't talk about
4   marketing.
5       Q.  Did you have any conversations with
6   anybody at CAA Sports --
7       A.  No.
8       Q.  -- about whether it was okay for you to do
9   the signing or not.
10      A.  No.
11      Q.  Did CAA Sports ask you to promise them
12  that it was okay for you to do the signing under
13  your contract with Clarity?
14      A.  No.
15      Q.  When you first were starting to think
16  about doing this signing and up until the point in
17  time it happened, who was going to attend in your
18  mind other than you?
19      A.  Say it again.
20      Q.  When you first started thinking about
21  doing this signing event that took place on
22  January 21st 2019, who did you think was going to
23  go to it with you?
24      A.  I didn't think anyone was going to go with
25  me.  The person that was doing the signing and
```

Page 101

```
1   that's it.
2       Q.  Did you think that your mom was going to
3   go with you?
4       A.  No.
5       Q.  Was there ever a plan for your mom to go
6   with you?
7       A.  No.
8       Q.  Did you think that the person you were
9   dating at the time was going to go with you?
10      A.  No.
11      Q.  Did you think that Todd France was going
12  to go with you?
13      A.  No, I didn't think anyone was going to go
14  with me.
15      Q.  So you didn't think Jake Silver was going
16  to go with you, right?
17      A.  I didn't think anyone was going to go with
18  me.
19      Q.  Did you communicate with Jake Silver about
20  how you were going to get from the airport to the
21  signing event?
22      A.  I don't remember.
23      Q.  Are you going to take an Uber, are you
24  going to get a car service?  Do you remember any
25  conversation about that?
```

CONFIDENTIAL TRANSCRIPT
PohlmanUSA Court Reporting    (877) 421-0099      PohlmanUSA.com

Page 102

1      A.  Yeah, I don't remember.
2      Q.  Do you remember how you got from the
3  airport to the signing?
4      A.  I don't remember.
5      Q.  How often do you typically go home to
6  Chicago during the season?
7      A.  During the season?
8      Q.  Or the off season.  Let's do that.  Like a
9  typical January, if you guys don't make the
10  playoffs, how often would you go home?
11      A.  I have a spot in Chicago outside of my
12  mom's house now.  I don't know.  Whenever I want
13  to.
14      Q.  That Facebook post that we looked at a
15  minute ago, were you aware -- until Emily Ries sent
16  it to you, were you aware that that had been
17  posted?
18      A.  No, I don't use Facebook.
19      Q.  Were you unhappy that the memorabilia
20  dealers had been posted that on Facebook?
21      A.  I could care less.
22      Q.  Were you surprised that they posted it on
23  Facebook and advertised it?
24      MR. CLEMENTS:  Objection, asked and
25  answered.  Answer again.

Page 103

1      A.  I could care less if they posted it or
2  didn't post it.  Who cares?
3      Q.  Did you have any conversations with Jake
4  Silver about the idea that this signing should be
5  kept private and should not be advertised?
6      A.  I didn't care.
7      Q.  Let's pull up the document dated
8  January 8, 2019, which is the signing contract.  So
9  this is the contract between you and Boone
10  Enterprises for this January 21, 2019 signing.
11  Let's go down to the end of it.  We'll mark this as
12  Exhibit 13.
13  (Thereupon, Plaintiff's Exhibit 14 was marked for
14  purposes of identification.)
15      MR. HERBER:  It should be Exhibit 14.
16      MR. CLEMENTS:  What is Exhibit 13?
17      MR. HERBER:  Mr. France's email to
18  Mr. Golladay on January 8, 2019.
19      Q.  So, Mr. Golladay, we're looking at this
20  contract.  Did you sign this contract?
21      A.  Yeah.
22      Q.  How did you sign it?
23      A.  It looks like it was signed
24  electronically.
25      Q.  So how did you do that?

Page 104

1      A.  I don't know.  It was three years ago.
2      Q.  Did you use the email that you received
3  from Todd France's email account to pull up the PDF
4  document that he sent you?
5      A.  I don't remember how I signed it, but I
6  signed it, clearly.
7      MR. CLEMENTS:  Belated objection,
8  foundation.
9      Q.  How did you return the contract to CAA
10  Sports after you signed it?
11      A.  I don't remember.
12      Q.  Do you remember who you emailed it to or
13  did you email it to anybody or did you put it in
14  the U.S. postage mail, or what?
15      A.  I don't remember how I returned it.
16      Q.  So you don't remember who you sent it to
17  or how you sent it; is that right?
18      MR. CLEMENTS:  It's been asked and
19  answered three times.
20      Go ahead.
21      A.  I don't remember how I returned it.
22      Q.  Let's go up a page or two to the Notices
23  section.  It says there -- in Section 13 it says,
24  "Notices.  All notices need to be delivered to the
25  address listed below," and then your mother's

Page 105

1  address is listed there, right?
2      A.  Right.
3      Q.  Do you know how your mother's address made
4  it into this contract?
5      A.  I don't.
6  (Thereupon, Plaintiff's Exhibit 15 was marked for
7  purposes of identification.)
8      Q.  Let's pull up another document.  This will
9  be Exhibit 15.  It's going to be dated January 16,
10  2019, some text messages from Mr. Boone that you
11  entered into this contract with, and I want to go
12  to page 7.  So these are text messages between
13  Craig Boone and Boone Enterprises and the other
14  gentlemen listed at the top are Daryl Eisenhour and
15  Gerry Ochs, just to orient you, okay?  Do you see
16  that?
17      A.  Yes.
18      Q.  One of these text messages says, "Car
19  service for Kenny, mom, Todd CAA $336."  Do you see
20  that?
21      A.  Yes.
22      Q.  Do you have any idea why the memorabilia
23  dealers thought that your mom was going to attend?
24      A.  I have no clue.
25      Q.  I mean, do you have any explanation for

1  why your mom is listed there as being included in
2  the car service?
3      **A.   I said I have no clue.**
4      Q.   And then it says, "Todd, CAA" there in
5  that sentence about the car service.  Do you have
6  any explanation for why Todd's name is there?
7      **A.   No, but you can ask those people.**
8      Q.   Yeah.  This is why I asked you earlier if
9  you thought that Todd France was going to attend
10  the signing with you.
11      **A.   Right.**
12      Q.   Because his name was in these text message
13  about riding in the car service with you.
14      **A.   I never saw these text messages until**
15  **right now, so that's why I said no, not that I know**
16  **of.  He wasn't supposed to be there.  He wasn't**
17  **there.**
18      Q.   Did you have an understanding that Todd
19  France might attend this signing?
20      MR. CLEMENTS:  Objection, asked and
21  answered.
22      **A.   I never once thought that he would be**
23  **there.**
24      Q.   And these are dated January 18, 2019,
25  these text messages?

1      **A.   So.**
2      Q.   I'm just noting that for the record.
3          Did Mr. Saffold know that this signing was
4  going to take place?
5      MR. CLEMENTS:  Objection, not reasonably
6  calculated to lead to the discovery of admissible
7  evidence, but you can answer.
8      **A.   I don't know.  Ask him.**
9      Q.   Did you have any discussions with
10  Mr. Saffold about the idea that you were going to
11  do a memorabilia signing on January 21, 2019?
12      MR. CLEMENTS:  Same objection.
13      You can answer.
14      **A.   I don't know.**
15      Q.   Other than this signing that took place on
16  January 21, 2019, did you do any other memorabilia
17  signings that Jason Bernstein and Clarity Sports
18  didn't know about?
19      **A.   Yes.**
20      Q.   Tell me about those.
21      **A.   When I did a signing they didn't know**
22  **about and it was never an issue.  Like I said, in**
23  **the contract I can do a third-party signing without**
24  **them being involved; no harm, no foul.**
25      Q.   So what was the other signing that you did

1  that was not coordinated with Clarity Sports
2  besides this one on January 21, 2019?
3      **A.   It was a private signing.  I don't**
4  **remember which one, but I've done a private signing**
5  **without them knowing before, yes.**
6      Q.   And when did that take place?
7      **A.   I don't remember.**
8      Q.   What year did it take place?
9      **A.   I don't remember when it took place.**
10      Q.   Who were the memorabilia dealers that you
11  worked with on that signing?
12      **A.   I don't remember.**
13      Q.   Do you remember the name of any person who
14  was involved in that signing besides you?
15      **A.   I don't remember.**
16      Q.   Do you remember what city the signing that
17  you're talking about took place in?
18      **A.   No.**
19      Q.   Do you remember what state the signing
20  that you're referring to took place in?
21      **A.   I don't.**
22      Q.   Do you remember how many items you signed
23  at this other private signing that you did without
24  Clarity knowing about it?
25      **A.   No.**

1      Q.   What kind of facility did this other
2  signing take place in, a hotel, warehouse?
3      **A.   I don't remember.**
4      Q.   Was it daytime or nighttime when you did
5  this other signing that Clarity didn't know about?
6      **A.   I don't remember.**
7      Q.   Can you tell me anything about this other
8  private signing that you did that you didn't
9  coordinate with Clarity, any person who was
10  involved, what state it took place in, what year it
11  was, anything like that?
12      **A.   I can't tell you anything.**
13      Q.   Do you remember if the items that you
14  signed at this other private signing that Clarity
15  didn't know about were sold on the market?
16      **A.   I don't remember.**
17      Q.   You know that there's a market for
18  memorabilia items signed by NFL stars like you,
19  right?
20      **A.   Yes, I know that items get sold, but**
21  **that's none of my concern.  I go there to sign and**
22  **get paid for it and I'm out.**
23      Q.   We have not been able to find any items
24  that have been offered for sale on any websites
25  that are items that you signed at a private signing

28  (Pages 106 to 109)

Page 110

1  that Clarity didn't know about. Can you help me
2  understand that?
3      A. What difference does it make?
4      Q. Well, I just want to know any details you
5  can give me about this other private signing you
6  say happened that Clarity didn't know about it.
7      A. They didn't need to know about any of
8  them. It's in the contract that I can do
9  third-party signings without them knowing and
10 without them getting any part of it and it wouldn't
11 be an issue so they don't need to know about any of
12 it. Who cares?
13     Q. How many private signings did you do that
14 Clarity didn't know about at all?
15     A. Enough.
16     Q. I mean, was it one or more than one?
17     A. It was enough.
18     Q. I understand you're saying it was enough,
19 but can you give me a number?
20     A. It was as many as I wanted to do.
21     Q. So how many was that, Mr. Golladay?
22     A. Enough to satisfy me.
23     Q. I mean, was it one, two, three? How many?
24     A. As many as I wanted to do.
25     Q. Can you tell me the state in the United

Page 111

1  States of America where any of these private
2  signings took place?
3      A. I can't. I don't remember.
4      Q. Did you ever talk with Mr. France after
5  the January 21st 2019, signing took place about
6  whether you had done other signings on your own?
7          MR. CLEMENTS: Objection. It's been asked
8  and answered.
9      A. Me and Todd never talked about marketing
10 and still don't to this day.
11     Q. So you never told Mr. France that you had
12 done memorabilia signings on your own in the past?
13     A. Right.
14         MR. CLEMENTS: Objection, it's been asked
15 and answered. You are badgering. You keep asking
16 the same question over and over.
17         You can answer again.
18     A. Me and Todd never talked about marketing
19 and still don't to this day.
20     Q. Let's pull up Mr. France's flight records,
21 January 17, 2019. These are flight records from
22 Mr. France.
23         MR. CLEMENTS: Objection, foundation.
24     Q. They are flight records relating to
25 Mr. France that we obtained from Delta Airlines.

Page 112

1  The way I read these flight reservation records --
2          MR. HERBER: Before you read them, can you
3  mark this as an exhibit?
4          MR. COMERFORD: This will be Exhibit 16.
5  (Thereupon, Plaintiff's Exhibit 16 was marked for
6  purposes of identification.)
7      Q. Mr. Golladay, according to the Todd France
8  flight records that we obtained from Delta
9  Airlines, there was a reservation created on
10 January 17, 2019, which is four days prior to the
11 signing that took place on January 21, 2019, and
12 the reservation called for Mr. France to depart
13 Atlanta on January 20th and arrive at O'Hare
14 Airport in Chicago, Illinois, and then on
15 January 21st 2019, which is the day of the signing,
16 Mr. France had a reservation to depart O'Hare
17 International Airport in Chicago, Illinois and
18 return to Atlanta. Do you see that?
19     A. Yes.
20     Q. Now, you were going to be in Chicago on
21 January 21, 2019 to do this memorabilia signing,
22 right?
23     A. I don't remember the date. Was that the
24 date?
25     Q. Yes, it was.

Page 113

1      A. Okay.
2      Q. Did you know that Mr. France had made a
3  flight reservation to travel from Atlanta to
4  Chicago on January 20th 2019 and return on
5  January 21st 2019?
6      A. No.
7      Q. And then these records say that Mr. France
8  flew from Atlanta to Chicago on January 23rd 2019,
9  and returned from Chicago to Atlanta on
10 January 23rd 2019; do you see that?
11     A. Yes.
12         MR. CLEMENTS: Objection, authentication
13 and foundation.
14     Q. Did you meet in person with Mr. France in
15 Chicago on January 23, 2019?
16     A. No.
17     Q. Did you meet in person with Mr. France at
18 any time in January of 2019?
19     A. I don't remember.
20     Q. How did you sign an SRA with Mr. France?
21     A. I don't remember.
22     Q. What was the process? Did you sign it
23 with him in person or not?
24     A. Yeah, I told you I don't remember.
25     Q. Do you remember if Mr. France sent you the

29 (Pages 110 to 113)

Page 114

1  SRA by email or sent you a copy for your records by
2  email?
3  **A.  I don't remember.**
4      Q.  Do you have a copy of the SRA that you
5  signed with Mr. France in January of 2019?
6  **A.  I don't know.**
7      Q.  Do you think that you should have a copy
8  of it?
9      MR. CLEMENTS:  Objection.  Not likely to
10  lead to discovery of admissible evidence,
11  argumentative, harassing the witness, but you can
12  answer.
13  **A.  I don't know if I have a copy or not.  If**
14  **I don't have a copy, I'm able to get a copy if I**
15  **need it.**
16      **We've got a couple more minutes.  I still**
17  **have stuff I've got to get to.**
18      Q.  Yeah, I'm trying to get through all this
19  stuff as fast as I can.
20      MR. CLEMENTS:  I think experienced
21  attorneys can estimate out of courtesy to a
22  third-party witness how much longer they have.
23  How much longer do you have?  An hour, two hours,
24  three hours?  You're asking your questions and
25  there aren't that many objections at all.  He's

Page 115

1  trying to answer.
2      MR. COMERFORD:  Let's just keep going and
3  I'll try to get through everything as soon as I
4  can.
5      MR. CLEMENTS:  Out of courtesy you won't
6  tell us?
7      MR. COMERFORD:  I can't estimate.  I'm not
8  able to estimate.
9      THE WITNESS:  I mean, like another hour or
10  two?
11      MR. CLEMENTS:  He told you he's not going
12  to tell you.  He's going to keep us all in suspense
13  and keep asking you questions.
14      THE WITNESS:  I'm not going to be staying
15  here -- like I say, I've still got stuff -- things
16  for my body and everything.
17      MR. COMERFORD:  I understand.
18      THE WITNESS:  I'm trying to work with you,
19  John.  How many more questions?  How long do you
20  think?
21      MR. COMERFORD:  I'm getting through it.  I
22  need to talk about your new contract and stuff like
23  that.
24      MR. CLEMENTS:  Okay.
25      THE WITNESS:  New contract, $72 million.

Page 116

1  I wouldn't have got the contract if I didn't sign
2  for Todd France.  Jason would have never been able
3  to give me that contract.  That's why I switched.
4      MR. CLEMENTS:  Why don't we let's take a
5  three-minute break?  I don't think there's a
6  question pending.
7      MR. COMERFORD:  Sure.  I'll sit right here
8  and be ready to continue.
9      MR. CLEMENTS:  I mean, we really want to
10  get this done tonight.  We're going to do the best
11  that we can.  Let's take a quick three-minute
12  break.
13      THE VIDEOGRAPHER:  Off the record,
14  4:50 p.m.
15          (Recess taken.)
16      THE VIDEOGRAPHER:  Back on the record,
17  5:02 p.m.
18  BY MR. COMERFORD:
19      Q.  Mr. Golladay, on the day of the signing,
20  do you remember where you were when you woke up
21  that morning?
22      **A.  Chicago.  Where else would I be?  The day**
23  **of the signing?**
24      Q.  Yes.
25      **A.  I guess Chicago, right?**

Page 117

1      Q.  Okay.  Where were you staying that trip to
2  Chicago?
3      **A.  My mom's house.  By that time I didn't**
4  **have my own spot, so I was staying with my mom.**
5      Q.  And there's been some discussion that you
6  might have had to fly into Chicago on the day of
7  the signing, and you're telling me that's not how
8  you recall it, correct?
9      **A.  I said I don't remember.**
10      Q.  Do you remember being late to the signing?
11      **A.  I don't.**
12      Q.  Who was there at the signing when you got
13  there?
14      **A.  Who was there?**
15      Q.  Yes.  I'm talking about the January 21,
16  2019 signing that was set up through CAA Sports and
17  Boone Enterprises.  So who was physically there at
18  the signing when you arrived?
19      **A.  Me and my ex-girl went to the signing and**
20  **that was it.  People who was close to the private**
21  **signing were there.**
22      Q.  And who were those people?
23      **A.  I wouldn't be able to point those guys out**
24  **right now.  I was there to sign and to leave.**
25      Q.  Do you remember their -- did they identify

CONFIDENTIAL TRANSCRIPT
PohlmanUSA Court Reporting    (877) 421-0099    PohlmanUSA.com

Page 118

1   themselves with their names?
2   **A.  If they did, I don't remember their names.**
3   Q.  How many people were there other than you
4   and your ex-girlfriend?
5   **A.  I have no clue.  I don't remember.**
6   Q.  Was it more than five?
7   **A.  I don't remember how many people.**
8   Q.  It could have been more than five?
9   **A.  I don't remember how many people.**
10  Q.  What was the place where this took place?
11  Was it a hotel room?
12  **A.  I don't remember.**
13  Q.  It could have been a hotel, it could have
14  been a warehouse, you just can't recall, correct?
15  **A.  I don't remember where it was at.**
16  Q.  How many items did you sign?
17  **A.  Who knows?  I don't know.**
18  Q.  How much money did you make from the
19  signing?
20  **A.  I don't remember.**
21  Q.  Did anyone give you a check while you were
22  there at the signing?
23  **A.  I don't remember.**
24  **(Thereupon, Plaintiff's Exhibits 17 and 18 were**
25  **marked for purposes of identification.)**

Page 119

1   Q.  Let's pull up a copy of the check and show
2   it to Mr. Golladay.  It's dated January 18, 2019.
3   It's made out to you.  It's from MVP Authentics,
4   LLC.  Did you ever receive this?
5   **A.  I must have received the check.**
6   Q.  It's in the amount of $7,750.  Did you
7   receive those funds?
8   **A.  If I did the signing, I received the funds**
9   **for sure.**
10  Q.  Do you remember anyone handing you this
11  check?
12  **A.  I don't.**
13  Q.  You see there's a place to endorse the
14  check on the back page.  Is that your handwriting
15  there?
16  **A.  If it's my name, then I signed the back of**
17  **the check.  No one signed it for me.**
18  Q.  Did you tell Mr. Saffold that CAA Sports
19  had arranged the signing for you?
20  **A.  No.**
21  Q.  Why didn't you tell him that?
22  **A.  Is it his business?**
23  Q.  You've described him, I think, as a
24  mentor, someone you talked with.
25  **A.  Okay.  I don't have to tell him about a**

Page 120

1   marketing event.
2   Q.  Did you know that he was going to have to
3   testify in this arbitration that we've looked at
4   the transcript for?
5   **A.  No.**
6   Q.  You didn't know that he was going to be
7   put under oath and testify about these events?
8   **A.  Yeah, I said no.**
9   Q.  Did anyone talk to you about whether you
10  would have to testify in the arbitration that took
11  place in late 2019?
12  **A.  I'm on the call now, so of course I have**
13  **to get called by someone.**
14  Q.  So there was an arbitration between
15  Mr. Bernstein and Mr. France that took place in, I
16  think, November and December of 2019.  Were you
17  aware of that?
18  **A.  No.**
19  Q.  Were you aware that Mr. Bernstein was
20  asking to testify in that arbitration?
21  **A.  No.**
22  Q.  Were you aware that Mr. France called
23  Mr. Saffold to testify at that arbitration and said
24  that he was going to speak on your behalf?
25  **A.  No.**

Page 121

1   MR. CLEMENTS:  Objection.  Who knows if
2   Mr. France actually said that.
3   Q.  Were you aware at all that Mr. Saffold was
4   testifying on your behalf at the arbitration?
5   **A.  No.**
6   MR. CLEMENTS:  I'll object to that.  I'm
7   not sure if it's a legal conclusion on your behalf.
8   Mr. Saffold was placed under oath and testified as
9   to his knowledge.  I don't know if he was
10  testifying -- if a witness can actually testify
11  on -- it's sort of a foundation objection.
12  Q.  So what you're telling me, Mr. Golladay,
13  is you weren't even aware that Mr. Saffold was
14  testifying at the 2019 arbitration, correct?
15  **A.  Correct.**
16  Q.  Other than this memorabilia signing that
17  took place on January 21, 2019, did CAA Sports
18  coordinate anything else with you before you signed
19  with Todd France, like any kind of other
20  memorabilia signings or events or anything?
21  **A.  No.**
22  Q.  Were you provided any shoes by anyone at
23  CAA Sports before you signed with Todd France?
24  **A.  No.  They didn't give me anything.**
25  Q.  Do you remember talking with Mr. Bernstein

31 (Pages 118 to 121)

Page 122

1  on the day of the signing?
2      A.  No.
3      Q.  A discussion about the logistics of your
4  surgery rehab?
5      A.  I don't remember talking to him.
6      Q.  Do you remember that you called
7  Mr. Bernstein on the day after the January 21, 2019
8  memorabilia signing to tell him you were
9  terminating him?
10     A.  I don't remember.  I don't remember the
11  date.
12     Q.  Do you remember where you were when you
13  called Mr. Bernstein?
14     MR. CLEMENTS:  He asked and answered this
15  already.  Even I know it was at his mom's house in
16  Chicago.  Are we covering the same ground?
17     Q.  So you do remember you were at your mom's
18  house when you called Mr. Bernstein, right?
19     A.  Right.
20     Q.  And this is kind of a big deal because
21  Mr. Bernstein had been your agent for a couple
22  years and was your agent since you were entering
23  the draft, right?
24     MR. CLEMENTS:  Objection, argumentative,
25  hypothetical.

Page 123

1      A.  Okay.
2      Q.  Would you agree with me?
3      MR. CLEMENTS:  Objection.
4      Q.  Did you feel bad about terminating
5  Mr. Bernstein at all?
6      A.  I had to do what was best for me and my
7  family and that's what I did.
8      Q.  Did you feel bad about it, though?
9      MR. CLEMENTS:  Objection.  Not reasonably
10  calculated to lead to the discovery of admissible
11  evidence.
12     You can answer.
13     A.  I didn't feel bad about it because I have
14  to do what's best for me and my family.
15     MR. CLEMENTS:  Also asked and answered.
16     Q.  You wrote an email to Mr. Bernstein --
17  let's pull that up.  It's dated January 24, 2019.
18  This will be Exhibit 18.
19     MR. HERBER:  John, the check is Exhibit
20  18.  This will be Exhibit 19.
21     MR. COMERFORD:  Thank you.  Sorry about
22  that.
23  (Thereupon, Plaintiff's Exhibit 19 was marked for
24  purposes of identification.)
25     Q.  Exhibit 19 is the January 24, 2019 email

Page 124

1  from you to Mr. Bernstein.  It looks like you sent
2  this from KennyGolladay@Yahoo.com; do you see that?
3      A.  Okay.
4      Q.  And it says, "Jason, per our conversation
5  and for formality, please let this email be written
6  confirmation as to the termination of our
7  agent/player SRA.  Please reply if you are willing
8  to waive the five-day period."  What's the five-day
9  period you're talking about there?
10     A.  If you allow that to be waived, then I
11  don't have to wait the five days and I'll be able
12  to hire a new agent.
13     Q.  Did you write this email or did you have
14  help with it?
15     A.  I wrote it.
16     Q.  Did anyone review it?
17     A.  No.
18     Q.  Did Mr. France or your mom or Mr. Saffold
19  or anybody review it?
20     A.  No.
21     Q.  What did you mean by that phrase, for
22  formality?  What does that mean?
23     A.  I wanted to make sure the email
24  was proper.  Since I did have a conversation with
25  him on the phone, which I didn't have to, the

Page 125

1  proper way to do it is to send an email.  I didn't
2  have to even give him a phone call, but I respect
3  from the relationship -- there was nothing wrong
4  with the relationship, to be honest, but to do
5  what's best for me and my family, I had to move on
6  from Jason, so I gave him a phone call, but to do
7  it the formal way, I put it in email, which I had
8  to do.
9      Q.  Did you have any conversations with Todd
10  France about what you should say to Mr. Bernstein
11  in the email?
12     MR. CLEMENTS:  Objection.  It's been asked
13  and answered.
14     A.  I said that already.  No, I didn't talk to
15  anybody about it.  I knew what I had to do and
16  that's what I did.
17     Q.  All right.  Let's pull up some text
18  messages between your mom, Stacy Wright Whitaker,
19  and Mr. Bernstein.  These are going to be dated --
20  the following is dated 2019-01-02.  I think these
21  have already been used as -- these are already an
22  exhibit, Exhibit 9.  And I want to go page 6, and
23  these are some texts between Mr. Bernstein and your
24  mother, Stacy Wright Whitaker, and you can see on
25  January 23, 2019, Mr. Bernstein writes and says,

Page 126

1   "Hey Stacy, let me know if you have a minute to
2   talk today and I will give you a call.  Thanks."
3          And she says, "Yes, I can call you when I
4   get in."
5          He says, "Okay, sounds good."
6          And then on January 24th, your mother
7   writes, "Hi, I'm blind-sided as well."
8          Did you have an understanding that your
9   mom was blind-sided by your decision to switch from
10  Mr. Bernstein to Mr. France?
11         MR. CLEMENTS:  Objection to these emails
12  as hearsay and any of the contents, but you can
13  answer.
14     **A.  I mean, to be honest, like I said, I had**
15  **already told friends at the beginning of December,**
16  **and then he went on to see my mom.  She was very**
17  **pleased with the meeting they had and the**
18  **conversation they had, but at the end of the day it**
19  **was still my choice.  It could have easily been no,**
20  **me being my own man, the type of person I am, I've**
21  **still got to make the decision I want to make, and,**
22  **yeah, I would still make the decision.  If she was**
23  **blind-sided, that's how she felt, okay?**
24     Q.  Let's go down a little bit in these texts.
25  She says, "We haven't talked extensively since

Page 127

1   before the surgery and the rift with the girlfriend
2   SMH," which that means shaking my head.  "I feel so
3   bad because this isn't the Kenny we know.  He isn't
4   staying with me while in Chicago, first ever."  Do
5   you see where I read that?
6      **A.  Yep.**
7      Q.  Does this refresh your memory that you
8   were not staying with your mom during this trip in
9   January 2019 to Chicago?
10     **A.  At the end of the day if I stay with her**
11  **or my dad, it doesn't matter.  I mean, all my**
12  **family is from Chicago.  It wasn't like I was out**
13  **on the street.**
14     Q.  Sure.  I'm just wondering, you told me
15  earlier that you were staying with your mom when
16  you did the signing and when you sent the
17  termination email to Mr. Bernstein and when you
18  called Mr. Bernstein on January 22, 2019.  In this
19  text she's saying that you're not staying with her.
20  I'm just asking, does that refresh your memory --
21         MR. CLEMENTS:  Objection.
22     Q.  -- that maybe you remember staying
23  somewhere else?
24         MR. CLEMENTS:  I think he said -- these
25  are texts between Mr. Golladay's mother and

Page 128

1   Mr. Bernstein.
2          MR. COMERFORD:  Sure.
3      Q.  So, Mr. Golladay, as you sit here, can you
4   remember who you were staying with when you went to
5   Chicago for the signing on January 21st 2019?
6      **A.  I don't remember.  I was staying with my**
7   **mom or staying with my dad or I could have got a**
8   **hotel.  It doesn't matter who I was staying with.**
9   **I'm from Chicago.  All my family is from Chicago.**
10     Q.  Let's go down a little bit and Mr.
11  Bernstein writes, "Hey, Stacy.  Yeah, obviously
12  disappointed and feels like it came out of nowhere,
13  especially after I was there with him for his
14  surgery.  You did nothing wrong.  I will give you a
15  call later or tomorrow if you're around."
16         And then she responds with kind of a sad
17  emoji face there.  Let's go down a little more.
18         And then on January 26th Mr. Bernstein
19  writes to your mom, Stacy Wright Whitaker, and she
20  responds and says, "I read it.  I don't understand
21  what's going on.  This isn't the same Kenny you
22  first met and that I thought I knew."
23         Do you see all that?
24     **A.  Yeah.**
25     Q.  Were you having any conversations with

Page 129

1   your mom at this point about switching from
2   Mr. Bernstein to Mr. France?
3      **A.  At the end of the day, I'm my own man, I**
4   **have to make decisions, and I made a great**
5   **decision.  So, I mean, that's the conversation**
6   **between those two, which is totally fine, but it**
7   **doesn't matter to me.  I made one of the biggest**
8   **decisions of my life as of now.**
9          MR. CLEMENTS:  Late objection.  I didn't
10  want to step on his answer, but it's hearsay.
11     Q.  So we know that Mr. Silver had a role in
12  setting up this memorabilia signing on January 21,
13  2019, correct?
14         MR. CLEMENTS:  Objection, argumentative,
15  speculative.
16     Q.  Do you know that to be true, Mr. Golladay?
17     **A.  He told me about it.  I'm not sure who set**
18  **it up.  He told me about it and I went to it.**
19     Q.  And Mr. -- all the information you got
20  about this signing, did it come from Mr. Silver or
21  did it come from Mr. Silver and anybody else?
22     **A.  Jake.**
23     Q.  So let's go up to today, has anybody else
24  at CAA done any marketing work for you other than
25  Mr. Silver?

Page 130

1    A.  I'm no longer even with CAA.
2    Q.  So let's go from January 2019 until the
3  time that you severed your relationship with CAA,
4  did anybody else --
5    A.  Well, the thing is I was with Todd France,
6  he was with CAA and he switched over to Athletes
7  First, and all my trust is with Todd, so I went --
8  now I'm with Athletes First, if that makes sense to
9  you.
10   Q.  Yes, it does.  I want to focus on CAA for
11  the next few questions.
12       Who did you work with at CAA on marketing
13  opportunities?
14   A.  I don't remember.  If it came to my
15  attention, then if I wanted to do it, then I'll do
16  it.
17   Q.  What are the names of the people at CAA
18  that you worked with on marketing opportunities?
19   A.  I don't remember.
20   Q.  What sort of marketing events did CAA set
21  up for you while you were under a contract with
22  CAA?
23   A.  Different ones.
24   Q.  So please tell me what you remember.
25   A.  I can't remember the ones they sent up.

Page 131

1    Q.  Can you name any marketing opportunities
2  or endorsement opportunities at all that CAA did
3  for you?
4    A.  I can't remember.  I'm sorry.
5    Q.  Did you make any money from marketing or
6  endorsement opportunities that CAA brought to you?
7    A.  If I did marketing, yes, I made money.
8    Q.  How much money did you make marketing or
9  endorsement deals that CAA brought to you?
10   A.  I'm not about to guess.  I don't know.
11   Q.  Was it more than 100,000?
12   A.  I'm not about to guess.
13   Q.  Can you give me your best estimate?
14   A.  I don't want to.
15   Q.  How many autograph signings have you done
16  since the January 21, 2019 signing until you and
17  Todd France left CAA?
18   A.  Quite a bit.
19   Q.  So can you do your best to estimate how
20  many?
21   A.  No.
22   Q.  Where did those signings take place?
23   A.  I don't remember.
24   Q.  Can you remember any signings that took
25  place from January 21, 2019 through the time that

Page 132

1  you and Mr. France left CAA that you attended?
2    A.  Yeah, I can't remember.
3    Q.  There was a commercial that you did for
4  Pepsi.  Do you remember that?
5    A.  Yeah.
6    Q.  And it was like an ad campaign called
7  Happy Golladays?
8    A.  Right.
9    Q.  Did you make money from that?
10   A.  Yeah.
11   Q.  And did CAA have a role in setting that up
12  for you with Pepsi?
13   A.  Yes.
14   Q.  Who did you work with at CAA on the Happy
15  Golladays campaign with Pepsi?
16   A.  I don't remember.
17   Q.  Was Mr. France involved in those
18  discussions with you and Pepsi?
19       MR. CLEMENTS:  Objection, asked and
20  answered.
21   A.  I haven't worked with Todd with marketing.
22  Still to this day I don't.
23   Q.  How much money did you get from Pepsi for
24  that campaign?
25   A.  I don't remember.

Page 133

1    Q.  Was it more than 100,000 or less?
2    A.  I'm not guessing.
3    Q.  Can you tell me if it was more or less
4  than 100,000?
5    A.  I'm not guessing.  I don't remember.
6    Q.  Do you have -- did you receive a paper
7  check or a direct deposit?
8    A.  I don't remember.
9    Q.  You know that you received money from
10  Pepsi, though, right?
11   A.  I wouldn't do it for free.
12   Q.  Right.  So we agree on that.  I'm just
13  trying to nail down some basics here because it's
14  difficult for you to remember these details, I
15  guess.
16       Was the Happy Golladays Pepsi campaign,
17  was that run through the NFL PA or was that just
18  through CAA?
19   A.  I don't remember.
20   Q.  Do you remember shooting the commercial?
21   A.  Yeah.  It was great.
22   Q.  Was there anybody else from CAA Sports to
23  hang out with you there while you were shooting the
24  commercial?
25   A.  I don't remember.

34  (Pages 130 to 133)

Page 134

1    Q.  Did you have an assistant or anybody with
2  you for that Happy Golladays commercial shoot?
3    **A.  I don't remember.**
4    Q.  Has CAA negotiated any shoe deals for you?
5    **A.  I have a Nike deal.**
6    Q.  And did CAA negotiate that deal?
7    **A.  Yes.**
8    Q.  How much money have you made from the Nike
9  deal that CAA negotiated for you?
10   **A.  I don't remember.**
11   Q.  Was it more than 100,000 or less than
12  $100,000?
13   **A.  I'm not guessing.**
14   Q.  Okay.  How about any other apparel
15  companies, either shoes or clothing?
16   **A.  I don't remember.**
17   Q.  Like besides Nike, can you remember any
18  others?
19   **A.  I can't.**
20   Q.  Do you know what the terms of the
21  marketing and endorsement contract that you had
22  with CAA Sports were in terms of how CAA would get
23  paid?
24   **A.  I don't remember the exact.  I'm not going
25  to guess on it.  I don't have it right in front of**

Page 135

1  **me.**
2    Q.  Was it commission based or did you have to
3  pay them a flat fee or how did it work?
4    **A.  I don't remember the exact.  I don't have
5  it in front of me.  I don't want to guess.**
6    Q.  So tell me what you remember generally
7  about it.
8    **A.  I don't remember anything about it.**
9    Q.  Have you told me everything you can
10  remember about marketing and endorsement work that
11  CAA Sports did for you during the time you were
12  under contract with CAA Sports?
13       MR. CLEMENTS:  Objection.  I believe it's
14  an improper question, everything.  As you sit here
15  today --
16   **A.  I explained everything and then I said I
17  didn't remember.**
18   Q.  We've talked about the fact that you got
19  money from Pepsi and from Nike and from some
20  memorabilia dealers for signing things, and that
21  all happened while you were under a contract with
22  CAA for marketing and endorsement work, right?
23   **A.  So what are you asking me?**
24   Q.  Is there any other companies that you can
25  recall that you got money from while you were under

Page 136

1  a contract with CAA?
2    **A.  If I can recall, I would have told you.**
3    Q.  Right.  So that's what I'm asking.  Can
4  you recall any others?
5    **A.  No.**
6    Q.  Let's talk about your contract offers from
7  the Lions.  Did the Lions make any offers to you?
8    **A.  Yes.**
9    Q.  What were the terms of the deal offered by
10  the Lions?
11   **A.  Say what?**
12       MR. CLEMENTS:  I'm not so sure.  I got to
13  request to mark this part of the transcript
14  confidential if we're going to be talking about --
15   Q.  How much money did the Detroit Lions offer
16  you to sign a new contract with them?
17       MR. CLEMENTS:  We're confidential,
18  correct?
19       MR. COMERFORD:  Yes.
20       MR. CLEMENTS:  Can you hold on just one
21  second?
22       MR. COMERFORD:  Sure.
23       MR. CLEMENTS:  I'm just trying to think
24  about this.  Yeah, as long as it's confidential,
25  we'll go question by question.  I'm not sure --

Page 137

1  yeah, I'm not sure there's an issue with the
2  relevant time period with the judge.  I'm not sure
3  how relevant offers are as opposed to you actually
4  have a contract, but in the interest of getting
5  through this, let's just go through it question by
6  question.  Just try your best to answer, and I
7  think all the financial stuff we'll probably have
8  to mark confidential, even though some of this
9  stuff might be public.  I don't know if these NFL
10  guys, if they know the terms of the contract, so
11  anything we say now is confidential marked
12  attorneys' eyes only.
13       MR. HERBER:  I'm also going to join in the
14  objection here to the extent this is outside of the
15  relevant allowable time period for discovery.
16   Q.  Go ahead, Mr. Golladay.
17   **A.  What was the question?**
18   Q.  What do you remember about the contract
19  offers that you received from the Lions for a new
20  contract?
21   **A.  I don't even remember them.  The one I got
22  from the Giants is so crazy and so life-changing, I
23  don't even remember.**
24   Q.  Was the offer that you received from the
25  Lions, was it for four years or three years or

35  (Pages 134 to 137)

Page 138

1  five years?
2  **A.  I don't remember.  I know I signed with**
3  **the Giants for four years, 72 million.  Todd France**
4  **helped me get that.**
5      Q.   How many offers did the Lions make to you
6  for a new contract?
7  **A.  I don't remember.**
8      Q.   Was it more than one?
9  **A.  Yeah, I don't remember.**
10     Q.   Do you remember what the average per year
11 was on the contracts from the Lions?
12 **A.  I don't.  The Giants one is 18 per year.**
13     Q.   Do you remember anything about the
14 guaranteed amount in the contracts that were
15 offered to you by the Lions?
16 **A.  I don't.  I've got 40 guaranteed from the**
17 **Giants.**
18     MR. CLEMENTS:  Is that 40?
19     Q.   Did you get any contract offers from any
20 other teams besides the Lions and the Giants?
21 **A.  I don't remember.**
22     Q.   Do you remember if the Lions' best offer
23 to you for a new contract was for more than 18
24 million per year or less than 18 million average
25 per year?

Page 139

1      **A.  I don't remember what the Lions offered me**
2  **at all.**
3      Q.   So it could have been more than the
4  Giants, you just don't remember?
5      MR. CLEMENTS:  Objection, speculation,
6  asked and answered.
7      **A.  Yeah, I don't remember.  I just know that**
8  **I signed with the Giants.**
9      Q.   So if the Lions offered you more money
10 than the Giants offered you, you're telling me you
11 just don't remember if they did or not?
12     MR. CLEMENTS:  Did they?  If you have any
13 information that they did, you can refresh his
14 recollection.
15     Q.   I'm honestly dying to know, Mr. Golladay.
16 **A.  I signed a four-year $72,000,000 contract**
17 **with the Giants.  That's all I can think about.  I**
18 **don't remember what the Lions did.**
19     Q.   Well, why did you not agree to the deals
20 that were offered to you by the Lions?
21 **A.  I felt like I deserved more, better.**
22     Q.   So let's talk about your contract with the
23 Giants.  You told me already the average is 18
24 million per year?
25 **A.  Yes.**

Page 140

1      Q.   And there's 40 million guaranteed, is that
2  what you told me?
3      **A.  Yeah, around there, I think.**
4      Q.   And so what does it mean if there's
5  guaranteed money?  Does that mean if you don't take
6  another snap in a regular season NFL game you still
7  get that?
8      MR. CLEMENTS:  Objection.  I think it's a
9  legal conclusion, but to the extent you have an
10 understanding as a player, obviously.
11     **A.  You pretty much know what guarantee means,**
12 **right?**
13     Q.   Yeah, I'm just asking is your
14 understanding of it the same as my understanding of
15 it?  Can we agree that you're going to get 40
16 million from the Giants even if you never take
17 another snap in the NFL?
18     MR. CLEMENTS:  Objection.  I think that's
19 a legal conclusion.  It might be a little more
20 complex.
21     **A.  Right.**
22     **Yes, I mean, he said it already.**
23     Q.   So what I said is correct?
24 **A.  What did you say?**
25     MR. CLEMENTS:  Who is "he"?

Page 141

1      Q.   Is it your understanding that you are
2  guaranteed to get $40 million from the Giants under
3  your new contract even if you never take another
4  snap in the NFL, fair?
5      **A.  Well, I plan on playing football until the**
6  **wheels fall off, and to be honest, I plan on**
7  **continuing taking snaps.  I'm not really worried**
8  **about not taking another snap again.  I don't even**
9  **want to put that in the atmosphere.  Sorry.**
10     Q.   It is your intent to play out your
11 four-year contract with the Giants and then get
12 another contract after that for more money, right?
13 **A.  If my body allows, yes.**
14     Q.   Are you aware of anything that's going to
15 stop you from being able to get another contract
16 after your current four-year deal with the Giants
17 is over?
18     MR. CLEMENTS:  Objection, speculation.
19 We're talking about four years in the future?  To
20 the extent you can answer.
21     **A.  What are you talking about?**
22     Q.   That's your goal, to not only do this deal
23 for four years, $72 million, but then play through
24 that deal and then get another deal after that for
25 more years and more dollars, right?

Page 142

1      A.   I'll probably be 30-something.  If I still
2    have the desire to play, then, yes.
3      Q.   And right now, as you sit here today,
4    that's your plan to continue playing past this
5    four-year contract, if you can, right?
6      A.   I'm 27, I'm still young, yes, but that's
7    three years from now, four years from now, you know
8    what I mean, so who knows?
9      Q.   It's your intent to continue to try to
10   make money off the field through marketing and
11   endorsement deals, however they are presented to
12   you, right?
13     A.   Right.
14     Q.   If you can do another deal with Nike or
15   another shoe company, then you're going to do that
16   deal if you feel like it's right, right?
17     A.   Why not?
18     Q.   Have you talked with Todd France about the
19   allegations that Mr. Bernstein and Clarity Sports
20   are making in this case?
21     A.   The only thing they pretty much told me is
22   to tell the truth, which I'm doing.
23     Q.   Have you talked -- how often do you talk
24   with Mr. France about this case?
25     A.   Not much.  It's simply, tell the truth,

Page 143

1    you've got to go through it, but just tell the
2    truth.  It will be over with, period.
3      Q.   Did Mr. France tell you anything about why
4    he was moving from CAA Sports to Athletes First?
5      A.   I don't remember.
6      Q.   Are you telling me you don't remember
7    whether he told you anything or not, or you just
8    can't remember what he told you?
9      A.   To be honest, my trust is with him and I
10   was going to go where he went.  It didn't really
11   matter to me.
12          MR. CLEMENTS:  For hygiene on the
13   transcript, are we done with the money questions?
14   I don't think any of this is confidential if you
15   want to make it simpler.
16          MR. COMERFORD:  Yeah, if I come back to
17   the money --
18          MR. CLEMENTS:  I don't want to designate
19   it because it's annoying for all the lawyers, so
20   it's not confidential now.
21     Q.   Other than Mr. France, have you talked to
22   any other CAA employees or former CAA employees
23   about the allegations that Mr. Bernstein and
24   Clarity Sports are making?
25     A.   No.

Page 144

1      Q.   Have you talked with Jake Silver about it?
2      A.   No.
3      Q.   Like Howard Skull, Bob Philp, anybody like
4    that?
5      A.   I haven't talked to anyone about it.
6      Q.   Have you ever talked -- without telling me
7    what was discussed, have you ever spoken with a
8    lawyer who works for CAA about these allegations?
9      A.   No.
10     Q.   Other than Mr. Iaconelli and Mr. Clements,
11   have you talked to any other lawyers about
12   Mr. Bernstein or Clarity Sports?
13     A.   No.
14     Q.   Have you referred any football players to
15   Todd France?
16     A.   No.
17     Q.   Have you ever talked to Todd France about
18   getting any discount on the agent fee that he
19   collects for any reason?
20     A.   No.
21     Q.   At some point in time we were provided
22   with a sworn declaration, a written declaration
23   that you signed.  Are you aware of that?
24     A.   No.
25     Q.   Do you have any recollection of signing a

Page 145

1    written declaration, making statements under oath
2    about Mr. Bernstein and his allegations?
3      A.   Yeah, I don't remember.
4      Q.   Do you remember anyone that you spoke with
5    about a written declaration that you would submit
6    under oath about Mr. Bernstein and the allegations
7    in this case?
8      A.   Yeah, I don't remember.
9      Q.   So I'm not -- I'm not going to ask you
10   whether you wrote the declaration yourself, because
11   you're telling me you just don't remember if you
12   did one or not, right?
13     A.   Say it again.
14     Q.   Do you have any memory of signing a
15   written --
16     A.   Say again.
17     Q.   Do you have any recollection of signing a
18   sworn statement where you made statements in
19   writing under oath --
20     A.   Yes.
21     Q.   -- concerning Mr. Bernstein and Clarity
22   Sports.
23     A.   Yes.
24     Q.   Who did you talk with about that written
25   sworn statement?

CONFIDENTIAL TRANSCRIPT
PohlmanUSA Court Reporting    (877) 421-0099    PohlmanUSA.com

1     A.  Well, I talked to Todd and told him I want
2  to tell my truth, and he sent it over to me and I
3  looked at it and signed it.  Everything was
4  correct.
5     Q.  Did you make any edits to it?
6     A.  No.
7     Q.  Other than Mr. France, did you talk to
8  anybody else about the written sworn declaration
9  that you signed?
10    A.  Not that I can recall.
11    Q.  When you -- let's go back to your
12 discussions with Todd France from September of 2018
13 to January 2019 until the moment you signed with
14 him.
15    A.  Say it again.
16    Q.  I want to ask you about the time frame
17 from when you met Todd France on September 24th
18 2018, until you signed an SRA with him on or about
19 January 24th or 25, 2019, okay.  In that time
20 period, you told me that Mr. France never provided
21 you with any references, right?
22    A.  Okay.
23    Q.  Is that still your testimony?  Yes?
24    A.  Of what?  What are you talking about?
25    Q.  You told me earlier that Mr. France didn't

1  provide you with any references, right?
2     A.  Okay.
3     Q.  And that's still your recollection as you
4  sit here right now, right?
5     A.  Right.
6     Q.  And I asked you if Mr. France had
7  described any contracts that he had done for other
8  players and you told me that he did not, right?
9     A.  Right.
10    MR. CLEMENTS:  All these questions were
11 asked and answered.
12    Q.  And did you talk with Mr. France about the
13 success he had had as an agent in that time period?
14    MR. CLEMENTS:  Again, asked and answered.
15    A.  I don't remember exactly what we talked
16 about.  Like I said, we talked a little bit of
17 ball, talked about life, feeling each other out.  I
18 don't remember exactly.  It was two, three years
19 ago.
20    Q.  And we know that he didn't talk about
21 references and he never gave you references, and he
22 didn't talk about other contracts he had done for
23 other players, correct?
24    MR. CLEMENTS:  Objection, asked and
25 answered.

1     A.  I answered that already.
2     Q.  And the answer to that, to what I said is
3  correct, right, he didn't do any of those things?
4     A.  I answered it already.
5     MR. CLEMENTS:  It's over and over.  What's
6  the point of this.  They're all asked and answered.
7  It's in the record.
8     MR. COMERFORD:  I think I'm pretty close
9  to done.  Let me take a couple minutes and look at
10 my notes and then we'll get back on the record and
11 I'll either be done or have a little bit of
12 cleanup.
13    THE VIDEOGRAPHER:  We're going off the
14 record at 5:41 p.m.
15        (Recess taken.)
16    THE VIDEOGRAPHER:  Back on the record,
17 5:56 p.m.
18 BY MR. COMERFORD:
19    Q.  Mr. Golladay, do you know who DeAndre
20 Hopkins is?
21    A.  Yes.
22    Q.  He's a wide receiver in the NFL, plays for
23 the Cardinals, right?
24    A.  Yes.
25    Q.  Did you know that DeAndre Hopkins was

1  represented by Todd France in the past?
2     A.  Okay.
3     Q.  Were you aware of that?
4     A.  Yes.
5     Q.  Do you know that Mr. Hopkins is no longer
6  represented by Todd France?
7     A.  No.  It don't really matter, but okay.
8     Q.  Are you aware of that?
9     A.  Huh-uh.  I don't know.  I don't care
10 really.
11    Q.  Have you ever spoken with DeAndre Hopkins
12 about Todd France?
13    A.  No.
14    Q.  Have you ever spoken with DeAndre Hopkins
15 about contracts with NFL teams?
16    A.  No.
17    Q.  Are --
18    A.  I don't know him personally.
19    Q.  Okay.
20    Are you aware of the contract that
21 Mr. Hopkins negotiated with the Arizona Cardinals
22 in 2020?
23    A.  Yeah.
24    Q.  Would you describe that contract as better
25 than your contract with the Giants or the same or

1    not as good?
2       **A.  I could care less.**
3       Q.  Yours is less?
4       **A.  I said I could care less.**
5       Q.  Do you know that Mr. Hopkins negotiated a
6    contract with the Cardinals for 27.5 million per
7    year for two years?
8       **A.  Good for him.**
9       Q.  Do you know whether Todd France negotiated
10   that contract?
11      **A.  I don't care who negotiated it.  I'm happy**
12   **to see everyone get paid.  I could care less who**
13   **did it or how much he got.**
14      Q.  Before I told you this, were you aware
15   that DeAndre Hopkins negotiated a contract for an
16   average per year of $27.5 million with the
17   Cardinals?
18      **A.  Yes.  I know he's the highest paid**
19   **receiver.  So what?**
20      Q.  You told me earlier that you could tell in
21   your gut that Jason Bernstein would not be able to
22   get you an $18 million-per-year contract.  Do you
23   remember that?
24      **A.  Okay.**
25      Q.  What was it that caused you to feel that

1    way about Mr. Bernstein?
2       **A.  That was just a feeling I had and it**
3    **really doesn't matter because that's the feeling I**
4    **felt, and I'm glad I made the decision I made.**
5       Q.  Can you point to any facts about
6    Mr. Bernstein that made you feel that he was not
7    going to be capable of getting you the contract you
8    wanted with an NFL team?
9       MR. CLEMENTS:  Hold on a second.
10   Objection.  It's argumentative.  I think it's
11   badgering the witness.  I mean, he testified that
12   he had a gut feeling, and I don't understand what
13   any of this means.  At some point it's going to be
14   harassing.
15      You can answer.
16      **A.  What was the question?**
17      Q.  Can you tell me any facts about
18   Mr. Bernstein that made you feel that he was not
19   capable of getting you the contract that you wanted
20   with an NFL team?
21      **A.  To be honest, it really doesn't matter.  I**
22   **mean, it's not like I made the wrong choice.  I**
23   **still made a great choice and I got what I felt**
24   **like I deserved.  Okay.**
25      Q.  Just to nail this down because I feel like

1    I need to get an answer on this, do you agree with
2    me that you can't tell me any facts about Jason
3    Bernstein that caused you to feel that he was not
4    capable of getting you the contract that you wanted
5    with an NFL team?
6       MR. CLEMENTS:  Objection, this calls for a
7    legal conclusion.  Its not reasonably calculated to
8    lead to discovery of admissible evidence.  As a
9    matter of fact, it's prohibited under the NFL regs
10   governing the termination of the SRAs, but you can
11   answer to the extent you can.
12      **A.  I answer to the best of my ability.**
13      Q.  So what's your answer?  Can you give me
14   any facts or not?
15      **A.  I didn't feel like he would be able to**
16   **give me the contract that I deserved so I made a**
17   **change and I'm happy with my change in picking Todd**
18   **France as my agent.**
19      Q.  So what are the facts about Mr. Bernstein
20   that made you feel that way?
21      **A.  It doesn't matter.  I didn't feel that way**
22   **and that's what I decided to stick with and I got**
23   **what I wanted in the end.**
24      Q.  I'm trying to give you every opportunity
25   to give me some facts.

1       MR. CLEMENTS:  Objection.  You're
2    badgering the witness because you're asking him
3    about something that is completely irrelevant,
4    Mr. Comerford, under the NFL regulations.  Are you
5    accusing him of violating the regulations?
6       MR. HERBER:  I'm going to join in the
7    objection as well.
8       MR. CLEMENTS:  It's an at-will contract,
9    and as you know, one of Mr. Kaplan's findings,
10   which is, quite frankly, by collateral estoppel is
11   a player or an agent can terminate the other one
12   for any reason or no reason at all.
13      MR. COMERFORD:  Mr. Clements --
14      MR. CLEMENTS:  Mr. Comerford.
15      MR. COMERFORD:  -- one more outburst and
16   I'm going to move for sanctions again for improper
17   objection.
18      MR. CLEMENTS:  It's not an outburst,
19   Mr. Comerford.  That's a fact.
20      MR. COMERFORD:  Please conduct yourself in
21   accordance with Judge Schwab's order.
22      MR. CLEMENTS:  I am.  And you should also
23   conduct yourself in accordance with her order.
24   You're asking the same question over and over
25   again.  You're being argumentative and you're

Page 154

1    badgering the witness.
2        Q.   Mr. Golladay, during the time period from
3    September 2018 through January 2019, did Mr. France
4    ever tell you that you should wait to sign with
5    him?
6        **A.  He said wait until the end of the season.**
7    **He was actually very patient and there was no rush**
8    **at all.**
9        Q.   Did he tell you why you should wait until
10   the end of the season?
11       **A.  Focus on the season, I mean, no**
12   **distractions.  Focus on the season, there was no**
13   **rush.**
14       Q.   Did he tell you anything else about why
15   you should wait?
16       **A.  No.**
17       Q.   I want to put one more document.  This
18   will be the last document.  This one is going to be
19   dated January 22, 2021.  It will be the subpoena to
20   you, Mr. Golladay, and this is the subpoena that is
21   bringing you here for this deposition.  I want to
22   go to page 7, please.  There are some documents
23   requested there.  You told me that you read the
24   subpoena, I think, right?
25       **A.  What do you want me to look at?**

Page 155

1        Q.   Do you see near the bottom of the page it
2    says "Documents requested"?
3        **A.  Okay.**
4        Q.   Let's mark this as another exhibit, if we
5    haven't already.
6        **A.  What documents are you talking about?**
7        MR. COMERFORD:  I think this is going to
8    be Exhibit 20.
9        THE REPORTER:  Yes.
10   (Thereupon, Plaintiff's Exhibit 20 was marked for
11   purposes of identification.)
12       Q.   So this subpoena was served on you,
13   Mr. Golladay, and it asked for you to produce
14   documents.  Do you understand that?
15       **A.  Okay.**
16       Q.   Number 1 is it asked for each and every
17   communication between you and Jake Silver.  The
18   documents are emails, text messages, direct
19   messages, anything in written format.  And what I
20   understand you told me earlier was that you didn't
21   look at your email account to see if you had emails
22   with Jake Silver, correct?
23       **A.  No.**
24       Q.   Am I right about that?
25       **A.  I didn't have anything.  I didn't have any**

Page 156

1    **emails.  I didn't have any text messages.  I didn't**
2    **have anything.**
3        Q.   So what I understood you telling me
4    earlier is you didn't look because you don't look
5    at your email account, right?
6        **A.  I checked my email and I didn't have**
7    **anything from Jake Silver, didn't have any text**
8    **messages from Jake Silver.**
9        Q.   Did you check your -- so number 2 is each
10   and every communication between you and Todd
11   France.
12       Did you check your email account for
13   communications between you and Todd France?
14       **A.  I didn't have any.**
15       Q.   But did you check?
16       **A.  If I didn't have any then I checked.  I**
17   **don't have any.**
18       Q.   When did you check?
19       **A.  I don't remember.  I don't have any.**
20       Q.   So what I understood you told me earlier
21   was that you didn't look at your email account.
22   Are you telling me something different now?
23       **A.  I checked.  I don't have any.  I don't**
24   **have any emails from Jake Silver texting me, and I**
25   **don't have emails from Todd France.**

Page 157

1        Q.   We looked at email you received on
2    January 8, 2019 from Todd France's email account at
3    CAA.  Do you remember that?
4        **A.  I don't remember.**
5        Q.   Do you know what happened to that email
6    account on your -- let me start over.
7        Do you know what happened to the
8    January 8, 2019 email that was sent from Todd
9    France's email account to your email account?
10       **A.  I don't.  I don't remember seeing the**
11   **email.  I don't know.**
12       Q.   Did you delete it?
13       **A.  No.  I don't remember seeing the email.  I**
14   **don't know if I got it.**
15       Q.   Is it still on your email account?
16       **A.  I don't know.**
17       Q.   And the reason you don't know is because
18   you didn't look, correct?
19       MR. CLEMENTS:  Objection, argumentative,
20   asked and answered.
21       Q.   Am I right?
22       **A.  I answered that question already.**
23       Q.   And the answer is that you didn't look,
24   right?
25       MR. CLEMENTS:  No.  It's asked and

CONFIDENTIAL TRANSCRIPT
PohlmanUSA Court Reporting    (877) 421-0099    PohlmanUSA.com

Page 158

1   answered.  Answer the question again.
2       A.   I didn't have the email.
3       Q.   Why don't you have that email anymore?
4       A.   I don't remember getting an email.  I
5   don't know if I got the email.
6       Q.   But you have no memory of deleting it,
7   right?
8       A.   I didn't delete an email.  I don't
9   remember getting the email.  I didn't see the
10  emails.
11      Q.   Does anyone other than you have access to
12  your email accounts?
13      A.   No.
14      Q.   Let's look at Number 3, each and every
15  communication between you and any employee of CAA
16  Sports, LLC or anyone acting its behalf.  So this
17  would include people like Bob Philp, Howard Skull
18  and other marketing employees of CAA.  Do you have
19  any emails from those people?
20      A.   No.
21      Q.   What happened to them?
22      A.   I don't remember even seeing emails.  I
23  don't know if I've got the emails.
24           MR. CLEMENTS:  Objection, foundation to
25  whether they're even --

Page 159

1       Q.   Did anyone from CAA ever send you an email
2   with, for example, a contract from Nike that was
3   going to pay you a lot of money?
4       A.   I don't remember seeing an email.
5       Q.   Did you delete any emails that you
6   received from CAA?
7       A.   No.
8       Q.   Do you know whether or not there are any
9   emails from CAA on your email account right now?
10      A.   I don't have any emails.  I don't send any
11  emails.
12      Q.   Number 4, each and every document or
13  communication that concerns, relates to you or
14  mentions the July 21, 2019, appearance and
15  autograph signing by you in Lombard, Illinois that
16  is referenced in the complaint.
17           Did you look for emails and texts about
18  that?
19      A.   I don't have any emails.  I don't remember
20  getting any emails.
21      Q.   Obviously you got the January 8, 2019
22  email from Todd France's email account?
23      A.   I don't know whose email that was.  I
24  don't remember seeing an email.  I don't know.
25      Q.   Number 5, would your answer be the same?

Page 160

1       A.   What is it?
2       Q.   Each and every document or communication
3   that concerns, relates to, or mentions the
4   negotiations and/or discussions for about or
5   concerning the January 21, 2019 appearance and
6   autograph signing by you in Lombard, Illinois that
7   is referenced in the complaint.
8           Same answer?
9       A.   Are you talking about emails?
10      Q.   Yes.
11      A.   I don't -- I don't remember getting any
12  emails.  I don't remember.
13      Q.   Do you have any texts about this?
14      A.   No.  I don't remember seeing any texts
15  about it or getting any texts.
16      Q.   Number 6, each and every communication
17  between you and Todd France that concerns, relates
18  to or mentions the January 21, 2019 appearance and
19  autograph signing by you in Lombard, Illinois that
20  is referenced in the complaint.
21           Same answer, you don't have any emails
22  like that anymore?
23      A.   Yeah, me and Todd don't even talk about
24  marketing.
25      Q.   Did you ever talk with Todd France about

Page 161

1   the Nike deal?
2       A.   No.
3       Q.   Number 7, each and every communication
4   between you and Jake Silver that concerns, relates
5   to or mentions the January 21, 2019 appearance and
6   autograph signing by you in Lombard, Illinois that
7   is referenced in the complaint.
8           Do you have any emails or communications
9   between you and Jake Silver about the signing?
10      A.   I don't have any emails.
11      Q.   What about text messages?
12      A.   I don't have any text messages.
13      Q.   Let's go to Number 8.  Each and every
14  communication between you and any employee of CAA
15  Sports, LLC or anyone acting on its behalf that
16  concerns, relates to or mentions the January 21,
17  2019 appearance and autograph signing by you in
18  Lombard, Illinois that is referenced in the
19  complaint.
20           Do you have any emails or text messages
21  about that?
22      A.   I didn't get any emails; don't have any
23  emails.
24      Q.   Number 9, each and every communication
25  between you and any person acting on behalf of Todd

CONFIDENTIAL TRANSCRIPT
PohlmanUSA Court Reporting   (877) 421-0099   PohlmanUSA.com

## Page 162

1    France.
2        Q.   Do you have any emails or text messages?
3        **A.   I don't remember getting any emails.**
4    **Don't have any emails.**
5        Q.   Do you remember exchanging text messages
6    with Todd France?
7        **A.   About what?**
8        Q.   About, you know, your interest in maybe
9    signing with him or just kind of how's it going in
10   that time period between when you started talking
11   with him and when you signed with him?
12       **A.   If I told Todd that I was going to be with**
13   **him in December, I'm pretty sure we had some type**
14   **of line of communication.**
15       Q.   So where are those texts?
16       MR. CLEMENTS:   Objection, foundation.
17       **A.   Hello?**
18       Q.   Where are those text messages between you
19   and Todd France?
20       MR. CLEMENTS:   Objection, foundation.
21       **A.   I've never said we texted about it.   It**
22   **could have been FaceTime, FaceTime audio.   I stay**
23   **in a high-rise building so I use FaceTime audio.**
24   **Yeah, I never said anything about a text.**
25       Q.   Do you have any texts between you and Todd

## Page 163

1    France in your possession on either of your phones
2    now?
3        **A.   Yeah.**
4        Q.   I mean -- I should be clear, let me try
5    that again.
6            Do you have any text messages between you
7    and Todd France from the 2018 or 2019 time period
8    on either of your phones?
9        **A.   No.**
10       Q.   Why not?
11       **A.   It's two, three years ago.   I went through**
12   **I don't know how many phones.**
13       Q.   You still have the same number.   Don't
14   they -- don't the text messages move over?
15       **A.   I don't back my phone up, use the iCloud,**
16   **I don't do that.   I have a phone here that is all**
17   **cracked up.   I need a new one now.**
18       Q.   I want to bring up a document just to have
19   you say they're yours, but I don't think I'll have
20   any questions about it.   So this document is going
21   to be 2018 September 27, Golladay texts with
22   France.   Let's bring that up.   This is 38 pages of
23   text messages that were produced by Todd France.
24           Are these text messages that you exchanged
25   with Todd France to your knowledge?   And we can

## Page 164

1    flip through them as much as you want to.
2        **A.   Yeah, I guess.   I don't know.   Yes.   I see**
3    **my name, "Hey, Todd, what's up?"**
4        Q.   And so these look like text messages that
5    you exchanged with Mr. France, correct?
6        **A.   Okay.   Yes.**
7            MR. COMERFORD:   And for the record,
8    Mr. Martin, can you identify the Bates numbering,
9    the Clarity Bates numbering for the record?
10           MR. MARTIN:   Yes.   This is Clarity 2513
11   through Clarity 2550.
12       Q.   Let's bring up another document, 2018 --
13   so that's marked Exhibit 21, those 38 pages.
14   (Thereupon, Plaintiff's Exhibit 21 was marked for
15   purposes of identification.)
16           MR. COMERFORD:   Exhibit 22 is going to be
17   2018-10-05, Mr. Martin.
18   (Thereupon, Plaintiff's Exhibit 22 was marked for
19   purposes of identification.)
20       Q.   Is that a text message that you exchanged
21   with Todd France?
22       **A.   Okay.   Yeah.**
23       Q.   Does that look like your text messages
24   with Todd France from October 2018?
25       **A.   Yeah.   I mean, it says my name.   I see**

## Page 165

1    that, yeah.
2        Q.   And these are marked Clarity 2514.
3            MR. COMERFORD:   And then the next one I
4    want to look at is 2018-11-30, Mr. Martin.   This is
5    Bates numbers Clarity 2446.   We'll mark this as
6    Exhibit 23.
7    (Thereupon, Defendant's Exhibit 23 was marked for
8    purposes of identification.)
9        Q.   Does this look like a text you exchanged
10   with Todd France?
11       **A.   I don't know.   Yeah.**
12       Q.   That's Exhibit 23.   And then I think we
13   just have one more of these.   Exhibit 24 is
14   2018-12-30.   The Bates numbering is Clarity 79
15   through Clarity 96.   Let's zoom in on these.   These
16   should be text messages between you and Jason
17   Bernstein from December and January --
18   December 2018 and January 2019.   Can you look at
19   those, Mr. Golladay, and verify that those are text
20   messages that you sent and received?
21       **A.   I can't.   It's small.   I can't even see**
22   **it.**
23   **(Thereupon, Plaintiff's Exhibit 24 was marked for**
24   **purposes of identification.)**
25       Q.   Let's do whatever we need to do so you

42   (Pages 162 to 165)

Page 166

1  have a chance to look at them.
2  **A. Okay. Yeah. What about it?**
3  Q.  Are these text messages that you received
4  and sent to and from Jason Bernstein?
5  **A. Yeah.**
6  Q.  I've got one more -- no, I think that's
7  it.
8  MR. COMERFORD:  Those are all the
9  questions I have at this time, Mr. Golladay.
10  MR. CLEMENTS:  This is William Clements.
11  I'm going to ask a couple of questions. I know
12  it's been a long day for everyone so I'll try to be
13  as quick as possible.
14  EXAMINATION OF KENNETH GOLLADAY
15  BY MR. CLEMENTS:
16  Q.  Mr. Golladay, I want you to focus on the
17  end of September 2018, the Lucky Strike bowling
18  event with Golden Tate.  Is there any doubt in your
19  mind that Todd France was at that event?
20  **A. He was at that event.**
21  Q.  And there's no doubt in your mind that you
22  were at the event.
23  **A. I was at the event.**
24  Q.  And is there any doubt in your mind that
25  you went up and introduced yourself to Todd France

Page 167

1  first?
2  **A. I definitely went up to him and introduced**
3  **myself to him.**
4  Q.  So Todd didn't seek you out, Mr. France
5  didn't seek you out at that event?
6  MR. COMERFORD:  Objection, leading.
7  **A. No.**
8  MR. CLEMENTS:  It's a third-party witness
9  so I'm not so sure --
10  MR. COMERFORD:  He's your client.
11  Q.  Can you explain to me what happens in the
12  minutes before and the minutes after you introduce
13  yourself to Todd France.
14  **A. Well, Golden and his wife pretty much just**
15  **thanked everybody for coming out and he pretty much**
16  **just shouted out his agent, Todd, and I was**
17  **already, you know, thinking about an agent change,**
18  **and I actually went up to Todd myself, you know,**
19  **introduced myself, and then, you know, told him --**
20  **pretty much asked him for his number and kind of**
21  **hit it off from there.**
22  Q.  Now, moving forward from that
23  September 2018, when did you first make the
24  decision that you wanted to move on and fire
25  Mr. Bernstein and go with another agent?

Page 168

1  MR. COMERFORD:  Objection, asked and
2  answered.
3  Q.  You can answer.
4  MR. CLEMENTS:  That was almost all your
5  questions.
6  You can answer.
7  **A. I pretty much reached out to Todd, and he**
8  **came back out to Detroit, pretty much just felt**
9  **each other out, talked a little ball, and, I mean,**
10  **the conversation went -- the conversation went**
11  **good, and, I was, like, man, that's somebody who I**
12  **would love to pretty much work with or something I**
13  **would love to be a part of.**
14  Q.  At what time did you come to that
15  conclusion, if you can remember?
16  **A. To be honest, right after we pretty much**
17  **had that little sit down, I was already thinking,**
18  **like, man -- it was like -- I don't want to say**
19  **love at first sight, but pretty much -- I mean, I**
20  **enjoyed the whole type of person he was, and just,**
21  **you know, had to pretty much keep making sure I**
22  **dotted all my I's and crossed all the Ts and**
23  **everything, and that's when I wanted to see if he**
24  **would go out there, meet my mom and that went**
25  **great.**

Page 169

1  Q.  So this would have been after
2  September 2018 and before Thanksgiving of 2018?
3  **A. Say again.**
4  Q.  When you came to that conclusion, I'm just
5  trying to narrow down the time, it would have been
6  sometime after September 2018 but before
7  Thanksgiving of 2018?
8  MR. COMERFORD:  Objection, leading, asked
9  and answer?
10  Q.  Well, when was it?  Do you know if it was
11  in that span?
12  **A. So I met with him sometime, maybe the end**
13  **of September, the beginning of November, I'm not**
14  **sure, and I know he met my mom in the beginning of**
15  **December, so that whole time right there was just**
16  **me still just brainstorming about it, but I knew I**
17  **loved the meeting that we had, and when we did**
18  **finally go out there and meet my mom, and she was**
19  **in with it as well, I knew, like, this was the guy.**
20  Q.  And when did you make the decision to move
21  on from Jason Bernstein and hire Todd France?
22  **A. Well, I told Todd pretty much right after**
23  **him and my mom met, that was the cherry on top, I**
24  **told him right then, like, "I want you to be my**
25  **agent."**

43  (Pages 166 to 169)

1    Q.  Could you narrow that down by month?  What
2  month are we talking about?
3    A.  In my mind in September I already knew I
4  was making an agent change.  In December I told
5  Todd, you know, "I want you to be my agent," so
6  that's, what October, November, December.
7    Q.  So was that in the beginning of December
8  that you told Todd?
9    A.  The beginning of December.
10    Q.  Was that prior to you hearing from
11  Mr. Silver or anybody about the signing event?
12    A.  Yeah, that was way before.
13    Q.  You telling Todd was way before you heard
14  about the memorabilia signing?
15    A.  Right.
16    Q.  Did the memorabilia signing event have
17  anything to do with your decision to change agents
18  and move on from Mr. Bernstein and hire Mr. France?
19    A.  Absolutely not.  To be honest, it was
20  almost like a slap in the face.
21    Q.  Why is that?
22    A.  To say that I would even change
23  agents for -- what was it -- I don't even remember
24  right now, $7,000.  That's -- changing agents for
25  $7,000, somebody just hanging $7,000 over my head,

1  I'm pretty smart with my money.  It's not like I'm
2  money hungry.  I wasn't going to do it.  What I
3  changed agents for is because I felt like Todd
4  would be able to get me the big contract that I
5  deserved and that I wanted.
6    Q.  We understand that your former agent,
7  Mr. Bernstein, through his lawyer, Mr. Comerford,
8  is saying that the signing event was used as a
9  bribe to get you to change agents.
10    A.  You can't bribe me with 7,000 bucks.
11  Yeah, that's kind of disrespectful.  It's okay.
12    MR. COMERFORD:  I object.  That is a
13  mischaracterization of the allegations and we've
14  never said that and that's highly objectionable.  I
15  move to strike.
16    Q.  Did you make the decision to change agents
17  before January 21, 2019?
18    A.  Yes.
19    Q.  And did anything that happened at the
20  signing event have anything to do with your
21  decision to change agents?
22    A.  No.
23    Q.  Do you recall anything that happened at
24  the signing event on January 21, 2019 where your
25  career was discussed by anybody at the memorabilia

1  signing event?
2    A.  No.
3    Q.  Can you recall whether they discussed what
4  agent represented you?
5    A.  No.
6    Q.  Did anybody at that signing event on
7  January 21, 2019 tell you that you should change
8  agents?
9    A.  No.
10    Q.  Did anybody who was in attendance at that
11  signing event mention Mr. Bernstein at all?
12    A.  No.
13    Q.  Did anybody mention Mr. France at all?
14    A.  No.
15    Q.  In the entire time, from the end of
16  September 2018 to your decision to change agents,
17  which I believe you testified was in December 2018,
18  did anybody badmouth Mr. Bernstein to you?
19    A.  No.
20    Q.  Anybody at all?
21    A.  No.
22    Q.  Did anybody cheerlead Mr. France to you?
23    A.  No.
24    Q.  Who made the decision to change agents?
25    A.  Me.

1    Q.  Was it Mr. Saffold?
2    A.  No.
3    Q.  Was it your mother?
4    A.  No.
5    Q.  It was solely you, correct?
6    A.  Correct.
7    Q.  Clarity Sports, who you were with, during
8  that time period from when you decided in
9  September when you first met France to the
10  beginning of December when you decided to change
11  agents, did anybody badmouth Clarity Sports?
12    A.  No.
13    Q.  At the signing event on January 21st, did
14  anybody badmouth Clarity Sports?
15    A.  No.
16    Q.  Did anybody mention Clarity Sports?
17    A.  No.
18    Q.  In your own words, can you -- in your own
19  head, is there any connection between the signing
20  event and the decision to change agents?
21    A.  None at all.
22    Q.  How about your decision to move on from
23  Clarity Sports, any connection between the signing
24  event and your decision to move on from Clarity
25  Sports?

Page 174

1    A.  My decision was made before the signing
2   event.
3    Q.  And you are correct, it was a little bit
4   more, $7,750.  In your dealings with Clarity Sports
5   prior, they obtained marketing events for you,
6   correct?
7    A.  Yeah.  I mean, they did -- 7700?
8    Q.  7750.
9    A.  As a rookie I was getting more than that,
10  you know what I mean?
11   Q.  So Clarity Sports paying for your
12  marketing events made you more money than the
13  signing event.
14   A.  Yes.
15   Q.  Can you explain for me in your own words
16  why you didn't immediately tell Jason Bernstein
17  that you were moving on from him and going with
18  Todd France?  Because there is -- I don't think
19  there's any dispute in the record that, you know,
20  January 22nd was the day of the phone call.  That
21  is not in dispute.
22   A.  I mean, like I said earlier, really just
23  no distractions to me or the team.  I didn't really
24  want to do it during the year.  I just kind of
25  wanted to finish the season out.  I had more

Page 175

1   football to play, you know.  I was in my second
2   year, I believe it was, having a good year, and I
3   didn't want to deal with that right there.
4    Q.  Was that a pleasant conversation to have,
5   to make?
6    A.  It wasn't, but just being a grown man, I
7   think I did it respectfully.  I didn't have to even
8   have that phone conversation with him, but as far
9   as it being business, I had to do it for me and my
10  family.
11   Q.  Did you ever talk to Jason Bernstein about
12  your New York Giants contract?
13   A.  I haven't talked to him.
14   Q.  As far as you know did he do anything to
15  obtain for you that New York Giants contract?
16   A.  No.
17   Q.  Who got that contract for you?
18   A.  Todd.
19   Q.  Now we see documents and it's another
20  thing that's probably not in dispute.  You may not
21  know.  Do you remember the Facebook post --
22   A.  Yes.
23   Q.  -- about the signing event that
24  Mr. Comerford showed you?
25   A.  Uh-huh.

Page 176

1    Q.  Did you have any knowledge of that
2   Facebook post?
3    A.  No.
4    Q.  When it was posted?
5    A.  No, I don't get on Facebook.
6    Q.  And I believe you said that Emily Ries
7   might have brought it to your attention.
8    A.  Right.
9    Q.  I'm trying to think how to phrase this.
10       Your dealings with Clarity, do you have
11  any reason to disagree with me that if an event was
12  covered under the Clarity Sports agreement, they
13  would get a 15 percent sports commission; is that
14  your recollection?
15   A.  Right.
16   Q.  Did they ever ask you to remit 15 percent
17  of what you made at that signing event to them?
18   A.  No.
19   Q.  But your understanding is they knew about
20  the signing event, right, because Emily Ries gave
21  you the advertisement for it?
22   A.  Right.
23   Q.  And this is in -- from January of 2019
24  until today, has anybody from Clarity Sports ever
25  said, "You owe us 15 percent of the signing"?

Page 177

1    A.  No.
2    Q.  Has Clarity Sports commenced any action
3   against you to recover that?
4    A.  No.
5    Q.  Has Mr. Bernstein ever asked you to remit
6   that 15 percent?
7    A.  No.
8    Q.  Has he initiated any action --
9    A.  No.
10   Q.  -- against you?
11       Was Mr. Bernstein the only agent who
12  negotiated the rookie contract with the Detroit
13  Lions?
14   A.  Yes.
15   Q.  And that deal was terminated at the end of
16  the 2020 season or end --
17   A.  I finished it out.
18   Q.  So is it your understanding that
19  Mr. Bernstein was paid his commission for all the
20  monies -- all the monies you eared from the Lions
21  under the rookie contract that he negotiated for
22  you?
23   A.  Yes, I paid every bit of it.
24   Q.  Has he ever tried to come after you for
25  more money?

45  (Pages 174 to 177)

1    **A.  No.**
2         MR. CLEMENTS:  Let's go off the record a
3    second.
4         THE VIDEOGRAPHER:  We're going off the
5    record at 6:31 p.m.
6         (Recess taken.)
7         THE VIDEOGRAPHER:  We're back on the
8    record at 6:35 p.m.
9    BY MR. CLEMENTS:
10        Q.  Just a few more questions.
11        Do you personally, and I just mean you,
12   Ken Golladay, owe CAA any money arising out of your
13   former business relationship with CAA?
14        **A.  No.**
15        Q.  To the best of your knowledge, has Todd
16   France ever received any compensation from anyone
17   pertaining in any way to the rookie contract with
18   the Detroit Lions that Mr. Bernstein obtained for
19   you?
20        **A.  No.**
21        MR. CLEMENTS:  Ms. Marsh, are you still
22   with us?  Can you put up Mr. Golladay's affidavit,
23   declaration from Kenny Golladay?  It might be at
24   this point Exhibit 22 or 23.
25        THE REPORTER:  25.

1    (Thereupon, Plaintiff's Exhibit 25 was marked for
2    purposes of identification.)
3         Q.  We would like to mark this
4    Exhibit Golladay 25.  It's the declaration of
5    Kenneth Golladay.
6         MR. CLEMENTS:  Lauren, can you scroll
7    down?
8         Q.  Please take a look at it as she scrolls.
9    And I believe Mr. Comerford asked you some
10   questions about this declaration.  He didn't mark
11   it as an exhibit or show it to you as far as I
12   could remember, but this is the document you were
13   answering questions about, the declaration.
14        And was everything in that document true
15   and correct as of the date you signed it?
16        **A.  Yes.**
17        Q.  To the best of your knowledge, has it
18   remained true and correct as you sit here today?
19        **A.  Yes.**
20        Q.  One final question, the signing event and
21   the $7,750 check, did you ever -- if you could
22   elaborate on this.  Have you ever understood that
23   that signing event, that $7,750 check you got for
24   appearing at the signing event to be a bribe or
25   some attempt to get you to switch agents from

1    Mr. Bernstein to Mr. France?
2         MR. COMERFORD:  Form.
3         **A.  No, I didn't.  To be honest, I thought it**
4    **was an opportunity and I just accepted it and went**
5    **about my day.**
6         Q.  And when you were done with the signing
7    event, you stayed in Chicago, right, went to either
8    your dad's house or your mom's house?
9         **A.  Yeah.  I don't really remember, but I**
10   **stayed in Chicago.**
11        MR. CLEMENTS:  I don't have any other
12   questions.  J.T. may have some.
13        EXAMINATION OF KENNETH GOLLADAY
14   BY MR. HERBER:
15        Q.  Mr. Golladay, my name is J.T. Herber.  I'm
16   here on behalf of Gerry Ochs and Redland Sports.
17   I've just kind of been hanging out here in the
18   background as everybody else is asking questions.
19   I realize it's getting late today and I've got some
20   questions for you, but I'm going to move through
21   these as quickly as I can.
22        Because everybody's covered various things
23   I'm going to jump around a little bit, so stick
24   with me here, if you could.
25        Prior to the day of the memorabilia

1    signing for which we're here, did you know Gerry
2    Ochs?
3         **A.  No.  I still don't know who he is.**
4         Q.  Did you ever know anyone that operated
5    under the name Redland Sports?
6         **A.  No.**
7         Q.  And based on your prior answer, am I clear
8    that prior to the memorabilia signing, to your
9    knowledge you never met anyone by the name of Gerry
10   Ochs?
11        **A.  No.**
12        Q.  Prior to the memorabilia signing, had you
13   met anyone who said they were acting on behalf of
14   Redland Sports?
15        **A.  No.**
16        Q.  At the memorabilia signing or at any other
17   time, did you ever talk to Gerry Ochs about the SRA
18   that you had with Jason Bernstein?
19        **A.  No.**
20        Q.  Prior to the memorabilia signing or at any
21   other time, did you ever talk to Gerry Ochs about
22   the EMA that you had with Clarity Sports?
23        **A.  No.**
24        Q.  Did you ever talk to Gerry Ochs about Todd
25   France?

Page 182

1    A.  No.
2    Q.  Did you ever talk to Gerry Ochs about CAA
3    Sports?
4    A.  No.
5    Q.  At the memorabilia signing, did you talk
6    to anyone about Jason Bernstein?
7    A.  No.
8    Q.  At the memorabilia signing, did you talk
9    to anyone about the EMA which you had with Clarity
10   Sports?
11   A.  No.
12   Q.  Was there any discussion you had with
13   anyone during the memorabilia signing about your
14   relationship with Clarity Sports?
15   A.  No.
16   Q.  Was there any discussion you had during
17   the memorabilia signing with anyone about your
18   relationship with Jason Bernstein?
19   A.  No.
20   Q.  Since the memorabilia signing, have you
21   ever talked to Gerry Ochs?
22   A.  No.
23   Q.  Since the memorabilia signing, have you
24   ever talked to anyone with Redland Sports?
25   A.  No.

Page 183

1    Q.  What role, if any, did Gerry Ochs play in
2    your decision to terminate the SRA with Jason
3    Bernstein?
4    A.  He didn't play a role.
5    Q.  What role, if any, did Gerry Ochs play in
6    your decision to terminate the EMA with Clarity
7    Sports?
8    A.  He didn't play a role.
9    Q.  What role, if any, did the memorabilia
10   signing play in your decision to terminate the SRA
11   with Jason Bernstein?
12   A.  It didn't play a role.
13   Q.  What role, if any, did the memorabilia
14   signing play in your decision to terminate the EMA
15   with Clarity Sports?
16   A.  It didn't play no role at all.  It was
17   just a quick signing and be done with it.  They did
18   nothing pertaining to nothing.
19   MR. HERBER:  Thank you, sir.  I have no
20   other questions for you.
21   MR. COMERFORD:  Mr. Golladay, this is John
22   Comerford.  I just have a couple more questions.
23   THE WITNESS:  How many questions you got?
24   MR. COMERFORD:  Just a couple more.
25   THE WITNESS:  I've got to start some of my

Page 184

1    day.  You all done took up my time.  If you've got
2    one or two questions.
3    EXAMINATION OF KENNETH GOLLADAY
4    BY MR. COMERFORD:
5    Q.  Mr. Golladay, I'm going to ask Mr. Martin
6    to bring up a document dated 2019 July 10 that
7    concerns marketing with the Nike deal, and we'll
8    mark this as Exhibit 26.
9    (Thereupon, Plaintiff's Exhibit 26 was marked for
10   purposes of identification.)
11   Q.  I know you're not on this email, but the
12   email of July 10, 2019, Howard Skull of CAA is
13   writing to Molly King of CAA.  Do you ever work
14   with Molly King?
15   A.  No.
16   Q.  And Howard Skull says, "Molly, have you or
17   Todd caught up with Kenny yet?  They just asked us
18   again on this one.  We're still trying to get other
19   offers from this rep."  And the subject of those
20   email exchanges is "Kenny Golladay Nike offer
21   June 13, 2019."  Do you see that?
22   A.  Yeah, I see it.
23   Q.  And then the top email is from Todd
24   France, that same email address we looked at
25   earlier, Todd.France@CAA.com, and he writes:

Page 185

1    "Kenny and I are speaking tomorrow.  He is
2    traveling to LA to throw with," name redacted, "and
3    knows we will walk through it.  Thank you."  Signed
4    Todd France.
5    Do you remember talking with Todd France
6    about the Nike offer in July 2019?
7    A.  Me and Todd don't discuss marketing.  I
8    don't know who sent the email.  I see it says Todd
9    France.  I don't know who sent the email.  I don't
10   know.
11   Q.  Do you have any explanation for why Todd
12   France sent this email to his colleagues at CAA
13   saying that you and him were going to talk about
14   the offer that you had gotten from Nike?
15   A.  I don't know who sent the email.
16   Q.  Do you have any explanation for why Todd
17   France said that in this email?
18   A.  I don't know who sent the email.  I see it
19   says Todd France.  I don't know if he sent the
20   email or not.  I don't know.
21   MR. CLEMENTS:  Objection, speculation.
22   Q.  And so what you're telling me today is
23   that you never talked with Todd France about the
24   Nike offer in mid-2019, correct?
25   A.  I've been telling you all day, me and him

47 (Pages 182 to 185)

Page 186

1   don't discuss marketing.
2       Q.  We know that the last game of your 2018
3   season was December 30th versus the Green Bay
4   Packers.  And then you called Mr. Bernstein and
5   told him you were terminating him about three weeks
6   later on January 22, 2019, right, as we discussed?
7       A.  Okay.
8       Q.  So why did you wait for three weeks after
9   the season ended to tell Mr. Bernstein you were
10  switching?
11      MR. CLEMENTS:  Asked and answered, but you
12  can answer it again.
13      A.  Why did I wait what?
14      Q.  Why did you wait --
15      A.  I didn't want any distractions during the
16  regular season.  I finished the season and I wanted
17  to continue finishing it out.  I deal with it when
18  I got a chance to.  I didn't want the distractions.
19  I answered that already.
20      Q.  Right.  And then the Lions' season ended
21  on December 30, 2018, and you then waited three
22  more weeks to terminate Mr. Bernstein.
23      Why did you wait three more weeks?
24      A.  What difference does it make?
25      Q.  You can answer.

Page 187

1       A.  What difference does it make?  That's when
2   I decided to do it.
3       Q.  Why did you wait until three weeks after
4   the regular season ended?
5       A.  I just answered that question.
6       Q.  Have you told me all the reasons that you
7   waited?  You're telling me "What difference does it
8   make?" but that's not a reason.
9       MR. CLEMENTS:  Objection, argumentative,
10  you're badgering the witness.
11      You can answer.  Whatever you want to add
12  or not add.
13      A.  I answered it already.
14      Q.  And your answer is "What difference does
15  it make?"
16      A.  I terminated him when I terminated him.
17      Q.  Do you have any explanation for why you
18  waited three -- over three weeks after the regular
19  season ended to finally terminate Mr. Bernstein?
20      A.  What difference does it make?
21      Q.  Is that your full explanation you want to
22  give me today?
23      MR. CLEMENTS:  Objection, argumentative,
24  badgering the witness.
25      Q.  Any other explanation you want to give me

Page 188

1   today for why you waited for three weeks after the
2   regular season ended?
3       A.  No.
4       Q.  You terminated Mr. Bernstein the very next
5   day after this memorabilia signing that CAA
6   arranged for you, correct?
7       A.  I don't know.
8       Q.  Why did you terminate Mr. Bernstein the
9   very next day after you did the memorabilia signing
10  that CAA arranged for you?
11      A.  First off, I had already made up my mind
12  that he was no longer my agent, and then I had to
13  get ready to have surgery and get ready for
14  training, so I was making sure I had all my
15  business taken care of.  If that's how it turned
16  out, that's how it turned out.
17      Q.  But why did you wait until after you did
18  the memorabilia signing that CAA arranged for you?
19      MR. CLEMENTS:  Objection.  I think he just
20  answer it.
21      A.  I answered.
22      Q.  Why didn't you terminate Mr. Bernstein
23  before you did the memorabilia signing?
24      MR. CLEMENTS:  Objection, it's
25  argumentative and you're badgering the witness,

Page 189

1   Mr. Comerford.  How many times are you going to ask
2   the same thing over and over?
3       Q.  You can answer.
4       A.  I just answered it.
5       Q.  Why did you not terminate Mr. Bernstein on
6   January 20th 2019?
7       A.  I did it when I did it.
8       Q.  So you can't offer me any reason, correct?
9       MR. CLEMENTS:  Objection, mischaracterizes
10  his testimony.
11      Q.  Can you offer me any reason why you didn't
12  do it January 20, 2019?
13      MR. CLEMENTS:  Objection, asked and
14  answered.
15      Q.  Go ahead.
16      MR. CLEMENTS:  Do you have anything to
17  add?
18      THE WITNESS:  No.
19      MR. COMERFORD:  Okay.  Those are all the
20  questions I have, Mr. Golladay.  Thank you for your
21  time today.
22      MR. CLEMENTS:  I have a couple I just want
23  to clarify.
24      EXAMINATION OF KENNETH GOLLADAY
25  BY MR. CLEMENTS:

48  (Pages 186 to 189)

## Page 190

1    Q.   The season ended for the Lions the end of
2  December.  You're saying that you had a medical
3  procedure to be done after that?
4    **A.   Right.**
5    Q.   What was the date of that, do you
6  remember?
7    **A.   I don't remember.**
8    Q.   But the medical procedure was before the
9  signing, correct?
10    **A.   Right.**
11    Q.   Was it an operation?  I don't want to pry
12  too much.  Did they knock you out?
13    **A.   Yeah.**
14    Q.   Local, anesthetic?
15    **A.   I was put to sleep.**
16    Q.   So it wasn't a minor procedure.
17    **A.   Right.**
18    Q.   And when did you get out of the hospital
19  for that?
20    **A.   The same day.**
21    Q.   You had to recuperate a little?
22    **A.   Yeah.**
23    Q.   How long was this before the signing, if
24  you remember?
25    **A.   I don't remember.**

## Page 191

1    Q.   Let me just concentrate because I don't
2  want to ask a bunch of questions.
3         Boone Enterprises, Daryl Eisenhour, Jason
4  Smith, MVP Enterprises, did any of them, the people
5  or the entities, play any role in your decision --
6    **A.   No.**
7    Q.   -- to terminate Mr. Bernstein and hire
8  Mr. France?
9    **A.   No.**
10    Q.   Did any of those persons or entities ever
11  advise you --
12    **A.   No.**
13    Q.   -- with respect to anything that has to do
14  with your career?
15    **A.   No.**
16         MR. CLEMENTS:  That's the only questions.
17  I'm done.
18         MR. COMERFORD:  Thank you, Mr. Golladay.
19         THE VIDEOGRAPHER:  This concludes the
20  deposition.  We are going off the record at
21  6:52 p.m.
22         MR. CLEMENTS:  We'll reserve our right.
23         MR. COMERFORD:  For Plaintiffs, we will
24  send the court reporter the exhibits that we
25  marked, and we would ask, Stephanie, that you put

## Page 192

1  stickers on them and we'll do our best to label
2  them, and e-tran and PDFs of the exhibits with the
3  stickers and we don't need any hard copy, and then
4  we would like a synced video.
5         MR. CLEMENTS:  We'll take the same thing.
6         (Deposition concluded at 6:55 p.m.)
7  ~ ~ ~ ~ ~ ~

## Page 193

1
2
3         I, KENNY GOLLADAY, do verify that I have
4  read the foregoing transcript and have had the
5  opportunity to make corrections/changes; and that
6  the foregoing is a true and correct transcript of
7  my testimony given August 30, 2021
8
9  Corrections/Changes Made _____
10
11  No Corrections/Changes Made _____
12
13
                   _____
14                    KENNY GOLLADAY
15
16       Sworn to before me,
       _____,
17                    Notary Public
18  this _____ day of _____, _____.
19
20
                   _____
21                    Notary Public
22  My commission expires _____.
23       - - -
24
25

49  (Pages 190 to 193)

Page 194

```
 1         C E R T I F I C A T E
 2
 3      I, Stephanie R. Dean, Court Reporter and Notary
        Public, duly commissioned and qualified, do hereby
 4    certify that the deposition of KENNY GOLLADAY was
        taken by me and reduced to Stenotypy, afterwards
 5    prepared and produced by means of Computer-Aided
        Transcription and that the foregoing is a true and
 6    correct transcription of the deposition was so
        taken as aforesaid.
 7           I do further certify that these
        proceedings were taken at the time and place in the
 8    foregoing caption specified.
             I do further certify that I am not a
 9    relative, employee of or attorney for any party or
        counsel, or otherwise financially interested in
10    this action.
          I do further certify that I am not, nor is the
11    court reporting firm with which I am affiliated,
        under a contract as defined in Civil Rule 28(D).
12           IN WITNESS WHEREOF, I have hereunto set my
        hand and affixed my seal of office on this 9th day
13    of September, 2021.
14
15
16
17
18
                  _____
19                 Stephanie R. Dean, RPR
20           My commission expires August 30, 2025.
                         - - -
21
22
23
24
25
```

**A**

**a.m** 1:16 4:2,10,13
12:12,15,23
**ability** 10:21
152:12
**able** 12:8,15 27:21
27:22,23 28:2
49:12,16 50:17
51:3 55:12
81:16,21 98:18
98:23 99:3
109:23 114:14
115:8 116:2
117:23 124:11
141:15 150:21
152:15 171:4
**Absolutely**
170:19
**accepted** 10:13
180:4
**access** 158:11
**account** 32:10
92:3,4,16,25
93:9 95:4,17
96:1,5,6 104:3
155:21 156:5,12
156:21 157:2,6
157:9,9,15
159:9,22
**accounts** 18:13
18:14 20:5
24:14 158:12
**accurate** 27:6
90:8 98:23
**accusing** 59:18
153:5
**acting** 78:11
158:16 161:15
161:25 181:13
**action** 177:2,8
194:10
**active** 13:7
**activities** 14:5
**ad** 132:6
**add** 187:11,12
189:17
**address** 14:12
94:10 95:18
104:25 105:1,3
184:24
**addressed** 43:17
**addresses** 19:17
**adjourn** 4:16
**admissible** 35:20
45:9 47:23
49:18 54:17
78:24 97:13
107:6 114:10

123:10 152:8
**advantage** 27:4
**advertised** 102:23
103:5
**advertisement**
176:21
**advice** 29:1,4
30:20 75:13,17
75:20,22,25
76:2,4,5,10,15
76:19,25 77:1
**advise** 191:11
**affairs** 21:10
**affect** 10:21
**affidavit** 178:22
**affiliated** 194:11
**affixed** 194:12
**aforesaid** 194:6
**afternoon** 5:17
**age** 5:12
**agencies** 39:8
**agency** 46:5
49:12,16 51:9
**agent** 16:2 27:22
28:11 34:22
35:18 39:3,11
41:2,7,24,25
43:9,14,14,15
43:19 44:10
46:14 47:20
50:22 57:4,5,11
58:2,4 66:10,12
66:15,16 71:13
71:15 76:23
82:7,23 93:18
98:11 122:21,22
124:12 144:18
147:13 152:18
153:11 167:16
167:17,25
169:25 170:4,5
171:6 172:4
177:11 188:12
**agent/player**
124:7
**agents** 27:12
32:12 38:20,21
39:17 40:9,14
40:22 46:2,25
53:2 54:13
72:13 73:15
77:15 170:17,23
170:24 171:3,9
171:16,21 172:8
172:16,24
173:11,20
179:25
**ago** 9:4 13:18

37:16 42:16
47:9 48:5 49:3
73:7 81:13
87:11 102:15
104:1 147:19
163:11
**agree** 16:14 64:2
64:21 65:10
77:7,12,23 90:6
123:2 133:12
139:19 140:15
152:1
**agreed** 22:10
81:19 86:25
**agreeing** 61:2
74:5
**agreement** 20:22
25:12 176:12
**ahead** 12:19
31:20 62:14
81:10 85:17
104:20 137:16
189:15
**Airlines** 111:25
112:9
**airport** 101:20
102:3 112:14,17
**al** 1:7 5:6
**Albert** 36:1,3,6,10
**allegations**
142:19 143:23
144:8 145:2,6
171:13
**alley** 47:3
**allow** 124:10
**allowable** 137:15
**allows** 141:13
**amended** 12:11
**America** 111:1
**amount** 119:6
138:14
**and/or** 160:4
**anesthetic** 190:14
**Ann** 75:5 78:22
**annoying** 143:19
**answer** 6:16,17
7:12 9:19 12:18
13:1 17:15 20:4
20:18 28:16
30:18 35:21
38:22 40:1 48:1
49:19 54:17
57:21 59:22
60:12,13 61:18
62:6 63:14,21
64:25 66:12
68:2,8,17 74:4
76:8 77:18 78:1

78:25 79:11
83:9 84:5 85:15
90:11,22 92:13
93:17 94:19
95:22 96:21
97:14 102:25
107:7,13 111:17
114:12 115:1
123:12 126:13
129:10 137:6
141:20 148:2
151:15 152:1,11
152:12,13
157:23 158:1
159:25 160:8,21
168:3,6 169:9
181:7 186:12,25
187:11,14
188:20 189:3
**answered** 9:16,18
9:20 12:17,24
17:13,16 28:23
28:23 32:9
42:24 43:16
44:13,22 47:1
54:9 67:21
82:22 84:5
90:10 93:2,16
100:1 102:25
104:19 106:21
111:8,15 122:14
123:15 125:13
132:20 139:6
147:11,14,25
148:1,4,6
157:20,22 158:1
168:2 186:11,19
187:5,13 188:21
189:4,14
**answering** 63:25
64:19 68:14
71:22 85:16
179:13
**anticipate** 68:8
**anybody** 10:25
12:2 18:3 20:9
37:17,19 40:13
40:20 44:4
45:20 47:7 52:8
54:5 83:14
86:10,13,17
92:23 96:18
98:3 100:6
104:13 124:19
125:15 129:21
129:23 130:4
133:22 134:1
144:3 146:8

170:11 171:25
172:6,10,13,18
172:20,22
173:11,14,16
176:24
**anymore** 20:3
158:3 160:22
**apparel** 134:14
**appear** 71:15
**appearance**
159:14 160:5,18
161:5,17
**APPEARANCES**
2:1
**appeared** 4:5
**appearing** 179:24
**appointments** 9:5
**appreciate** 26:22
26:23 68:12
**approach** 42:21
42:22 43:8
**approached**
42:25 43:4,12
43:13
**approaches** 47:24
**approve** 32:6
**Araina** 79:12,13
79:21
**arbitration** 16:4
16:11 33:3,6,14
35:10 38:12
63:23 71:21
120:3,10,14,20
120:23 121:4,14
**Arbor** 75:5 78:22
**area** 80:17 87:24
**argumentative**
39:25 59:15
60:24 61:20
63:13,20 70:21
74:3 76:7 90:9
90:20 114:11
122:24 129:14
151:10 153:25
157:19 187:9,23
188:25
**arising** 178:12
**Arizona** 149:21
**arranged** 85:2
119:19 188:6,10
188:18
**arranging** 83:23
84:23
**arrive** 87:15
112:13
**arrived** 117:18
**asked** 6:12 7:13
12:16 17:12,18

28:22 30:12
34:6 41:9 42:23
43:2,6,20 44:12
44:21 53:25
54:3,9 66:6
67:20 84:4
90:10 93:1,16
100:1 102:24
104:18 106:8,20
111:7,14 122:14
123:15 125:12
132:19 139:6
147:6,11,14,24
148:6 155:13,16
157:20,25
167:20 168:1
169:8 177:5
179:9 184:17
186:11 189:13
**asking** 16:13
38:16 44:1 54:4
62:7 65:9 75:21
75:24 76:3,4,14
76:18 84:20
92:21 93:5
99:15 111:15
114:24 115:13
120:20 127:20
135:23 136:3
140:13 153:2,24
180:18
**assistance** 52:2
**assistant** 134:1
**at-will** 153:2
**ate** 41:10
**athlete** 12:20
**Athletes** 130:6,8
143:4
**Atlanta** 112:13,18
113:3,8,9
**atmosphere**
141:9
**attached** 92:1
**attaches** 91:23
**attachment** 94:14
**attempt** 179:25
**attend** 12:21,25
13:8 80:9,12
100:17 105:23
106:9,19
**attendance**
172:10
**attended** 32:21
132:1
**attention** 83:19
130:15 176:7
**attorney** 20:20
194:9

**attorneys** 4:6,6,8
4:15,15 114:21
**attorneys'** 1:13
21:1 22:9
137:12
**audio** 24:8 47:18
87:11 162:22,23
**August** 1:16 4:2
5:3 12:5 13:14
13:18 193:7
194:20
**Authentic** 2:8
**authentication**
113:12
**Authentics** 2:7
86:6,17 119:3
**authorized** 91:1,5
**autograph** 80:16
84:24 131:15
159:15 160:6,19
161:6,17
**autographs** 2:8
85:4
**available** 14:2
**average** 138:10
138:24 139:23
150:16
**aware** 7:9 10:16
13:19 14:11,15
17:20 35:2,15
35:23,24,24
57:6 83:5
102:15,16
120:17,19,22
121:3,13 141:14
144:23 149:3,8
149:20 150:14

---
**B**

**back** 19:14 21:7
22:23 23:10
25:14 40:2
41:21 42:3
64:10 65:19
66:9,14 69:5
71:20 73:8 75:9
79:16 80:13
83:18 85:14,17
90:2 95:10
97:23 116:16
119:14,16
143:16 146:11
148:10,16
163:15 168:8
178:7
**background**
79:25 180:18
**bad** 123:4,8,13

127:3
**badgering** 111:15
151:11 153:2
154:1 187:10,24
188:25
**badmouth** 172:18
173:11,14
**ball** 42:15 147:17
168:9
**based** 60:7 135:2
181:7
**basically** 57:14
**basics** 133:13
**Bates** 35:14 164:8
164:9 165:5,14
**bathroom** 68:25
**Bay** 186:3
**becoming** 47:20
**beginning** 41:14
126:15 169:13
169:14 170:7,9
173:10
**behalf** 2:2,7,14
97:5,10 120:24
121:4,7 158:16
161:15,25
180:16 181:13
**Belated** 104:7
**believe** 61:19 82:9
135:13 172:17
175:2 176:6
179:9
**Bennett** 2:3
**Bernstein** 1:4
2:21 5:6,23
14:20,24 15:9
17:19 18:1,19
18:24 21:2
22:18 23:17,22
25:11,23 27:11
28:2 30:3,15
31:17 32:7,14
33:10,12,16,23
34:7,12,21
35:17 36:4,7,10
39:18 40:9,15
49:15 50:9,17
51:2,12 52:4,8
52:13,23 54:22
56:6,14,16 57:2
57:13,15,18,25
58:4,10,21,21
59:2,8,14 60:1,4
62:17,25 63:8
63:10,12,18
64:4,23 65:4
67:12 68:20
69:25 72:17

73:3 74:10,15
74:18,22,25
75:6,13,16,21
76:4,14 78:7,8
78:19 80:4 91:4
91:7 99:7
107:17 120:15
120:19 121:25
122:7,13,18,21
123:5,16 124:1
125:10,19,23,25
126:10 127:17
127:18 128:1,11
128:18 129:2
142:19 143:23
144:12 145:2,6
145:21 150:21
151:1,6,18
152:3,19 165:17
166:4 167:25
169:21 170:18
171:7 172:11,18
174:16 175:11
177:5,11,19
178:18 180:1
181:18 182:6,18
183:3,11 186:4
186:9,22 187:19
188:4,8,22
189:5 191:7
**Bernstein's** 33:11
62:3
**best** 28:9 46:12
51:1 116:10
123:6,14 125:5
131:13,19 137:6
138:22 152:12
178:15 179:17
192:1
**better** 6:14 10:19
25:25,25 49:15
139:21 149:24
**big** 26:7 28:11
41:15,16 50:15
50:15,21 99:2
122:20 171:4
**biggest** 129:7
**Bill** 8:1
**bills** 23:5,6,8
**bit** 38:14 55:10
74:17 88:19
126:24 128:10
131:18 147:16
148:11 174:3
177:23 180:23
**blank** 66:17
**blind-sided** 126:7
126:9,23

**blue** 78:19
**board** 92:10
**Bob** 144:3 158:17
**body** 9:12,13
12:21,25 13:2,5
13:7,9 115:16
141:13
**book** 40:16
**Boone** 2:7,8,8
86:5,14 92:1
94:14 103:9
105:10,13,13
117:17 191:3
**bottom** 56:7
155:1
**bought** 8:6
**Boulevard** 2:4
**Bowl** 15:16 76:11
**bowling** 36:19,20
39:15 40:6,12
41:6 42:3,9,13
43:17 47:2
166:17
**box** 78:19,19
**brainstorming**
169:16
**brand** 13:25 27:1
39:6
**Branzburg** 2:10
**break** 6:18 7:12
7:14 68:24
116:5,12
**bribe** 171:9,10
179:24
**bring** 12:4 13:13
26:1 36:16
38:11 49:8 56:3
63:23 68:23
72:2,18 85:24
91:18 94:6
163:18,22
164:12 184:6
**bringing** 154:21
**brother** 26:7
42:18
**brought** 92:14
131:6,9 176:7
**bucks** 171:10
**building** 162:23
**bunch** 31:12 35:4
191:2
**business** 35:22
35:25 59:9 90:5
90:13 119:22
175:9 178:13
188:15

---
**C**

**C** 194:1,1
**CAA** 1:7 20:10
46:10,12,13,14
46:15 81:15
82:4 83:14
84:23 85:8
88:12 91:21
94:9 100:6,11
104:9 105:19
106:4 117:16
119:18 121:17
121:23 129:24
130:1,3,6,10,12
130:17,20,22
131:2,6,9,17
132:1,11,14
133:18,22 134:4
134:6,9,22,22
135:11,12,22
136:1 143:4,22
143:22 144:8
157:3 158:15,18
159:1,6,9
161:14 178:12
178:13 182:2
184:12,13
185:12 188:5,10
188:18
**CAA.com** 94:11
**calculated** 35:20
45:8 47:22
49:18 54:16
78:24 97:13
107:6 123:10
152:7
**call** 21:20 24:7
47:17 50:19
51:16,17,20
52:1 68:11
120:12 125:2,6
126:2,3 128:15
174:20
**called** 5:12 25:11
50:21 52:3,3,8
52:13,22 69:12
112:12 120:13
120:22 122:6,13
122:18 127:18
132:6 186:4
**calls** 74:4 77:16
77:24 91:13
98:1 152:6
**camp** 6:24 9:10
13:24 14:10
32:21
**campaign** 132:6
132:15,24
133:16

**camps** 32:19
**capable** 151:7,19
152:4
**caption** 194:8
**car** 101:24 105:18
106:2,5,13
**Cardinals** 148:23
149:21 150:6,17
**care** 9:12 13:6
67:3,14 82:11
82:14 84:10,12
84:19,21 102:21
103:1,6 149:9
150:2,4,11,12
188:15
**career** 15:19 48:1
171:25 191:14
**careers** 46:17,17
**cares** 65:13 66:23
90:13 103:2
110:12
**case** 1:6 5:5,6
11:25 96:4
142:20,24 145:7
**cash** 81:4
**caught** 184:17
**caused** 28:1
150:25 152:3
**cc'd** 92:7
**certainly** 60:21
65:3
**certified** 5:14
**certify** 194:4,7,8
194:10
**cetera** 62:5,5
**chance** 63:9
166:1 186:18
**change** 27:12
39:1 43:10,14
64:3,23 66:10
66:15 73:15
77:9,20 152:17
152:17 167:17
170:4,17,22
171:9,16,21
172:7,16,24
173:10,20
**changed** 77:14,19
171:3
**changing** 53:2
72:12 170:24
**characterize**
60:25
**check** 14:14 18:2
18:8,12 19:6
20:11 118:21
119:1,5,11,14
119:17 123:19

133:7 156:9,12
156:15,18
179:21,23
**checked** 18:7,14
78:14 156:6,16
156:23
**Checking** 88:22
**cheerlead** 172:22
**cherry** 41:20,23
169:23
**Chicago** 52:16,18
58:16 80:10,17
80:22 87:20,24
102:6,11 112:14
112:17,20 113:4
113:8,9,15
116:22,25 117:2
117:6 122:16
127:4,9,12
128:5,9,9 180:7
180:10
**choice** 31:6
126:19 151:22
151:23
**Christmas** 73:16
**Christmas.'** 72:8
73:12
**city** 87:25 108:16
**Civil** 194:11
**clarify** 189:23
**clarity** 1:3 5:5,23
25:18 26:19
27:11 30:13
31:12,17 32:7
32:14,22 34:3
34:16 35:6 50:9
56:7 72:18 73:3
81:18 98:17
99:4 100:13
107:17 108:1,24
109:5,9,14
110:1,6,14
142:19 143:24
144:12 145:21
164:9,10,11
165:2,5,14,15
173:7,11,14,16
173:23,24 174:4
174:11 176:10
176:12,24 177:2
181:22 182:9,14
183:6,15
**clean** 35:7
**cleanup** 148:12
**clear** 4:11 65:5
67:12 68:20
163:4 181:7
**clearly** 27:12,13

48:5 51:5 104:6
**Clements** 2:9 3:3
3:5 8:10,21 9:15
9:24 10:5,24
12:16 17:12
20:16,22 21:1,6
22:8,22 28:15
28:22 30:9,12
30:17 31:14,19
35:19 37:3
39:24 42:8,23
44:12,21 45:7
47:21 49:17
52:21 54:9,15
59:15 60:6,16
61:11,12,17,21
61:24 62:10,14
63:13,20 64:8
64:13 66:18
67:6,20 68:6
70:21 74:3 76:7
77:16,24 78:23
79:7,10,15 83:8
84:4 85:21 88:4
90:9,20 92:5,11
92:18 93:1,15
94:18 95:8,21
96:12,20 97:12
98:1 100:1
102:24 103:16
104:7,18 106:20
107:5,12 111:7
111:14,23
113:12 114:9,20
115:5,11,24
116:4,9 121:1,6
122:14,24 123:3
123:9,15 125:12
126:11 127:21
127:24 129:9,14
132:19 135:13
136:12,17,20,23
138:18 139:5,12
140:8,18,25
141:18 143:12
143:18 144:10
147:10,14,24
148:5 151:9
152:6 153:1,8
153:13,14,18,22
157:19,25
158:24 162:16
162:20 166:10
166:10,15 167:8
168:4 178:2,9
178:21 179:6
180:11 185:21

186:11 187:9,23
188:19,24 189:9
189:13,16,22,25
191:16,22 192:5
**Clements'** 64:11
**client** 55:14
167:10
**client's** 61:1
**close** 117:20
148:8
**closely** 85:15
**clothing** 134:15
**clue** 14:17 19:2
24:18 36:11
70:7,23 81:1,3
84:6 96:2
105:24 106:3
118:5
**collateral** 153:10
**colleague** 12:5
**colleagues**
185:12
**collected** 33:10
**collects** 144:19
**college** 14:22
**come** 52:18 58:16
72:5 74:19
78:12,22 85:10
90:4 129:20,21
143:16 168:14
177:24
**Comerford** 2:3
3:3,4 4:1,3 5:16
5:22 16:13
22:10 35:9
36:16 37:5
38:11 45:8 55:5
55:20 60:20
61:11,12,21
62:10 64:10,17
69:1,7,11,19
79:18 97:22
112:4 115:2,7
115:17,21 116:7
116:18 123:21
128:2 136:19,22
143:16 148:8,18
153:4,13,14,15
153:19,20 155:7
164:7,16 165:3
166:8 167:6,10
168:1 169:8
171:7,12 175:24
179:9 180:2
183:21,22,24
184:4 189:1,19
191:18,23
**comes** 27:18

56:24
coming 25:1
  32:13 41:7
  43:18,19 167:15
commenced
  177:2
commentary
  62:12
commercial 132:3
  133:20,24 134:2
commission
  135:2 176:13
  177:19 193:22
  194:20
commissioned
  194:3
communicate
  22:18 23:1,21
  24:6 47:13 83:6
  87:7 101:19
communication
  71:16,18 155:17
  156:10 158:15
  159:13 160:2,16
  161:3,14,24
  162:14
communications
  82:19 92:2
  156:13 161:8
companies
  134:15 135:24
company 142:15
compensation
  178:16
complaint 159:16
  160:7,20 161:7
  161:19
completely 62:16
  153:3
complex 140:20
computer 12:9
Computer-Aided
  194:5
concentrate
  191:1
concern 109:21
concerned 50:3,8
  50:10
concerning
  145:21 160:5
concerns 25:22
  27:2,10 28:7,14
  28:20 159:13
  160:3,17 161:4
  161:16 184:7
concluded 192:6
concludes 191:19
conclusion 77:17

77:25 121:7
  140:9,19 152:7
  168:15 169:4
conduct 153:20
  153:23
confidential 1:13
  20:17,19,21
  22:8 79:8 94:9
  136:14,17,24
  137:8,11 143:14
  143:20
confidentiality
  22:24 79:17
confirmation
  124:6
confused 62:9
confusing 60:18
  61:6
conjunction 86:5
connection 67:8
  173:19,23
consideration
  29:3,5 30:21
considering 27:3
constantly 39:1
  42:11
construction 8:7
  79:23
contact 47:10
  62:18 81:6
contacted 98:5
contents 126:12
continually 39:2
continue 116:8
  142:4,9 186:17
continuing 141:7
contract 14:25
  15:2,9 17:1,3
  25:10,17 50:14
  90:2 91:24,25
  92:24 93:8,14
  94:15,23 95:2,4
  97:3,5,9 98:16
  98:18,20 100:13
  103:8,9,20,20
  104:9 105:4,11
  107:23 110:8
  115:22,25 116:1
  116:3 130:21
  134:21 135:12
  135:21 136:1,6
  136:16 137:4,10
  137:18,20 138:6
  138:19,23
  139:16,22 141:3
  141:11,12,15
  142:5 149:20,24
  149:25 150:6,10

150:15,22 151:7
  151:19 152:4,16
  153:8 159:2
  171:4 175:12,15
  175:17 177:12
  177:21 178:17
  194:11
contracts 48:8,11
  138:11,14 147:7
  147:22 149:15
control 20:5
conversation
  11:6,10 43:5
  48:5,6 51:11,25
  55:1 57:17 58:6
  58:20 60:1
  71:13 73:13,17
  73:23 74:6
  83:25 91:4
  101:25 124:4,24
  126:18 129:5
  168:10,10 175:4
  175:8
conversations
  16:21 45:14,17
  45:20 55:25
  57:9 58:8 78:16
  83:14 90:24
  92:22 93:6
  98:13 99:19,23
  100:5 103:3
  125:9 128:25
convo 69:14
  70:12
COOPER 2:15
coordinate 109:9
  121:18
coordinated
  108:1
copy 96:9 114:1,4
  114:7,13,14,14
  119:1 192:3
correct 23:8 25:8
  25:19 39:18,22
  40:9,19 53:3
  62:21,24 63:3
  65:6,16 99:21
  117:8 118:14
  121:14,15
  129:13 136:18
  140:23 146:4
  147:23 148:3
  155:22 157:18
  164:5 173:5,6
  174:3,6 179:15
  179:18 185:24
  188:6 189:8
  190:9 193:6

194:6
corrections/cha...
  193:5,9,11
correspondence
  26:24
counsel 4:3 5:9
  10:13 194:9
couple 114:16
  122:21 148:9
  166:11 183:22
  183:24 189:22
course 42:14
  48:21 120:12
court 1:1 5:8,10
  6:5,9 7:7 61:22
  61:25 85:13,16
  97:22 191:24
  194:3,11
courtesy 114:21
  115:5
covered 176:12
  180:22
covering 122:16
cracked 163:17
Craig 2:8 105:13
crazy 21:13
  137:22
created 112:9
crossed 82:13
  168:22
curious 48:11
current 55:14
  141:16
currently 20:14

**D**

D 2:3 3:1
d/b/a 2:8
dad 127:11 128:7
dad's 180:8
Daryl 2:7 105:14
  191:3
date 5:3 52:5,7,24
  56:4 77:6 86:24
  86:25 87:4,8
  94:7 112:23,24
  122:11 179:15
  190:5
dated 25:14 55:9
  56:4 69:9 74:8
  77:4 88:18
  91:19,22 94:8
  94:13 103:7
  105:9 106:24
  119:2 123:17
  125:19,20
  154:19 184:6
dates 66:13,14

dating 23:10 79:2
  80:3,6 101:9
day 4:13 7:4 13:22
  16:4 23:3 28:8
  32:5,8 33:3,6
  51:1 52:19,22
  56:15 65:13,14
  71:12 80:22
  82:7,23 89:23
  93:19 100:3
  111:10,19
  112:15 116:19
  116:22 117:6
  122:1,7 126:18
  127:10 129:3
  132:22 166:12
  174:20 180:5,25
  184:1 185:25
  188:5,9 190:20
  193:18 194:12
days 112:10
  124:11
daytime 109:4
deal 8:5 27:19,19
  28:3,11 48:16
  48:19 50:15,16
  51:3 83:11
  122:20 134:5,6
  134:9 136:9
  141:16,22,24,24
  142:14,16 161:1
  175:3 177:15
  184:7 186:17
dealer 99:8
dealers 89:21
  98:5,10 99:16
  102:20 105:23
  108:10 135:20
dealing 10:18
  14:7,8
dealings 174:4
  176:10
deals 48:23 90:4
  131:9 134:4
  139:19 142:11
dealt 13:4
Dean 1:21 194:3
  194:19
DeAndre 148:19
  148:25 149:11
  149:14 150:15
December 41:14
  41:23 54:14,20
  55:9 56:4,15
  57:18,22 58:1
  58:14 59:5
  62:16 63:1
  65:21 66:11,15

66:19 69:10,14
69:25 70:3,9
72:12,16 75:22
76:15 79:3
86:22 120:16
126:15 162:13
165:17,18
169:15 170:4,6
170:7,9 172:17
173:10 186:3,21
190:2
**decide** 45:5 77:9
87:18
**decided** 27:12
65:22 71:3,9
77:15,23 152:22
173:8,10 187:2
**decision** 29:24
39:1 48:3 51:1,6
65:1,14,18 72:6
73:15 80:7
126:9,21,22
129:5 151:4
167:24 169:20
170:17 171:16
171:21 172:16
172:24 173:20
173:22,24 174:1
183:2,6,10,14
191:5
**decisions** 129:4,8
**declaration**
144:22,22 145:1
145:5,10 146:8
178:23 179:4,10
179:13
**Defendant's** 3:17
165:7
**Defendants** 1:8
2:7,14 4:7,15
**defined** 194:11
**definitely** 167:2
**delete** 20:8
157:12 158:8
159:5
**deleted** 23:16
24:19
**deleting** 158:6
**delivered** 104:24
**Delta** 111:25
112:8
**depart** 112:12,16
**depiction** 27:6
**deposed** 5:14
11:25
**deposit** 133:7
**deposition** 1:11
4:17 5:2 6:2 8:9

8:16 9:7 11:1,4
11:18,21 12:4
12:12 13:13,18
13:21 14:13
62:13 154:21
191:20 192:6
194:4,6
**describe** 16:19
149:24
**described** 119:23
147:7
**deserved** 50:15
139:21 151:24
152:16 171:5
**designate** 143:18
**desire** 142:2
**details** 47:14
110:4 133:14
**Detroit** 30:16
41:10 47:5
58:15 80:13
88:8 136:15
168:8 177:12
178:18
**difference** 19:23
110:3 186:24
187:1,7,14,20
**different** 6:13
62:2 84:20 93:5
130:23 156:22
**differently** 34:8
34:13,18
**difficult** 133:14
**digits** 21:17
**dinner** 39:9 40:25
40:25 41:3 47:8
49:2,5,7 58:15
80:12
**direct** 24:9,12,15
24:16,19,23,24
25:1,2,8 133:7
155:18
**disagree** 75:17
176:11
**disappointed**
128:12
**discount** 144:18
**discoverable**
35:20
**discovery** 45:9
47:22 49:18
54:16 78:24
97:13 107:6
114:10 123:10
137:15 152:8
**discuss** 185:7
186:1
**discussed** 144:7

171:25 172:3
186:6
**discussion** 117:5
122:3 182:12,16
**discussions**
17:13 29:20,24
30:2 31:8 73:2
86:10,13,16
107:9 132:18
146:12 160:4
**displeasure** 33:16
**dispute** 174:19,21
175:20
**disrespectful**
171:11
**distinction** 45:3
**distracted** 65:23
**distraction** 59:11
**distractions**
154:12 174:23
186:15,18
**District** 1:1,1 5:8
5:8
**DM** 24:8,9,11
80:24 81:7
87:10
**doctor** 75:14
**document** 12:9
26:1 36:17
57:21 68:23
69:12 74:8
88:17 91:18,25
103:7 104:4
105:8 154:17,18
159:12 160:2
163:18,20
164:12 179:12
179:14 184:6
**documents** 11:20
12:7 17:18
154:22 155:2,6
155:14,18
175:19
**doing** 5:18 25:23
31:2 33:18,24
34:3 35:8 42:11
45:3 68:15
80:21 86:20
100:16,21,25
142:22
**dollars** 141:25
**dotted** 168:22
**doubt** 166:18,21
166:24
**Douglas** 29:6,18
29:25 30:3,15
31:2
**Dowd** 2:3

**draft** 122:23
**drafted** 15:4
**drive** 37:17,19
**drop** 21:2
**dropped** 75:8
**dry** 70:23
**duly** 5:13 194:3
**dying** 139:15

───────────

## E

**E** 3:1 194:1,1
**e-tran** 192:2
**eared** 177:20
**earlier** 38:18
106:8 127:15
146:25 150:20
155:20 156:4,20
174:22 184:25
**early** 56:19 58:1
58:25 62:16
**easier** 40:5 95:10
**easily** 126:19
**Eastern** 4:2,10,11
4:14,17 5:4
12:12
**eat** 47:6
**editorializing**
57:20 60:17
**edits** 146:5
**Eisenhour** 2:7
105:14 191:3
**either** 23:21 45:21
52:19 71:7
73:21,22 78:2
85:11 93:7
134:15 148:11
163:1,8 180:7
**elaborate** 179:22
**electronically**
103:24
**EMA** 181:22 182:9
183:6,14
**email** 4:8,18 14:12
14:14 18:4,8,13
18:14 19:16
20:5 26:3,18,21
37:7 50:20
51:15 59:17,19
60:18 91:20,22
92:3,4,20,25
93:4,9,11 94:6,7
94:10,16,22
95:3,3,6,7,16,17
95:18,25,25
96:5,6,7,14
103:17 104:2,3
104:13 114:1,2
123:16,25 124:5

124:13,23 125:1
125:7,11 127:17
155:21 156:5,6
156:12,21 157:1
157:2,5,8,9,9,11
157:13,15 158:2
158:3,4,5,8,9,12
159:1,4,9,22,22
159:23,24
184:11,12,20,23
184:24 185:8,9
185:12,15,17,18
185:20
**emailed** 104:12
**emails** 14:12,16
17:20,25 18:2,4
18:13 19:8,13
20:8,11,12 26:2
33:11,15,22
34:1 71:7,10
83:2,7 87:9
92:16 93:12
95:18 96:4
126:11 155:18
155:21 156:1,24
156:25 158:10
158:19,22,23
159:5,9,10,11
159:17,19,20
160:9,12,21
161:8,10,20,22
161:23 162:2,3
162:4
**Emily** 26:18 33:12
34:2,16 88:20
88:21 89:3,18
89:25 90:7,18
90:25 91:10,14
98:20 99:7
102:15 176:6,20
**emoji** 128:17
**employee** 158:15
161:14 194:9
**employees**
143:22,22
158:18
**ended** 186:9,20
187:4,19 188:2
190:1
**endorse** 119:13
**endorsement**
25:18 131:2,6,9
134:21 135:10
135:22 142:11
**enjoyed** 168:20
**ensure** 26:25
**entered** 105:11
**entering** 122:22

**Enterprises** 2:7,8
86:5,14 91:24
92:1 94:15
103:10 105:13
117:17 191:3,4
**entire** 172:15
**entirety** 38:24
**entities** 191:5,10
**entitled** 7:7
**especially** 128:13
**ESQ** 2:3,9,9,15,15
**estimate** 114:21
115:7,8 131:13
131:19
**estoppel** 153:10
**et** 1:7 5:6 62:5,5
**eval** 74:21
**evening** 37:14
45:15,18 70:10
**event** 29:15 32:18
32:19,21 36:14
36:19,20,22
37:22 38:1,3,18
39:15 40:6,12
41:6 42:3,10,13
43:17 45:21,25
47:3 93:21,22
93:24 94:3,3
95:13,24 100:21
101:21 120:1
166:18,19,20,22
166:23 167:5
170:11,16 171:8
171:20,24 172:1
172:6,11 173:13
173:20,24 174:2
174:13 175:23
176:11,17,20
179:20,23,24
180:7
**events** 10:21
32:17 120:7
121:20 130:20
174:5,12
**everybody** 21:4
40:17 41:7 42:9
43:18 167:15
180:18
**everybody's**
180:22
**evidence** 35:21
45:9 47:23
49:19 54:17
78:25 97:14
107:7 114:10
123:11 152:8
**ex-girl** 117:19
**ex-girlfriend**

118:4
**exact** 134:24
135:4
**exactly** 85:16
147:15,18
**examination** 3:2
5:13,15 166:14
180:13 184:3
189:24
**example** 13:6
159:2
**exchange** 70:17
89:2,4
**exchanged** 18:18
19:13 33:13
163:24 164:5,20
165:9
**exchanges**
184:20
**exchanging** 162:5
**exclusive** 98:11
**excuse** 38:25
**exhibit** 3:7,7,8,9,9
3:10,10,11,11
3:12,12,13,13
3:14,15,15,16
3:16,17,17,18
3:18 13:10,11
13:14,15 35:10
35:11 37:4,6,8,8
38:12 55:19,21
55:22 56:10,11
63:23 69:18,19
69:20,21,22,24
71:20 74:11,12
86:1 88:15,18
91:16,19 94:4
103:12,13,15,16
105:6,9 112:3,4
112:5 123:18,19
123:20,23,25
125:22,22 155:4
155:8,10 164:13
164:14,16,18
165:6,7,12,13
165:23 178:24
179:1,4,11
184:8,9
**exhibits** 3:6,8,14
35:4,8 37:9
118:24 191:24
192:2
**experienced**
114:20
**expires** 193:22
194:20
**explain** 6:17
167:11 174:15

**explained** 135:16
**explanation** 97:6
97:11 105:25
106:6 185:11,16
187:17,21,25
**exposure** 26:25
**expressing** 33:16
**extensively**
126:25
**extent** 137:14
140:9 141:20
152:11
**eyes** 1:13 21:2
22:9 137:12

**F**

**F** 194:1
**face** 128:17
170:20
**Facebook** 23:24
85:25 86:9
88:25 102:14,18
102:20,23
175:21 176:2,5
**FaceTime** 24:8,8
47:17,18 87:10
87:10,13,14
162:22,22,23
**facility** 109:1
**fact** 11:24 35:15
37:22 62:17
135:18 152:9
153:19
**facts** 54:10 151:5
151:17 152:2,14
152:19,25
**factual** 60:22 61:2
61:3
**failed** 55:12
**fair** 15:3 25:6 60:5
61:5 62:18 63:1
63:12 64:5,24
65:5 74:2 141:4
**fall** 141:6
**family** 26:6 28:10
49:23 50:13
123:7,14 125:5
127:12 128:9
175:10
**far** 8:8 15:6 18:15
48:2 54:10
98:24 175:8,14
179:11
**fast** 114:19
**favor** 61:1
**February** 72:24
72:25 73:5
**fee** 135:3 144:18

**feedback** 41:18
**feel** 6:17 21:14
22:16,20 23:2
27:21 28:1
50:17,22 51:2
59:13 67:14,18
67:25 77:2
85:15 123:4,8
123:13 127:2
142:16 150:25
151:6,18,25
152:3,15,20,21
**feeling** 28:4 41:19
51:5 147:17
151:2,3,12
**feelings** 27:20
50:18
**feels** 67:15 128:12
**felt** 16:8 25:24
27:7,19 28:13
28:19,21,24,25
46:18 50:15
67:10,15,16,18
67:23,25 68:3
68:18 126:23
139:21 151:4,23
168:8 171:3
**field** 46:20 142:10
**fifth** 45:12
**final** 65:18 179:20
**finally** 76:17
169:18 187:19
**financial** 137:7
**financially** 194:9
**find** 109:23
**findings** 153:9
**fine** 20:20 129:6
**finish** 7:3 68:7
81:10 174:25
**finished** 7:8
177:17 186:16
**finishing** 186:17
**fire** 167:24
**firm** 194:11
**first** 5:13 10:4
26:5 36:12
39:19 41:21
45:22 47:8,14
48:2 49:1 74:16
74:17 80:21
86:19 100:15,20
127:4 128:22
130:7,8 143:4
167:1,23 168:19
173:9 188:11
**five** 26:14 118:6,8
124:11 138:1
**five-day** 124:8,8

**flat** 135:3
**flew** 113:8
**flight** 78:13
111:20,21,24
112:1,8 113:3
**flip** 164:1
**Floor** 2:10
**fly** 74:21 117:6
**focus** 10:19 13:24
14:1 58:13
130:10 154:11
154:12 166:16
**folks** 73:3
**follow** 29:4
**following** 39:9
40:25 70:9
125:20
**follows** 5:14
**football** 34:20
35:16 48:1
141:5 144:14
175:1
**footballs** 85:5
**foregoing** 193:4,6
194:5,8
**Form** 180:2
**formal** 125:7
**formality** 124:5,22
**format** 155:19
**formed** 31:23
**former** 55:14
143:22 171:6
178:13
**Forsyth** 2:4
**forthcoming**
62:17
**forward** 31:7
167:22
**foul** 30:8 81:16
107:24
**found** 27:22
**foundation** 36:14
42:8 60:20
61:13 83:8 92:5
92:11,18 94:18
95:8,21 96:12
104:8 111:23
113:13 121:11
158:24 162:16
162:20
**four** 26:13 112:10
137:25 138:3
141:19,23 142:7
**four-year** 139:16
141:11,16 142:5
**fourth** 44:23
**frame** 25:21 54:14
146:16

**France** 11:3,11,17
11:23 16:3,7,14
16:16,18,22
17:10,20 18:1
18:19,24 19:12
20:9,15 23:1,17
23:22 27:24
28:10 36:12,18
36:23,25 41:8
42:22 43:19
44:5,10,20
45:11,15,18,22
45:25 46:5,23
47:4,8,11,19,24
47:25 48:8,15
48:19 49:8,11
49:14,25 50:1
51:7 52:12,18
53:5,13,16
54:22 55:6,8,9
55:11 56:1
58:11,15,16
59:25 60:5
62:18 63:9 64:4
64:24 69:13
70:2,6,10,20
71:1,2,8 75:24
76:5,18 77:4,8
77:13 80:3,13
81:20,23 82:9
82:15,20 83:2,5
83:22 84:2,9,23
91:21 92:15,23
92:24 93:7,8,13
94:7,11,17
95:12,19 96:13
99:24 101:11
106:9,19 111:4
111:11,22,25
112:7,12,16
113:2,7,14,17
113:20,25 114:5
116:2 120:15,22
121:2,19,23
124:18 125:10
126:10 129:2
130:5 131:17
132:1,17 138:3
142:18,24 143:3
143:21 144:15
144:17 146:7,12
146:17,20,25
147:6,12 149:1
149:6,12 150:9
152:18 154:3
156:11,13,25
160:17,25 162:1
162:6,19 163:1

163:7,22,23,25
164:5,21,24
165:10 166:19
166:25 167:4,13
169:21 170:18
172:13,22 173:9
174:18 178:16
180:1 181:25
184:24 185:4,5
185:9,12,17,19
185:23 191:8
**France's** 92:4
95:3,17 103:17
104:3 111:20
157:2,9 159:22
**frankly** 153:10
**free** 6:17 133:11
**freshman** 20:2
**Friday** 4:7,18
**Friedberg** 2:16
**friend** 26:6 29:7
29:10
**friends** 126:15
**front** 8:12 49:9
134:25 135:5
**full** 4:12 5:19
187:21
**fully** 76:17
**funds** 119:7,8
**funny** 78:11
**further** 194:7,8,10
**future** 50:16,16
141:19

**G**
**game** 140:6 186:2
**general** 10:13
57:10 58:24
65:10
**generally** 6:19
135:6
**generation** 49:24
**gentleman** 42:6
**gentleman's** 38:6
**gentlemen** 105:14
**Gerry** 2:14 105:15
180:16 181:1,9
181:17,21,24
182:2,21 183:1
183:5
**getting** 9:11 44:8
60:18,24 76:13
83:19 92:15
96:7 110:10
115:21 137:4
144:18 151:7,19
152:4 158:4,9
159:20 160:11

160:15 162:3
174:9 180:19
**Giant** 50:24
**Giants** 8:6 13:25
51:4 137:22
138:3,12,17,20
139:4,8,10,17
139:23 140:16
141:2,11,16
149:25 175:12
175:15
**girlfriend** 79:16
79:20 127:1
**give** 29:1 44:23
50:19 79:22
110:5,19 116:3
118:21 121:24
125:2 126:2
128:14 131:13
152:13,16,24,25
187:22,25
**given** 60:7 193:7
**glad** 28:5 44:7
81:3 85:9 151:4
**Glover** 46:13
**GM** 56:18 57:3
**gmail** 20:3
**go** 6:20,21 12:19
16:5 22:23 30:6
31:20 35:14
36:21 37:23
38:3,13 40:17
41:17 42:3
46:14 55:10
56:6 62:14
63:24 64:10
65:5,20 67:13
68:21 71:20
77:1,22 78:7
79:16,24 81:10
81:16 85:6,11
85:17 96:4
100:23,24 101:3
101:5,9,12,13
101:16,17 102:5
102:10 103:11
104:20,22
105:11 109:21
125:22 126:24
128:10,17
129:23 130:2
136:25 137:5,16
143:1,10 146:11
154:22 161:13
167:25 168:24
169:18 178:2
189:15
**goal** 141:22

**goals** 27:5
**goes** 30:19 69:15
74:20 78:2 90:2
**going** 6:25 7:5 8:7
12:6,22 15:7
17:19 20:19,21
21:19 22:21
23:3 26:2,2
27:13 35:23
37:23 38:14
41:24,25 47:15
47:15 48:15
54:21 55:7 56:4
56:5 59:3,6
62:10 64:3,18
64:22 65:5
66:10 67:13
68:8,21 69:9
73:8,15 74:9,19
74:22 76:16
77:1,20 79:3,19
79:23 85:11,13
87:16 88:22
91:19 92:3,17
94:7 100:17,22
100:24 101:2,9
101:11,13,15,17
101:20,23,24
105:9,23 106:9
107:4,10 112:20
115:2,11,12,14
116:10 120:2,6
120:24 125:19
128:21 134:24
136:14 137:13
140:15 141:14
142:15 143:10
145:9 148:13
151:7,13 153:6
153:16 154:18
155:7 159:3
162:9,12 163:20
164:16 166:11
171:2 174:17
178:4 180:20,23
184:5 185:13
189:1 191:20
**Golden** 36:14
38:7,18 41:6
43:16 44:9,14
44:19 45:15,17
46:13 54:5
166:18 167:14
**Golden's** 46:9
**Golladay** 1:12 3:2
4:4,14 5:3,12,15
5:21,22 12:8,19
16:7,15,20

17:15 28:25
34:12 35:15
38:19 40:5
47:24 55:24
57:4,5 59:18,18
59:22 60:15,21
61:9 62:15 64:3
64:6,9,14,14,18
64:22 66:21
67:9 68:12 69:8
83:18 86:3 94:1
103:18,19
110:21 112:7
116:19 119:2
121:12 128:3
129:16 137:16
139:15 148:19
154:2,20 155:13
163:21 165:19
166:9,14,16
178:12,23 179:4
179:5 180:13,15
183:21 184:3,5
184:20 189:20
189:24 191:18
193:3,14 194:4
**Golladay's** 4:8
48:1 127:25
178:22
**Golladay_Kenny**
94:14
**Golladay_Kenn...**
91:24
**Golladays** 132:7
132:15 133:16
134:2
**good** 5:17 41:11
42:17 49:24
56:17,23 57:16
58:5,23 60:2
65:3 67:11
68:19 126:5
150:1,8 168:11
175:2
**gotten** 57:2
185:14
**governing** 152:10
**gray** 78:19
**great** 41:17 46:17
46:20 55:4
69:14 70:12
129:4 133:21
151:23 168:25
**Green** 186:3
**ground** 122:16
**grown** 23:7 30:19
175:6
**guarantee** 140:11

**guaranteed**
138:14,16 140:1
140:5 141:2
**guess** 17:6 70:18
70:22 77:19
91:12 95:2
116:25 131:10
131:12 133:15
134:25 135:5
164:2
**guessing** 133:2,5
134:13
**guest** 42:7
**gut** 28:4,5 150:21
151:12
**guy** 27:24 42:2
70:23 169:19
**guys** 49:1 60:4
72:18 84:1 92:6
102:9 117:23
137:10

_____

**H**

**half** 6:20
**hand** 194:12
**handing** 119:10
**handle** 31:24
**handwriting**
119:14
**hang** 133:23
**hanging** 170:25
180:17
**happen** 97:6
**happened** 18:23
38:1 47:2 49:25
71:14 78:3 91:8
91:11 96:16
97:11 100:17
110:6 135:21
157:5,7 158:21
171:19,23
**happening** 10:16
78:15
**happens** 167:11
**happy** 27:14
33:17,24 34:2
44:3 50:25
132:7,14 133:16
134:2 150:11
152:17
**harassing** 90:21
114:11 151:14
**hard** 27:20 50:18
192:3
**harm** 30:8 81:16
107:24
**Harrison** 2:10
**Harvey** 2:10

**hate** 20:12
**head** 127:2
170:25 173:19
**hear** 30:10 80:21
**heard** 17:10 36:25
170:13
**hearing** 16:4,11
33:3,6 35:10
38:12 58:2
63:24 64:9,15
71:21 83:18
170:10
**hearsay** 30:17
54:15 57:19,20
60:7 67:7 92:12
126:12 129:10
**heart** 13:23 21:13
**held** 16:11
**Hello** 162:17
**help** 27:5 38:4
39:8 50:5 52:25
110:1 124:14
**helped** 138:4
**helpful** 75:6
**helps** 41:17 72:5
**Herber** 2:15 3:4
35:3,3,13 37:7
55:18 69:17,21
69:24 103:15,17
112:2 123:19
137:13 153:6
180:14,15
183:19
**hereinafter** 5:14
**hereunto** 194:12
**hey** 39:10 41:1
57:3 58:1,22
60:2 74:18
83:17 88:21
98:9 126:1
128:11 164:3
**Hi** 126:7
**high** 20:2 26:11
**high-rise** 162:23
**highest** 150:18
**highlighted** 67:2
71:23
**highly** 171:14
**hire** 71:3,9 76:23
124:12 169:21
170:18 191:7
**hit** 80:23 81:7
83:10 89:6,7
167:21
**hold** 136:20 151:9
**home** 7:20 37:19
75:9 102:5,10
**honest** 10:19

15:22 20:1
21:12 24:24
25:24 27:20
30:25 41:11
46:7 50:18
51:14 78:3 81:3
125:4 126:14
141:6 143:9
151:21 168:16
170:19 180:3
**honestly** 139:15
**Hopkins** 148:20
148:25 149:5,11
149:14,21 150:5
150:15
**hospital** 190:18
**hotel** 109:2
118:11,13 128:8
**hour** 6:20,20 9:4
9:21,22 114:23
115:9
**hours** 7:1,3,9
114:23,24
**house** 7:18,19 8:5
8:6 52:10,15
102:12 117:3
122:15,18 180:8
180:8
**how's** 88:22 162:9
**Howard** 144:3
158:17 184:12
184:16
**Huh-uh** 149:9
**hungry** 171:2
**hygiene** 143:12
**hypothetical** 60:9
62:4 122:25

_____

**I**

**I's** 168:22
**Iaconelli** 2:9 8:9
8:20 9:14,23
10:5,24 30:11
144:10
**Iaconelli's** 4:18
**iCloud** 163:15
**idea** 28:21 54:20
64:7 65:1,10
68:3,5,18,22
81:5 82:3 88:7,8
92:23 93:8
98:15 103:4
105:22 107:10
**identification**
13:12,16 35:12
37:10 55:23
56:12 69:23
74:13 86:2

88:16 91:17
94:5 103:14
105:7 112:6
118:25 123:24
155:11 164:15
164:19 165:8,24
179:2 184:10
**identify** 35:13
81:11 117:25
164:8
**ILES** 2:15
**Illinois** 14:23
80:18 87:21
88:2,2,4,7
112:14,17
159:15 160:6,19
161:6,18
**immediately**
174:16
**improper** 59:20
135:14 153:16
**include** 93:24
158:17
**included** 26:24
106:1
**income** 31:24
**incomplete** 60:9
62:4
**incorrect** 85:22
**influence** 41:15
**information** 62:25
81:6 129:19
139:13
**initiated** 177:8
**injury** 9:11 10:18
14:7,8
**input** 80:7
**inquiry** 26:22
**Instagram** 23:24
**instruct** 61:18
**intent** 141:10
142:9
**interest** 39:4
137:4 162:8
**interested** 38:20
39:17 40:8,13
40:21 194:9
**International** 1:3
5:5,24 112:17
**interruption**
64:12
**introduce** 46:15
167:12
**introduced** 41:8
43:20 166:25
167:2,19
**introducing** 42:5
**involved** 13:4

82:15 90:3
107:24 108:14
109:10 132:17
**involving** 26:4
**irrelevant** 153:3
**irrespective** 61:4
**issue** 4:19 72:12
81:21 99:2
107:22 110:11
137:1
**issues** 56:18
57:16 58:5,23
60:3
**items** 108:22
109:13,18,20,23
109:25 118:16
**itinerary** 78:14

_____

**J**

**J** 2:9
**J.T** 2:15 35:3
180:12,15
**Jake** 24:2,3,4,6,15
25:2,7 80:23
81:14,23,24
82:1 83:13,17
86:19 87:5,7
91:20,21,25
92:3,9,14,22
93:7,10 98:8,14
99:19 101:15,19
103:3 129:22
144:1 155:17,22
156:7,8,24
161:4,9
**James** 79:13,21
**January** 10:10
18:12 20:10
38:24 46:24
52:5,22 54:20
64:2,21 65:17
67:10 68:21
72:16,23 74:17
74:23 75:2,7,22
76:15 77:4,14
78:10 79:3
80:10,20 82:10
82:20 83:2,15
83:20 84:25
85:23,24 86:9
86:20,23 87:1
88:18,23 89:22
91:20,23 93:21
94:8,13,24
95:19 100:22
102:9 103:8,10
103:18 105:9
106:24 107:11

107:16 108:2
111:5,21 112:10
112:11,13,15,21
113:4,5,8,10,15
113:18 114:5
117:15 119:2
121:17 122:7
123:17,25
125:25 126:6
127:9,18 128:5
128:18 129:12
130:2 131:16,25
146:13,19 154:3
154:19 157:2,8
159:21 160:5,18
161:5,16 165:17
165:18 171:17
171:24 172:7
173:13 174:20
176:23 186:6
189:6,12
**Jason** 1:4 2:7,21
5:5,23 14:20
18:24 23:17,22
25:11 26:23
27:10,20 28:1
30:3,5,15 31:16
32:6 34:21
35:16 36:3,6,10
41:24 50:9,17
51:12 54:21
56:14 60:4
62:20 72:2,17
73:2 74:15,18
74:25 76:14,24
80:3 81:18 91:4
98:20 99:6
107:17 116:2
124:4 125:6
150:21 152:2
165:16 166:4
169:21 174:16
175:11 181:18
182:6,18 183:2
183:11 191:3
**jcomerford@do...**
2:5
**Jersey** 7:17
**jerseys** 85:4
**job** 6:14 13:9,9
33:17,24 34:3
44:2 49:15
**John** 2:3 4:3 5:22
23:7 41:5 44:18
54:7 68:22
69:17 79:22
115:19 123:19
183:21

**join** 137:13 153:6
**Jones** 2:16
**judge** 137:2
153:21
**July** 25:22 26:17
27:7,9,15 28:7
28:14 38:25
159:14 184:6,12
185:6
**jump** 180:23
**June** 184:21
**junior** 14:21

──────── **K** ────────
**Kaplan's** 153:9
**Kasey** 5:21
**keep** 20:19 40:17
60:4 68:19
111:15 115:2,12
115:13 168:21
**keeping** 65:3
67:11
**Ken** 26:15 27:8
42:13 44:9 54:1
65:15 66:1,2
73:14 74:6
178:12
**Kenneth** 1:12 3:2
5:2,12,15,21
26:4,5,18 28:13
36:9 53:14
55:10,11 56:14
166:14 179:5
180:13 184:3
189:24
**KennethGollad...**
19:17
**Kenny** 16:15,20
26:24,24 27:3
28:25 55:13
56:16 58:2,22
59:18 66:23
67:14 105:19
127:3 128:21
178:23 184:17
184:20 185:1
193:3,14 194:4
**Kenny's** 74:19
**KennyGolladay...**
19:21 124:2
**kept** 71:24 103:5
**KG** 70:15
**kind** 14:5 26:6
28:2 38:23
39:10 41:1 42:5
90:2 109:1
121:19 122:20
128:16 162:9

167:20 171:11
174:24 180:17
**King** 184:13,14
**Klehr** 2:10
**knew** 27:17 28:8,8
41:23,24 43:13
46:7 65:20 82:9
82:12,14 84:9
84:10,15,17,19
84:23 89:24
125:15 128:22
169:16,19 170:3
176:19
**knock** 85:1
190:12
**know** 6:13 9:3
15:22,23 17:19
17:22 18:2,15
18:23 19:1 20:3
21:12 22:14
24:2,4 25:3
26:15,15 28:13
30:6 34:23 36:1
36:9 41:6 43:15
44:2 46:8,16
48:20,22,24
52:4 53:5,10,12
53:12,13,15,19
53:21 54:8,25
56:23 57:22,24
58:10 59:2,6,8
60:10,12,13
64:3,22 65:12
66:1,13,14 70:8
70:24 71:4
73:19 76:16
80:19 81:13
83:4,10,22,24
84:2,3,7,14,18
85:5,8 87:24
89:14,20 90:1,3
92:2,7,15,19
93:3,4,11,12
95:6,7 96:9,18
96:21 97:17
99:2,6,10,12,15
102:12 104:1
105:3 106:15
107:3,8,14,18
107:21 109:5,15
109:17,20 110:1
110:4,6,7,11,14
113:2 114:6,13
118:17 120:2,6
121:9 122:15
126:1 127:3
129:11,16
131:10 133:9

134:20 137:9,10
138:2 139:7,15
140:11 142:7
147:20 148:19
148:25 149:5,9
149:18 150:5,9
150:18 153:9
157:5,7,11,14
157:16,17 158:5
158:23 159:8,23
159:24 162:8
163:12 164:2
165:11 166:11
167:17,18,19
168:21 169:10
169:14 170:5
174:10,19 175:1
175:14,21 181:1
181:3,4 184:11
185:8,9,10,15
185:18,19,20
186:2 188:7
**knowing** 81:18
108:5,24 110:9
**knowledge** 54:10
60:22 61:2,4
97:15 121:9
163:25 176:1
178:15 179:17
181:9
**known** 26:8
**knows** 42:9
118:17 121:1
142:8 185:3

──────── **L** ────────
**LA** 29:9 185:2
**label** 192:1
**lane** 42:16
**late** 16:11 57:10
70:11 72:23
77:13 95:8
117:10 120:11
129:9 180:19
**laughing** 42:15
**launch** 32:10
**Lauren** 2:22 179:6
**law** 6:9
**lawful** 5:12
**lawyer** 144:8
171:7
**lawyers** 7:24
11:23 143:19
144:11
**lead** 35:20 45:8
47:22 49:18
54:16 67:17
78:24 97:13

107:6 114:10
123:10 152:8
**leading** 167:6
169:8
**league** 15:13
46:12
**leave** 117:24
**leaving** 17:19
**led** 15:25 58:21
**left** 131:17 132:1
**legal** 77:17,25
121:7 140:9,19
152:7
**let's** 12:4 13:13
16:4 22:8 25:10
25:21 26:1 33:3
33:5 36:16
38:11 39:10
41:1 42:3 44:23
55:5 58:13
63:23,24 64:10
68:23 71:20,25
72:1,1,5,16 74:8
74:9 80:16
85:24 88:17
91:18 94:6
97:22 102:8
103:7,11 104:22
105:8 111:20
115:2 116:4,11
119:1 123:17
125:17 126:24
128:10,17
129:23 130:2
136:6 137:5
139:22 146:11
155:4 158:14
161:13 163:22
164:12 165:15
165:25 178:2
**letting** 59:2
**level** 27:2
**life** 41:16 44:3
51:1 129:8
147:17
**life-changing**
137:22
**line** 33:8 63:25
162:14
**lines** 57:6
**linked** 61:9
**Lions** 10:17 38:8
57:3,10 136:7,7
136:10,15
137:19,25 138:5
138:11,15,20
139:1,9,18,20
177:13,20

178:18 190:1
**Lions'** 10:13
138:22 186:20
**listed** 96:25 97:3
97:9 104:25
105:1,14 106:1
**listen** 85:14
**listening** 8:8
**little** 9:11 38:14
55:10 58:25
61:25 74:17
81:4 85:22
88:19 126:24
128:10,17
140:19 147:16
148:11 168:9,17
174:3 180:23
190:21
**live** 22:5
**living** 14:18
**LLC** 1:4,7 2:7,16
5:5,24 31:23
119:4 158:16
161:15
**LLP** 2:3,10
**Local** 190:14
**location** 87:15,19
88:14
**locker** 46:9
**logistics** 122:3
**logo** 32:1,3,4,6,8
**logos** 32:4
**Lombard** 80:17
88:4 159:15
160:6,19 161:6
161:18
**long** 6:21,23 9:14
9:17 21:6 22:22
26:8 45:10
46:17 47:9,10
47:12 49:3
61:23 62:11,12
73:6 87:11
115:19 136:24
166:12 190:23
**longer** 41:25
51:21 52:2 68:9
68:11 80:8
114:22,23 130:1
149:5 188:12
**look** 11:20 17:23
18:3,20 19:3
26:4 30:7 39:2
39:10 41:1 44:3
48:20 49:9
52:25 76:14
88:17 96:4
98:22 148:9

154:25 155:21
156:4,4,21
157:18,23
158:14 159:17
164:4,23 165:4
165:9,18 166:1
179:8
**looked** 15:19
29:11 33:9,11
39:7 70:25
88:25 102:14
120:3 146:3
157:1 184:24
**looking** 38:21
55:13 60:19
66:7 95:16
103:19
**looks** 56:18 58:20
58:24 59:24
60:3 70:1 88:20
103:23 124:1
**lot** 14:1 17:7
24:25 32:12
79:24 159:3
**Louis** 2:4
**love** 168:12,13,19
**loved** 41:11,12
169:17
**Lucky** 37:11
166:17
**lying** 59:19

————————
**M**

**mail** 104:14
**main** 13:24 14:1
**maintenance** 13:2
**major** 25:22 27:2
27:10 28:14,20
**making** 29:24
45:3 49:23
61:22 62:11
70:11 142:20
143:24 145:1
168:21 170:4
188:14
**man** 23:7 24:2
27:8 30:19 45:1
54:24 65:11,14
126:20 129:3
168:11,18 175:6
**manager** 57:10
58:24
**mark** 20:16 22:8
35:9 55:18
69:17 79:7
103:11 112:3
136:13 137:8
155:4 165:5

179:3,10 184:8
**marked** 13:10,11
13:15 20:21
35:5,6,11 37:10
55:22 56:7,11
69:22 74:12
86:1 88:15
91:16 94:4
103:13 105:6
112:5 118:25
123:23 137:11
155:10 164:13
164:14,18 165:2
165:7,23 179:1
184:9 191:25
**market** 2:10
109:15,17
**marketing** 25:18
31:12,18 39:7,8
39:10 41:1
49:11,15,20,21
49:22 50:2,8
73:4 81:17 82:5
82:7,24 83:11
83:12 93:19,21
93:21,23 94:2
95:15 98:11,16
98:19,21,25
100:2,4 111:9
111:18 120:1
129:24 130:12
130:18,20 131:1
131:5,7,8
132:21 134:21
135:10,22
142:10 158:18
160:24 174:5,12
184:7 185:7
186:1
**marking** 37:3
**Marsh** 2:22
178:21
**Martin** 16:5 36:17
69:11 164:8,10
164:17 165:4
184:5
**massage** 13:2,3,6
13:7
**Matt** 2:20
**matter** 45:10
66:24 76:1,12
82:18 84:15,22
85:2,7,11
127:11 128:8
129:7 143:11
149:7 151:3,21
152:9,21
**matters** 76:9 78:4

78:5
**Matthew** 46:10
**max** 7:1
**maximum** 7:8
26:25
**mean** 15:5 20:2
21:3 22:19
24:12,25 25:24
27:24 28:24
30:13 37:15
40:16 41:15
43:11 48:2,4,14
50:11 53:19
70:7,18,22
71:13 73:6 74:5
76:9,25 77:1
78:2 81:12
83:25 87:5,18
92:6 99:9
105:25 110:16
110:23 115:9
116:9 124:21,22
126:14 127:11
129:5 140:4,5
140:22 142:8
151:11,22
154:11 163:4
164:25 168:9,19
174:7,10,22
178:11
**means** 127:2
140:11 151:13
194:5
**meant** 62:9
**media** 23:20,21
24:14,20,22
25:8
**medias** 24:13
**medical** 190:2,8
**medications**
10:20
**meet** 8:20,23 9:14
14:20 27:5
36:12 47:15,15
52:18 113:14,17
168:24 169:18
**meeting** 9:1,17
39:5 41:11,12
41:17 45:21
47:14 126:17
169:17
**memorabilia** 80:9
82:10,20 83:3
89:20 98:5,10
99:8,13,16
102:19 105:22
107:11,16
108:10 109:18

111:12 112:21
121:16,20 122:8
129:12 135:20
170:14,16
171:25 180:25
181:8,12,16,20
182:5,8,13,17
182:20,23 183:9
183:13 188:5,9
188:18,23
**memory** 10:22
25:7 127:7,20
145:14 158:6
**mention** 172:11
172:13 173:16
**mentioned** 21:7,9
22:23 23:14
78:13
**mentions** 159:14
160:3,18 161:5
161:16
**mentor** 26:7
119:24
**mess** 63:11,18
**message** 24:7,9
24:12,15,24
25:8 55:7,9 56:5
57:2 58:22
69:13 70:16
89:2 94:10
106:12 164:20
**messaged** 24:16
25:3
**messages** 17:20
18:17,18,20,22
18:24 19:9,13
23:16,25 24:20
25:1 33:9,14,22
34:1 47:16
58:19 60:19,23
61:8,14 69:9
70:25 71:2,4
83:1 91:12
105:10,12,18
106:14,25
125:18 155:18
155:19 156:1,8
161:11,12,20
162:2,5,18
163:6,14,23,24
164:4,23 165:16
165:20 166:3
**messaging** 24:23
**messenger** 23:24
**met** 8:24 9:23
29:7 36:13,18
36:22 39:6
41:21 46:23

55:1,2 58:14,16
128:22 146:17
169:12,14,23
173:9 181:9,13
**methods** 27:3
**miaconelli@kle...**
2:12
**Michael** 2:9 8:9
**Michigan** 37:12
75:5
**mid-2019** 185:24
**Middle** 1:1 5:8
**Mike** 8:1
**million** 27:24 51:3
115:25 138:3,24
138:24 139:24
140:1,16 141:2
141:23 150:6,16
**million-per-year**
150:22
**mind** 22:7 41:20
59:5 61:4 65:19
66:10,14 76:18
76:22 77:9,14
77:20,20 82:13
100:18 166:19
166:21,24 170:3
188:11
**mine** 7:21 29:7,10
**minor** 190:16
**minute** 102:15
126:1
**minutes** 114:16
148:9 167:12,12
**mischaracteriz...**
171:13
**mischaracterizes**
189:9
**mischaracterizi...**
64:16
**misquoted** 64:8
**MO** 2:4
**Molly** 184:13,14
184:16
**mom** 12:1 21:25
22:5 23:5 30:14
30:22 41:15,15
41:21 42:1 54:1
58:17 69:15
70:12 74:15
78:7,18,22 96:9
96:15,18,23
101:2,5 105:19
105:23 106:1
117:4 124:18
125:18 126:9,16
127:8,15 128:7
128:19 129:1

168:24 169:14
169:18,23
**mom's** 52:10
102:12 117:3
122:15,17 180:8
**moment** 77:8,13
146:13
**Monday** 1:16
13:18
**Mondays** 14:4
**money** 14:2
118:18 131:5,7
131:8 132:9,23
133:9 134:8
135:19,25
136:15 139:9
140:5 141:12
142:10 143:13
143:17 159:3
171:1,2 174:12
177:25 178:12
**monies** 177:20,20
**monster** 27:18,19
48:15,19
**month** 170:1,2
**morning** 9:5,7
12:22 74:21
116:21
**mother** 22:3 53:2
53:6 54:12,19
78:8 97:8
125:24 126:6
127:25 173:3
**mother's** 52:15
104:25 105:3
**move** 125:5
153:16 163:14
167:24 169:20
170:18 171:15
173:22,24
180:20
**moving** 143:4
167:22 174:17
**MVP** 2:7 86:5,17
119:3 191:4

_____
**N**
_____

**N** 3:1
**nail** 133:13 151:25
**name** 5:19,22
24:3 38:6 53:2
79:4,12 106:6
106:12 108:13
119:16 131:1
164:3,25 180:15
181:5,9 185:2
**named** 36:1
**names** 7:25 118:1

118:2 130:17
**narrow** 169:5
170:1
**near** 155:1
**necessary** 79:9
**need** 6:18 30:8
40:2 48:23 52:2
68:13,24 104:24
110:7,11 114:15
115:22 152:1
163:17 165:25
192:3
**needed** 25:25
**needing** 46:19
**negotiate** 14:24
134:6
**negotiated** 15:3,9
134:4,9 149:21
150:5,9,11,15
177:12,21
**negotiations** 15:6
160:4
**neither** 4:14
**never** 5:24 49:20
49:22 50:4 78:2
78:13,14 81:22
81:25 82:1,13
85:19 92:14
93:10,23 94:2
95:23 100:2
106:14,22
107:22 111:9,11
111:18 116:2
140:16 141:3
146:20 147:21
162:21,24
171:14 181:9
185:23
**new** 7:17 8:5,6
13:24,25,25
39:11 41:2
50:24 56:23
86:23 115:22,25
124:12 136:16
137:19 138:6,23
141:3 163:17
175:12,15
**news** 56:23
**NFL** 13:23 14:19
14:25 15:10,12
15:20,25 16:8
16:23 23:11
24:25 29:8,15
45:11 47:23
109:18 133:17
137:9 140:6,17
141:4 148:22
149:15 151:8,20

152:5,9 153:4
**night** 37:1 70:12
70:12
**nighttime** 109:4
**Nike** 134:5,8,17
135:19 142:14
159:2 161:1
184:7,20 185:6
185:14,24
**noise** 79:24
**non-confidential**
21:8
**nonchalant** 70:23
**Northern** 14:22
**Notary** 193:17,21
194:3
**notes** 148:10
**notice** 12:4,11
13:13 96:25
**noticed** 4:9 13:17
**notices** 14:13
97:4,10 104:22
104:24,24
**noting** 107:2
**November** 120:16
169:13 170:6
**Novi** 37:12
**number** 5:7 20:14
20:17 21:6,9,10
21:12,16,20,22
22:2,6,11,14,15
22:25,25 23:2,3
23:18 35:14
39:8 41:9 43:2,6
43:21 44:1,3
110:19 155:16
156:9 158:14
159:12,25
160:16 161:3,13
161:24 163:13
167:20
**numbering** 164:8
164:9 165:14
**numbers** 20:13
21:4,11 22:17
22:22 23:6,13
165:5
**numerous** 93:16

_____
**O**
_____

**O'Hare** 112:13,16
**oath** 6:7 120:7
121:8 145:1,6
145:19
**object** 4:12 67:6
121:6 171:12
**objected** 98:6
99:8

**objection** 12:16
17:12 28:15,22
30:17 31:14,19
35:19 39:24
42:8,23 44:21
47:21 52:21
54:15,23 57:19
59:15 60:6
61:17 63:13,20
70:21 74:3 76:7
77:16,24 78:23
83:8 84:4 90:9
90:20 92:5,11
92:18 93:15
94:18 95:8,21
96:12,20 97:12
98:1 102:24
104:7 106:20
107:5,12 111:7
111:14,23
113:12 114:9
121:1,11 122:24
123:3,9 125:12
126:11 127:21
129:9,14 132:19
135:13 137:14
139:5 140:8,18
141:18 147:24
151:10 152:6
153:1,7,17
157:19 158:24
162:16,20 167:6
168:1 169:8
185:21 187:9,23
188:19,24 189:9
189:13
**objectionable**
171:14
**objections** 61:23
62:3,12 114:25
**obligation** 77:22
**obligations** 6:24
9:6 12:20 13:8
**obnoxious** 61:25
**obstructionist**
62:3
**obtain** 175:15
**obtained** 111:25
112:8 174:5
178:18
**obviously** 128:11
140:10 159:21
**Ochs** 2:14 105:15
180:16 181:2,10
181:17,21,24
182:2,21 183:1
183:5
**October** 36:4

80:14 85:22
164:24 170:6
**off-the-field** 31:24
**offer** 51:9 136:15
137:24 138:22
184:20 185:6,14
185:24 189:8,11
**offered** 109:24
136:9 138:15
139:1,9,10,20
**offers** 136:6,7
137:3,19 138:5
138:19 184:19
**office** 7:18 194:12
**okay** 6:14,15 7:6
7:14,14,22
16:17 17:6
21:15,18,19
22:3 28:6 33:21
41:5 44:19
59:13 64:1,21
65:2 68:23
78:20,20 79:21
79:24 80:1
85:20 89:12,24
98:15 99:20,24
100:8,12 105:15
113:1 115:24
117:1 119:25
123:1 124:3
126:5,23 134:14
146:19,22 147:2
149:2,7,19
150:24 151:24
155:3,15 164:6
164:22 166:2
171:11 186:7
189:19
**old** 26:15 36:13
**older** 26:14 38:4
**once** 11:18 42:1
47:23,24 49:22
85:19 93:10
106:22
**ones** 130:23,25
**open** 40:16
**operated** 181:4
**operation** 190:11
**opine** 60:10
**opinion** 27:8
46:11 77:2
**opportunities**
39:3,5 72:2,4,17
73:4 82:5
130:13,18 131:1
131:2,6
**opportunity** 72:19
85:6 152:24

180:4 193:5
**opposed** 137:3
**order** 153:21,23
**orient** 105:15
**original** 60:11
**ought** 44:9
**outburst** 153:15
153:18
**outside** 14:9
98:21,24 99:4
102:11 137:14
**owe** 176:25
178:12

---

**P**

**p.m** 4:11,17 5:4
69:6 88:24
116:14,17
148:14,17 178:5
178:8 191:21
192:6
**PA** 2:11,17 29:8
29:15 133:17
**package** 27:17
50:12
**packages** 46:10
**Packers** 186:4
**page** 16:5 26:3
33:6,8 34:10
38:13 42:1 56:7
63:24 64:10
69:12 71:21
78:8 104:22
105:12 119:14
125:22 154:22
155:1
**pages** 163:22
164:13
**paid** 23:8 109:22
134:23 150:12
150:18 177:19
177:23
**paper** 133:6
**papers** 8:12 49:8
**part** 13:9 21:13
41:16 71:23
110:10 136:13
168:13
**parties** 90:4
**party** 30:6 60:8,22
81:17 98:19
194:9
**patient** 154:7
**pay** 23:5,6 135:3
159:3
**paying** 14:1 75:19
75:23 76:24
174:11

**PDF** 91:25 94:15
104:3
**PDFs** 192:2
**pending** 5:7 116:6
**Pennsylvania** 1:1
5:9
**people** 8:4 13:4
34:25 42:6
53:22,23,25
54:2 59:17
85:10 99:13
106:7 117:20,22
118:3,7,9
130:17 158:17
158:19 191:4
**Pepsi** 132:4,12,15
132:18,23
133:10,16
135:19
**percent** 90:8
176:13,16,25
177:6
**period** 18:1 42:2
46:3,22 58:13
61:5 66:17
67:16 82:24
124:8,9 137:2
137:15 143:2
146:20 147:13
154:2 162:10
163:7 173:8
**person** 9:24 36:1
97:4,10 100:25
101:8 108:13
109:9 113:14,17
113:23 126:20
161:25 168:20
**person's** 79:4
**personal** 20:15
21:10 28:4
95:18,25
**personally** 149:18
178:11
**persons** 191:10
**perspective** 55:15
**pertaining** 178:17
183:18
**Philadelphia** 2:11
**Philp** 144:3
158:17
**phone** 10:1 20:13
20:14 21:3,14
21:23,25 22:1,2
22:4,6,20 23:13
23:18 24:7
33:11 51:16,17
51:20 52:1 58:1
70:8 87:12,13

90:24 91:3,13
124:25 125:2,6
163:15,16
174:20 175:8
**phones** 19:2
163:1,8,12
**phrase** 124:21
176:9
**physically** 117:17
**pick** 32:3
**picking** 26:21
152:17
**place** 20:23 25:11
25:17 40:6
71:18 72:23
80:17,20 84:3
84:24 87:16
88:8 94:24 98:3
98:14 99:25
100:21 107:4,15
108:6,8,9,17,20
109:2,10 111:2
111:5 112:11
118:10,10
119:13 120:11
120:15 121:17
131:22,25 194:7
**placed** 121:8
**Plaintiff's** 3:7,7,8
3:8,9,9,10,10,11
3:11,12,12,13
3:13,14,14,15
3:15,16,16,17
3:18,18 13:11
13:15 35:11
37:9 55:22
56:11 69:22
74:12 86:1
88:15 91:16
94:4 103:13
105:6 112:5
118:24 123:23
155:10 164:14
164:18 165:23
179:1 184:9
**Plaintiffs** 1:5 2:2
4:4,11,18
191:23
**plan** 74:19,20
101:5 141:5,6
142:4
**planning** 89:21
**platform** 24:11,17
**platforms** 23:21
23:25 24:20,22
25:8
**play** 141:10,23
142:2 175:1

183:1,4,5,8,10
183:12,14,16
191:5
**played** 59:12
**player** 15:13 16:8
16:22 46:19
140:10 153:11
**players** 34:21
35:16 45:24
48:9,12,21,24
53:8 144:14
147:8,23
**playing** 141:5
142:4
**playoffs** 102:10
**plays** 148:22
**pleasant** 175:4
**please** 5:11,19
6:12 54:18
62:11 69:17
77:11 95:9
97:23 124:5,7
130:24 153:20
154:22 179:8
**pleased** 48:6
126:17
**point** 42:21 59:1
59:25 66:17
70:20 90:19
100:16 117:23
129:1 144:21
148:6 151:5,13
178:24
**portion** 21:8
**positively** 70:20
**possession** 163:1
**possibility** 80:21
**possible** 69:2
76:3 166:13
**possibly** 53:2
**post** 85:25 86:9
88:25 89:5
102:14 103:2
175:21 176:2
**postage** 104:14
**posted** 102:17,20
102:22 103:1
176:4
**posturing** 56:19
58:25
**potential** 46:25
**potentially** 54:13
54:21
**Pottsville** 2:17
**prepare** 8:15
11:20
**prepared** 194:5
**preseason** 14:6

PRESENT 2:20
presented 142:11
pretty 11:7,7,16
  15:5 20:4 28:24
  41:19,20,21
  43:16 70:23,23
  76:21 82:22
  140:11 142:21
  148:8 162:13
  167:14,15,20
  168:7,8,12,16
  168:19,21
  169:22 171:1
pride 46:20
primary 21:22
prior 45:18,21
  112:10 170:10
  174:5 180:25
  181:7,8,12,20
private 91:24
  94:15 103:5
  108:3,4,23
  109:8,14,25
  110:5,13 111:1
  117:20
pro 12:20 15:16
  32:19,21 76:11
probably 23:10
  26:11 73:1
  137:7 142:1
  175:20
problems 15:8
procedure 190:3
  190:8,16
proceed 35:7
proceeding 6:8
  67:8
proceedings
  194:7
process 113:22
produce 4:9,10
  155:13
produced 33:13
  55:8 71:1 94:8
  163:23 194:5
prohibited 152:9
promise 100:11
promotion 32:25
proper 124:24
  125:1
propose 87:19
proposed 87:5
provide 53:16
  55:13 147:1
provided 53:5,13
  121:22 144:21
  146:20
pry 190:11

public 137:9
  193:17,21 194:3
pull 16:4 33:3,5
  55:5 74:8 103:7
  104:3 105:8
  111:20 119:1
  123:17 125:17
purposes 13:12
  13:16 35:12
  37:10 55:23
  56:12 69:23
  74:13 86:2
  88:16 91:17
  94:5 103:14
  105:7 112:6
  118:25 123:24
  155:11 164:15
  164:19 165:8,24
  179:2 184:10
put 31:21 46:20
  49:9 104:13
  120:7 125:7
  141:9 154:17
  178:22 190:15
  191:25
putting 86:4

Q

qualified 194:3
quarterbacks
  46:12
question 7:13
  31:15 33:8 34:5
  34:11 40:2,4
  42:10 44:14
  45:7 53:11
  54:18 59:20,23
  60:11,24 61:5
  61:19,20 62:6,7
  64:1,20 65:2
  66:21 67:19
  68:1,6,7,13,16
  71:22 74:24
  84:20,22 85:14
  85:18 88:6 93:6
  97:7,16,20,24
  111:16 116:6
  135:14 136:25
  136:25 137:5,6
  137:17 151:16
  153:24 157:22
  158:1 179:20
  187:5
questioning 4:13
  7:4
questions 6:8,12
  6:16 7:8 16:14
  38:16 39:14

62:1,1,13 64:1
  64:20 79:11
  114:24 115:13
  115:19 130:11
  143:13 147:10
  163:20 166:9,11
  168:5 178:10
  179:10,13
  180:12,18,20
  183:20,22,23
  184:2 189:20
  191:2,16
quick 81:4 116:11
  166:13 183:17
quicker 79:11
quickly 180:21
Quin 46:13
quite 131:18
  153:10

R

R 1:21 194:1,3,19
Raquel 29:6,16,25
  30:3,15,23 31:2
  31:9 39:7
reach 91:7,10
  98:4,8
reached 98:9 99:7
  99:12,14,16
  168:7
reaching 57:13
  81:15,24 82:1,4
read 17:7 40:2
  55:17 56:8,20
  64:18 85:14,17
  85:18 97:23,24
  112:1,2 127:5
  128:20 154:23
  193:4
readback 85:21
ready 9:11 116:8
  188:13,13
realize 180:19
really 8:22 15:7
  41:11 48:6 56:8
  66:1 76:1,9 78:3
  78:12 97:17
  116:9 141:7
  143:10 149:7,10
  151:3,21 174:22
  174:23 180:9
reason 51:13
  63:15,17 75:17
  144:19 153:12
  153:12 157:17
  176:11 187:8
  189:8,11
reasonably 35:19

45:8 47:22
  49:17 54:16
  78:23 97:12
  107:5 123:9
  152:7
reasoning 48:14
reasons 63:7
  187:6
recall 10:21 28:19
  91:14 117:8
  118:14 135:25
  136:2,4 146:10
  171:23 172:3
receive 94:16,23
  97:4,10 119:4,7
  133:6
received 4:7 20:9
  28:11 80:24
  95:4 96:3 104:2
  119:5,8 133:9
  137:19,24 157:1
  159:6 165:20
  166:3 178:16
receiver 14:19
  38:8 148:22
  150:19
receivers 15:25
receives 93:12
receiving 15:24
  26:25 83:7
  94:21 95:7
recess 69:4
  116:15 148:15
  178:6
recollection
  139:14 144:25
  145:17 147:3
  176:14
reconvene 4:17
record 4:1,20 5:1
  5:10,20 35:14
  48:20 69:3,6
  85:21 107:2
  116:13,16 148:7
  148:10,14,16
  164:7,9 174:19
  178:2,5,8
  191:20
records 21:3
  111:20,21,24
  112:1,8 113:7
  114:1
recover 177:3
recovery 13:8
recruit 47:19
recruiting 48:2
recuperate
  190:21

redacted 94:9
  185:2
redesign 32:2
Redland 2:14 5:6
  86:3,10 180:16
  181:5,14 182:24
reduced 194:4
refer 21:15 36:3,6
  79:15,19
referenced
  159:16 160:7,20
  161:7,18
references 53:6
  53:14,16 54:5
  56:1 60:17 62:8
  146:21 147:1,21
  147:21
referral 55:13
referrals 55:25
referred 36:10
  144:14
referring 34:20
  35:16 108:20
reflected 5:9
refresh 127:7,20
  139:13
refusing 4:9
regs 47:24 152:9
regular 140:6
  186:16 187:4,18
  188:2
regulations 45:11
  153:4,5
rehab 122:4
relates 159:13
  160:3,17 161:4
  161:16
relating 23:17
  111:24
relationship
  63:11,19 65:4
  65:13 67:11
  68:19 125:3,4
  130:3 178:13
  182:14,18
relative 194:9
relevant 137:2,3
  137:15
remained 179:18
remember 9:19
  10:6,9,13,17
  11:2,12,14,19
  14:21 16:9
  22:13,19 24:18
  25:5 29:13,20
  29:22,23 30:1,2
  30:5,14,24,25
  31:1,10,13,16

31:22,23,25
32:1,4,11,20,22
32:24,25 33:2
34:20,24 36:15
37:14,15,18,20
37:21,24,25
38:2 42:16,20
43:5,22,25 44:2
46:4 47:1,9,12
47:18 48:3,7
49:3,4,6 51:11
51:17,20,23,24
52:1,7,10,24
54:25 56:2 57:8
57:17,25 58:5
58:12 70:5,17
70:19 71:6,10
71:17 72:11,14
72:15,21,22
73:2,6,8,13,17
73:20,22,23
74:1,6,22,25
75:10,15 77:6
78:15,21 79:1,4
80:5,15,24,25
81:1,9,12 83:21
86:21,22,24,25
87:5,6,11,20,22
88:1,10,11,13
89:2,4,23 90:24
91:3,9,15 94:21
95:7 96:7,14
99:11 101:22,24
102:1,2,4 104:5
104:11,12,15,16
104:21 108:4,7
108:9,12,13,15
108:16,19,22
109:3,6,13,16
111:3 112:23
113:19,21,24,25
114:3 116:20
117:9,10,25
118:2,5,7,9,12
118:15,20,23
119:10 121:25
122:5,6,10,10
122:12,17
127:22 128:4,6
130:14,19,24,25
131:4,23,24
132:2,4,16,25
133:5,8,14,19
133:20,25 134:3
134:10,16,17,24
135:4,6,8,10,17
137:18,21,23
138:2,7,9,10,13

138:21,22 139:1
139:4,7,11,18
143:5,6,8 145:3
145:4,8,11
147:15,18
150:23 156:19
157:3,4,10,13
158:4,9,22
159:4,19,24
160:11,12,14
162:3,5 168:15
170:23 175:21
179:12 180:9
185:5 190:6,7
190:24,25
remit 176:16
177:5
Remote 1:11 2:1
rep 46:15 184:19
repeat 31:15 97:7
97:16
rephrase 59:21
97:20
reply 124:7
reporter 1:21 5:10
30:10 85:13,17
97:23 155:9
178:25 191:24
194:3
reporting 194:11
represent 5:23
39:9
representation
25:12 64:4,23
represented
46:21 48:22
149:1,6 172:4
representing
46:18
request 21:1
136:13
requested 154:23
155:2
required 27:1
research 48:22
reservation 112:1
112:9,12,16
113:3
reserve 4:19
191:22
resources 27:4
51:8,13,19,25
respect 50:20
51:16 125:2
191:13
respectfully 175:7
respond 70:2,5,13
96:13

responded 64:6
89:13
responding 70:19
responds 56:22
128:16,20
response 18:4,21
26:22 34:9
responsive 19:9
rest 49:24 59:12
restroom 6:19
results 68:15
return 104:9
112:18 113:4
returned 104:15
104:21 113:9
review 124:16,19
riding 106:13
Ries 26:19 33:12
34:2,16 88:20
89:3,18,25 90:7
90:19,25 91:10
91:14 99:7
102:15 176:6,20
rift 127:1
right 5:25 6:22,24
7:11,15 8:7 9:10
9:12 11:9 14:1,6
14:8 15:14,21
15:25 18:15
19:18,21 20:25
22:3 25:12,13
25:15,20 28:18
30:7 31:13
33:18 34:18
36:19 38:17,21
40:10,22,23
43:11 44:19
45:14 46:9
48:16,17 51:6
52:6,20 53:1
54:3 55:3 57:1
58:17,18 61:7
63:3 64:17 66:6
66:12 67:1,5
71:17,25 72:7
73:1,11,24
75:20 76:10,13
77:5,15,21 78:6
79:13 84:2,17
90:18 91:12
94:20 97:18
99:5,22 101:16
104:17 105:1,2
106:11,15
109:19 111:13
112:22 116:7,25
117:24 122:18
122:19,23

125:17 132:8
133:10,12
134:25 135:22
136:3 140:12,21
141:12,25 142:3
142:5,12,13,16
142:16 145:12
146:21 147:1,4
147:4,5,8,9
148:3,23 154:24
155:24 156:5
157:21,24 158:7
159:9 168:16
169:15,22,24
170:15,24 175:3
176:8,15,20,22
180:7 186:6,20
190:4,10,17
191:22
rights 4:19
Road 2:16
role 96:23 129:11
132:11 183:1,4
183:5,8,9,12,13
183:16 191:5
rookie 14:24
25:15 29:8
32:12 36:14
174:9 177:12,21
178:17
rookies 29:9
room 7:22 8:2
118:11
round 15:4
route 65:20
RPR 1:21 194:19
Rule 194:11
run 133:17
rush 72:1,13
154:7,13

_____

**S**

sad 128:16
Saffold 26:4,5,18
28:13 29:1,18
29:23 33:5,7,19
34:6 35:16 36:9
37:21,25 38:15
38:16 39:16,19
40:7,24 42:4,9
42:12,12 53:14
54:1 55:6,10,11
55:25 56:6,14
56:22 57:14,15
58:9 63:25
64:14,19,20
65:6,10,16 66:7
66:22 67:7,10

67:23,24 68:3
68:18,22 69:25
70:1 71:22,24
72:11,15 73:14
73:24 107:3,10
119:18 120:23
121:3,8,13
124:18 173:1
Saffold's 38:22
42:18 64:25
73:9
sale 109:24
sanctioned 61:22
61:24
sanctions 153:16
satisfy 48:18
110:22
saw 60:21 70:11
70:16 106:14
saying 4:8 7:2
18:11 20:20
30:5 38:23
42:11 51:18,24
57:3,14 58:1
59:16 71:25
72:15 76:20
78:10 80:25
81:9 98:10,21
110:18 127:19
171:8 185:13
190:2
says 16:13 17:7
40:25 55:12
56:16,22 57:21
69:14 70:10,15
73:10 74:18
75:16 86:3 89:6
89:7,10 94:10
94:13 95:9
104:23,23
105:18 106:4
124:4 125:25
126:3,5,25
128:20 155:2
164:25 184:16
185:8,19
Schnorr 2:20
school 20:2 26:11
Schwab's 153:21
screen 12:6,9
16:6 66:8 94:21
screenshot 88:24
scroll 69:15 179:6
scrolls 179:8
seal 194:12
season 15:12,17
16:12 41:13
65:23 76:12

102:6,7,8 140:6
154:6,10,11,12
174:25 177:16
186:3,9,16,16
186:20 187:4,19
188:2 190:1
**second** 21:3,12
36:15 78:8
79:22 136:21
151:9 175:1
178:3
**section** 104:23,23
**see** 12:8,13,14
13:17,20 18:4
18:13 19:3
26:17,19,20
33:8,20 37:12
39:12 55:17
56:20,25 62:2
65:7 66:12,22
67:2,3 70:3,4,18
72:1,5,5,9,16
74:9 76:6,19
78:9 86:6 88:25
89:8,9,15 94:11
94:20 96:4,6,10
98:23 99:14
105:15,19
112:18 113:10
119:13 124:2
125:24 126:16
127:5 128:23
150:12 155:1,21
158:9 164:2,25
165:21 168:23
175:19 184:21
184:22 185:8,18
**seeing** 96:14
157:10,13
158:22 159:4,24
160:14
**seek** 167:4,5
**seen** 33:14 61:14
71:1,7
**send** 33:22 34:1
95:10,12 96:9
125:1 159:1,10
191:24
**sending** 14:11
25:7 71:10
**sends** 88:24
**senior** 14:22
**sense** 68:16 130:8
**sent** 51:15 71:4
92:16,24 93:3,9
93:11 97:1
102:15 104:4,16
104:17 113:25

114:1 124:1
127:16 130:25
146:2 157:8
165:20 166:4
185:8,9,12,15
185:18,19
**sentence** 106:5
**September** 38:19
39:4,15 40:7,12
40:20 46:3 59:4
65:20 66:9,14
66:19 76:22
80:14 146:12,17
154:3 163:21
166:17 167:23
169:2,6,13
170:3 172:16
173:9 194:13
**served** 10:9 17:17
18:11 19:4
155:12
**service** 10:14
101:24 105:19
106:2,5,13
**set** 32:17 90:14
117:16 129:17
130:20 194:12
**sets** 85:12
**setting** 32:22
82:16 87:3,8
129:12 132:11
**seven** 7:9
**severed** 130:3
**shaking** 127:2
**shape** 72:6
**share** 12:6 94:21
**sharing** 62:24
**shifted** 39:10 41:1
**shoe** 134:4
142:15
**shoes** 121:22
134:15
**shoot** 134:2
**shooting** 133:20
133:23
**short** 69:1
**shot** 50:20
**shouted** 41:7
43:19 167:16
**show** 10:12 12:7
16:5 26:2 33:4
38:14 55:7 69:8
119:1 179:11
**showed** 32:3
175:24
**showing** 16:10
**shows** 91:12,21
**sight** 168:19

**sign** 78:4 85:4
95:1,9 103:20
103:22 109:21
113:20,22 116:1
117:24 118:16
136:16 154:4
**signed** 8:5 46:24
49:25 51:8 55:3
55:3 77:3,8,13
77:21 85:5 92:1
103:23 104:5,6
104:10 108:22
109:14,18,25
114:5 119:16,17
121:18,23 138:2
139:8,16 144:23
146:3,9,13,18
162:11 179:15
185:3
**signing** 80:9,16
80:22 82:10,21
83:3,11,15,20
83:24 84:3,8,24
85:1,2,2,3,25
86:4,20 87:1
89:21,24 90:13
90:14,25 91:5,8
91:11 92:16,24
93:8,14 94:24
95:1,5,13,20,23
96:16,19,23
97:1 98:3,6,14
98:16 99:3,3,21
99:25 100:9,12
100:16,21,25
101:21 102:3
103:4,8,10
106:10,19 107:3
107:11,15,21,23
107:25 108:3,4
108:11,14,16,19
108:23 109:2,5
109:8,14,25
110:5 111:5
112:11,15,21
116:19,23 117:7
117:10,12,16,18
117:19,21
118:19,22 119:8
119:19 121:16
122:1,8 127:16
128:5 129:12,20
131:16 135:20
144:25 145:14
145:17 159:15
160:6,19 161:6
161:9,17 162:9
170:11,14,16

171:8,20,24
172:1,6,11
173:13,19,23
174:1,13 175:23
176:17,20,25
179:20,23,24
180:6 181:1,8
181:12,16,20
182:5,8,13,17
182:20,23
183:10,14,17
188:5,9,18,23
190:9,23
**signings** 85:10
107:17 110:9,13
111:2,6,12
121:20 131:15
131:22,24
**Silver** 24:2,3,6,15
25:2,7 81:14,24
83:13,17 86:19
87:7,19 91:20
91:21,25 92:9
92:22 93:7 98:8
98:14 99:19
101:15,19 103:4
129:11,20,21,25
144:1 155:17,22
156:7,8,24
161:4,9 170:11
**Silver's** 92:3
**simpler** 143:15
**simply** 142:25
**single** 49:6
**sir** 7:16 10:23
13:17 14:11
17:17 23:15
183:19
**sit** 25:6 116:7
128:3 135:14
142:3 147:4
168:17 179:18
**sitting** 8:8
**Skull** 144:3
158:17 184:12
184:16
**slap** 170:20
**slated** 15:6
**sleep** 190:15
**small** 165:21
**Smalls** 36:1,3,6
36:10
**smart** 171:1
**SMH** 127:2
**Smith** 2:7 191:4
**smoothly** 74:20
**snap** 140:6,17
141:4,8

**snaps** 141:7
**social** 23:20,21
24:13,14,20,22
25:8
**sold** 109:15,20
**solely** 173:5
**somebody** 25:4
42:19 45:4
46:21 59:17
82:4 96:25
168:11 170:25
**soon** 69:2 115:3
**sorry** 44:17 56:8
79:25 99:1
123:21 131:4
141:9
**sort** 29:24 65:9
121:11 130:20
**sound** 33:18 77:5
**sounds** 56:23
126:5
**source** 94:25 99:6
**span** 169:11
**speak** 10:25 11:3
17:1,3 19:8 44:5
120:24
**speaking** 61:23
62:11 66:18
185:1
**specific** 39:3
44:14
**specified** 194:8
**speculation** 28:15
28:23 60:7 74:4
96:20 98:2
139:5 141:18
185:21
**speculative**
129:15
**spent** 75:1
**spoke** 10:4 11:5
11:16 45:22
46:25 53:1
56:16 58:22
145:4
**spoken** 5:24 10:1
11:17,24 144:7
149:11,14
**sports** 1:3,7 2:14
5:5,6,23 25:18
27:11 30:13
31:12,17 32:7
34:3,17 81:15
86:4,10 94:9
100:6,11 104:10
107:17 108:1
117:16 119:18
121:17,23

133:22 134:22
135:11,12
142:19 143:4,24
144:12 145:22
158:16 161:15
173:7,11,14,16
173:23,25 174:4
174:11 176:12
176:13,24 177:2
180:16 181:5,14
181:22 182:3,10
182:14,24 183:7
183:15
**spot** 87:22,22
102:11 117:4
**SRA** 77:3,8,13,21
113:20 114:1,4
124:7 146:18
181:17 183:2,10
**SRAs** 152:10
**St** 2:4
**Stacey** 74:18
**Stacy** 53:3 74:10
74:15 78:18
97:8 125:18,24
126:1 128:11,19
**Stafford** 46:11
**standard** 25:11
**standing** 30:16
**star** 16:8,15,19,22
16:25 17:3,11
**stars** 109:18
**start** 4:13 12:12
12:15,23 14:22
25:21 64:11
68:14 157:6
183:25
**started** 9:20 29:10
100:20 162:10
**starting** 56:18
58:24 63:25
100:15
**starts** 22:14 78:10
**state** 5:19 6:22
61:4 88:12
108:19 109:10
110:25
**statement** 145:18
145:25
**statements** 145:1
145:18
**States** 1:1 5:8
111:1
**stats** 15:19
**stay** 127:10
162:22
**stayed** 180:7,10
**staying** 115:14

117:1,4 127:4,8
127:15,19,22
128:4,6,7,8
**stenographic**
5:10
**Stenotypy** 194:4
**step** 129:10
**Stephanie** 1:21
191:25 194:3,19
**stick** 63:10 152:22
180:23
**stickers** 192:1,3
**stop** 62:11 141:15
**stopping** 62:7
**strategizing** 27:3
**street** 2:10 127:13
**strike** 37:11
166:17 171:15
**stuck** 38:23
**stuff** 6:25 17:7
20:15 52:25
68:10 114:17,19
115:15,22 137:7
137:9
**subject** 184:19
**submit** 145:5
**subpoena** 10:10
10:14 14:12
17:17,23 18:5
18:12,21 19:4
19:10 96:3
154:19,20,24
155:12
**subpoenaed** 21:3
**success** 147:13
**suggest** 44:4,20
**suggested** 45:10
88:11,12
**suggesting** 45:4
**Suite** 2:4
**summer** 29:12,17
30:23 31:7,11
37:7 38:25 50:3
**Sunday** 88:23
**super** 28:11
**Superbowl** 72:4
72:19,22,24
73:4
**support** 27:1
36:21 38:4
**supposed** 106:16
**sure** 11:16 14:2
15:5,6 18:10
29:15 31:16
35:9 40:4 41:10
45:2 49:23
55:20 59:16
60:23 70:11

74:20 76:17
78:11 79:18
97:8,21 99:18
116:7 119:9
121:7 124:23
127:14 128:2
129:17 136:12
136:22,25 137:1
137:2 162:13
167:9 168:21
169:14 188:14
**surgeon** 76:10
**surgery** 74:19,23
75:1,4,7,8,11,14
76:11 78:9,22
122:4 127:1
128:14 188:13
**surprised** 102:22
**Susan** 2:21
**suspense** 115:12
**swear** 5:11
**switch** 54:21 59:3
77:15 80:4
126:9 179:25
**switched** 116:3
130:6
**switching** 51:13
51:18 54:13
129:1 186:10
**sworn** 5:13
144:22 145:18
145:25 146:8
193:16
**synced** 192:4

---

**T**

**T** 194:1,1
**table** 29:24
**take** 6:18 7:6,12
7:13 9:12 27:1,4
29:3,5 30:20
46:19 68:8
71:25 72:13
84:24 87:16
101:23 107:4
108:6,8 109:2
116:4,11 131:22
140:5,16 141:3
148:9 179:8
192:5
**taken** 6:2 69:4
116:15 148:15
178:6 188:15
194:4,6,7
**talk** 20:15 25:10
34:21 35:17
39:19,20 40:10
44:9,20 47:20

48:8 49:1,11
50:1 51:7 53:20
55:14 80:2,16
81:2 82:3,6,24
82:25 83:12
86:19 87:3
93:13,19,20
95:14 100:3
111:4 115:22
120:9 125:14
126:2 136:6
139:22 142:23
145:24 146:7
147:12,20,22
160:23,25
175:11 181:17
181:21,24 182:2
182:5,8 185:13
**talked** 19:12
38:15 40:24
48:4 49:4,20,22
57:15 70:8
78:11 81:22,25
82:1 93:10,23
94:2,3 95:23
96:18 100:2
111:9,18 119:24
126:25 135:18
142:18,23
143:21 144:1,5
144:6,11,17
146:1 147:15,16
147:17 168:9
175:13 182:21
182:24 185:23
**talking** 16:12
29:17 37:21,25
38:20 39:17
40:8,14,21 41:4
46:2 47:3 55:11
57:4,5 58:3,3,10
72:3,19 78:9
79:21 108:17
117:15 121:25
122:5 124:9
136:14 141:19
141:21 146:24
155:6 160:9
162:10 170:2
185:5
**Tate** 38:7,18 44:9
44:15,19 45:15
45:18 54:5
166:18
**Tate's** 36:14
**team** 13:25 14:5
51:4 55:16
59:11 65:24

72:2,17 151:8
151:20 152:5
174:23
**teammate's** 36:13
**teammates** 42:14
**teams** 138:20
149:15
**tell** 10:7 11:6,8
16:7 17:10
19:23 25:4
29:19 30:22
34:7,12,16 46:5
49:14 51:14
59:13 60:2
62:20,22 63:5
63:15,16,17,22
65:15 81:20,23
90:16 92:9
96:15 98:4,9
107:20 109:7,12
110:25 115:6,12
119:18,21,25
122:8 130:24
133:3 135:6
142:22,25 143:1
143:3 146:2
150:20 151:17
152:2 154:4,9
154:14 172:7
174:16 186:9
**telling** 30:14
33:17,23 34:2
40:17 52:1 63:8
72:11 74:1
117:7 121:12
139:10 143:6
144:6 145:11
156:3,22 170:13
185:22,25 187:7
**terminate** 52:12
76:16 153:11
183:2,6,10,14
186:22 187:19
188:8,22 189:5
191:7
**terminated**
177:15 187:16
187:16 188:4
**terminating** 122:9
123:4 186:5
**termination** 124:6
127:17 152:10
**terms** 28:6 47:3
134:20,22 136:9
137:10
**testified** 6:5 40:24
71:24 73:25
89:6 121:8

**testify** 64:9,15
151:11 172:17
120:3,7,10,20
120:23 121:10
**testifying** 33:7
121:4,10,14
**testimony** 64:16
73:9 146:23
189:10 193:7
**text** 17:20 18:17
18:18,20,22,23
19:9,13 23:16
24:6 33:9,14,22
34:1 47:16,17
55:6,7,8 56:3,5
58:19,22 60:19
60:23 61:8,14
69:8,13,25 70:2
70:11,25 71:2,4
74:10 83:1 87:8
88:20 89:2
91:12 95:10
105:10,12,18
106:12,14,25
125:17 127:19
155:18 156:1,7
161:11,12,20
162:2,5,18,24
163:6,14,23,24
164:4,20,23
165:9,16,19
166:3
**texted** 41:9 43:6
43:21 47:5
70:10 162:21
**texting** 156:24
**texts** 56:14 60:8
61:7 62:8 74:15
78:7 95:12
125:23 126:24
127:25 159:17
160:13,14,15
162:15,25
163:21
**Thank** 17:9
123:21 183:19
185:3 189:20
191:18
**thanked** 41:6
43:18 167:15
**Thanks** 126:2
**Thanksgiving**
169:2,7
**thing** 6:23 7:11
41:16 49:6
50:13 130:5
142:21 175:20
189:2 192:5

**things** 10:19 13:4
19:24 33:4
73:25 115:15
135:20 148:3
180:22
**think** 15:2,15,19
17:4,5 24:16
25:2 29:18 33:1
35:5 37:7 40:5
50:5 54:2 55:20
61:6 64:2,21
65:11,12 72:25
76:1,9 77:4 78:3
80:13 81:7
82:12,15,17
84:9,17,18,23
85:21,23 93:1
100:15,22,24
101:2,8,11,13
101:15,17 114:7
114:20 115:20
116:5 119:23
120:16 125:20
127:24 136:23
137:7 139:17
140:3,8,18
143:14 148:8
151:10 154:24
155:7 163:19
165:12 166:6
174:18 175:7
176:9 188:19
**thinking** 43:9,14
59:1 100:20
167:17 168:17
**third** 15:4 30:6
44:17 81:17
90:3 98:19
**third-party** 107:23
110:9 114:22
167:8
**thorough** 26:22
**thought** 27:23
49:14 85:19
105:23 106:9,22
128:22 180:3
**three** 7:1,3 44:22
48:5 104:1,19
110:23 114:24
137:25 142:7
147:18 163:11
186:5,8,21,23
187:3,18,18
188:1
**three-minute**
116:5,11
**throw** 185:2
**throwing** 42:15

**time** 4:3,10,16 5:4
5:4 9:1,3 10:4
18:1 20:6,6
21:14 23:4,10
25:21 29:1,2
38:5,9,24 39:4
42:14,17 44:17
44:24 45:12
46:3,23 47:8,15
52:19 54:14
57:3,10 58:9,14
58:14 59:2,11
59:25 61:5
67:16 71:25
72:4,13,20 75:1
76:24 77:10
79:2,20 80:3,7
85:10 90:19,22
100:17 101:9
113:18 117:3
130:3 131:25
135:11 137:2,15
144:21 146:16
146:19 147:13
154:2 162:10
163:7 166:9
168:14 169:5,15
172:15 173:8
181:17,21 184:1
189:21 194:7
**times** 14:3 44:22
93:16 104:19
189:1
**today** 4:2 6:8 7:3
8:24 9:2,15 10:2
11:21 12:5
68:15 126:2
129:23 135:15
142:3 176:24
179:18 180:19
185:22 187:22
188:1 189:21
**Today's** 5:3
**Todd** 11:3 16:3,7
16:14,16,18,21
17:10 18:19,24
19:12 20:9 23:1
23:17,22 27:23
28:10 36:12
39:6 41:8,25
42:1,22 43:19
44:5,10 45:11
45:15,18,22,25
46:23 47:3,10
47:24,24 48:19
49:25 50:22,23
50:25 54:22
55:1 56:1 58:10

58:15 59:6,25
60:5 62:18
65:21 66:11,16
69:13 70:2,14
71:1,2,3,8,8
76:18,23 77:4,8
77:13 78:4 80:3
80:13 81:20,22
81:23,25 82:1,3
82:6,9,23 83:2,5
83:10,12 84:6
84:23 85:7
91:21 92:4,9,14
92:15,19,23,24
93:7,8,10,12,18
94:11,16 95:3
95:14,17,19,23
99:23 100:2
101:11 104:3
105:19 106:4,9
106:18 111:9,18
112:7 116:2
121:19,23 125:9
130:5,7 131:17
132:21 138:3
142:18 144:15
144:17 146:1,12
146:17 149:1,6
149:12 150:9
152:17 156:10
156:13,25 157:2
157:8 159:22
160:17,23,25
161:25 162:6,12
162:19,25 163:7
163:23,25 164:3
164:21,24
165:10 166:19
166:25 167:4,13
167:16,18 168:7
169:21,22 170:5
170:8,13 171:3
174:18 175:18
178:15 181:24
184:17,23 185:4
185:5,7,8,11,16
185:19,23
**Todd's** 93:4,11
106:6
**Todd.France@...**
184:25
**ToddFrance@C...**
91:22
**told** 11:7 33:5
38:19 39:16
40:7,13,20
42:24 50:21
51:12 58:4 63:4

58:15 59:6,25
65:21 66:5,11
66:16 76:22
83:22 111:11
113:24 115:11
126:15 127:14
129:17,18 135:9
136:2 139:23
140:2 142:21
143:7,8 146:1
146:20,25 147:8
150:14,20
154:23 155:20
156:20 162:12
167:19 169:22
169:24 170:4,8
186:5 187:6
**tomorrow** 128:15
185:1
**tonight** 56:17
58:23 116:10
**top** 14:10 34:9
41:20,23 59:10
105:14 169:23
184:23
**topics** 76:5,19
**topped** 96:19
**total** 27:17 50:12
**totally** 21:11
129:6
**touch** 29:19 59:25
63:8
**touchdowns**
15:13,20,24
**track** 48:20 60:5
**training** 9:10
13:23 14:10
188:14
**transcript** 16:10
33:4 35:10
38:12 63:24
64:19 66:7
68:14 71:21
120:4 136:13
143:13 193:4,6
**transcription**
194:5,6
**travel** 113:3
**traveling** 185:2
**treatment** 14:9
**trick** 61:1
**tried** 177:24
**trip** 117:1 127:8
**trouble** 83:18
**true** 59:14 60:10
62:15 89:17
129:16 179:14
179:18 193:6
194:5

**trust** 130:7 143:9
**truth** 11:8 142:22
142:25 143:2
146:2
**truthful** 90:18
**try** 6:13,16 85:15
115:3 137:6
142:9 163:4
166:12
**trying** 9:12 29:21
60:3,25 61:1
66:3 67:1,17
83:5 97:17
114:18 115:1,18
133:13 136:23
152:24 169:5
176:9 184:18
**Ts** 168:22
**Tuesday** 74:21
**turned** 188:15,16
**TVs** 33:1
**Twitter** 32:10
**two** 7:1,2 9:3,20
11:23 19:16
21:11,16 22:17
23:14 48:4 92:6
104:22 110:23
114:23 115:10
129:6 147:18
150:7 163:11
184:2
**type** 71:15 95:2
126:20 162:13
168:20
**typical** 102:9
**typically** 29:4
102:5

———————
**U**
———————
**U.S** 104:14
**Uber** 87:17 101:23
**Uh-huh** 175:25
**unable** 9:6 12:23
13:21
**understand** 6:7
6:11 18:10,17
19:16 26:13
36:18 43:11
50:5 59:20
65:16 77:3
79:20 81:14
84:21,21 93:20
99:18 110:2,18
115:17 128:20
151:12 155:14
155:20 171:6
**understanding**
14:4 41:3 42:4

52:4 67:22
84:12,13 86:8
106:18 126:8
140:10,14,14
141:1 176:19
177:18
**understood** 9:22
38:17 39:22
48:14 156:3,20
179:22
**unfair** 61:19
**unhappy** 27:15
102:19
**United** 1:1 5:7
110:25
**use** 6:18 16:19
19:24 20:3,6
21:13,25 22:15
22:21 23:3
24:14,22 30:15
30:23 31:9
68:24 75:14
102:18 104:2
162:23 163:15

———————
**V**
———————
**vague** 31:14
52:21
**varies** 13:7
**various** 180:22
**verified** 32:11
**verify** 165:19
193:3
**versus** 5:6 186:3
**vets** 38:4 46:16
**video** 192:4
**videoconferenc...**
4:5
**Videographer**
2:20 5:1 69:3,5
116:13,16
148:13,16 178:4
178:7 191:19
**videotaped** 1:11
5:2 12:11
**view** 16:25 27:9
30:22
**violating** 153:5
**visit** 41:14
**Vizio** 32:25
**vs** 1:6

———————
**W**
———————
**wait** 47:10 65:22
72:7 73:11,14
124:11 154:4,6
154:9,15 186:8
186:13,14,23

**waited** 186:21
187:7,18 188:1
**waive** 124:8
**waived** 124:10
**walk** 185:3
**walked** 43:20
**walking** 42:5
**want** 4:13 6:21
10:12 14:2
18:10 26:3,25
29:8,9 33:4
38:12 39:20
56:3,6,13 59:10
59:21 60:14
61:3,18 62:1
63:11,18 65:12
65:21,23 66:16
69:8 71:23
74:14 77:2,23
85:14 96:9
98:22 99:18
102:12 105:11
110:4 116:9
125:22 126:21
129:10 130:10
131:14 135:5
141:9 143:15,18
146:1,16 154:17
154:21,25
163:18 164:1
165:4 166:16
168:18 169:24
170:5 174:24
175:3 186:15,18
187:11,21,25
189:22 190:11
191:2
**wanted** 25:25
27:17,18 28:9,9
34:7,13,14,17
44:6 45:2 46:14
46:21 48:15
50:12,15,21
65:20 66:11,15
76:6 78:21
98:24 110:20,24
124:23 130:15
151:8,19 152:4
152:23 167:24
168:23 171:5
174:25 186:16
**wants** 47:25
78:12
**warehouse** 109:2
118:14
**Wasilewski** 2:21
**wasn't** 27:13

187:3 188:17

35:24 39:3
45:11 59:14
60:8,11 68:20
77:20 90:5,12
106:16,16
127:12 171:2
175:6 190:16
**way** 6:13 28:21
34:14 39:22
56:24 59:24
65:5 67:12,18
67:25,25 68:21
71:14 73:21,22
74:1 76:13 78:2
87:14 90:4
112:1 125:1,7
151:1 152:20,21
170:12,13
178:17
**ways** 54:8
**wclements@kle...**
2:12
**we'll** 20:16 56:9
69:1 79:10,20
103:11 136:25
137:7 148:10
165:5 184:7
191:22 192:1,5
**we're** 4:1,14 7:7,8
21:7 26:2 42:15
55:7 62:6,8
68:15 69:5
79:21 95:16
103:19 116:10
136:14,17
141:19 148:13
178:4,7 181:1
184:18
**we've** 5:24 11:16
23:14 33:10
39:7 93:23 94:2
114:16 120:3
135:18 171:13
**websites** 109:24
**week** 9:11 11:13
11:13 13:18
**weeks** 186:5,8,22
186:23 187:3,18
188:1
**went** 19:1 28:5
41:5,6,8,10,11
41:13,14,17
44:6,11,16,17
44:25 45:1,12
47:5 48:5 55:1,2
55:4 74:25
76:10,11,11
80:10 84:8 85:1

117:19 126:16
128:4 129:18
130:7 143:10
163:11 166:25
167:2,18 168:10
168:10,24 180:4
180:7
**weren't** 70:19
75:24 121:13
**Westwood** 2:16
**wheels** 141:6
**WHEREOF**
194:12
**whichever** 22:20
23:2
**Whitaker** 53:3
74:10,16 78:18
97:9 125:18,24
128:19
**wide** 14:19 38:8
148:22
**wife** 167:14
**William** 2:9 8:10
166:10
**Williamson** 2:16
**willing** 124:7
**witness** 4:4 5:11
20:24 40:3
44:23 61:1,10
61:16 66:20
88:5 90:21
114:11,22 115:9
115:14,18,25
121:10 151:11
153:2 154:1
167:8 183:23,25
187:10,24
188:25 189:18
194:12
**woke** 116:20
**woman** 80:2,6
**wondering**
127:14
**word** 16:19
**words** 38:23
173:18 174:15
**work** 19:25 25:19
25:23 29:14,16
30:4 31:2,17
51:22 63:5
115:18 129:24
130:12 132:14
135:3,10,22
168:12 184:13
**worked** 31:11
53:8 62:22
108:11 130:18
132:21

**working** 8:4 12:6
51:21 55:15
**works** 63:5 144:8
**worried** 49:21,23
50:14 141:7
**worthy** 27:19
**wouldn't** 31:21
41:13 62:5
75:19 92:7
110:10 116:1
117:23 133:11
**Wright** 53:3 74:10
74:16 78:18
97:8 125:18,24
128:19
**write** 58:21 60:8
124:13
**writes** 26:21
56:16 74:18
88:22 89:5
91:25 125:25
126:7 128:11,19
184:25
**writing** 26:18
91:22 145:19
184:13
**written** 68:14 95:9
96:8 124:5
144:22 145:1,5
145:15,24 146:8
155:19
**wrong** 50:6 125:3
128:14 151:22
**wrote** 59:17 88:21
89:17 123:16
124:15 145:10

─────────
**X**
─────────
**X** 3:1

─────────
**Y**
─────────
**Yahoo** 20:3
**yeah** 10:3 17:24
19:7 26:11 29:9
31:25 37:5 40:3
42:16 47:6 48:7
54:4,7 57:24
64:6,25 66:3
67:2,2,2,3 69:21
70:4,7,16 72:10
74:5 77:6 79:14
80:11 81:4,25
82:22 87:13
89:13,24,25
91:15 92:21
93:3,5 96:11
97:19 102:1
103:21 106:8

113:24 114:18
120:8 126:22
128:11,24 132:2
132:5,10 133:21
136:24 137:1
138:9 139:7
140:3,13 143:16
145:3,8 149:23
160:23 162:24
163:3 164:2,22
164:25 165:1,11
166:2,5 170:12
171:11 174:7
180:9 184:22
190:13,22
**year** 10:7,18
11:15 14:13,21
14:22 20:2 29:8
36:14,15 56:19
57:22 59:12
108:8 109:10
138:10,12,24,25
139:24 150:7,16
174:24 175:2,2
**Year's** 86:23
**years** 26:14 36:15
37:16 42:16
48:5 81:13
104:1 122:22
137:25,25 138:1
138:3 141:19,23
141:25 142:7,7
147:18 150:7
163:11
**yellow** 67:3
**Yep** 16:1 19:19
37:13 127:6
**yesterday** 78:13
**York** 8:6 13:25
50:24 175:12,15
**young** 26:10
142:6

─────────
**Z**
─────────
**zoom** 4:5 11:8
56:9 74:16
88:19 165:15

─────────
**0**
─────────
**049** 69:12

─────────
**1**
─────────
**1** 3:7 13:10,11
155:16
**1:19-cv-00305-YK**
1:6 5:7
**10** 2:16 3:11 86:1
184:6,12

**10:00** 4:10,13
12:12,15,23
**10:05** 1:16 4:2
**100** 90:8
**100,000** 131:11
133:1,4 134:11
134:12
**103** 3:13
**105** 3:13
**11** 3:11 15:24
88:15,18
**112** 3:14
**118** 3:14
**12** 3:12 26:17
91:16,19
**123** 3:15
**13** 3:7,7,12 94:4
103:12,16
104:23 184:21
**139** 71:21
**14** 3:13 103:13,15
**14th** 2:10
**15** 3:13 105:6,9
176:13,16,25
177:6
**155** 3:15
**16** 3:14 105:9
112:4,5
**164** 3:16,16
**165** 3:17,17
**166** 3:3 38:13
**17** 3:14 69:10,14
70:3 111:21
112:10 118:24
**179** 3:18
**17901** 2:17
**18** 3:14 70:9
106:24 118:24
119:2 123:18,20
138:12,23,24
139:23 150:22
**180** 3:4
**1835** 2:10
**184** 3:4,18
**189** 3:5
**19** 3:15 63:25
123:20,23,25
**1900** 2:4
**19103** 2:11
**1something** 45:3

─────────
**2**
─────────
**2** 3:7 13:14,15
156:9
**2:00** 4:11,17
**2:12** 5:4
**20** 3:15 155:8,10
189:12

**2018** 17:25 18:25
19:14 24:5
25:10,22 26:18
27:7,9,16 28:7
28:14 29:12,17
29:23 30:23
31:1,7,11,18
36:4,16 37:7
38:19,25 39:16
40:7,13,20 46:3
50:3 54:20 55:9
56:4,15 57:11
57:18,23 58:1
58:14 62:16
63:1 66:19
69:10,14,25
70:3,9 72:12,16
75:22 76:15
79:3 86:22
146:12,18 154:3
163:7,21 164:12
164:24 165:18
166:17 167:23
169:2,2,6,7
172:16,17 186:2
186:21
**2018-10-05**
164:17
**2018-11-30** 165:4
**2018-12-06** 55:6
**2018-12-17** 69:12
**2018-12-30**
165:14
**2018/January**
54:14
**2018712** 26:1
**2019** 15:12,16,24
16:11,12 18:1
18:25 19:14
20:10 24:5
46:24 52:5,22
54:14,20 64:2
65:17 67:10
68:21 72:16,23
72:25 73:5
74:17,23 75:2,7
75:22 76:15
77:5,14 78:10
79:3 80:10,14
80:20 82:10,20
83:2,15,20
84:25 85:23,23
85:24 86:9,23
88:18,23 89:22
91:20,23 93:21
94:8,13,24
95:19 100:22
103:8,10,18

105:10 106:24
107:11,16 108:2
111:5,21 112:10
112:11,15,21
113:4,5,8,10,15
113:18 114:5
117:16 119:2
120:11,16
121:14,17 122:7
123:17,25
125:25 127:9,18
128:5 129:13
130:2 131:16,25
146:13,19 154:3
157:2,8 159:14
159:21 160:5,18
161:5,17 163:7
165:18 171:17
171:24 172:7
176:23 184:6,12
184:21 185:6
186:6 189:6,12
**2019-01** 74:8
**2019-01-02**
125:20
**2019-01-24** 74:9
**2020** 149:22
177:16
**2021** 1:16 4:2 5:3
10:8,10 11:15
18:12 31:1
154:19 193:7
194:13
**2025** 194:20
**20th** 112:13 113:4
189:6
**21** 3:16 15:20
80:20 82:10,20
83:2,15,20
84:25 85:22,23
89:22 93:21
95:19 103:10
107:11,16 108:2
112:11,21
117:15 121:17
122:7 129:12
131:16,25
159:14 160:5,18
161:5,16 164:13
164:14 171:17
171:24 172:7
**215.569.2700** 2:11
**21st** 80:10 86:20
87:1 94:24
100:22 111:5
112:15 113:5
128:5 173:13
**22** 3:16 52:5,22

127:18 154:19
164:16,18
178:24 186:6
**22nd** 174:20
**23** 3:17 113:15
125:25 165:6,7
165:12 178:24
**23rd** 13:14,18
113:8,10
**24** 3:17 39:15 40:7
40:12,20 123:17
123:25 165:13
165:23
**2446** 165:5
**24th** 38:19 39:4
77:4 126:6
146:17,19
**25** 3:18 146:19
178:25 179:1,4
**2513** 164:10
**2514** 165:2
**2550** 164:11
**26** 3:18 184:8,9
**26th** 128:18
**27** 142:6 163:21
**27.5** 150:6,16
**272** 16:5
**28(D)** 194:11

---
**3**
---

**3** 3:8 35:10,11
38:12 63:23
64:2 65:17
67:10 68:21
71:20 86:9
158:14
**3:31** 69:3
**3:48** 69:6
**30** 1:16 5:3 186:21
193:7 194:20
**30-something**
142:1
**30th** 4:2 12:5
186:3
**314.889.7300** 2:5
**336** 105:19
**35** 3:8
**37** 3:8
**38** 163:22 164:13
**3rd** 64:21 72:25
85:24

---
**4**
---

**4** 3:8 37:6,8,9
74:17 159:12
**4:03** 88:24
**4:50** 116:14
**40** 138:16,18

140:1,15 141:2

---
**5**
---

**5** 3:3,8 22:14 37:8
37:9 159:25
**5:02** 116:17
**5:41** 148:14
**5:56** 148:17
**55** 3:9
**56** 3:9
**570.622.5933** 2:17

---
**6**
---

**6** 3:9 55:9,21,22
56:4,15 57:18
58:14 69:25
88:18,23 125:22
160:16
**6:31** 178:5
**6:35** 178:8
**6:52** 191:21
**6:55** 192:6
**63105** 2:4
**667** 56:7
**69** 3:10
**6th** 57:22

---
**7**
---

**7** 3:9 56:10,11
69:24 105:12
154:22 161:3
**7,000** 170:24,25
170:25 171:10
**7,750** 119:6 174:4
179:21,23
**71** 33:6,8
**72** 27:24 34:10
51:3 115:25
138:3 141:23
**72,000,000** 139:16
**74** 3:10
**7700** 174:7
**773-556-4698**
22:12
**773-964-9486**
21:5
**7733** 2:4
**7750** 174:8
**79** 165:14
**7P** 89:9,10

---
**8**
---

**8** 3:10 26:3 33:8
69:20,21,22
78:10 91:20,23
94:8,13 103:8
103:18 157:2,8
159:21 161:13

**86** 3:11 21:20,22
22:25 23:18
**88** 3:11

---
**9**
---

**9** 3:10 74:11,12
125:22 161:24
**91** 3:12
**924** 36:17
**94** 3:12
**96** 165:15
**99** 63:24 64:10
**9th** 194:12